ORIGINAL

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| WILLIAM G. TOURET, et al., Plaintiffs, v. NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, et al., Defendants. | CIVIL ACTION NO. 04-198T |

**DECLARATION OF S. DAVID GRABER, P.E.**

Pursuant to 28 U.S.C. § 1746 S. David Graber states as follows:

1. I am a Consulting Engineer, located in Stoughton, Massachusetts. A copy of my abbreviated resume is attached.

2. In preparing this Declaration I have reviewed in detail the draft and final Environmental Assessment for the Partial Funding of a Proposed Life Sciences Building at Brown University, Providence, Rhode Island, dated May 2003 and July 2003, respectively; the draft and final Finding of No Significant Impact, which were published at approximately the same time as the draft and final EAs, respectively; the Final Report Air Quality Assessment Life Sciences Building Brown University, Providence, RI, prepared by Rowan Williams Davies & Irwin Inc. (RWDI), dated December 5, 2001; records regarding Brown University on file at the Rhode Island Department of Environmental Management (DEM); and portions of the Administrative Record. Unless otherwise noted, all references below to the "EA" and "FONSI" are, respectively, to the Final EA (AR 113) and Final FONSI (AR 116).

11

3. On June 21, 2004, I visited the site of the proposed Life Sciences Building and examined the area surrounding the site including the areas in which the plaintiffs live. I viewed, from various vantage points, the present location, configuration, and facilities of the existing Biomedical Complex, and the foundation excavation and placement of concrete reinforcing steel for the proposed Life Sciences Building. I also viewed the area in which the plaintiffs reside in relation to the existing Biomedical Complex and the adjacent proposed Life Sciences Building, including proximity and the topography of the area.

4. In preparing this affidavit, I have consulted with A. David Scarchilli, Consultant in Air Quality and Industrial Ventilation Design, OccuHealth, Inc., Mansfield, MA, and Kenneth S. Weinberg, Consultant in Environmental Health & Safety and Toxicology, Safdoc Systems, LLC., Stoughton, MA.

5. Based on my review of the EA and FONSI, it is my opinion that the analysis of the potential air quality impacts of the proposed Life Sciences Building – and in particular the extent to which emissions of toxic air pollutants to be vented into the atmosphere from the various new laboratories, in conjunction with the emissions from existing laboratories at Brown – was totally deficient, was not based upon adequate data, and does not answer the question whether the building could cause significant health effects in the nearby population of residents, students, and Brown University personnel in the area of the building.

6. More specifically, these documents have the following major defects: the data and analyses in the EA are not sufficient to enable a determination of whether the air emissions might have adverse health impacts or to make reasonably reliable estimates of the potential adverse health effects of the air emissions; the EA and FONSI make arbitrary and unsupported

assumptions in reaching conclusions regarding air quality and potential health effects; and key air emissions and health issues are not examined or have only cursory conclusions.

7. It is my opinion that specific conclusions in the EA and FONSI that the facility would not have adverse air/health impacts are not supported. The following are examples of such unsupported conclusions:

a. None of the identified air emissions generated from the operation of the proposed building, from boilers, an emergency generator, cooling towers, and exhaust from research fume hoods, are expected to result in significant impacts, either individually or cumulatively when considered together with other past, present, and reasonably foreseeable future actions in the area of Brown University or Providence, Rhode Island (EA, p. 2, and FONSI, p. 3).

b. Emissions would be diluted to such an extent that they would be unlikely to increase ground-level concentrations of hazardous air pollutants at or beyond the property line (EA, pp. 30, 32, and EA, Appendix E, pp. 64-65).

c. NASA and DOE have concluded, on the basis of the EA, that partial funding for the proposed Life Sciences Building will not impose significant environmental impacts (EA, p. 2), and that the construction and operation of the proposed Life Sciences Building will not individually or cumulatively have a significant effect on the quality of the human environment (FONSI, p. 3).

8. In addressing the question of whether the emissions might have adverse health impacts, the EA relies largely on a report referenced at page 30 as "Rowan et al. 2001." That refers to the December 5, 2001 RWDI report (AR 40 [0173-0205]). The Introduction to the RWDI report states: "The objective of this assessment was to provide guidance…on the exhaust

and air intake design for the proposed Life Sciences Building (LSB)." However, the EA (p. 30) states that "The intent of this [study] was to provide guidance in locating new air intakes, but this can also be used as a worst-case scenario, assuming that dilution increases as the emissions travel farther away from the building."

9. This "worst-case" approach thus may be regarded apparently as an informal screening method, by which the EA attempts to demonstrate that upon initial entrainment[1] dilution (perhaps with some limited additional dilution) the exhaust is rendered safe from a health standpoint and is therefore rendered safe after the greater (but not quantified) dilution that would subsequently occur.

