ORIGINAL

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| WILLIAM G. TOURET, et al., Plaintiffs, | |
| v. | CIVIL ACTION NO. 04-198T |
| NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, et al., Defendants. | |

**DECLARATION OF WILLIAM G. TOURET**

Pursuant to 28 U.S.C. § 1746, William G. Touret states as follows:

1. I am a plaintiff in this action. I reside at 9 Olive Street in Providence, approximately one block from the site of the proposed Life Sciences facility. I make this declaration in support of plaintiffs' motion to strike.

2. I have read defendant Brown University's Memorandum of Law in Opposition to Plaintiffs' Motion to Supplement the Record and all of the other documents filed to date in this action.

3. To my knowledge, the first information that I and other members of the public with whom I have been in contact received from Brown that the proposed Life Sciences Building might discharge significant amounts of toxic emissions was contained in the Draft Environmental Assessment (EA), published on or about June 2, 2003.

4. At the first of their two detailed public presentations to the community about the proposed Life Sciences Building nearly two years earlier, on October 16, 2001, which I attended, Brown's representatives did not provide any information about the emission of chemicals into

17

the atmosphere. Similarly, at their second and last detailed public presentation about the proposed building, at a hearing conducted by the office of the State Historic Preservation Officer (the RI Historic Preservation & Heritage Commission) (SHPO) on November 28, 2001 pursuant to Section 106 of the National Historic Preservation Act (NHPA), which I also attended, Brown's representatives again did not provide information about such emissions. To the extent that the subject of the proposed Life Sciences Building arose in the course of other, later meetings with Brown's representatives on other subjects, Brown's representatives did not offer or provide any information about possible future toxic emissions -- other than to state that studies about emissions were ongoing and that any such emissions would be within legal limits.[1]

5. In the period after the November 28, 2001 meeting, to my knowledge the only information that the community received about the continuing proceedings between Brown, the federal agency defendants, and the office of the SHPO was in the form of copies of occasional correspondence from the office of the SHPO to Brown or correspondence from the Providence Preservation Society to Brown (e.g., AR 31, 33, 38, 79). As a result, I and one other member of College Hill Neighborhood Association, plaintiff Ronald Dwight, periodically requested copies of the file of the RI Historic Preservation & Heritage Commission (the office of the State Historic Preservation Officer). It was the only way we knew of that would enable us to monitor the post-November 28, 2001 proceedings more closely.

6. It was by reviewing in the first week of March 2002 our copy of the SHPO file that we learned of Brown's private presentation on February 26, 2002 to Ann Hooker [Clarke] of NASA and representatives from the office of the SHPO about the proposed Life Sciences Building (AR 42). In part because of the community's exclusion from that meeting and from all

---

[1] Brown's representatives provided more limited, architectural planning updates about the Life Sciences Building, at public meetings that I attended on July 31, 2002 and October 9, 2002.

other of the post-November 28, 2001 proceedings among and between Brown, the federal agency defendants, and the SHPO, on May 3, 2002 College Hill Neighborhood Association requested "consulting party" status pursuant to regulations promulgated under the NHPA (AR 48). NASA later denied our request (AR 78).[2]

7. On July 30, 2002, nearly a full year before the Draft EA was published, I sent a letter to Marisa Quinn (then with Brown's office of Community and Government Relations) in which I requested information relating to emissions and other issues (a copy of my letter is annexed to this declaration as Exhibit A). I met with Ms. Quinn, together with Steven Morin of Brown's Risk Management office, at Brown on September 5, 2002. On that date, I provided Ms. Quinn and Mr. Morin with a more detailed list of the subjects about which I was seeking information (a copy of that list is annexed to this declaration as Exhibit B). Mr. Morin said that it would take years to gather the information I had requested and thus declined to provide any.[3] I accordingly informed them that I would contact third-party sources (such as the federal Environmental Protection Agency and the appropriate state agency) for relevant information, which I commenced shortly thereafter. At that time, of course, Brown was apparently in possession of most if not all of the emissions information that was later included in the Draft EA and Final EA -- including the RWDI Air Quality Assessment Report dated December 5, 2001

---

[2] NASA denied the request by letter dated September 5, 2002 (AR 78), apparently at the urging of Richard Greenwood, a Project Review Coordinator at the RI Historic Preservation & Heritage Commission and former part-time instructor at Brown (see AR 30 at 0071, AR 33 at 0074, AR 75 at 0380-81).

[3] At the conclusion of that same meeting, however, Ms. Quinn offered to provide information relating to the standards of care used at the existing Biomedical Building's animal care facility.

