ORIGINAL

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

WILLIAM G. TOURET, et al.,

Plaintiffs,

v.

NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, et al.,

Defendants.

CIVIL ACTION NO. 04-198T

**PLAINTIFFS' ASSENTED-TO MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD**

Plaintiffs William G. Touret, et al. move, with the assent of all defendants, to supplement the Administrative Record in this case by the inclusion of the following two e-mail messages, copies of which are attached hereto:

1. E-mail message dated January 29, 2003 from Marisa Quinn (Brown University) to Lizabeth Montgomery (NASA) (1 page); and
2. E-mail message dated July 7, 2004 from Ann H. Clarke (NASA) to John H. Eckhardt (NASA), with forwarded e-mail message dated July 8, 2003 from Marissa Quinn (Brown University) to Desiree B. Thalley (Batelle ) (3 pages).

The plaintiffs first obtained these two documents during the week of August 23, 2004 when NASA – in response to plaintiffs' June 4, 2004 Freedom of Information Act ("FOIA") request – provided to plaintiffs approximately 300 additional documents related to the Life Sciences Building project which had not been included in the Administrative Record previously certified to this Court. After discussion with counsel for the federal defendants and Brown University, the plaintiffs have agreed that they will seek to supplement the Administrative Record with only these two e-mail messages. Accordingly, the defendants do not object to allowance of this motion to so supplement that record.

These documents should be included as a supplement to the record previously certified by the federal defendants because these two documents are in the record which was before the federal

21

agencies at the time of their decision. See the last paragraph of 5 U.S.C. § 706, which states that in making its determination whether an action is arbitrary and capricious, "the court shall review *the whole record* or those parts of it cited by a party...." (emphasis added). A complete administrative record, in fact, is essential to permit this Court to make a proper determination of this question. See Defenders of Wildlife v. Norton, 239 F. Supp. 2d 9, 21 (D. D.C. 2002) ("it is questionable whether the Court would be in a position to adequately address the [agency]'s conclusions under the APA" if the administrative record is incomplete). In compiling the administrative record, *all* documents which may have been directly or *indirectly* part of the decision-making process must be included. See Bar MK Ranches v. Yeutter, 994 F.2d 735, 739 (10th Cir. 1993) ("[t]he complete administrative record consists of all documents and materials directly or indirectly considered by the agency"), Portland Audubon Society v. Oregon Lands Coalition, 984 F.2d 1534, 1548 (9th Cir. 1993) ("[t]he whole record includes everything that was before the agency pertaining to the merits of its decision"); Amfac Resorts, LLC v. United States Department of the Interior, 143 F. Supp. 2d 7, 12 (D. D.C. 2001) ("whole record" means "all materials that 'might have influenced the agency's decision,' and not merely those on which the agency relied in its final decision," citing, Bethlehem Steel v. EPA, 638 F.2d 994, 1000 (7th Cir. 1980); .South Carolina Dept. of Health & Environmental Control, 85 F. Supp. 2d 596, 604 (D. S.C. 1999) (administrative record must reflect "all that the agency considered"); Ammex, Inc. v. United States, 62 F. Supp. 2d 1148, 1156 (Ct. Intl. Trade 1999) ("the 'whole' administrative record has come to be seen as 'all documents and materials directly or indirectly considered by agency decisionmakers and includes evidence contrary to the agency's position,' quoting, Thompson v. United States Dep't of Labor, 885 F.2d 531, 555 (9th Cir. 1989).

Accordingly, the plaintiffs request that this Court allow the Administrative Record to be supplemented by inclusion of the two e-mail messages attached to this motion. The federal defendants and defendant Brown University assent to the allowance of this motion.

Plaintiffs William G. Touret et al.,

By their attorneys,

WILLIAM W. HARSCH/Bar No. 3688
170 Westminster Street, Suite 800
Providence, RI 02903
Tel. 401-454-446
Fax 401-351-3914

PETER L. KOFF
Massachusetts BBO #276520
130 Catboat Rd.
Wellfleet, MA 02667
Tel. 508-349-1130
Fax 508-349-1126

Dated: November 12, 2004

**CERTIFICATE OF SERVICE**

I hereby certify that on the __ day of November, 2004, I caused a copy of the foregoing to be hand-delivered to the following:

Robin E. Feder, Esq.
Assistant U.S. Attorney
Chief, Civil Division
Fleet Center
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Joseph Avanzato, Esq.
Kristen W. Sherman, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
2300 Financial Plaza
Providence, RI 02903-2443

Beverly E. Ledbetter, Esq.
Vice President and General Counsel
Box 1913
Brown University
Providence, RI 02912-1913

J. William W. Harsch

X-Sender: aclarke@mail.hq.nasa.gov
X-Mailer: QUALCOMM Windows Eudora Version 4.3.2
Date: Thu, 19 Dec 2002 10:05:24 -0500
To: lmontgom@pop200.gsfc.nasa.gov, Carlos Lopez <Carlos.Lopez-1@nasa.gov>
From: Ann H Clarke <aclarke@hq.nasa.gov>
Subject: Fwd: Draft MOA
Cc: Howard Kass <hkass@hq.nasa.gov>

FYI. I've forwarded the proposed draft MOA to Code FE. Julius Dasch is the POC but will be retiring in 10 days so he asked me to cc Dr. Malcom Phelps, who would be the NASA signatory on the MOA and the FONSI whenever these are ready to be signed.

