**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| WILLIAM G. TOURET, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, et al.,<br><br>Defendants. | CIVIL ACTION NO. 04-198T |

## NOTICE OF FILING

PLEASE TAKE NOTICE that pursuant to Plaintiffs' Assented-To Motion to Supplement the Administrative Record dated November 12, 2004, the attached document:

> Copy of E-mail message dated July 7, 2004 from Ann H. Clarke (NASA) to John H. Eckhardt (NASA), with forwarded e-mail message dated July 8, 2003 from Marissa Quinn (Brown University) to Desiree B. Thalley (Batelle ) (3 pages)

was filed this date with the Court.

Dated: February 10, 2005

WILLIAM G. TOURET/Pro Se
11 South Angell Street #264
Providence, RI 02906-5206
Tel. (800) 345-0080
Fax (401) 831-5329

31

# CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of February, 2005, I caused a copy of the foregoing to be sent by postage prepaid mail to the following:

William W. Harsch, Esq.
170 Westminster Street, Suite 800
Providence, RI 02903

Robin E. Feder, Esq.
Assistant U.S. Attorney
Chief, Civil Division
Fleet Center
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Joseph Avanzato, Esq.
Kristen W. Sherman, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

Beverly E. Ledbetter, Esq.
Vice President and General Counsel
Box 1913
Brown University
Providence, RI 02912-1913

William G. Touret

X-Sender: aclarke@mail.hq.nasa.gov
X-Mailer: QUALCOMM Windows Eudora Version 6.1.1.1
Date: Wed, 07 Jul 2004 13:05:30 -0400
To: john.h.eckhardt@nasa.gov
From: Ann H Clarke <ann.h.clarke@nasa.gov>
Subject: Fwd: A few edits...
Cc: lizabeth.r.montgomery@nasa.gov

> X-Sender: Marisa_Quinn@postoffice.brown.edu
> Date: Tue, 8 Jul 2003 10:06:40 -0400
> To: thalley@BATTELLE.ORG
> From: Marisa Quinn <Marisa_Quinn@brown.edu>
> Subject: A few edits...
> Cc: peter.siebach@ch.doe.gov, Lizabeth.R.Montgomery@nasa.gov, ann.hooker@hq.nasa.gov, SwartzL@BATTELLE.ORG
> X-Brown-MailScanner: Found to be clean
>
> Hi Desiree--
>
> I shared with Henry Huppert in our Environmental Health and Safety Office part of the suggested edits that Lucy has outlined (in the beginning of the summary of comments and responses). I wanted to be sure he was comfortable with the third paragraph. I have pasted the actual language that she gave to us, and following below are Henry's suggested edits. I have since shared the larger document with him and will get you any other substantive edits by the end of the day.
>
> Thanks-
> Marisa
>
> **FROM LUCY'S DOCUMENT--**
>
> 4. On page 29 (Section 4.1.1.6, Air Quality), the text should be changed to read:
>
> Very small amounts of air emissions would be generated in the laboratories of the proposed building as a result of the use of chemicals during research. Containers would be kept closed when not in use to minimize air emissions. Volatile and toxic chemicals would be used under fume hoods to limit exposure to staff. The fume hoods would be vented to the outside air using Strobic-type exhaust fans mounted on top of the roof to dilute and dissipate the air emissions (3,000 to 1 dilution). Emissions from fume hoods are not specifically regulated under Rhode Island state law. Air emissions from the university as a whole are regulated under an existing Air Operating Permit issued by RIDEM.

Based on information from the existing Biomedical Complex, Brown University estimates that no more than 1,500 pounds of fugitive emissions would be released annually from the proposed Life Sciences Building. [INSERT FOOTNOTE TO READ: In the Draft EA, this volume was incorrectly stated to be 6,000 pounds of emissions. That volume is the amount estimated for all laboratories at Brown University. Approximately 25 percent of the total laboratory emissions (or 1,500 pounds) are attributable to work in the Biomedical Complex. In 2001, the volume estimated to have been released from the Biomedical Complex was 1,330 pounds, or a total of 5,320 pounds for emissions from all university laboratories. This volume does not change substantially from year to year. Annual emissions from the proposed Life Sciences Building are expected to be about the same as, or less than, those from the Biomedical Complex.] These emissions would be primarily from the use of ethanol, a volatile organic compound that is used widely in biological research. Other emissions could include very small volumes of hazardous air pollutants (also known as air toxics) commonly used in laboratories such as chloroform, hydrazine, methylene chloride, toluene, and xylene. None of these emissions would rise to a level requiring an air toxics permit from RIDEM under Rhode Island's Air Toxics Regulations because they would be far below the minimum quantities stated in the regulations (Air Pollution Control Regulation No. 22). Moreover, all emissions would be diluted to such an extent that there would be no increase in ground level concentration of a hazardous air pollutant at or beyond the property line.

It should be noted that the estimate of up to 1,500 pounds of air emissions is highly conservative. First, the volume of fugitive emissions from all university laboratories in 2001 was 5,230 pounds, with approximately 25 percent, or 1,330 pounds, estimated to be from the existing Biomedical Complex. Second, emissions from the existing Biomedical Complex include emissions from an incinerator. Because the proposed Life Sciences Building would not include an incinerator, emissions from the proposed building would be less than those from the existing Biomedical Complex. Third, many of the research activities at other laboratories at Brown University would be transferred to the new Life Sciences Building, resulting in no net increase or only a small increase in the overall fugitive emissions from laboratories at the university as a whole.

The university also commissioned a study to mathematically model, physically model and wind tunnel test the effect of the emissions at the immediately surrounding buildings, assuming dilution would increase beyond these buildings (*Air Quality Assessment Report*, December 5, 2001, Rowan, Williams, Davies, and Irwin). The study also modeled the effect of the existing emissions listed above, and other surrounding exhausts, at the proposed building's air intakes. The intent of this was to provide guidance in locating new air intakes, but this can also be used as a worst-case scenario, assuming that dilution increases as the emissions travel farther away from the building.

[NEW PARAGRAPH]New air emissions sources, including fume hoods and boilers, would be added to the university's existing Air Operating Permit issued by RIDEM. The proposed building would operate within the requirements of RIDEM. Brown University is responsible for compliance with RIDEM's air permitting requirements, which RIDEM monitors and enforces.

# HENRY'S COMMENTS

Paragraph 2.

Take out hydrazine as an example chemical. To my knowledge, it is not used in the biomed complex and it has a very low regulatory threshold.

The following sentence is difficult to say without modeling air emissions:
Moreover, all emissions would be diluted to such an extent that there would be no increase in ground level concentration of a hazardous air pollutant at or beyond the property line.

I know this is vague but ..
Emissions from the building are diluted to such an extent that it is unlikely to increase ground level concentration of a hazardous air pollutants at or beyond the property line.

You might want to revise the third paragraph as follows

It should be noted that the estimate of up to 1,500 pounds of air emissions is highly conservative. First, the volume of fugitive emissions from all university laboratories in 2001 was 5,230 pounds, with approximately 25 percent, or 1,330 pounds, estimated to be from the existing Biomedical Complex. In 2002, this fell to an estimate of 4,852 pounds for the university as a whole and 1,213 from the Biomed Complex. Second, the emissions are estimated based on mass balances performed that do not account for materials that remain in the laboratories as part of experimental processes and research samples. Finally, it is anticipated that the LSB will house 51 lab modules whereas the existing biomed complex houses approximately 80 labs.

Last Paragraph.

Fume hoods will not be in revised permit. Say

boilers and emergency generator