**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| WILLIAM G. TOURET, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, et al.,<br><br>Defendants. | CIVIL ACTION NO. 04-198T |

**PLAINTIFFS' MOTION TO FILE AMENDED COMPLAINT**

Plaintiffs William G. Touret, et al., move this Court for an order pursuant to Rule 15(a), Fed.R.Civ.P., permitting them to file an amended complaint. A copy of the proposed amended complaint is attached to the motion.

The reasons why this Court should allow the amendment are set forth in the accompanying memorandum and declaration.

Dated: February 28, 2005

Respectfully submitted,

WILLIAM G. TOURET/Pro Se
11 South Angell Street #264
Providence, RI 02906-5206
Tel. (800) 345-0080
Fax (401) 831-5329

WILLIAM W. HARSCH/Bar No. 3688
170 Westminster Street, Suite 800
Providence, RI 02903
Tel. (401) 454-4466
Fax (401) 401-351-3914

Attorney for Plaintiffs Thomas A. Bennett, William G. Black, Eileen F. Rosenberg-Black, Antoinette Breed, Allyn Copp, Ronald A. Dwight, Pamela Hext Dwight, G. Dale Dulgarian, as he is Trustee for KSD Trust, Virginia G. Riggs, Yvonne G. Shilling, and College Hill Neighborhood Association

33

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of February, 2005, I caused a copy of the foregoing to be hand-delivered to the following:

Robin E. Feder, Esq.
Assistant U.S. Attorney
Chief, Civil Division
Fleet Center
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Joseph Avanzato, Esq.
Kristen W. Sherman, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

Beverly E. Ledbetter, Esq.
Vice President and General Counsel
Brown University
110 South Main Street
Providence, RI 02903

William G. Touret

**Proposed Amended Complaint**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| WILLIAM G. TOURET, THOMAS A. BENNETT, WILLIAM G. BLACK, EILEEN F. ROSENBERG-BLACK, ANTOINETTE BREED, ALLYN COPP, RONALD A. DWIGHT, PAMELA HEXT DWIGHT, G. DALE DULGARIAN, as he is Trustee for KSD TRUST, VIRGINIA G. RIGGS, YVONNE G. SHILLING, and COLLEGE HILL NEIGHBORHOOD ASSOCIATION, | |
| Plaintiffs, | CIVIL ACTION NO. 04-198T |
| v. | |
| NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, DEPARTMENT OF ENERGY, and BROWN UNIVERSITY, | |
| Defendants. | |

**[PROPOSED] AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. In this action the plaintiffs seek declaratory, injunctive, and other equitable relief with respect to the location, construction, and operation of a new Life Sciences Building at Brown University, Providence, Rhode Island. The plaintiffs allege that the construction of the facility has commenced in violation of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 et seq., and the implementing regulations of the Council on Environmental Quality (40 CFR Parts 1500–1508), the National Aeronautics and Space Administration (14 CFR Part 1216, Subpart 1216.3), and the Department of Energy (10 CFR Part 1021).

## PARTIES

2. The following plaintiffs join in this action:

a. Plaintiff William G. Touret, who resides at 9 Olive Street, Providence, Rhode Island, lives within one block of the proposed facility.

b. Plaintiff Thomas A. Bennett, who resides at 8 Olive Street, Providence, Rhode Island, lives within one block of the proposed facility.

c. Plaintiffs William G. Black and Eileen F. Rosenberg-Black, who reside at 12 Olive Street, Providence, Rhode Island and 50 Park Row West, Providence, Rhode Island, live within one block of the proposed facility.

d. Plaintiff Antoinette Breed, who resides at 7 Cushing Street, Providence, Rhode Island, lives within three blocks of the proposed facility.

e. Plaintiff Allyn Copp, who resides at 12 Keene Street, Providence, Rhode Island, lives within four blocks of the proposed facility.

f. Plaintiffs Ronald A. Dwight and Pamela Hext Dwight, who reside at 155 Benefit Street, Providence, Rhode Island, live within four blocks of the proposed facility.

g. G. Dale Dulgarian is a plaintiff as he is Trustee of KSD Trust (the "trust"), the owner of real estate located at 252-268 Thayer Street in Providence, Rhode Island, which is located on the same block as the proposed facility.

h. Plaintiff Virginia G. Riggs, who resides at 6 Olive Street, Providence, Rhode Island, lives within one block of the proposed facility.

i. Plaintiff Yvonne G. Shilling, who resides at 94 Angell Street, Providence, RI, lives within one block of the proposed facility.

j. Plaintiff College Hill Neighborhood Association ("CHNA") is a nonprofit organization that represents the residents of the historic College Hill neighborhood of Providence. CHNA has approximately 180 households as paid members who live in the area surrounding the proposed facility. The mailing address of CHNA is 248 Bowen Street, Providence, RI 02906.

3. Defendant National Aeronautics and Space Administration ("NASA") is an agency of the United States, having its headquarters office at 300 E St. SW, Washington, D.C.

4. Defendant Department of Energy ("DOE") is a cabinet agency of the United States, having its headquarters at 1000 Independence Ave. SW, Washington, D.C.

5. Defendant Brown University ("Brown" or the "University") is a non-profit educational corporation organized under the laws of the State of Rhode Island. The main campus of Brown is located in the College Hill residential section of the City of Providence.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (Administrative Procedure Act); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346(a)(2) (United States as defendant); 28 U.S.C. § 2201 (declaratory judgment); and 40 CFR § 1500.3 (Council on Environmental Quality Regulations). Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

## FACTUAL STATEMENT

### The Brown University Project

7. Brown has recently begun construction of a new Life Sciences Building (the "facility" or the "project") located adjacent to the existing Biomedical Center and attached Grimshaw-Gudewicz Building (collectively the "Biomedical Building"). The project site, which

is located in the center of the College Hill residential neighborhood, is bordered by Brown, Meeting, Thayer, and Olive Streets and is immediately south of the University's Pembroke Campus.

8. The facility has been proposed, and is being constructed, to facilitate Brown's scientific research in the areas of microbiology, genetics, genomics, and biochemistry. The facility -- which will modernize and expand laboratory and research space at Brown -- has been designed to encourage scientific collaboration among faculty, staff and students and consolidate research activities which are now being done at other locations. Once the facility is completed, Brown will relocate some or all of its Department of Molecular Biology, Cell Biology and Biochemistry, its Department of Neuroscience, its Department of Cognitive and Linguistics Sciences, and its Brain Science Program from other facilities to the new facility. The facility will also contain new space for interdisciplinary initiatives in genetics and genomics. It is currently expected that about 53 existing faculty members will be relocated to the new facility and that, over the next several years, as many as 11 new faculty members will be located in the new facility.

9. The facility will have approximately 170,000 gross square feet of space with five levels above grade and one level below grade. The facility has been designed to contain (a) approximately 51 laboratory modules, which would increase by fifty percent Brown's overall biomedical research space, (b) 69 faculty offices, (c) two administrative suites, three large seminar or conference rooms, and 15 small conference rooms, and (d) research suites for magnetic resonance imaging units and electron microscopy.

10. The specific future research programs and activities to be conducted in the facility, which are not precisely known at this time, will be defined in the future as the needs for

research are determined and funding (including funding from NASA, DOE, National Institutes of Health ("NIH"), and other federal and state agencies and other sources) is obtained. It is currently anticipated by Brown, however, that the laboratories and equipment in the new facility will be used for research in the fields of genetics, cell biology, biochemistry, brain chemistry, and human perception and behavior, among others. Brown estimates that the facility, together with its recently-purchased Doran-Speidel Building located at 70 Ship Street in the Providence Jewelry District that is now being renovated, will attract an additional $23.4 million in annual federal research support.

11. The research and related activities to be conducted in the facility will include the storage and use of biological and radioactive materials and laboratory chemicals such as acids, bases, solvent, and various other chemicals. These activities will result in the generation of hazardous, radioactive, medical, and biological wastes; air emissions from boilers, an emergency generator, cooling towers, research fume hoods, and through building windows, doors, and other openings; and wastewater discharges from the accidental or incidental disposal of chemicals and other wastes down sink drains.

12. The University has estimated that the facility's construction cost will be approximately $95 million. Construction will take approximately 30 months, requiring demolition of three historic properties, utility relocation, demolition and excavation of rock and sill, and construction of the facility itself. Under the present construction schedule it is anticipated that the facility will be ready for occupancy in or about April 2006.

13. The College Hill neighborhood is a densely-populated residential section of Providence containing a mixture of administrative, academic, residential, and athletic facilities of both Brown and the Rhode Island School of Design ("RISD"); private residences including many

historic buildings; and retail and commercial buildings. An estimated 8,000-9,000 Brown and RISD undergraduate and graduate students live in dormitories, other residential facilities, and privately-owned housing that surround the project site. Approximately 20,000 persons, other than Brown or RISD students, live in the College Hill and immediately adjacent neighborhoods. Three Providence public schools, two Providence private schools, and at least four nursing homes are located in the vicinity of Brown and the project site.