10. Evaluation of the above-mentioned informal "worst-case" approach reveals major deficiencies. First, the RWDI report assesses the quality of the exhaust upon initial dilution in the vicinity of the proposed rooftop exhaust fans. This is essentially the "near-field dilution," resulting primarily from entrainment of ambient air due to the momentum and, in some cases, buoyancy (warm air lighter than cold air) of the exhaust. That is distinct from the "far-field dilution," which results from plume mixing subsequent to the near-field dilution, and is dependent upon wind speed and other weather conditions. RWDI compared the mixed concentrations due to initial dilution to the American Conference of Governmental Industrial Hygienists (ACGIH) 8-hour average occupational-health limits. But those limit values are published for an employee exposure for a conventional 8-hour workday and a 40-hour work week to which it is believed that nearly all workers, presumed to be a generally-healthy worker population, may be repeatedly exposed, day after day, without adverse effect. Those limit values

1 Entrainment refers to the incorporation of adjacent, ambient air into a jet or plume of gas, due to shear forces exerted by latter on the former, with the result that the continuing jet or plume is comprised of a mixture of the initial exhaust and ambient air.

do not address the effects of the emissions on: (1) the public at large, which includes more-sensitive individuals such as children, the elderly, and immuno-compromised individuals; and (2) individuals such as residents for whom exposure may be far more continuous than an 8-hour workday and a 40-hour work week.

11. Furthermore, the EA fails to demonstrate that the proposed Life Sciences Building would provide the far-field dilution discussed above (paragraphs 8, 9, and 10), necessary to protect the public health. One cannot simply assume that it would be provided. The inadequacy of the ACGIH occupational-health limits as screening limits for public-health effects can be seen by comparing the ACGIH limits with the limits given in Rhode Island DEM Air Pollution Control Regulation No. 22 – Air Toxics, Last Amended 27 April 2004, Table 1.[2] This comparison can be done most specifically for some chemicals mentioned in the EA, in the RWDI report, and in permit actions for the existing Brown University Biomedical Complex[3] which I have reviewed. Such chemicals include chloroform, ethylene oxide (EtO), methylene chloride (also called dichloromethane), nitric acid, toluene, and xylene. The concentrations of these chemicals would have to be diluted from the occupational limits by three to five orders of magnitude (i.e., on the order of 1,000 to 100,000 times) to protect public health at the abutting residential and commercial areas and other locations on the Brown campus. In this respect, the

2 This regulation can be obtained by going to http://www.state.ri.us/dem and following links to Publications/Regulations – Air Quality – Air Resources regulations – No. 22 – Air Toxics (4/27/04).

3 For ethylene oxide (EtO), sources are a 1/21/97 memo by David Wise to Brown's Animal Care Facility re: modeling study for use of EtO emissions and an 8/11/95 letter from Daniel Sarachick of Brown University to Rhode Island DEM with copy of Brown air toxics operating permit for animal care facility. For chloroform and methylene chloride/dichloromethane, source is Brown University Biomed Center/Grimshaw-Gudewicz RIDEM Air Permit Summary (RI-2001-009), Attachment 6 – Miscellaneous Emissions Information.

EA relies excessively, if not exclusively, on the RWDI report, which fails to address these important public-health issues.

12. Appendix A of the RWDI report provides further discussion of the methodology by which its air-quality assessments were done. The RWDI report states that spill scenarios were considered for 324 liquid chemicals and reference is made to related information "described in detail in another RWDI Technical Note." However, the chemicals are not named, so one has to speculate as to what those chemicals are, and the "RWDI Technical Note" is not included. It is impossible for a reviewer to check the assumptions or validity of the methodology with the information provided.

13. The RWDI report provides a general criterion for designing laboratory fume hood ventilation (within the limitations discussed above). The report states (Appendix A, p. 5) that "a more stringent criterion may be desirable if chemical usage is intense or if potentially exposed people are sensitive." But the report does not provide any guidance for determining what it means by the phrases "intense chemical usage" or the "sensitiv[ity]" of "potentially exposed people." It further states (Appendix A, p. 2) that the criterion is "adequate for about 90 percent of the chemicals" (referring to the 324 chemicals considered). The RWDI report thus suggests that it failed to apply an adequate criterion for the remaining 10 percent of the chemicals.