(RWDI Report) that is referred to in the Graber declaration submitted by plaintiffs with their August 10, 2004 motion to supplement the administrative record in this proceeding.[4]

8. I later reviewed documents concerning hazardous wastes and air emissions as they related to Brown University, at the Boston office of the federal Environmental Protection Agency and at the Providence office of the RI DEM. At the latter agency, two documents in particular suggested that the existing Biomedical Building might in fact be discharging toxic emissions over a wide area. A 1986 DEM internal memorandum questioned whether DEM had

---

4 In its memorandum, Brown refers to a document entitled "Brown University Life Sciences Building -- Submission to State Historic Preservation Officer, February 4, 2002" (AR 40 at 0084-230). Brown apparently provided that document to the office of the State Historic Preservation Officer (SHPO) on or about February 4, 2002. The document mentions emissions issues in its main text and contains as Appendices two documents relevant to emissions issues. The first of those Appendices, Appendix A, includes an undated copy of Brown's Air Operating Permit from Rhode Island's Department of Environmental Management (DEM) (AR 40 at 0114-171). The second document, Appendix B, is a copy of the RWDI Air Quality Assessment Report, dated December 5, 2001 (RWDI Report) (AR 40 at 0172-205), which is discussed in the Graber declaration submitted with plaintiff's motion dated August 10, 2004 to supplement the administrative record. Brown seems to suggest that members of the public may have had access prior to June 2003 to the "Submission to State Historic Preservation Officer" document (Brown Memorandum, at 5). To my knowledge, that is incorrect. At no time was a complete or even near-complete copy of that document available in the SHPO file. Rather, only a few loose individual pages from that document were present in the SHPO file when we obtained a copy of the file in early March 2002. Even as presently set forth in the Administrative Record, the integrity of the "Submission to State Historic Preservation Officer" document is questionable. For one thing, it is unclear whether the copy of Brown's RI DEM Air Operating Permit was originally part of Appendix A, because in the copy of Appendix A included in the Administrative Record, the Air Operating Permit is preceded by another document dated October 2002 -- some eight months after the date of the main document (see AR 40 at 0123-124]). For another, according to the main document, the title of Appendix A should have been "Report on Existing Emissions from [Brown's] Office of Environmental Health & Safety" (see AR 40 at 0085). Instead, the title of Appendix A reads, "Life Sciences Primer" (AR 0115). Copies of three other loose pages that we obtained from the SHPO file in early March 2002 described past National Institutes of Health funding to Brown and the State of Rhode Island. I included those copies as Exhibit C to my July 1, 2002 comments to the Draft EA (AR 123 at 0928-930). In my comments, I described those loose pages as apparently having originated from the fragment of the "Submission to State Historic Preservation Officer" document (see AR 123 at 0902). From the AR, it now appears that those pages were not part of that document: they appear in the Administrative Record with the notes taken by NASA's Ann Hooker [Clarke] during her visit to Brown on February 26, 2002 (AR 42 at 0240-242).

followed up on a 1984 federal OSHA report about possibly harmful air emissions from Brown's Biomedical Building and other of its nearby laboratory facilities (a copy of that 1986 memorandum and two attachments is annexed hereto as Exhibit C).

9. The second document was a 1976 DEM report about a complaint by a resident of 31 John Street in Providence, approximately nine blocks south of Brown's Biomedical Building, near the Fox Point section. The resident had complained of unpleasant odors that had caused her to keep her windows closed. Brown had acknowledged to DEM that the odors had originated from its incinerator at the Biomedical Building (a copy of the 1976 complaint report is annexed hereto as Exhibit D). The two documents, together, suggested the possibility that harmful emissions were being discharged by the Biomedical Building and other nearby laboratory facilities, and that such emissions could be disbursed over a wide area.

10. I also located at RI DEM other documents reflecting additional complaints by private citizens to DEM about Brown's air emissions. I did not find at RI DEM any documents, however, from which I could form a reasonable conclusion as to whether Brown's existing facilities were discharging toxic air emissions.

11. Given the breadth and complexity of the subject matter of Brown's possible noncompliance with federal and state environmental regulations, my unfamiliarity with that area of law, Brown's unwillingness to provide information about emissions from its Biomedical Building, and my desire to evaluate these issues more efficiently, in late 2002 I contacted attorney William Harsch for assistance.