Ann

> Date: Thu, 19 Dec 2002 10:03:44 -0500
> To: jdasch@hq.nasa.gov
> From: Ann H Clarke <aclarke@hq.nasa.gov>
> Subject: Fwd: Draft MOA
> Cc: mphelps@hq.nasa.gov
>
> Julius,
> Attached is a recent draft of the proposed MOA to mitigate adverse effects of Brown U.'s proposed Life Sciences Building, which NASA and DOE are funding in part.
>
> The MOA is required under 36 CFR part 800, which implements sec. 106 of the National Historic Preservation Act, whenever there is a Federal undertaking (in this case the NASA and DOE grants) that may have an adverse effect on properties eligible for or listed on the National Register of Historic Places. The term undertaking is defined to include partial funding.
>
> MOA's are usually included in the Environmental Assessments as an appendix and the combined document is circulated for public and interagency comment.
>
> A draft EA is anticipated.
>
> We've asked the applicant to do the legwork, but in the end the Federal agencies must review the material and sign off on the EA/FONSI and the MOA.
>
> DOE and NASA will be signatories with the State Historic Preservation Officer on the MOA.
>
> The applicant may choose to be a concurring party on the MOA.
>
> NASA would then attach the terms and conditions of the EA and MOA to the grant along with any other grant conditions.
>
> The GSFC POC's for NEPA (Beth Montgomery) and facilities POC (Carlos Lopez) have suggested that CODE FE rather than the Center Director would be the preferred NASA signatory.
>
> Ann

X-Sender: Marisa_Quinn@postoffice.brown.edu
Date: Wed, 18 Dec 2002 11:10:18 -0500
To: Patrice.Brewington@ch.doe.gov, tmculloch@achp.gov,
Lizabeth.r.montgomery.1@gsfc.nasa.gov, carlos.lopez.1@gsfc.nasa.gov
From: Marisa Quinn <Marisa_Quinn@brown.edu>
Subject: Draft MOA
Cc: rgreenwood@rihphc.state.ri.us, ann.hooker@hq.nasa.gov,
Yolanda_Lamboy@brown.edu, Walter_Hunter@brown.edu
X-MailScanner: Found to be clean

Dear all--

As you all know, Brown has been working closely with the Rhode Island Historic Preservation and Heritage Commission --the RISHPO--to address concerns that they have expressed regarding the scale, massing and design vocabulary of the Life Sciences project, which is partially funded with NASA and DOE funds. Last week we received a letter from the RISHPO that indicates that based on the ongoing work we have done with them, and as a result of the most recent set of designs we shared with them, that they would be prepared to enter into an MOA that includes some key provisions. Attached is a draft MOA that addresses those issues. Please let me know next steps, including any process and associated timeline that will being us to a signed MOA. On a parallel path we have prepared an EA that is being reviewed internally. The MOA will become an attachment to the EA.

It is my understanding that the next steps involve either having each signatory sign a copy of the MOA and then we can compile all signatures into one MOA, or one version can be circulated for signature. It is also my understanding that NASA is the lead agency.

If you would like, I could mail/fed-ex copies of the most recent designs along with a copy of the SHPO letter. Please share your addresses. I can fax copies of the letter referenced above today if you would like.

Thank you-

Marisa

LSB_MOA_Dec18_draft2.doc

X-Sender: aclarke@mail.hq.nasa.gov
X-Mailer: QUALCOMM Windows Eudora Version 6.1.1.1
Date: Wed, 07 Jul 2004 13:05:30 -0400
To: john.h.eckhardt@nasa.gov
From: Ann H Clarke <ann.h.clarke@nasa.gov>
Subject: Fwd: A few edits...
Cc: lizabeth.r.montgomery@nasa.gov

X-Sender: Marisa_Quinn@postoffice.brown.edu
Date: Tue, 8 Jul 2003 10:06:40 -0400
To: thalley@BATTELLE.ORG
From: Marisa Quinn <Marisa_Quinn@brown.edu>
Subject: A few edits...
Cc: peter.siebach@ch.doe.gov, Lizabeth.R.Montgomery@nasa.gov, ann.hooker@hq.nasa.gov, SwartzL@BATTELLE.ORG
X-Brown-MailScanner: Found to be clean

Hi Desiree--

I shared with Henry Huppert in our Environmental Health and Safety Office part of the suggested edits that Lucy has outlined (in the beginning of the summary of comments and responses). I wanted to be sure he was comfortable with the third paragraph. I have pasted the actual language that she gave to us, and following below are Henry's suggested edits. I have since shared the larger document with him and will get you any other substantive edits by the end of the day.