## **The Federal Environmental Review Process**

14. The Congress has appropriated $6.25 million for the construction of the facility, which has been, or will be, funded through grants to Brown from NASA (a total of $5,250,000) and DOE (a total of $1,000,000).

15. The partial funding of the facility by NASA and DOE is "a major Federal action significantly affecting the quality of the human environment" within the meaning of NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C).

16. On or about June 2, 2003 NASA, as the lead agency, and DOE, as a cooperating agency, published a draft Environmental Assessment ("EA"), along with a draft Finding of No Significant Impact ("FONSI"), which purported to examine the potential environmental impacts of the proposed facility. After receipt of comments from at least 39 individuals, organizations, and agencies (including comments submitted by and in consultation with the plaintiffs), the final EA and final FONSI (dated July 2003) were published by NASA and DOE on or about August 8, 2003. The EA and FONSI concluded that the construction and operation of the proposed facility would not individually or cumulatively have a significant effect on the human environment and, therefore, preparation of an environmental impact statement ("EIS") is not required.

**PLAINTIFFS' STANDING**

17. Each of the above-listed plaintiffs will be injured by the construction, use, and operation of the facility. In particular, the research activities to be conducted in the facility will require the usage and storage of laboratory chemicals, radioactive materials, and biological materials, which will cause the release of wastes and air emissions to the surrounding neighborhood. The wastes that will be generated from operations of the laboratories and released into the surrounding environment include volatile and toxic chemicals that are hazardous to human health and the environment. The use and operation of the facility will, and/or has the serious potential to, increase the risk of adverse health and other environmental impacts to students, faculty, and residents in the surrounding area and the College Hill neighborhood and to the historic area itself.

18. The procedures designed in NEPA, and its implementing regulations, are designed in part to protect the plaintiffs against the approval by NASA and DOE of a project which may cause damage to the environment and human health unless and until NASA and DOE have completed a proper evaluation of the potential impacts of, alternatives to, and mitigation measures regarding the proposed project.

19. Plaintiffs have been, are being, and will be aggrieved by the failures of NASA and DOE to carry out their duties under NEPA and its implementing regulations, to evaluate the direct and cumulative impacts and indirect effects of the project.

20. The individual plaintiffs, the trust, and the members of CHNA live and work in the vicinity of the project site and use the College Hill area for outdoor activities, shopping and other commercial activities, and passive recreation.

21. The health, environmental interests, economic interests, and recreational opportunities of plaintiffs are being and will be adversely affected by the actions of NASA and DOE that are the subject of this complaint.

22. The relief sought by plaintiffs in this action will restore or protect plaintiffs' rights by ensuring that the health and environmental impacts of, alternatives to, and mitigation measures regarding the project are properly evaluated before the facility is constructed and operated.

**FIRST CLAIM (Violations of NEPA)**

23. Plaintiffs repeat and reallege paragraphs 1 to 22.

24. In the period prior to the year 2000, defendant Brown began operating one or more science laboratories and/or science laboratory buildings in the College Hill section of Providence, including its Arnold Lab, Barus and Holley Building, Green House, Hemisphere Building, Metcalf Research, Metcalf Chemistry, J. Walter Wilson, Walter Hall, 167 Angell Street, and Biomedical Building.

25. Upon information and belief, since at least the year 2000, Brown has been engaged in planning its proposed Life Sciences Building.

26. On or about January 30, 2001, Alice A. Tangredi-Hannon of Brown's Office of Research Administration signed a written "Application for Federal Assistance."

27. The purpose of the "Application for Federal Assistance" was to attempt to obtain one or more federal grants for funds for construction of one or more portions of the proposed Life Sciences Building. Upon information and belief, the application was submitted to federal and state government agencies.

28. The first page of the "Application for Federal Assistance" stated that Dr. Peter R. Shank, Associate Dean for Research, was the "person to be contacted on matters involving this application." At least several pages included as a part of that "Application for Federal Assistance" referred to Dr. Shank as the "Principal Investigator."

29. Included as a part of that "Application for Federal Assistance" was a nine-page "Environmental Analysis Form." Each page of the Environmental Analysis Form stated that Peter R. Shank was the "Principal Investigator."

30. Question B(1) of the Environmental Analysis Form asked whether "the project" would "[i]ncrease identifiable ambient air pollution levels from a new emission source or from existing sources?" In response to Question B(1), Dr. Shank left blank checkboxes stating Impact YES and Impact NO, and answered "Need modeling to answer."

31. Question B(16) of the Environmental Analysis Form asked whether "the project" would "[c]hange the direction and wind velocity as to affect the local population (i.e., high rise building)?" In response to Question B(16) of the Environmental Analysis Form, Dr. Shank checked a box marked "Impact YES" and added, "modeling would have to be done...."

32. On or about September 10, 2001, Brown delivered copies of a "Draft Mitigation Report" dated August 30, 2001 to the Rhode Island Historic Preservation & Heritage Commission (the "RIHP&HC"). The Chairman of the RIHP&HC, Frederick C. Williamson, in his capacity as State Historic Preservation Officer ("SHPO"), had begun a review under Section 106 of the National Historic Preservation Act ("NHPA") of the possible impacts of the proposed Life Sciences Building upon local historic resources. Eventually Brown, NASA, and DOE became parties to that review.

33. The Draft Mitigation Report included a description of the process that Brown had utilized to choose the site for the proposed Life Sciences Building. The "basic goals and planning principles" underlying the site choice were the following:

a. Consolidate Brown's Life Science program.

b. Provide necessary functional relationships between existing and proposed facilities.

c. Centralize the animal care facility to a single location.

d. Maintain and strengthen existing pedestrian links.

e. Comply with the existing campus Master Plan.

f. Locate within Brown's Institutional Zone.

34. The search was eventually limited to four possible sites. According to the Draft Mitigation Report, those four, all within two blocks or less of Brown's existing Biomedical Building, would satisfy two factors that Brown considered to be very important: (a) each of the four sites would better serve the undergraduate student population by being located on-campus; and (b) each of the four sites would have close physical proximity to Brown's Biomedical Building. Further according to the Draft Mitigation Report, of those four sites, only the site ultimately selected -- which was directly adjacent to the Biomedical Building in the same city block -- contained sufficient square footage for the proposed Life Sciences Building.

35. Brown did not make the "Draft Mitigation Report" available to the public.

36. On October 16, 2001, representatives from Brown made their first detailed presentation to the College Hill community about the proposed Life Sciences Building project. Brown's principal presenter at that meeting was Dr. Peter Shank.

37. In the course of his presentation about the proposed Life Sciences Building, Dr. Shank emphasized the millions of dollars of funding that Brown anticipated that research at the proposed Life Sciences Building would attract annually from NIH and other federal and state agencies and other sources during the useful life of the Life Sciences Building.

38. In the course of his presentation about the proposed Life Sciences Building, Dr. Shank stated that the community would benefit from those anticipated millions of dollars of research monies.

39. In the course of his presentation about the Life Sciences Building, Dr. Shank stated that the site for the proposed Life Sciences Building was chosen primarily to maximize the convenience of students and faculty at Brown, many of whom would also utilize the existing, adjacent Biomedical Building.

40. In the course of his presentation about the proposed Life Sciences Building, neither Dr. Shank nor anyone else at that meeting advised the audience that the proposed Life Sciences Building would discharge hazardous and otherwise harmful emissions into the community air.

41. In the course of his presentation about the proposed Life Sciences Building, neither Dr. Shank nor anyone else at that meeting advised the audience that the existing, adjacent Biomedical Building, as well as other Brown laboratory buildings, discharged hazardous and otherwise harmful emissions into the community air.

42. During the October 16, 2001 presentation, members of the audience expressed opposition in whole or in part to the Life Sciences Building project that Dr. Shank had described. Some urged that the proposed Life Sciences Building should be sited next to the Brown-affiliated Rhode Island Hospital.

43. On November 28, 2001, the RIHP&HC conducted an evening public hearing at Brown pursuant to NHPA Section 106.

44. The purpose of the hearing was for the office of the SHPO to receive public comments about the project's possible adverse effects upon historic resources in the local area.

45. Representatives from Brown, including Dr. Peter Shank and Donald Marsh, M.D., then Dean of Medicine and Biological Sciences, attended the hearing and described the proposed Life Sciences Building project.

46. In the course of the meeting about the proposed Life Sciences Building, none of Brown's representatives or anyone else at that meeting advised the audience that the proposed Life Sciences Building would discharge hazardous and otherwise harmful emissions into the community air.