14. The EA (p. 30) further states, with reference to the RWDI report, that the University commissioned a study to "mathematically model, physically model, and wind-tunnel-test the effect of the emissions at the immediately surrounding buildings, assuming dilution would increase beyond these buildings." However, the RWDI report provides no such

information reflective of any physical modeling or wind-tunnel testing.[4] Furthermore, there is no indication in the EA that certain important RWDI recommendations for additional analysis were or would be implemented, including the following:

a. The end users of the facility should assess whether the suggested dilution criterion would be adequate for the specific range of activities taking place and types of chemicals used in the labs (RWDI, p. 5).

b. The RWDI report (p. 9) states: "There are currently four or five radioisotope fume hoods included in the proposed design for the [proposed Life Sciences Building]. At this time, <u>the mechanical exhaust system for these hoods has not been completed and thus these exhausts were not considered as part of this study</u>" (emphasis added). Following some specific suggestions for further investigation, the report adds that: "Additional analysis would be required to assess these different design options." The EA provides no further information.

c. If the stack heights proposed by RWDI are unacceptable, then wind tunnel testing is recommended to refine the stack height recommendations from the numerical study (RWDI, p. 13). The EA is silent on this point.

d. More generally, the RWDI report gives specific design parameters, such as stack parameters (RWDI, Table 1), and recommendations including stack heights and others (pp. 12-13). The EA provides no indication of the extent to

---

4 As part of a January 2001 federal grant application for the proposed Life Sciences Building, Brown acknowledged the need to perform modeling before it could determine whether the proposed facility would cause identifiable ambient air pollution levels to increase, as well as determine whether it would cause an increase in wind velocity and change of wind direction that would affect the local population. 1/31/2001 Environmental Analysis Form, pp. 2, 4.

which these parameters and recommendations might be included in the specific building design. Without such information, a proper assessment cannot be made.

15. Even if the purposes for which the EA relied on the RWDI report were valid (they are not valid, for the reasons discussed above), the EA is flawed for the additional reason that the RWDI report assumes an incorrectly-tall building height and thus a corresponding incorrectly-tall rooftop exhaust height. The proposed Life Sciences Building was originally designed to stand six stories above ground and have a height of 85 feet. The December 5, 2001 RWDI report, in a diagram on page 14, shows that 85-foot proposed height.

16. But, as stated at page 62 of the EA, on July 31, 2002, nearly eight months after the date of the RWDI report, Brown decided to reduce the height of the proposed Life Sciences Building by one floor, to a height of five stories or approximately 75 feet (see also EA at 56). The rooftop exhausts would therefore be located approximately 10 feet closer to the ground than the RWDI report assumes. This fact is important because the proposed Life Sciences Building would stand near the bottom of the steep hill formed by Meeting and Olive Streets. Residential homes near the top of the hill would thus be closer in elevation to the height of the rooftop exhausts of the proposed Life Sciences Building. Reducing the height of the rooftop exhausts would presumably expose the surrounding residential homes and pedestrian environment to higher concentrations of emissions.

17. In order to have completed a proper environmental assessment regarding public-health impacts, the EA's analysis should have started by using as a basis of comparison in the screening analysis air-quality limits which are protective of the health of the general public. Such limits might include those of the Rhode Island Department of Environmental Management's Regulation No. 22, or such additional appropriate limits. For those chemicals not

passing the screening based on initial (near-field) dilution, modifications to reduce near-field chemical concentrations, and/or additional analysis (far-field dilution), possibly with design modifications, would have to be carried out. Near-field concentrations could be reduced by avoiding the use of certain chemicals, using fume hood exhaust systems with greater air flow rates, or adding state-of-the-art air-cleaning devices for certain chemicals. Far-field dilution could be increased, if necessary, by constructing exhaust stacks sufficient to achieve lower concentrations before reaching sensitive areas, etc. Such far-field analysis would entail calculating downwind impacts at the property line and on sensitive downwind receptors. Such methods are well established, readily used, and have in fact been used in the past for Brown University air emissions according to documents I have reviewed.[5] The EA does not address the question of such downwind impacts in any reasonable form, whether by eliminating the need to do so by screening methodology, by considering downwind impacts by analysis for chemicals not passing such an initial screening, or otherwise. Although not endorsing them in every respect, useful guidance for accomplishing some of the above may be found in:

a. Stanford University's Research & Laboratory Safety guidelines and resources.[6]

---

5 E.g., 10/3/95 document entitled "Screen 2C" by Sigma Research Corp. (computer emissions modeling); 10/4/95 document entitled "Screen 2C" by Sigma Research Corp. (computer emissions modeling); 10/16/95 letter from Rhode Island DEM's Daniel Wise to Brown University's Daniel Sarachick re: use of ethylene oxide; 6/14/96 memo by Daniel Wise to file re: use by Brown of EtO sterilizer; and 1/21/97 memo by Daniel Wise to Brown's Animal Care Facility re: modeling study for use of EtO emissions.