12. When the Draft EA was published on or about June 2, 2003, I reviewed the references therein to the RWDI Report, two Accentech noise-study reports, and Brown's RI DEM Air Operating Permit. I thereupon requested and obtained copies of those documents from

Ms. Quinn and reviewed them for the first time. Because to my knowledge the community had not received any emissions data from Brown prior to the June 2, 2003 publication of the Draft EA, I and other members of the community requested -- first at a meeting with State Historic Preservation Officer Frederic C. Williamson on June 27, 2002, and later in writing to NASA -- that the 30-day period for submitting comments about the Draft EA be extended to allow us to review more thoroughly the newly presented extensive emissions and other environmental impact information (see AR 106 at 0627; AR 123 at 897-899 and AR 123 generally). The federal agency defendants did not grant that request.[5]

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 14th day of September 2004.

William G. Touret

[5] The comment period was apparently extended for apparently less than 30 days to permit agencies from the State of Rhode Island to submit their comments to the Draft EA (AR 107 at 0632).

EXHIBIT A

William G. Touret
9 Olive Street
Providence, RI 02906-1309
(401) 861-0419
wtouret@worldnet.att.net

July 30, 2002

Marisa Quinn
Director
Community & Government Relations
P.O. Box 1920
Brown University
Providence, RI 02912-1920

Re: Biomedical and Proposed Lifesciences Facilities

Dear Ms. Quinn:

I have mentioned to you that I am interested in obtaining information from Brown about environmental-related matters as they relate to Brown's existing biomedical facility and the proposed lifesciences facility (I will refer to them both as the "facilities"). My interest arises from my concern as a local resident as to the potential short- and long-term health risks of living adjacent to the facilities and to the issue of whether the facilities may represent a nuisance.

Most broadly, I am interested in obtaining information from Brown about the details of any and all present and reasonably foreseeable activities at the facilities that may represent a threat to my health, physical and mental, and/or safety. By way of example, those activities include but are not necessarily be limited to:

1. Emission into the local atmosphere of harmful or potentially harmful chemical and other physical substances -- harmful or potentially harmful by reason of their inherent nature or local concentration.

2. Use solely within the facilities of the same substances.

3. Generation of harmful or potentially harmful radiation, such as electricity, microwave, radio, nuclear, or other – harmful or potentially harmful by reason of inherent nature or local concentration. This would include the supply of electrical power and similar resources to the facility through the local neighborhood.

4. Storage, as opposed to use, emission, or generation, of the materials listed in 1-3, above.

5. Noise generation that is audible outside the facilities.

6. Animal research experiments at the facilities, and whether such experiments are conducted humanely.

As a part of an analysis of possible health and safety risks, I would also want to review whatever regulatory provisions are in effect now and may affect the activities I have listed. To the extent such information is available from third parties, I would not necessarily expect Brown to furnish it.

This letter is intended as an overview. I would be pleased to provide you with more detail on these points at your convenience.

I appreciate your assistance.

Very truly yours,

William G. Touret

cc: Michael J. McCormick

EXHIBIT B

Information Items

1. **Emission into the local atmosphere of harmful or potentially harmful chemical and other physical substances -- harmful or potentially harmful by reason of their inherent nature or local concentration.**

   a. Ventilation for/from the facilities

   - single or separate systems for ordinary airflow and exhaust of hazardous/non-hazardous air
   - heavy blower exhausts: manufacturers/types/models/years
   - locations on facilities
   - directions of exhaust
   - factors that determine when the heavy blowers operate and what they discharge
   - filtering type, if any
   - monitoring for hazardous emissions at exhaust points, if any
     - measure of discharge amounts from ventilation system per time period (e.g., annual, biannual, etc.), if any
     - measure of accumulation of discharge in local area, if any
   - contingency plans for controlling unintended harmful emissions, if any:
     - for building users
     - for neighborhood
     - for both during possible construction of proposed life sciences facility

   b. Incinerators in the facilities

   - manufacturers/types/models/years
   - locations in facilities
   - frequency of use
   - types of materials incinerated within past five years and anticipated in future to be incinerated

   c. Materials that could potentially be included in incineration and/or exhaust from facilities

   - all chemicals used within the facility
   - all physical substances that may emit measurable vapors
   - all physical substances that are emitted by combustion or other processes (remains of laboratory animals and other waste disposal; asbestos; etc.)
   - regulations (federal and/or state), if any, to which emissions from the facilities are or may be subject; and reports made pursuant to such regulations within the past 24 months

2. **Use solely within the facilities of the same substances.**

   - same as 1, above

3. **Generation of harmful or potentially harmful radiation, such as electricity, microwave, radio, nuclear, or other -- harmful or potentially harmful by reason of inherent nature or local concentration. This would include the supply of electrical power and similar resources to the facility through the local neighborhood.**

   a. Energy/power delivered to the facilities

   - types and amounts (electricity, gas, steam, heating oil, kerosene, etc.)
     - for electricity, use -- if any -- of step-up or step-down transformers in or near the facilities
   - purposes for which power/energy used within the facilities
   - locations of transmission avenues

   b. Energy/power generated, created, or otherwise used within the facilities (e.g., electrical, microwave, radio, nuclear, laser, fire (e.g., waste incineration):