Thanks-
Marisa

**FROM LUCY'S DOCUMENT--**

4. On page 29 (Section 4.1.1.6, Air Quality), the text should be changed to read:

Very small amounts of air emissions would be generated in the laboratories of the proposed building as a result of the use of chemicals during research. Containers would be kept closed when not in use to minimize air emissions. Volatile and toxic chemicals would be used under fume hoods to limit exposure to staff. The fume hoods would be vented to the outside air using Strobic-type exhaust fans mounted on top of the roof to dilute and dissipate the air emissions (3,000 to 1 dilution). Emissions from fume hoods are not specifically regulated under Rhode Island state law. Air emissions from the university as a whole are regulated under an existing Air Operating Permit issued by RIDEM.

Based on information from the existing Biomedical Complex, Brown University estimates that no more than 1,500 pounds of fugitive emissions would be released annually from the proposed Life Sciences Building. [INSERT FOOTNOTE TO READ: In the Draft EA, this volume was incorrectly stated to be 6,000 pounds of emissions. That volume is the amount estimated for all laboratories at Brown University. Approximately 25 percent of the total laboratory emissions (or 1,500 pounds) are attributable to work in the Biomedical Complex. In 2001, the volume estimated to have been released from the Biomedical Complex was 1,330 pounds, or a total of 5,320 pounds for emissions from all university laboratories. This volume does not change substantially from year to year. Annual emissions from the proposed Life Sciences Building are expected to be about the same as, or less than, those from the Biomedical Complex.] These emissions would be primarily from the use of ethanol, a volatile organic compound that is used widely in biological research. Other emissions could include very small volumes of hazardous air pollutants (also known as air toxics) commonly used in laboratories such as chloroform, hydrazine, methylene chloride, toluene, and xylene. None of these emissions would rise to a level requiring an air toxics permit from RIDEM under Rhode Island's Air Toxics Regulations because they would be far below the minimum quantities stated in the regulations (Air Pollution Control Regulation No. 22). Moreover, all emissions would be diluted to such an extent that there would be no increase in ground level concentration of a hazardous air pollutant at or beyond the property line.

It should be noted that the estimate of up to 1,500 pounds of air emissions is highly conservative. First, the volume of fugitive emissions from all university laboratories in 2001 was 5,230 pounds, with approximately 25 percent, or 1,330 pounds, estimated to be from the existing Biomedical Complex. Second, emissions from the existing Biomedical Complex include emissions from an incinerator. Because the proposed Life Sciences Building would not include an incinerator, emissions from the proposed building would be less than those from the existing Biomedical Complex. Third, many of the research activities at other laboratories at Brown University would be transferred to the new Life Sciences Building, resulting in no net increase or only a small increase in the overall fugitive emissions from laboratories at the university as a whole.

The university also commissioned a study to mathematically model, physically model and wind tunnel test the effect of the emissions at the immediately surrounding buildings, assuming dilution would increase beyond these buildings (*Air Quality Assessment Report*, December 5, 2001, Rowan, Williams, Davies, and Irwin). The study also modeled the effect of the existing emissions listed above, and other surrounding exhausts, at the proposed building's air intakes. The intent of this was to provide guidance in locating new air intakes, but this can also be used as a worst-case scenario, assuming that dilution increases as the emissions travel farther away from the building.

[NEW PARAGRAPH]New air emissions sources, including fume hoods and boilers, would be added to the university's existing Air Operating Permit issued by RIDEM. The proposed building would operate within the requirements of RIDEM. Brown University is responsible for compliance with RIDEM's air permitting requirements, which RIDEM monitors and enforces.

# HENRY'S COMMENTS

Paragraph 2.

Take out hydrazine as an example chemical. To my knowledge, it is not used in the biomed complex and it has a very low regulatory threshold.

The following sentence is difficult to say without modeling air emissions:
Moreover, all emissions would be diluted to such an extent that there would be no increase in ground level concentration of a hazardous air pollutant at or beyond the property line.

I know this is vague but ..
Emissions from the building are diluted to such an extent that it is unlikely to increase ground level concentration of a hazardous air pollutants at or beyond the property line.

You might want to revise the third paragraph as follows

It should be noted that the estimate of up to 1,500 pounds of air emissions is highly conservative. First, the volume of fugitive emissions from all university laboratories in 2001 was 5,230 pounds, with approximately 25 percent, or 1,330 pounds, estimated to be from the existing Biomedical Complex. In 2002, this fell to an estimate of 4,852 pounds for the university as a whole and 1,213 from the Biomed Complex. Second, the emissions are estimated based on mass balances performed that do not account for materials that remain in the laboratories as part of experimental processes and research samples. Finally, it is anticipated that the LSB will house 51 lab modules whereas the existing biomed complex houses approximately 80 labs.

Last Paragraph.

Fume hoods will not be in revised permit. Say

boilers and emergency generator