47. In the course of the meeting about the proposed Life Sciences Building, none of Brown's representatives or anyone else at that meeting advised the audience that the existing, adjacent Biomedical Building, as well as other Brown laboratory buildings, discharged hazardous and otherwise harmful emissions into the community air.

48. Upon information and belief, in or about December 2001, Brown received a written report that one of its architects had commissioned from Rowan Williams Davies & Irwin, Inc, dated December 5, 2001, entitled "Air Quality Assessment Report" (the "RWDI Report").

49. In or about February 2002, Brown prepared a document entitled "Presentation to State Historic Preservation Officer February 4, 2002." Page 23 of that document contained a discussion of the "Atmospheric Output of the Proposed Building:"

> Like any major building, the proposed Life Sciences Building will also include emissions, some of which will be included in future Air Operating Permits. The identified emissions generated by the

> proposed building are (2) boilers, (1) emergency generator, (3) cooling towers, and miscellaneous research fume hoods. The University commissioned a study from RWDI to calculate the affect [*sic*] of these emissions at the immediately surrounding buildings, assuming of [*sic*] dilution would only increase beyond these buildings. The study also modeled the affect [*sic*] of the existing emissions listed above, and other surrounding exhaust, at the proposed building's air intakes. The intent of this was to provide guidance in locating new air intakes, but this can also be used as a worst-case scenario, assuming that dilution increases as the emissions travel farther away from the building. The study makes several recommendations (both design and operating), all of which are being considered by the University at this time. This study is Appendix B." (Emphasis added.)

50. The "study from RWDI" to which the preceding excerpt refers was the same RWDI Report dated December 5, 2001.

51. Upon information and belief, Brown intended readers of page 23 of the "Presentation to State Historic Preservation Officer February 4, 2002" to rely on the RWDI Report as an air modeling study that provided a reliable basis for concluding that hazardous and otherwise harmful emissions from the proposed Life Sciences Building would not cause a significant impact on the environment.

52. Upon information and belief, readers of page 23 of the "Presentation to State Historic Preservation Officer February 4, 2002" in fact relied on the RWDI Report as an air modeling study that provided a reliable basis for concluding that hazardous and otherwise harmful emissions from the proposed Life Sciences Building would not cause a significant impact on the environment.

53. On February 26, 2002, Brown conducted a private presentation in Providence, Rhode Island about the proposed Life Sciences Building project. A representative from NASA and two representatives from the RIHP&HC attended that meeting, as did various individuals

from and consultants to Brown. Defendants did not advise plaintiffs or other members of the local community about the presentation and did not invite them to attend it.

54. In March 2002, plaintiff William G. Touret obtained an incomplete copy of the Life Sciences Building project file from the RIHP&HC and learned of Brown's February 26, 2002 private presentation.

55. By letter dated May 3, 2002 to Ann Hooker Clarke of NASA, plaintiff Touret, on behalf of plaintiff College Hill Neighborhood Association ("CHNA"), requested that NASA grant CHNA "consulting party" status pursuant to regulations promulgated under NHPA Section 106.

56. In his May 3 letter, plaintiff Touret advised Clarke, among other things, that absent such "consulting party" status, CHNA's ability meaningfully to participate in and otherwise monitor the ongoing NHPA Section 106 review process would be impaired. On June 19, 2002, plaintiff Touret sent a copy of his May 3 letter to Clarence Hickey of DOE.

57. Upon information and belief, the federal Advisory Council for Historic Preservation ("ACHP") recommended to NASA that it grant CHNA's request for "consulting party" status.

58. Upon information and belief, NASA agreed with the ACHP's recommendation and prepared a draft letter granting plaintiff CHNA's request for CHNA to be accorded "consulting party" status.

59. On June 11, 2002, Ann Hooker Clarke of NASA sent an email to Peter Siebach of DOE and others at DOE and NASA, in which she stated in part: "Traffic congestion, air quality, and solid and hazardous waste disposal are the other major issues, but Brown is doing or has

done traffic studies, air quality analysis, and I believe is addressing the solid and hazardous waste issue."

60. On or about July 18, 2002, Henry Huppert of Brown completed and returned to DOE a DOE "Environmental Evaluation Notification Form" ("EENF") in connection with the proposed Life Sciences Building project.

61. Huppert answered in the affirmative Question III.B.24 of the questionnaire, which asked whether "the proposed action [would] involve any of the following regulated substances or activities ...: Hazardous, Toxic, or Criteria Pollutant Air Emissions."

62. Huppert answered in the negative Question III.C.42 of the questionnaire, which asked whether "the proposed action [would] involve ... Action of a State Agency in a State with NEPA-type law. (Does the State Environmental Quality Review Act Apply?)"

63. At least several pages included as a supplement to Huppert's responses to that questionnaire refer to Dr. Peter Shank as the "Principal Investigator."

64. Upon information and belief, most if not all of the content of the several pages that Huppert included as a supplement to his responses to that questionnaire was taken from the January 31, 2001 Environmental Analysis Form that Dr. Peter Shank had prepared.

65. Section III.24 of Huppert's EENF form's supplement provided:

> "Hazardous, Toxic and Criteria Air Pollutant air Emissions: Hazardous, Toxic, and Criteria Pollutant air emissions are generated in the laboratories as a result of the research occurring. Volatile and/or toxic chemicals are typically used in fume hoods to limit exposure to staff. Containers are kept closed when not in use to minimize air emissions."

66. Huppert did not include within his responses to the DOE EENF questionnaire the previous written conclusions that Dr. Peter Shank had set forth in his responses to the January 31,

2001 Environmental Analysis Form, namely (1) that modeling would be necessary to determine whether the proposed Life Sciences Building would increase identifiable air pollution levels from a new emission source or from existing sources, and (2) that the proposed Life Sciences Building would change the direction and wind velocity as to affect the local population, and would require modeling.

67. By letter dated July 30, 2002, plaintiff Touret requested information from Brown about possible environmental impacts from its Biomedical Building and proposed Life Sciences Building, including impacts relating to chemical emissions and noise.

68. On or about August 2, 2002, representatives of DOE and NASA -- following their review of Henry Huppert's completed EENF -- concluded that NEPA's provisions required defendants to prepare an Environmental Assessment.

69. On or about August 29, 2002, Clarence Hickey of DOE sent an email message to Peter Siebach of DOE. In that email message, Hickey indicated concern about granting CHNA's May 3, 2002 request for "consulting party" status under NHPA Section 106.

70. In his email message, Hickey expressed concern that CHNA might, as a "consulting party," have veto power over any Memorandum of Agreement ultimately entered into at the conclusion of the ongoing NHPA Section 106 review process. Such a veto power, he wrote, "could keep the agencies engaged in this matter for some time, on this project that is not a programmatic DOE action. Is this desirable? Maybe legally required, no, though, correct?" He added that if the SHPO did not want CHNA to be granted "consulting party" status, DOE would not object.

71. By letter dated September 5, 2002, Ann Hooker Clarke of NASA denied CHNA's request for "consulting party" status.

72. The Section 106 review involved most of the same parties and many of the same issues as defendants' review under NEPA. As a result, the denial of CHNA's request for "consulting party" status had the effect of impairing CHNA's ability timely to learn about and be heard by defendants with respect to relevant issues in the NEPA review.

73. As a result of plaintiff Touret's July 30, 2002 letter to Brown, on September 5, 2002 plaintiff Touret met with two representatives of Brown at Brown's Maddock Alumni Center. Plaintiff Touret met with Marisa Quinn, then Director of Brown's Office of Government and Community Relations, and Stephen Morin, Director of Brown's Office of Environmental Health and Safety.

74. At that meeting, plaintiff Touret provided Quinn and Morin with an expanded list of subjects relating to the possible environmental impacts from the proposed Life Sciences Building and existing Biomedical Building about which he was requesting information.

75. Quinn and Morin declined to provide any of the information plaintiff Touret had requested, on the ground that it would be unduly burdensome and would require too much time to produce.

76. At the time of plaintiff Touret's meeting with Quinn and Morin, and unknown to plaintiff Touret, Brown had within its possession copies of the RWDI Report and two noise studies.

77. After meeting with Quinn and Morin, plaintiff Touret reviewed files relating to Brown at the Rhode Island Department of Environmental Management ("RIDEM"). Among the documents plaintiff Touret reviewed was a May 18, 1976 RIDEM report. The report provided that representatives from Brown had admitted to a RIDEM investigator that Brown's animal care

facility incinerator at its Biomedical Building was the source of malodorous emissions that had offended a resident, at her home, on John Street in Providence.

78. The complainant's residence on John Street was located more than six city blocks south of the Biomedical Building.

79. The May 18, 1976 report demonstrated the very substantial distance that emissions from the existing Biomedical Building can travel in the air.