6 This can be obtained by going to http://www.stanford.edu/dept/EHS/prod/researchlab/index.html and following links to Laboratory Design Guidelines – 1.1 Ventilation.

b. Lawrence Livermore National Laboratory guidance on evaluation and control of facility airborne effluents.[7]

18. The RWDI analysis discussed above uses a generic approach in which a large number of (unspecified) chemicals are considered, which could be acceptable if properly carried out and supplemented as discussed herein. Such an approach would be augmented, as appropriate, by consideration of specific chemicals likely to be used at the facilities.

19. The EA fails to provide a list or perform a review of the chemicals likely to be used in the existing and proposed laboratories and the residuals of which would be released into the air, making it impossible at present to determine what range of hazardous chemicals might be used and what volumes of those chemicals might be released into the air. Brown has previously prepared and submitted such reports, including pounds of chemicals purchased, used, and disposed of as waste or emitted into the air, to the Rhode Island DEM. Previous reports of chemicals released into the air from the research laboratories at Brown include benzene, formaldehyde, and hydrochloric acid.

20. Brown has previously reported ethylene oxide as being used as a sterilant in the animal facilities currently in operation at the Biomedical Complex. Ethylene oxide emissions of one pound per year must be reported under Regulation No. 9 – Air Pollution Control Permits.[8] The EA does not clarify whether or not an enhanced or larger animal facility would be built in the proposed Life Sciences Building, which could engender environmental impacts, particularly due to odors and use of chemicals. The RWDI report mentions (p. 5) "vivarium exhausts"

7 This can be obtained at http://www. llnl.gov/es_and_h/hsm/doc_12.03/doc12-03.html.

8 This can be obtained by going to http://www.state.ri.us/dem and following links to Publications/Regulations – Air Quality – Air Resources regulations – No. 9 – Air Pollution Control Permits (4/27/04).

located at the proposed Life Sciences Building, but neither that report nor the EA provides any indication of what would be housed in the vivarium or the expected emissions. Nor is there any clear explanation of the intended future use of the existing animal facilities at the Biomedical Complex.

21. The EA fails not only in that it does not make the best reasonable estimates of what chemicals, in what quantities, and with what emissions can be expected, but for the additional reason that it does not develop a process by which reassessments would be made as plans became more definitive or changed, as types and quantities of chemicals would change, and as research projects would change over time. Emissions from such new chemicals could be very unsafe.

22. A pathological waste incinerator is presently in operation at the Biomedical Complex. The EA fails to discuss a potential increase in the use of that incinerator, and also fails to mention any reports or studies on any levels of dioxin being emitted, although it is known that plastics and other medical type devices, including those used in animal research laboratories and burned in incinerators, result in the release of dioxins. While the issue of the relationship of exposure to dioxins and the development of cancer has not been fully resolved, it has been made clear through EPA actions over the last decade that the concern over these effects is sufficient to warrant the closure of numerous medical and pathological waste incinerators across the country in an effort to reduce dioxin production and release. This issue would have to be addressed.

23. The EA also fails to evaluate the potential incremental impacts on the surrounding population that might result due to the release of even small amounts of potentially hazardous or toxic materials from the proposed Life Sciences Building's laboratories. The close proximity of residents of the College Hill area and Brown University students and staff to the new Life

Science Building should have prompted NASA and DOE to conduct a careful review of the activities and research planned for the new facility, including the chemicals that would be used and released as air emissions. Even small increments of such materials could have significant impacts on personnel at the University, students, and local residents. The very need for fume hoods to protect workers inside the laboratories is indicative of the danger of these chemicals. Continued exposure to irritants, sensitizers, and potential carcinogens can have a long-term adverse effect on healthy individuals, and a more short term, but significant, adverse effect on those in the community who already suffer from diseases like asthma or immuno-compromised conditions.

24. Some of the potential health effects from the chemicals that are likely to be emitted to the atmosphere from the proposed facility include adverse effects on lung function and the cardiovascular system more generally, known human carcinogenicity, irritation, chemical sensitization, harmful neurological effects, poisoning by inhalation, and reproductive hazard. Information on such health effects is available from several sources, including:

a. The *Rhode Island Air Toxics Guideline*, Revised April 2004.[9]

b. The Agency for Toxic Substances and Disease Registry.[10]

c. *The Merck Index, An Encyclopedia of Chemicals, Drugs, and Biologicals*, and reference sources cited therein.