   - the magnitude of the power generated in a unit of time
   - the purposes for the power generation
   - filtering type, if any
   - monitoring for hazardous emissions at emission points, if any
     - measure of emission amounts per time period (e.g., annual, biannual, etc.), if any
   - contingency plans for controlling unintended harmful emissions, if any:
     - for building users
     - for neighborhood
     - for both during possible construction of proposed life sciences facility

   c. Regulations (federal and/or state), if any, to which such energy/power emissions from the facilities are or may be subject; and reports made pursuant to such regulations within the past 24 months

4. **Storage, as opposed to use, emission, or generation, of the materials listed in 1-3, above.**

   - evidence of continuing compliance with recent EPA consent agreement.

5. **Noise generation that is audible outside the facilities.**

   - ventilation system: presumed origin of objectionable noise
   - reasons for operation of ventilation system other than during 9-5 daytime period
   - possible alternative practices or equipment that would reduce or eliminate noise

6. **Animal research experiments at the facilities, and whether such experiments are conducted humanely.**

   - nature and purpose of the experiments
   - types of subjects of the experiments
   - reports of details of experiments
   - oversight, if any, of experiments by independent third parties from perspective of humane treatment of subject animals
   - all of above for past ten years and anticipated future five year period

EXHIBIT C

RHODE ISLAND DEPARTMENT OF ENVIRONMENTAL MANAGEMENT

DIVISION OF AIR AND HAZARDOUS MATERIALS

**TELEPHONE DISCUSSION**

Company: Brown University

Address: Providence

Date/Hour of Conversation: 9/25/86 3:50 pm

Talked with: Ralph Gumpert, Federal OSHA

Subject: Exhaust from lab hoods

Mr. Gumpert called to ask if a referral from OSHA in July 1984 had ever been addressed by DAHM. Employees in three lab buildings at Brown University had been concerned about exposure to the exhaust air from lab hood vents by either 1)reentrainment into the air conditioner intakes or 2) exposure to exhaust from one vent when fixing the fan belt at a neighboring vent.

The three buildings of concern are: 1)the Biomedical Center, which has one large fan and vent for all of the hoods, 2) the Wilson Labs. which has 15-20 separate roof vents, and 3) the Barus and Holly Building, which has approximately 10 roof vents from lab hoods. The Biomedical Center exhaust is fitted with a particulate filters but otherwise there are no controls on any of the exhausts. At the time, OSHA could only find one violation-the absence of a respirator program-but felt that DAHM might have jurisdiction in regulating the air emissions.

Recently, OSHA has received complaints from employees in the Barus and Holly Building of eye and throat irritation and a number of odors. These symptoms seem to be associated with the use of the air conditioners when no windows are open. Apparently, the intake for the air conditioners is near the hood exhaust. In surveying the building OSHA found a variety of solvents, acids, and alkalis stored in the hoods.

I told Mr. Gumpert that we don't have jurisdiction on the source's property. It is unlikely that any substances would be used in sufficient quantities to violate any of our regulations, including the proposed toxics regulation. It would also be very difficult to inventory this source, since it consists of dozens of units which operate and order independently. I didn't rule out further evaluation at some future date if that seems appropriate.

Barbara Morin

Barbara Morin

wa

Steve

**U. S. Department of Labor** Occupational Safety and Health Administration

380 Westminster Mall, Room 243
Providence, RI 02903
(401)-528-4669

July 11, 1984

Reply to the Attention of:

Barry W. Muller, Director of Air and Hazardous Materials Division
Rhode Island Department of Environmental Management
Room 204, 75 Davis St., Cannon Bldg.
Providence, RI 02908

Dear Mr. Muller:

As a result of a recent OSHA inspection at Brown University, a number of observations were made which indicate that various hazardous materials are being released into the atmosphere without prior treatment.

Please find enclosed a referral report to assist you in any action you deem necessary. If you have any questions please feel free to call Mr. Fred Joseph of my staff at 401-528-4667.