80. Hazardous and otherwise harmful emissions of the kinds already being discharged from Brown's existing Biomedical Building and other laboratory facilities and those that defendants knew would be discharged by the proposed Life Sciences Building are often odorless and colorless and therefore local residents and others cannot detect their presence in the air.

81. A second document that plaintiff Touret reviewed was a RIDEM memorandum dated September 25, 1986 by Barbara Morin of RIDEM's Division of Air and Hazardous Materials ("DAHM"). The memorandum was a record of a telephone conversation on that date between Morin and Ralph Gumpert, the latter an employee of the Federal Occupational Safety & Health Administration ("OSHA"). According to the memorandum, Gumpert had called to ask whether RIDEM had followed up on the results of a previous OSHA inspection in or about June 1984 of Brown's Biomedical Building and other laboratory facilities. In July 1984, OSHA had reported that "as a result of a recent OSHA inspection at Brown, a number of observations were made which indicate that various hazardous materials are being released into the atmosphere without prior treatment."

82. In her September 25, 1986 memorandum, Morin went on to report that, according to Gumpert, OSHA had also received more recent reports from employees of one of Brown's

laboratory facilities, who had complained of eye and throat irritation and odors from laboratory chemical exhausts that had re-entered the laboratory building.

83. Further according to Morin's memorandum, she advised Gumpert that RIDEM likely did not have jurisdiction to pursue the matter and that otherwise it would likely be difficult to investigate.

84. In or about September 2002, NASA and DOE delegated to Brown the writing of the initial draft of the Environmental Assessment.

85. On or about October 1, 2002, the Brown Daily Herald published an article about the status of the proposed Life Sciences Building. The article described the extraordinary pressure that Brown was under to build and complete the proposed facility. The article provided in part as follows:

> "The absence of a life sciences building is hampering the ability of several University departments to recruit new faculty members, said Donald Marsh, former dean of medicine and biological sciences.
>
> * * *
>
> "The molecular biology, cell biology and biochemistry and neuroscience departments hope to expand their departments by up to 25 faculty members each, McKeown [Mike McKeown, professor of molecular biology, cell biology and biochemistry and a department representative to the building committee] said.
>
> * * *
>
> "But all available lab space has already been assigned to faculty, even though some faculty nearing retirement have already given up their lab space, Marsh said. He called the situation a 'critical problem.'
>
> * * *

> "The condition of current laboratory facilities poses another setback to recruiting new faculty, McKeown said.
>
> "Because Brown is competing against other prestigious and well-funded institutions, the University's ability to continue to recruit depends not only on its atmosphere, but also on convincing potential faculty members that they can have a working lab set up to their satisfaction, McKeown said.
>
> "'All is lost if we try to recruit people into a building that is approaching being non-functional,' McKeown said."

86. In or about February 2003, Brown completed a 29-page document entitled "Environmental Assessment Report." The document was Brown's first draft of what eventually became the draft EA that was distributed to the public on June 2, 2003. Brown did not distribute the February 2003 draft to the public.

87. The February 2003 draft referred to the RWDI Report in substantially the same language as the RWDI Report had been described in the "Presentation to State Historic Preservation Officer February 4, 2002."

88. On March 18, 2003, Peter Siebach of DOE wrote to his counterpart at NASA, Lizabeth Montgomery. He enclosed a copy of the February 2003 draft EA by Brown, together with comments by Clarence Hickey and others from DOE. Siebach stated:

> "We believe that the current document is a good start of the process to prepare an EA to satisfy the requirements of the National Environmental Policy Act (NEPA) for National Aeronautics and Space Administration (NASA) and DOE. The draft document does contain a number of substantial weaknesses which will require concerted effort by NASA and DOE to correct."

89. On March 24, 2003, Patrice Brewington of DOE approved the DOE EENF and recommended to Peter Siebach that defendants prepare an EA with respect to the proposed Life Sciences Building project.

90. On April 1, 2003, Peter Siebach of DOE approved the DOE EENF as previously completed by Henry Huppert of Brown, and recommended that DOE perform an "Environmental Assessment per 10 CFR 1021.400(c)* *Historic Preservation issues."

91. On or about April 14, 2003, Brown completed a 35-page revised draft EA, entitled "Final Environmental Assessment" and dated April 14, 2003. The document was Brown's second draft of what eventually became the draft EA that was distributed to the public on June 2, 2003. Brown did not distribute the April 14, 2003 draft to the public.

92. In an email message dated April 14, 2003 transmitting the draft EA of that date to Lizabeth Montgomery of NASA, Paul Dietel of Brown stated: "there is significant pressure to complete this process so that the MOA [the Memorandum of Agreement that would conclude the NHPA Section 106 review] can be finalized as quickly as possible."

93. Also on April 14, 2003, Marisa Quinn of Brown advised Montgomery that 'We are under tremendous pressure to get this thing moving[.]"

94. Pages 21-22 of the April 14, 2003 draft "[Final] Environmental Assessment" referred to the RWDI Report in substantially the same language as the RWDI Report had been described in the "Presentation to State Historic Preservation Officer February 4, 2002."

95. On or about April 17, 2003, plaintiffs' attorney William Harsh telephoned Ann Hooker Clarke of NASA and expressed his concerns about the individual and cumulative effects of potential air emissions from the laboratories of the proposed Life Sciences Building as well as from Brown's existing science buildings.

96. In an email message dated April 29, 2003, Peter Siebach of DOE wrote to DOE attorney Vicki Prouty about Brown's April 14, 2003 draft "Final Environmental Assessment":

> "Here is the Brown EA. My quick flip through says; 'much better' although I still need to buckle down and scrub it before my trip. There are still some format problems <u>and I don't like that no other alternative was really analyzed, but hey, it is a Congressionally mandated Grant</u>. I have yet to put my fingers on anything that would make it hard to get this thing pretty close to final draft edited in a couple of days at Brown. Most problems are just wording.
>
> * * *
>
> "I'd like general comments by May 9th at latest -- and biggies ASAP." (Emphasis added.)

97. On April 30, 2003, DOE attorney Vicki Prouty sent an email message to Peter Siebach and others at DOE. In her email message, Prouty expressed numerous criticisms about Brown's April 14, 2003 draft "Final Environmental Assessment." She suggested that NASA "take over the document, hire a contractor to do it, or sit down with the university and work through the defects." She also stated that "Given that no construction can start until the FONSI is issued, I am somewhat astounded that more progress has not been made."

98. On April 30, 2003, Clarence Hickey of DOE sent an email message in reply to Vicky Prouty. In his message he stated:

> "Thanks for this feedback. I agree with Vicki on the lead agency feds needing to take the ball from here.... It would be easier and more timely if the feds could just get the electronic document on Brown Univ. and do the reformatting and redrafting. I suspect that most of the necessary information is in the document and in the NEPA minds of the feds.
>
> "As an alternative, if the document as stands is acceptable with NASA, perhaps DOE could let NASA approve it and then DOE could adopt it with the revisions that would be needed to support a DOE FONSI."

99. On April 30, 2003, Peter Siebach of DOE sent an email message to Vicki Prouty and Clarence Hickey of DOE. In his email message, Siebach stated that he believed that

Brown's April 14, 2003 draft EA could be successfully reworked; he and Lizabeth Montgomery of NASA had recommended to Brown that Brown hire a consultant to help complete the draft EA and draft FONSI; he and Montgomery planned to be in Providence between May 12 and May 14 to work on the draft EA with Brown's representatives; and NASA wanted the draft EA to be released to the public in mid-May, "the next week after [Siebach's] trip" to Providence.

100. Upon information and belief, in or about the first week of May, 2003, Lucinda Low Swartz of Batelle Memorial Institute entered into a contract with Brown to serve as a consultant to help complete the draft and final EAs, FONSIs, and MOAs.

101. Upon information and belief, Peter Siebach of DOE recommended Swartz to Brown in part because Swartz had previous experience in historic preservation issues.

102. In an email message dated May 15, 2003, Peter Siebach of DOE advised Vicky Prouty of DOE, Lucinda Swartz of Battelle, and Lizabeth Montgomery of NASA of his concern about the draft EA's treatment of the alternative sites purportedly considered for the proposed Life Sciences Building. He wrote that "the adjacency criterion [the criterion that the proposed Life Sciences Building be located adjacent to the Biomedical Building] may be perceived as a transparent attempt to force fit a singular location option. I would suggest that if the teaching hospital [Rhode Island Hospital] is not adjacent to existing science facilities, neither does the [proposed Life Sciences Building] HAVE TO BE."

103. On May 16, 2003, Peter Siebach of DOE submitted a written determination to Marvin E. Gunn, Jr. of DOE, in which Siebach formally recommended that DOE prepare an Environmental Assessment and FONSI with respect to the proposed Life Sciences Building. Siebach stated that the only possibly significant environmental impact was to historic structures.