25. Although it is qualified and somewhat dated (1996), modeling work by the U.S. Environmental Protection Agency suggests that concentrations of two of the chemicals of

---

9 This can be obtained by going to http://www.state.ri.us/dem and following links to Program – Air Resources – Air Toxic Guidelines.

10 This can be obtained at http://www.atsdr.cdc.gov/cgi-bin/search-tox.

significance, chloroform (see paragraph 11 above) and formaldehyde (see paragraph 19 above), are elevated in the Providence area.[11] Moreover, the EA acknowledges that Rhode Island is a serious non-attainment area for ozone (EA, p. 18). At the very least, this suggests that background concentrations of these chemicals (and others), as well as particulates, should be measured in the area that would be impacted by emissions from the Brown University laboratory buildings, and those background concentrations considered in far-field dispersion calculations.

26. The EA also fails to consider other likely cumulative impacts of emissions from the proposed Life Sciences Building upon the local environment. The proposed Life Sciences Building would stand adjacent to and be connected physically to Brown's existing Biomedical Complex. According to the EA, in 2002 the Biomedical Complex released approximately 1,200 pounds of emissions from volatile and toxic chemicals (EA, p. 30). The EA further states that in 2002 other nearby Brown laboratory buildings released an approximately 3,650 additional pounds of such emissions (EA, p. 30). The EA further estimates that the proposed Life Sciences Building would release an additional approximately 1,500 pounds of such emissions (EA, p. 13). Thus, the total estimated emissions load, including that of the proposed Life Sciences Building, would be approximately 6,350 pounds annually.

27. The EA also fails to consider the fact that, as noted above, the proposed Life Sciences Building would stand near the bottom of the steep hill formed by Meeting and Olive Streets, in effect near the bottom of a valley or basin, thereby exposing the surrounding environment to effectively closer exhaust stacks. Furthermore, exhaust emissions from the proposed Life Sciences Building, together with those from the adjacent Biomedical Complex and

---

11 This information can be obtained by going to http://www.epa.gov/region1/eco/airtox/greatest.html then linking to Map of Modeled Ambient Concentrations for Chloroform and Formaldehyde.

other nearby Brown science buildings, might not disperse efficiently because of the valley- or basin-like effect, thereby increasing the effective exposure on the surrounding environment.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 7th day of August 2004.

S. David Graber

S. David Graber

**S. DAVID GRABER** - *Consulting Engineer*

## EDUCATION

- BS, Mechanical Engineering, University of Miami, 1963
- SM, Mechanical Engineering, Massachusetts Institute of Technology, 1965
- Professional Degree of Civil Engineer, Massachusetts Institute of Technology, 1966
- Special Summer Studies in Stream and Estuarine Water Quality Analysis (Manhattan College) and Heat Disposal from Power Generation (MIT)

## REGISTERED PROFESSIONAL ENGINEER

- Massachusetts
- New York

## TECHNICAL SOCIETIES

- American Society of Civil Engineers
- American Society of Mechanical Engineers
- Water Environment Federation
- Tau Beta Pi (Engineering Honor Society)

## AWARDS AND HONORS

- American Society of Civil Engineers' J. C. Stevens Award for 1972.
- American Society of Civil Engineers' Samuel A. Greeley Award for 1969.
- Listed in "Who's Who in Engineering," "Who's Who in Massachusetts," and "Who's Who in America."

Mr. Graber has 38 years experience in environmental engineering. During that time, he has analyzed air emissions and evaluated Environmental Assessments and Findings of No Significant Impact which have been prepared by federal agencies under the National Environmental Policy Act of 1969. He has reviewed extensively and commented on numerous air quality analyses and draft air quality permits for: emission control stacks associated with laboratory, wastewater, and sludge processing emissions and an on-site thermal power plant; for wastewater residuals facilities with sludge drying/pelletizing equipment and regenerative thermal oxidation; a proposed recycling center; a proposed power generating facility; and incinerator air emissions. Some of these projects have been in Rhode Island, and he has worked on additional projects in Rhode Island, including preparation of the Cranston, Rhode Island Industrial Wastewater Pretreatment Report which included limits for the protection of collection system workers from toxic gaseous emissions.

Author of twenty eight technical publications and presentations, including those published in the following journals and books: *Proceedings of the Fluid Amplification Symposium*; *Journal of Environmental Engineering*; *Journal of Hydraulic Engineering*; *Journal of Water Environment Research*; <u>Catchment Runoff and Rational Formula</u>; <u>Developments in Theoretical and Applied Mechanics</u>; *Journal of Waterway, Port, Coastal & Ocean Engineering*; *Proceedings of 2004 ASME Heat Transfer/Fluids Engineering Summer Conference*.