Sincerely,

Kipp W. Hartmann

KIPP W. HARTMANN
Area Director

Enclosure

RECEIVED
JUL 16 1984
RI DEPT. OF ENVIRONMENTAL MANAGEMENT
DIVISION OF AIR & HAZARDOUS MATERIALS

---

Referral Report

**U.S. Department of Labor**
Occupational Safety and Health Administration

MMDD Date | 1. Reporting ID: 112300 | 2. Previous Activity? ☒ Yes ☐ No. If Yes, Enter Type: I Number: 144600 | 3. Referral Number (identifies this Referral) ▶900557760 [redacted]

4. a. ☐ Change? b. Establishment Name: Brown University

6. a. ☐ Change? b. Site Address (Street, City, State, ZIP): J.W. Wilson Labs / Barus & Holley Bldg / Biomedical Center | 7. City Code: 0190 | 8. County Code: 007

9. Mailing Address (Street, City, State, ZIP): P.O.B 1914 Providence RI 02912

[redacted]

10. Type of Business: University | 11. Primary SIC: 8221 | 12. No. of Employees: 5000

13. Ownership (Mark "X" in one box): a. ☒ Private Sector b. ☐ Local Government c. ☐ State Government d. ☐ Federal Agency/Code

14. Referred by: | 15. Date Received: 6/4/84
a. ☐ CSHO (Within office)/CSHO ID
b. ☒ Federal OSHA
c. ☐ State OSH
d. ☐ Discrimination
e. ☐ Other Federal Agency/Code
f. ☐ Consultation
g. ☒ State/Local Government
h. ☐ Media
i. ☐ Other (specify)

16. Source or Contact (Name, Location, Affiliation, Telephone Number): Safety Office John Mattson 863-3353 4th floor Admin Bldg

17. a. Safety (1) ☐ Imminent Danger (2) ☐ Serious (3) ☐ Other | b. Health (1) ☐ Imminent Danger (2) ☐ Serious (3) ☒ Other

18. ☐ Migrant Farmworker Camp

19. Hazard Description: No treatment of chemical effluent to the air from the above three buildings except for particulate filters in biomedical center.
A variety of organic solvents, acids, alkalies, inorganic acids, radioisotopes, biohazards and other toxic materials may be vented to the atmosphere at any one time without scrubbers.
The limit of 100 Tons/year for entire University may be exceeded if total includes power plants. There have been incidents of effluent reentering buildings. Cont'd

[redacted]

20. a. ☐ Send Letter | b. Date Letter Sent: | c. Date Response Due: | 21. Supervisor(s) Assigned a. b.

22. Inspection Planned? ☐ Yes ☐ No | If Yes, Priority: | If No, Reason:

23. Transfer to (Name): RI Dept. of Environmental Mgt. - Air & Hazardous Materials Div. | 24. Transfer Date: 7/2/84

25. Transfer to (Category):
a. ☐ Federal OSHA/Reporting ID
b. ☐ State OSH/Reporting ID
c. ☐ Other Federal Agency/Code
d. ☒ State/Local Government RIDEM Air + Hazardous Materials Div
e. ☐ Other

26. Optional Information

| Type | ID | Value | Type | ID | Value |
|---|---|---|---|---|---|
| [redacted] | | | | | |
| | | | | | |

27. Total Entries: 1

28. Comments

EXHIBIT D

RHODE ISL. DEPARTMENT OF HEALTH
DIVISION OF AIR POLLUTION CONTROL
Providence, Rhode Island 02908

**COMPLAINT REPORT**

No. 76-106 Assigned To Santoro

Telephone Complaint: Yes x No ____

Complaint Received: Date 17 May 1976 Day Monday Time 3 PM

Name and Address of Complainant:
Mrs. Curtis
31 John Street
Providence, RI
Tele. No.: work:863-2197 home:274-9235

Name and Address of Alleged Source:
Brown University Animal Care Facility
Cor. Brown & Meetings Streets
Providence, RI
Tele. No.:

Nature of Complaint: Odor from pathological waste being burned

**Complainant"s Statement**

Frequency of Occurrence: First time today

Duration of Occurrence:

Times of Occurrence (Morning, afternoon, night):

Effects: Can't open windows

**Complainee's Statement**

Person Contacted: Dr. Bovar, Director

Frequency of Occurrence: First time

Reason for Occurrence: Overload of incinerator

Preventive Measures Taken: See below

**Inspector's Observations**

Investigation Time: From 9:20 AM To 10:05 AM No. of Photographs:

Site Observations:

Action Taken: Contacted Dr. Bovar who said the reason for the odor was that they overloaded the incinerator with carcasses (all carcasses had to be burned

Remarks: due to breakdown of cooler--cooler repaired Monday, 17 May 1976) and they could not get temperature high enough. Dr. Bovar explained to Mrs. Curtis (over)

Inspector: [signature] Antonio A. Santoro Date: 18 May 1976
tg

the reason for the odor.

I called on Mrs. Curtis and she informed me that Dr. Bovar had explained to her the problem and cause of odor. She seemed to be satisfied and hoped that it would not happen again.