He wrote that "The LSB [proposed Life Sciences Building] could adversely impact certain historic structures in downtown [*sic*] Providence, Rhode Island."

104. Siebach also stated in his memorandum to Gunn that "Since NASA has already commenced preparing the EA, it is tentatively anticipated that the entire project (including those parts DOE has responsibility for) will be completed by the end of June 2003."

105. On May 19, 2003, Lizabeth R. Montgomery sent an email message to Peter Siebach of NASA, Marisa Quinn of Brown, and Lucinda Swartz of Batelle. Montgomery stated:

> "We would like to go with a 30 day comment period for the draft EA and draft FONSI. If requested, there is really no reason to grant an extension. The public has already had ample time to provide input (with all the outreach that Brown has done) and there is [*sic*] should be no new information."

106. On May 21, 2003, Lucinda Swartz sent an email to Peter Siebach of DOE. She stated, with respect to the draft EA and draft FONSI that she was then preparing, that "Historic preservation is the only issue, and that's been resolved."

107. On May 23, 2003, Marvin E. Gunn, Jr. of DOE approved Siebach's May 16, 2003 recommendation that DOE prepare an Environmental Assessment and FONSI.

108. Upon information and belief, on June 2, 2003, defendants published a notice of availability of the draft EA, draft FONSI, and draft Memorandum of Agreement pursuant to NHPA Section 106. The notice of availability provided for a 30-day comment period.

109. The 61-page Draft EA listed the following individuals as its preparers: Paul Dietel (Brown), Peter Holden (Brown), Henry Huppert (Brown), Lizabeth R. Montgomery (NASA), Stephen Morin (Brown), Marisa Quinn (Brown), Peter Siebach (DOE), and Lucinda Swartz (Battelle).

110. On June 5, 2003, Peter Siebach of DOE wrote to the Rhode Island Statewide Planning Program and RIDEM. In his letter, Siebach stated that "historic preservation" was "the primary issue of concern" within the draft EA. Siebach stated that the draft EA had adopted mitigations recommended by RIHP&HC for impacts to historic resources. In his letter, Siebach did not mention any other possible environmental impacts.

111. Page 29 of the June 2, 2003 draft EA addressed air emissions issues and described the RWDI Report:

> "Very small amounts of air emissions would be generated in the laboratories of the proposed building as a result of the use of chemicals during research. Containers would be kept closed when not in use to minimize air emissions. Volatile and toxic chemicals would be used under fume hoods to limit exposure to staff. The fume hoods would be vented to the outside air using Strobic-type exhaust fans mounted on top of the roof to dilute and dissipate the air emissions (3,000 to 1 dilution). Based on information from the existing Biomedical Complex, Brown University estimates that no more than 2,740 kilograms (6,000) pounds of fugitive emissions would be released. Emissions from fume hoods are not specifically regulated under Rhode Island state law. Air emissions from the university as a whole are regulated under an existing Air Operating Permit issued by RIDEM.
>
> "The University also commissioned a study to mathematically model, physically model and wind tunnel test the effect of the emissions at the immediately surrounding buildings, assuming dilution would increase beyond these buildings (Air Quality Assessment Report, December 5, 2001, Rowan, Williams, Davies, and Irwin). The study also modeled the effect of the existing emissions listed above, and other surrounding exhausts, at the proposed building's air intakes. The intent of this was to provide guidance in locating new air intakes, but this can also be used as a worst-case scenario, assuming that dilution increases as the emissions travel farther away from the building. New air emissions sources, including boilers, would be added to the university's existing Air Operating Permit issued by RIDEM. The proposed building would operate within the requirements of RIDEM."

112. Page 13 of the June 2, 2003 draft EA addressed biological materials issues and provided:

> "Operations at the proposed Life Sciences Building could include the initiation of Biosafety Level 2 research, which would involve the management of a broad spectrum of indigenous, moderate-risk biological materials.... There are currently no proposals for working with more dangerous select agents at the proposed Life Sciences Building. If a proposal were made in the future to work with select agents at the proposed Life Sciences Building, procedures reflective of current laws, regulations, and best practices would be developed."

113. Upon reviewing the draft EA, plaintiffs and other members of the community learned for the first time that the proposed Life Sciences Building was expected to discharge approximately 6,000 pounds of hazardous and otherwise harmful emissions annually into the neighborhood air.

114. Upon reviewing the draft EA, plaintiffs and other members of the community learned for the first time that the proposed Life Sciences Building might be used in the future as a site for Biosafety Level 2 research that could involve "more dangerous select agents."

115. On or about June 6, 2003, plaintiff Touret requested and received from Marisa Quinn of Brown a copy of the RWDI Report and two noise studies cited in the draft EA. Upon information and belief, none of the plaintiffs had known of the existence of the RWDI Report or the two noise studies prior to reviewing the draft EA.

116. Upon information and belief, the RWDI Report was insufficient and inappropriate for use as a wind modeling and/or health safety study of the emissions from the proposed Life Sciences Building, for numerous reasons including but not limited to the following:

a. The RWDI Report by its own terms was not intended to serve as a measure of the possible effects upon the external human environment of hazardous and otherwise

harmful emissions. Rather, it was intended solely to provide guidance for the placement of air intakes for the proposed Life Sciences Building.

b. The RWDI Report did not utilize wind tunnel testing.

c. The RWDI Report incorrectly assumed a permissible level of safe human exposure to hazardous and otherwise harmful emissions that was over 1,000 times higher than the levels that are in fact considered safe from a proper scientific perspective.

d. The RWDI Report failed to consider all of the chemicals and other substances that likely would be used in the proposed Life Sciences Building.

e. The RWDI Report failed to take into account the unique hillside topography of the area and the effects upon emissions from the proposed Life Sciences Building of changes in wind velocity and direction.

f. The RWDI Report was prepared when the proposed Life Sciences Building's rooftop emissions exhausts were anticipated to be one story higher than later designs contemplated. Later designs placed the discharge level one story lower, and thereby one story closer, to the private homes on the nearby hill to the west and a student dormitory across the street to the north.

g. The RWDI Report was prepared before Brown's architects and engineers had finalized the specific air intake and emissions discharge designs and equipment for the proposed Life Sciences Building.

h. The RWDI Report failed to consider the effects of hazardous and otherwise harmful emissions from the proposed Life Sciences Building upon persons in the community with compromised immune systems or other health conditions.

i. The RWDI Report failed to consider the cumulative effect of the aggregate emissions from all of the nearby Brown laboratories as a whole.

117. By email message dated June 11, 2003 to Marisa Quinn of Brown, plaintiff Touret asked for an estimate of the quantity of hazardous and otherwise harmful emissions then being discharged by the existing, adjacent Biomedical Building.

118. By email message dated June 23, 2003, Marisa Quinn replied that the draft EA was in error to the extent that it had estimated that the proposed Life Sciences Building would discharge approximately 6,000 pounds annually of hazardous and otherwise harmful emissions into the neighborhood air. Rather, she said that the 6,000-pound amount represented the total amount of anticipated annual hazardous and otherwise harmful emissions from all Brown laboratory buildings in the area following completion of the proposed Life Sciences Building.

119. On June 27, 2003, several plaintiffs, attorney William Harsch, and other members of the College Hill community met with Fredrick C. Williamson and Richard Greenwood of RIHP&HC. At that meeting, plaintiffs, Harsch, and the other community members urged Frederick Williamson to support an extension of the 30-day comment period for the draft EA and draft FONSI for not less than 120 days. In support of their request they noted among other reasons the large amount of unexpected, newly-released, and highly technical scientific information contained in the draft EA about hazardous and otherwise harmful emissions and other complex scientific subjects, and the timing of its release in the summer when many community members were unavailable.

120. By letter dated July 1, 2003, Fredrick C. Williamson recommended an extension of 30 days, but only for the purpose of allowing state agencies -- which had not timely received copies of the draft EA and draft FONSI -- additional time to submit comments about the two

documents.

121. By letter dated July 1, 2003, plaintiffs' attorney William Harsch submitted written objections to the draft EA and draft FONSI, including the failure to evaluate the likely cumulative impact of anticipated future funding by other government agencies; the failure of the consultation process with Rhode Island state agencies and with the community; the failure by defendants to disclose environmental studies; the failure by defendants timely to disclose the real purpose of the proposed Life Sciences Building (federal government research); the failure to evaluate the impacts of aggregate air emissions; and the need for a full environmental impact statement by all future funding agencies.

122. By letter dated July 1, 2003, plaintiff Touret submitted written objections to the draft EA and draft FONSI, including the insufficiency of the RWDI Report as an air modeling and health and safety study; the insufficiency of the site selection criteria; the insufficiency of the noise analysis; the failure to evaluate properly cumulative impacts; the insufficient analysis of reasonable alternatives; the insufficiency of the public involvement in the evaluation process; the absence of good faith on defendants' part; and the need for a full environmental impact statement.

123. Over 37 other members of the community submitted comments regarding the draft EA and draft FONSI. The overwhelming majority of those members of the community objected to the draft EA and draft FONSI, requested additional time to submit comments, and urged that a full environmental impact statement be performed.

124. Following the close of the comment period, defendants prepared the final EA, final FONSI, and final Memorandum of Agreement pursuant to NHPA Section 106.

125. Among the modifications that defendants made to the draft EA, before publishing the final EA, was the addition of language relating to air emissions.

126. On or about July 8, 2003, Marisa Quinn of Brown sent an email message to Desiree Thalley of Battelle. Upon information and belief, Thalley was then assisting Brown's consultant Lucinda Swartz of Battelle in writing the text of the final EA.

127. Marisa Quinn sent copies of her July 8, 2003 email message to Thalley to Peter Siebach of DOE, Lizabeth Montgomery of NASA, Ann Hooker Clarke of NASA, and Lucinda Swartz of Battelle.

128. In her email message, Quinn reported that she had previously sent to Henry Huppert of Brown proposed language from Lucinda Swartz to be inserted in the final EA relating to air emissions issues. She included in her email message the proposed language sent to Huppert, and Huppert's responses concerning that proposed language.

129. One of the proposed sentences to be inserted into the final EA, and sent to Huppert, was the following: "Moreover, all emissions [from the proposed Life Sciences Building] would be diluted to such an extent that there would be no increase in ground level concentration of a hazardous air pollutant at or beyond the property line."

130. In response, Huppert wrote that the foregoing proposed sentence "is difficult to say without modeling air emissions." Huppert then suggested that the foregoing proposed sentence be modified, as follows: "I know this is vague, but .. 'Emissions from the building are diluted to such an extent that it is unlikely to increase ground level concentration of a hazardous air pollutants [*sic*] at or beyond the property line."

131. Huppert's comments and proposed language reflected and confirmed defendants' understanding that adequate air modeling for the proposed Life Sciences Building had not in fact

ever been performed.

132. Huppert's comments and proposed language also suggested that ground level concentrations of hazardous air pollutants and otherwise harmful emissions from existing Brown laboratory buildings such as the adjacent Biomedical Building were unknown and might represent a present health hazard to the public.

133. In the absence of proper air modeling, Huppert had no scientific basis for his deliberately and admittedly vague assertion that "Emissions from the building are diluted to such an extent that it is unlikely to increase ground level concentration of a hazardous air pollutants [*sic*] at or beyond the property line."

134. Defendants later included Huppert's proposed language on pages 30 and 64 of the final EA.

135. Another modification that defendants made to the draft EA, before publishing the final EA, was the addition of language relating to possible future funding by NASA, DOE, NIH, and other federal and state agencies and other sources. That language provided in part:

> "neither agency [NASA or DOE] has been asked to or has any plans to grant additional monies for the construction or operation of the proposed building, including future research projects. Funding for future research activities at the proposed Life Sciences Building would come from many sources, not just federal agencies. Any research funding provided by the National Institutes of Health (NIH) would be subject to the NEPA regulations promulgated by that agency...." (EA, page 68.)

136. On or about August 8, 2003, defendants published the 69-page final EA and the final FONSI. The final EA was substantially identical to the draft EA, but for minor changes to the text -- of which two are described above -- and the addition of an Appendix E in which

defendants offered responses to written public comments to the draft EA.

137. The final EA and final FONSI concluded that the construction and operation of the Life Sciences Building would not have a significant environmental effect upon the local environment.

138. To the extent that NASA and DOE relied upon Brown personnel and consultants hired by Brown to perform aspects of the NEPA review process, NASA and DOE remained responsible for that process and for the content of the final EA and final FONSI.

139. The decisions of NASA and DOE to issue a FONSI for the project, and not to prepare an environmental impact statement ("EIS"), were arbitrary and capricious and were made in violation of NEPA, the CEQ regulations, and the relevant NEPA regulations of NASA and DOE for the following reasons, among others:

a. NASA and DOE did not have adequate data and information upon which to make a proper determination that the project is unlikely to have significant health and/or environmental effects so that preparation of an EIS was not required.

i. For example, the conclusion that emissions from existing and new laboratory fume hoods and related sources would be unlikely to have adverse health or air quality effects was reached without having sufficient information about: (1) the types, quantities, and anticipated usages of chemicals and other substances which are now in use in existing Brown laboratories and would be used in the new laboratories; (2) the specific dilution criteria incorporated into the facility's design including the precise specifications for the facility's fume hoods and exhaust stacks; (3) site-specific meteorological conditions; and (4) the findings of a comprehensive air modeling study and health risk assessment.

ii. For example, defendants failed to consider the potentially significant health and safety consequences of the reasonably foreseeable likelihood that research performed in the Life Sciences Building "could include the initiation of Biosafety Level 2 research" that could utilize "more dangerous select agents."

b. The EA's conclusion -- that the amounts and cumulative effects of future funding by other government agencies and other sources were not reasonably foreseeable -- failed to consider the very substantial and reasonably foreseeable future funding by NIH and other federal and state agencies and other sources upon which Brown was already publicly and conspicuously relying and upon which the viability of the future operation of the Life Sciences building depended.

c. NASA and DOE failed to take a "hard look" at the environmental consequences of their approval of the project and did not consider the relevant factors.

d. NASA and DOE failed to take a "hard look" at the reasonable alternatives to the project and did not consider the relevant factors.

i. NASA and DOE failed to consider the potentially significant health and safety impacts when they evaluated alternative possible sites for the proposed Life Sciences Building.

ii. The factors that defendants applied in their purported consideration of alternative possible sites for the proposed Life Sciences Building were incorrectly applied and incomplete.

iii. NASA and DOE failed to take a "hard look" at the "no-action" alternative, and did not consider the relevant factors, including the very substantial

amounts of reasonably foreseeable funding by NIH and other federal and state agencies and other sources upon which Brown was already publicly and conspicuously relying and upon which the viability of the future operation of the Life Sciences Building depended, and the alternative environmental effects of not building the proposed Life Sciences Building.

e. The EA relied upon anticipated mitigation effects in concluding that likely significant environmental impacts, such as health effects from hazardous and otherwise harmful emissions and noise levels, were not significant, in violation of CEQ regulations.

140. Substantial questions remain unaddressed whether the construction, operation and use of the facility may cause significant adverse health and environmental impacts. For example, upon information and belief plaintiffs allege that NASA and DOE did not have sufficient data and information upon which a reasoned evaluation could be made of the potential future quantity and types of hazardous air pollutants which would be emitted from the increased research activities and operations of the facility and the potential effects of these emissions on human health.

141. NASA and DOE did not make a reasoned finding that the project's environmental and health effects are not significant.

142. The effects of the project on the human environment are highly controversial and involve highly uncertain, unique, and unknown risks that NASA and DOE failed to consider.

143. Plaintiffs are suffering, and have suffered, legal wrong and/or are adversely affected or aggrieved within the meaning of 5 U.S.C. § 702 because of unlawful final agency actions of NASA and DOE.

144. NASA and DOE are each an "agency" within the meaning of the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

145. Plaintiffs are entitled to judicial review of the final agency actions that are the subject of this complaint.

146. The actions of NASA and DOE that are the subject of this complaint are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; have been taken beyond the applicable statutory authority and requirements; were made without observance of the procedures required by law; and to the extent that the facts in this action may be subject to a trial de novo, are unwarranted by the relevant facts, all as provided in 5 U.S.C. §§ 706(2)(A), (C), (D), (E), and (F).

147. An actual controversy exists within the jurisdiction of this Court regarding the rights and other legal relations of the plaintiffs with respect to the failures of NASA and DOE to carry out their duties to comply with the above-referenced provisions of law, as to which declaratory judgment is appropriate pursuant to 28 U.S.C. §§ 2201-2202.

**SECOND CLAIM (Bad Faith)**

148. Plaintiffs repeat and reallege paragraphs 1-147.

149. Prior to their publication of the final EA and final FONSI, defendants knew that a proper evaluation of the possible impacts of hazardous and otherwise harmful emissions upon the human environment from the proposed Life Sciences Building would require one or more air modeling studies.

150. Prior to their publication of the Final EA and Final FONSI, defendants knew that a proper evaluation of the possible cumulative impacts of hazardous and otherwise harmful emissions upon the human environment from the proposed Life Sciences Building, Biomedical

Building, and other Brown laboratory buildings would require one or more air modeling studies.

151. Prior to their publication of the final EA and final FONSI, defendants knew that the RWDI Report was not an adequate air modeling study for evaluating the possible impacts of hazardous and otherwise harmful emissions upon the human environment from the proposed Life Sciences Building, and that no other air modeling study had been performed.

152. Prior to their publication of the final EA and final FONSI, defendants knew that the RWDI Report was not a comprehensive or otherwise adequate air modeling study for evaluating the possible impacts of hazardous and otherwise harmful emissions upon the human environment from the proposed Life Sciences Building, Biomedical Building, and other Brown laboratory buildings, and that no other air modeling study had been performed.

153. Notwithstanding their knowledge, defendants knowingly included a false and misleading description of the RWDI Report and its purported purpose in the draft EA and final EA and in previously disseminated documents.

154. Upon information and belief, defendants knowingly included a false and misleading description of the RWDI Report and its purported purpose in the draft EA, final EA, and in previously disseminated documents for the sole purpose of representing falsely to third parties that defendants had in fact performed a sufficient air modeling study of the possible individual impacts of hazardous and otherwise harmful emissions from the proposed Life Sciences Building and the possible cumulative impacts of such emissions from the proposed Life Sciences Building, Biomedical Building, and other Brown laboratory buildings upon the human environment, and inducing third parties to rely upon those false representations.

155. Upon information and belief, third parties in fact relied upon those false and misleading representations.

156. Upon information and belief, third parties who relied upon those false and misleading representations were damaged thereby.

157. Upon information and belief, plaintiffs were damaged thereby.

158. By reason of the foregoing, the decisions of NASA and DOE to issue a FONSI for the project, and not to prepare an EIS, were made in violation of NEPA, the CEQ regulations, and the relevant NEPA regulations of NASA and DOE, and are not entitled to deference under the "arbitrary and capricious" standard in this judicial proceeding.

**THIRD CLAIM (Bad Faith)**

159. Plaintiffs repeat and reallege paragraphs 1-158.

160. NEPA requires that those affected by a major federal action be afforded a reasonable opportunity to participate in the NEPA review process.

161. Defendants refused reasonable requests by plaintiffs and other members of the community to obtain information about and to submit comments in regard to the Life Sciences Building project, on at least three occasions.

162. Defendants unreasonably refused the May 3, 2002 request by plaintiff CHNA to be made a "consulting party" in the related NHPA Section 106 review process. That refusal had the effect of materially impairing the ability of plaintiffs to participate meaningfully in the parallel NEPA review process.

163. Defendants unreasonably refused to provide plaintiff Touret with emissions-related information in response to his written and oral requests on July 30, 2002 and September 5, 2002.

164. Defendants unreasonably refused to grant the reasonable requests by plaintiffs and other members of the community to extend the comment period after defendants' June 2, 2003 publication of the draft EA and draft FONSI, to allow plaintiffs and others a reasonable opportunity to understand and respond to the unexpected and newly-released information in the draft EA about hazardous and otherwise harmful emissions and other complex scientific subjects.

165. By reason of the foregoing, the decisions of NASA and DOE to issue a FONSI for the project, and not to prepare an EIS, were made in violation of NEPA, the CEQ regulations, and the relevant NEPA regulations of NASA and DOE and are not entitled to deference under the "arbitrary and capricious" standard in this judicial proceeding.

**FOURTH CLAIM (Bad Faith)**

166. Plaintiffs repeat and reallege paragraphs 1-165.

167. Defendants were required to consider all reasonable site alternatives for the proposed Life Sciences Building.

168. In the EA, defendants utilized criteria in the site selection process that were inapplicable or otherwise unreasonable, misrepresented criteria that were potentially applicable, and otherwise omitted criteria that they should have considered.

169. Upon information and belief, defendants failed to apply appropriate siting criteria in order to ensure that only the chosen building site would satisfy the criteria listed in the EA.

170. As a result, defendants failed to consider reasonable alternative sites for the proposed Life Sciences Building.

171. By reason of the foregoing, the decisions of NASA and DOE to issue a FONSI for the project, and not to prepare an EIS, were made in violation of NEPA, the CEQ regulations, and the relevant NEPA regulations of NASA and DOE and are not entitled to deference under

the "arbitrary and capricious" standard in this judicial proceeding.

**FIFTH CLAIM (Predetermination of Result)**

172. Plaintiffs repeat and reallege paragraphs 1-171.

173. NEPA requires that upon the completion of an environmental assessment, and prior to the issuance of a FONSI, the preparers must consider whether the findings of the environmental assessment require an EIS.

174. Months before completing the draft EA, and prior to receiving comments from the public after publication of the draft EA, defendants made a determination to issue a final EA and FONSI and did not thereafter consider whether it was necessary to prepare an EIS.

175. By reason of the foregoing, the premature decisions of NASA and DOE to issue a FONSI for the project, and not to prepare an EIS, were made in violation of NEPA, the CEQ regulations, and the relevant NEPA regulations of NASA and DOE, and are not entitled to deference under the "arbitrary and capricious" standard in this judicial proceeding.

**PRAYERS FOR RELIEF**

WHEREFORE, plaintiffs pray that this Court enter the following relief on Claims One through Five:

1. That this Court enter a declaratory judgment in favor of plaintiffs with regard to the actions of NASA and DOE.

2. That this Court find and enter judgment that the actions of NASA and DOE are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the applicable laws and regulations relied on by plaintiffs.

3. That this Court enter such preliminary and permanent injunctive relief as is appropriate (a) to restrain and enjoin the defendants from their unlawful conduct and actions that

are being taken in violation of law, (b) to require NASA and DOE to prepare an EIS for the project; and (c) to enjoin Brown, pending compliance with the requirements of NEPA, from further construction and operation of the proposed Life Sciences Building.

4. That this Court award plaintiffs attorney's fees and costs to the extent allowed by law.

5. That this Court grant and award plaintiffs such other and additional relief as they are entitled to under this complaint.

______________________
William G. Touret/Pro Se
11 South Angell Street #264
Providence, RI 02906-5206
Tel. (800) 345-0080
Fax (401) 831-5329

______________________
J. WILLIAM W. HARSCH/Bar No. 3688
170 Westminster Street, Suite 800
Providence, RI 02903
Tel. (401) 454-4466
Fax (401) 351-3914

Attorney for Plaintiffs Thomas A. Bennett, William G. Black, Eileen F. Rosenberg-Black, Antoinette Breed, Allyn Copp, Ronald A. Dwight, Pamela Hext Dwight, G. Dale Dulgarian, as he is Trustee for KSD Trust, Virginia G. Riggs, Yvonne G. Shilling, and College Hill Neighborhood Association

Dated: February __, 2005

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| WILLIAM G. TOURET, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, et al.,<br><br>Defendants. | CIVIL ACTION NO. 04-198T |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO FILE AMENDED COMPLAINT**

Plaintiffs William G. Touret, et al., submit this memorandum in support of their motion to file an amended complaint. A copy of the proposed Amended Complaint is attached to the motion.

As is set forth in the attached declaration of William G. Touret, plaintiffs are making this motion because defendants have refused to stipulate to the proposed amendment.

**FACTS**

**A. Summary of this Action.**

Plaintiffs commenced this action on May 21, 2004. It arises from the proposed Life Sciences Building project by defendant Brown University ("Brown") in the College Hill section of Providence. The original complaint alleges that the two federal agency defendants that are providing partial construction funding for the project, the National Aeronautics and Space Administration ("NASA") and the United States Department of Energy ("DOE") (hereafter collectively the "federal agency defendants"), violated the provisions of Section 102(2)(C) of the

National Environmental Policy Act of 1969, 42 U.S.C. § 4332, et seq. ("NEPA") and regulations promulgated thereunder, by failing to prepare an environmental impact statement ("EIS") and instead preparing an environmental assessment ("EA") accompanied by a finding of no significant impact ("FONSI").

The federal agency defendants concluded that preparation of an EIS was not required. In their opinion, the construction and operation of the new facility at Brown "would not individually or cumulatively have a significant affect [*sic*] on the quality of the human environment." FONSI at 3.[1]

The original complaint alleges, in a single claim for relief, that the federal agency defendants failed to consider potentially significant environmental impacts -- including the impact of anticipated hazardous air emissions. The complaint further alleges that the decision by the federal agency defendants not to prepare an EIS was arbitrary and capricious and otherwise not in accordance with law. The complaint seeks declaratory and injunctive relief.

On or about June 4, 2004, plaintiffs served Freedom of Information Act ("FOIA") requests on defendants DOE and NASA. Thereafter, on or about July 12, 2004, plaintiffs received approximately one dozen documents from DOE and, on or about August 23, 2004, plaintiffs received approximately 300 additional documents from NASA. On or about July 27, 2004, the federal agency defendants filed a joint Administrative Record. Most of the documents produced by the federal agency defendants pursuant to plaintiffs' FOIA requests were not included in the Administrative Record.

---

[1] Administrative Record ("AR") 116 [at 801]. The proposed Life Sciences Building is presently under construction. Its exterior five-story steel skeleton appears to be completed or

Thereafter, by assented-to motion filed November 12, 2004, two documents from the FOIA production were added to the Administrative Record. The federal agency defendants and Brown have otherwise declined to consent to include additional documents from the FOIA production and other third-party sources in the Administrative Record.

At a hearing on November 17, 2004, this Court denied plaintiffs' motion to supplement the Administrative Record with two declarations -- one, a declaration by plaintiffs' expert S. David Graber -- without prejudice to plaintiffs' submission of those documents for the Court's consideration with a future dispositive motion (Hearing Transcript at 50-51).[2]

**B. Plaintiffs' Amended Complaint**

The proposed Amended Complaint sets forth five claims for relief. It restates and expands the single claim in the original complaint for violations of NEPA, to include detailed allegations that defendants: (a) failed to consider reasonably foreseeable individual and cumulative impacts such as the substantial additional federal research funding that Brown has predicted publicly that researchers at the proposed Life Sciences Building will attract, and the future use at the proposed Life Sciences Building of what the EA described as "more dangerous select [biological] agents"; (b) failed to consider reasonable alternative building site locations; and (c) failed to consider properly the required "no-action alternative" (Proposed Amended Complaint ("AC") ¶¶ 139-147).

The second through fourth claims allege bad faith on defendants' part, in that defendants (a) deliberately misled the public and others by falsely representing a preliminary study of

---

nearing completion.

2 Also on November 17, 2004, the Court denied plaintiffs' motion to strike certain portions

possible air intake locations (the "RWDI Report")[3] as a reasonable air and safety study of the possible impacts of hazardous and otherwise harmful emissions from the proposed Life Sciences Building (AC ¶¶ 148-158; (b) deliberately and improperly refused to allow the public to participate reasonably in the NEPA review process (AC ¶¶ 159-165); and (c) deliberately and improperly applied site selection criteria to ensure that only the previously chosen building site would satisfy those criteria (AC ¶¶ 166-171). The fifth claim alleges that the federal agency defendants made an improper predetermination, months prior to defendants' publication of the final EA and before comments from the public were considered, not to prepare an EIS (AC ¶¶ 172-175). Like the original complaint, the proposed Amended Complaint seeks declaratory and injunctive relief.

The proposed Amended Complaint is the result of plaintiffs' continuing review of documents produced by the federal agency defendants after the filing of the original complaint -- those included within the Administrative Record and those produced by the federal agency defendants in response to plaintiffs' FOIA requests -- as well as other documents that plaintiffs have obtained from additional sources.

## ARGUMENT

### A. The Federal Rules Favor Amendments of Pleadings

Rule 15(a), Fed.R.Civ.P., provides in part that following the service of a responsive pleading, "a party may amend the party's pleading only by leave of court or by written consent of

---

of a memorandum filed by defendant Brown (Hearing Transcript at 50-51).

[3] The "RWDI Report" is a report that was prepared for Brown's architects by Rowan Williams Davies and Irwin, Inc., dated December 5, 2001, entitled "Air Quality Assessment Report" (AC ¶¶ 48-50).

the adverse party; and leave shall be freely given when justice so requires." Rule 15(a) embodies the long-standing federal policy of favoring amendments to pleadings and hearing cases on the merits. See, e.g., Foman v. Davis, 371 U.S. 178, 82 (1962); Hatch v. Dept. for Children, Youth and their Families, 274 F.3d 12, 19 (1st Cir. 2001); Shock v. U.S., 21 F.Supp.2d 115, 121 (D.R.I. 1998); Berthiaume v. Enterprise Rent-A-Car, 164 F.R.D. 121, 122-24 (D.Mass.1995); Cummins v. Sealol, Inc., 690 F.Supp. 134, 135 (D.R.I 1988).

**B. The Proposed Amendment Should be Allowed**

The proposed Amended Complaint should be allowed, for several reasons. The amendment will assist this Court and the parties, by setting forth plaintiffs' original claim for relief (for violations of NEPA) with greater specificity and documentary support. That greater specificity and documentation should in turn serve to cause the first claim to be resolved more quickly.

The newly-added second through fifth claims for relief, which allege bad faith and predetermination of result, may -- in addition to assisting the Court in gaining a more accurate understanding of the seriously flawed administrative process that plaintiffs allege occurred here -- permit the Court to apply a standard of review less deferential than the "arbitrary and capricious" standard typically applied in review of agency action cases. See, e.g., Davis v. Mineta, 302 F.3d 1104, 1112-13 (10th Cir. 2002) (predetermination of result); Washington County, N.C. v. U.S. Dept. of Navy, __ F.Supp. __, No. CIV.A.2:04 CV 3BO(2), slip. op. at 10 (E.D.N.C. Feb. 18, 2005) (2005 WL 407783) (predetermination of result). The second through fifth claims may also permit the Court greater latitude to consider evidence not now formally part of the Administrative Record. See, e.g., Town of Norfolk v. U.S. Army Corps of Engineers, 968

F.2d 1438, 1456-60 (1st Cir. 1992); Valley Citizens for a Safe Environment v. Aldridge, 886 F.2d 458, 459-60 (1st Cir. 1989); Strahan v. Linnon, 966 F.Supp. 111, 114 (D.Mass. 1997). Here, plaintiffs contend that the Administrative Record is materially incomplete. Plaintiffs maintain that many of the documents that plaintiffs obtained from the federal agency defendants through their FOIA requests, as well as other documents that plaintiffs obtained from third parties, should have been included in the Administrative Record.

Lastly, the proposed amendment is timely and will not unfairly prejudice defendants.

**CONCLUSION**

For all of these reasons, plaintiffs request that this Court allow the proposed Amended Complaint to be filed.

William G. Touret/Pro Se
11 South Angell Street #264
Providence, RI 02906-5206
Tel. (800) 345-0080
Fax (401) 831-5329

J. WILLIAM W. HARSCH/Bar No. 3688
170 Westminster Street, Suite 800
Providence, RI 02903
Tel. (401) 454-4466
Fax (401) 351-3914

Attorney for Plaintiffs Thomas A. Bennett, William G. Black, Eileen F. Rosenberg-Black, Antoinette Breed, Allyn Copp, Ronald A. Dwight, Pamela Hext Dwight, G.

Dale Dulgarian, as he is Trustee for KSD Trust, Virginia G. Riggs, Yvonne G. Shilling, and College Hill Neighborhood Association

Dated: February 28, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of February, 2005, I caused a copy of the foregoing to be hand-delivered to the following:

Robin E. Feder, Esq.
Assistant U.S. Attorney
Chief, Civil Division
Fleet Center
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Joseph Avanzato, Esq.
Kristen W. Sherman, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

Beverly E. Ledbetter, Esq.
Vice President and General Counsel
Brown University
110 South Main Street
Providence, RI 02903

William G. Touret

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| WILLIAM G. TOURET, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, et al.,<br><br>Defendants. | CIVIL ACTION NO. 04-198T |

**DECLARATION OF WILLIAM G. TOURET**

Pursuant to 28 U.S.C. § 1746, William G. Touret states as follows:

1. I am a plaintiff in this action and am representing myself in a pro se capacity. I make this declaration in support of plaintiffs' motion to file an amended complaint.

2. On February 7, 2005, I distributed copies of plaintiffs' proposed amended complaint to counsel for defendants. I included with the proposed pleading a stipulation allowing the amendment. I also included a letter in which I requested that counsel advise me promptly if they would not agree to stipulate to the amendment.

3. On February 11, 2005, I received a faxed letter from Kristen W. Sherman, Esq., whose office represents defendant Brown University ("Brown"). In her letter, Ms. Sherman stated that Brown would not agree to stipulate to the amendment. Ms. Sherman confirmed her position to me in a telephone conversation on February 14, 2005.

4. I spoke by telephone with Robin E. Feder, Esq., Assistant United States Attorney, whose office is counsel to the federal agency defendants, on February 14 and 18, 2005. On

February 18, 2005, Ms. Feder advised me that her office would recommend that the federal agency defendants not stipulate to the amendment.

I declare under penalty of perjury that the forgoing is true and correct. Executed on this 28th day of February, 2005.

William G. Touret

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of February, 2005, I caused a copy of the foregoing to be hand-delivered to the following:

Robin E. Feder, Esq.
Assistant U.S. Attorney
Chief, Civil Division
Fleet Center
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Joseph Avanzato, Esq.
Kristen W. Sherman, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

Beverly E. Ledbetter, Esq.
Vice President and General Counsel
Brown University
110 South Main Street
Providence, RI 02903

William G. Touret