UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| WILLIAM G. TOURET, et al., Plaintiffs | : | |
| v. | : | C.A. No. 04-198T |
| NASA, et al., Defendants | : | |

**FEDERAL DEFENDANTS' OBJECTION TO PLAINTIFFS' SECOND MOTION TO SUPPLEMENT**

The Federal defendants, NASA and the United States Department of Energy, object to plaintiffs' second motion for leave to supplement the administrative record for the reasons set forth in the attached memorandum of law.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

ROBIN E. FEDER
Assistant U.S. Attorney
Fleet Center
50 Kennedy Plaza, 8th floor
Providence, RI 02903
(401) 709-5000
(401) 709-5017 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of December, 2005, I caused a copy of the foregoing to be forwarded, by postage prepaid mail, to :

J. William W. Harsch, Esq.
170 Westminster Street, Suite 800
Providence, RI 02903

Joseph Avanzato, Esq.
Kristen W. Sherman, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
2300 Financial Plaza
Providence, RI 02903-2443

William Touret
11 South Angell Street, #264
Providence, RI 02906-5206

Beverly E. Ledbetter, Esq.
General Counsel
Office of the General Counsel
Brown University
110 South Main Street
Providence, RI

Nancy A. DeQuinzio

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| WILLIAM G. TOURET, et al., Plaintiffs | : | |
| v. | : | C.A. No. 04-198T |
| NASA, et al., Defendants | : | |

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF OBJECTION TO PLAINTIFFS' SECOND MOTION TO SUPPLEMENT**

## I. BACKGROUND

The Court is already familiar with plaintiffs' claims. As background, and in keeping with the Court's request that the motion and objections be brief, the Federal defendants (NASA and DOE) incorporate herein the memorandum in support of their objection to plaintiffs' first motion to supplement the administrative record (record or AR), filed on August 31, 2004, Docket No. 12.

## II. JUDICIAL REVIEW IS LIMITED TO THE ADMINISTRATIVE RECORD

In its April 27, 2005, ruling on plaintiffs' motion for leave to file an amended complaint, the Court identified the following four narrow exceptions to record review in APA cases: 1) Where the record is not complete because it does not include all of the information presented to or relied upon by the agency in making its decision; 2) where there is additional evidence that comes out after the Agency proceeding is concluded that would affect the result and that was not available or known to the parties; 3) where the agency either withheld or failed to consider important information that was not available to the objectors at the time of the administrative proceedings or where information was withheld in bad faith; and 4) where the court needs help in understanding the record that was compiled, such as in a very technical matter. See, Transcript dated April 27, 2005, pp. 7-9, Docket No. 43.

The Court's approach comports with the law on record review in this Circuit. See, e.g., Valley Citizens for a Safe Environment v. Aldridge, 886 F.2d 458, 460 (1st Cir. 1989). See also, Olsen v. United States, 414 F.3d 144, 155-56 (1st Cir. 2005); and Memorandum and Order, Martin, M.J., dated November 21, 2005, at pp. 2-3, Docket No. 64.

## III. PLAINTIFFS FAIL TO CARRY THEIR BURDEN OF DEMONSTRATING THAT ANY OF THE 82 PROPOSED ADDITIONAL DOCUMENTS FALL INTO ANY OF THE EXCEPTIONS TO RECORD REVIEW

As the Court stated on November 17, 2004, when it denied plaintiffs' first motion to supplement the record,

> The question is whether the record is complete, whether there are things that were omitted from the record and not considered by the agency that ought to have been considered. That's a question we leave for another day.

Transcript, dated 11/17/04, p. 50, Docket No. 26. That day has arrived, and the answer is that the AR is complete. Nothing has been omitted from the record that ought to have been included. Plaintiffs' proposed supplementation does not fall within any of the exceptions to record review identified by the Court. Moreover, none of the documents that plaintiffs offer was relied on by the Agency Decisionmakers, nor would any of the documents have changed the decision, even if they had been considered. See, Declarations of Vicki Prouty and Elizabeth Montgomery, attached hereto as Exhibits A and B, and submitted in support of the Federal defendants' objection to plaintiffs' second motion to supplement the record. The agencies did not withhold or fail to consider any information that was not available to the objectors, and have offered no documents which the Court needs to understand the record. The vast majority of the issues and information on environmental impacts contained within the proffered documents already appears in documents contained in the AR. Id. Those that are not are contained in documents that were

not available to the Agency Decisionmakers, as those documents had not yet been received, created or located at the time of the decision. Id.

There are additional reasons why the supplementation should not be allowed. The Federal defendants have categorized these reasons and those stated above, and grouped the 82 documents proposed for supplementation by these categories into a chart, attached as Exhibit C. The following explanatory key is to be used in conjunction with the chart:

**EXPLANATORY KEY**

A. OUTSIDE COURT'S CRITERIA - These documents do not meet the Court's criteria for supplementation of the record.[1] Every document proposed for supplementation falls into this category. The record includes all of the information presented to or relied upon by the Agencies in making their decision and none of the documents proposed to supplement the Agencies' record, whether or not available or known to the parties at the time of the Agencies' decision, would affect the agencies' decision. The AR shows that the Agencies considered the air emissions, noise, and other impacts that plaintiffs repeatedly raised prior to and during the administrative proceeding, and now seek to raise again through the proffered documents, and the record compiled is not so technical that the court needs help in understanding it. See, Transcript dated April 27, 2005, pp. 7-9.

B. NO CHANGE IN OUTCOME - These documents, even if added to the Administrative Record, would not change the outcome reached by the Agency Decisionmakers. Every document proposed for supplementation falls into this category. Even if information contained within a document might justify revision of a particular statement in the Environmental Assessment (EA), it does not change the Agencies' Finding of No Significant Impacts (FONSI), which Finding was not disputed by the reviewing regulatory agencies upon whose expertise the Agencies were justified in relying.[2] See, Prouty Declaration, ¶ 20 and Montgomery Declaration, ¶ 18. See also, Town of Norfolk v. U.S. Army Corps of Eng'rs, 968 F.2d 1438, 1459-60 (1st Cir. 1992) ("adding these submissions to the record would serve no purpose.").

C. DUPLICATIVE - The issues or information addressed in these documents (although not the documents themselves) are already reflected in the AR in summary fashion and were considered by the Agency Decisionmakers. Inclusion of these documents in the record would be duplicative

[1] The text of the Court's criteria appears in Section II, *supra*.

[2] The State of Rhode Island Department of Environmental Management (RIDEM) and the Rhode Island Historic Preservation and Heritage Commission (RIHPHC) are the regulatory agencies upon whose expertise was relied. AR 0705-07, 0708, 0709-10, 0711-13.

and add nothing. See, Prouty Declaration, ¶ 19 and Montgomery Declaration, ¶ 16. See also, Town of Norfolk, 968 F.2d at 1460 (court need not allow supplementation of the record with information which is already documented in the AR); City of Santa Clarita v. U.S. Dep't of the Interior, 2005 U.S. Dist. LEXIS 27350, *6 (C.D. Calif. 2005) (The exceptions to record review do not allow for extra-record evidence where the extra-record material might supply a fuller record, but otherwise does not address issues not already in the administrative record).

D. DOCUMENTS NOT CONSIDERED - These documents were not directly considered by the Agency Decisionmakers in rendering their decision. Every document proposed for supplementation falls into this category, and these documents were properly excluded here. See, Prouty Declaration, ¶ 18 and Montgomery Declaration, ¶ 15. See also, Town of Norfolk, 968 F.2d at 1456-57; Sierra Club v. Dombeck, 161 F. Supp.2d 1052, 1063 (D. AZ 2001).

E. MOOT - These documents support a premise that is moot, not actionable or for which there is no remedy. For example, documents relating to historical preservation are moot because the buildings at issue have already been torn down, and the issue was not raised in the complaint. Other examples of documents in this category are documents identifying alleged errors in a precursor document that were corrected prior to the issuance of the final EA. Each of these documents is moot, not actionable and/or cannot be remedied. See, e.g., Southwest Ctr. For Biological Diversity v. U.S. Forest Service, 307 F.3d 964, 973 (9th Cir. 2002) (an actual controversy must exist at all phases of the litigation).

F. NO AUTHORITY - These documents deal with an issue (or issues) outside of the authority or control of the Agency Decisionmakers. For example, a number of documents deal with the National Institute for Health (NIH), but NIH did not participate in the NEPA process for the LSB. NASA requested participation of NIH in the NEPA process, but NIH declined. See, Prouty Declaration, ¶ 22 and Montgomery Declaration, ¶ 20. On information and belief, NIH determined that its involvement in the project did not constitute a Major Federal Action requiring NEPA processes. While the Council on Environmental Quality (CEQ) regulations provide for requesting participation of another agency, they do not accord the authority to require another agency to participate (40 CFR1501.6(a)(1). Moreover, there is no evidence that plaintiffs challenged NIH's determination.

G. IMPROPER IMPUTATION - These documents purport to be evidence of conduct by Brown University (the Grantee) or its agent Batelle, indicative of bad faith or improper behavior that cannot be imputed to the Agency Decisionmakers. Moreover, this is not a case in which Brown "secretly and improperly" pressured the Agencies into issuing a FONSI. The AR is replete with evidence of the Agencies' independent analysis, review of and changes to the proposed EA. See, e.g., Town of Norfolk, 968 F.2d at 1458-59.

H. ROUTINE EXCLUSIONS - These documents are intra-agency or inter-agency staff memoranda typically excluded from an AR (for example, routine administrative communications, including emails scheduling meetings, arranging teleconferences, forwarding of

other emails, or coordinating actions); or documents containing deliberative communications typically excluded from the AR (for example, documents reflecting the editing process). See, Prouty Declaration, ¶ 17 and Montgomery Declaration, ¶ 14. See also, Town of Norfolk, 968 F.2d at 1456 (No requirement in administrative law to collect and include in the record all documents reflecting oral communications with an agency).

I. NOT AVAILABLE - These documents were not available to the Agency Decisionmaker at the time of the issuance of the final decision – they were either received, created or located subsequent to the final decision. See, Prouty Declaration, ¶ 21 and Montgomery Declaration, ¶ 19. See also, Town of Norfolk, 968 F.2d at 1456-57; and Airport Communities Coalition v. Graves, 280 F. Supp.2d 1207, 1213 (W.D. Wash. 2003).

J. SELF-SERVING - These documents were generated by one or more of the plaintiffs, are self-serving and of little probative value. In some cases, the documents were generated for the purpose of litigation and are likewise self-serving and of little probative value. Further, to the extent that they reflect information or opinions contained in the public comments that were before the Agency Decisionmakers, they add nothing to the record.

K. SANDBAGGING - These documents present information that plaintiffs knew about during the extended comment period and could have provided to the Agency Decision makers, but failed to do so. The Federal defendants refer to this as "sandbagging." In practical terms, either the information in plaintiffs' notes was provided to the Agencies (in which case, it was considered), or it was not, in which case, plaintiffs should not be allowed to supplement the record with it now. The NEPA process should not be used to prevent, delay or interfere with projects plaintiffs oppose. See, e.g., Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, *553-554 (1978) ("[A]dministrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that "ought to be" considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters "forcefully presented."").

L. NO DATA - These documents appear to be presented solely as purported evidence of bad faith and improper conduct by the Agency Decisionmakers, but contain no factual information on environmental impacts. See, Town of Norfolk, 968 F.2d at 1456 (documents which contain no factual or policy information relative to the agency action need not be included in the record). See also, "G. Improper Imputation," supra.

## SPECIFIC COMMENTS REGARDING INDIVIDUAL OR GROUPS OF DOCUMENTS

**1. Emails** - For the reasons expressed in the Chart, the numerous emails and other documents proffered by plaintiffs were not included in the AR. Although plaintiffs rely heavily on these emails to establish bad faith - or predetermination of result - the emails actually establish that the Agencies were not willing to "rubber stamp" Brown's information and analysis. Similarly, the document at Tab 72, "handwritten notes, produced by Brown ... of the meeting that took place at Brown on May 12, 2003" reflects the Agencies' critical review of the April 2003 draft of the EA (AR 0461-0499). The notes capture concerns that the Agencies' NEPA experts went to Providence to resolve, by meeting with Brown and its contractor, Battelle, and continuation of dialogue post-meeting (AR 0456-60; 0517-29). The Agencies did not include every email and precursor document in the AR. The few included were selected as representative of the extensive involvement the Agencies had in planning an integrated NEPA process and evaluating the potential for environmental impacts (See, e.g., AR 0290-0384; see also, Prouty Declaration, ¶ 17 and Montgomery Declaration, ¶ 17).

**2. Tabs 1 - 4 - Toxic Air Emissions** - Certain of the documents proposed for inclusion in the AR are both inappropriate for inclusion in the record and unnecessary. These are the documents which themselves were not available to the Agency Decisionmakers (i.e., were not contained in the agency files), such as these proposed documents regarding toxic air emissions. Furthermore, they do not contradict the fundamental conclusions of the EA, which characterizes the overall air quality impact of the proposed building as minimal and able to be accommodated

within Brown's permit (AR 0747-51, 0783-84).[3] Ultimately, the EA concludes that the operations of the building must comply with the state's air quality permitting process (AR 0650).[4]

Moreover, the reasoning plaintiffs use to support their motion for supplementation with these documents is faulty. The fallacy lies in equating "emission of a toxic substance in excess of the threshold in Table III of the RIDEM regulations," with a significant impact on air quality. The truth of the matter is that the thresholds in Table III are not directly related to air quality at all, they only trigger the permitting process. See, Rhode Island Air Pollution Control Regulation No. 22, Air Toxics, para. 22.3.3(a). It is the ground level ambient concentration of the substance that correlates to health effects, and these are mitigated by many factors between the source and the receptor at ground level and across the property line, and it is this level that RIDEM must assure will not be violated by emissions from the LSB. See, Rhode Island Air Pollution Control Regulation No. 22, Air Toxics, para. 22.4.1. Plaintiffs would have the Court believe that RIDEM

---

[3] Plaintiffs' assertions that the LSB would exceed air quality standards are based upon an unsupported assumption. Specifically, plaintiffs' attempt to take an estimate of the LSBs contribution to the total air emissions for the Brown University campus, and apply it on a chemical by chemical basis. This assumes that the LSB would emit a share of each chemical pollutant that is proportional to the Providence campus as a whole. In other words, it assumes that the LSB, a biology and medical science building, would emit the same proportion of each chemical as a chemistry building, or an engineering building, or a steam plant. This assumption takes a simple overall estimation and uses it as a methodology for individual chemical measurements, a purpose for which it was neither intended nor suitable. It ignores the differing activities that are conducted in each building, which logically will lead to different chemicals being used and ultimately emitted.

[4] New air emissions sources, including boilers, would be added to the University's existing Operating Permit, issued by the Rhode Island Department of Environmental Management (RIDEM).

will be deceived by statements in the EA,[5] when in fact, RIDEM's comments on the EA emphasized its responsibility for evaluating ambient air impacts from air toxics emissions, not just from the LSB, but "from all operations at the university" (AR 0708) . Plaintiffs' argument, therefore, is with their elected officials and RIDEM, not these Federal agencies. Regarding the "bad faith" allegations, these documents do not have the significance that plaintiffs attribute to them. The Huppert numbers (Tab 1) were no more than a rough estimate, and therefore including just the ballpark "total" was appropriate. As explained by Lucy Swartz (whom Brown hired for her expertise with NEPA analyses, at the urging of DOE), in an e-mail which plaintiffs did not include in the Appendix:

> Remember that I said I was going to include a table that Henry Huppert had sent me that shows the emissions for each compound for 2001? After talking with Henry, we decided that was a bad idea. It suggests a level of precision that isn't there. What Henry does (and he can explain it better) is that every year he takes an inventory of the stuff in the labs - he knows what came in and he knows what's left, and he assumes everything else went out the stack. But that is not necessarily true. It could still be in beakers, for example. Since the numbers are all an estimate, it seemed better not to use them.

The Swartz email, dated July 5, 2003, is attached as Exhibit D. Actual emissions, of course, would depend on numerous factors for which data is not available – such as the type of research conducted, how it will be conducted, and the efficiency of laboratory personnel and equipment.

Even assuming, arguendo, that the EA should have stated, "air emissions would not rise to a level that would violate regulatory standards," instead of "air emissions would not rise to a level requiring an air toxics permit," the distinction is irrelevant in terms of impacts, and does not subvert the Agencies' determination. RIDEM's comments on the EA affirmed that the RIDEM

[5] Ironically, plaintiffs would have us not rely on the competency of the regulators, while at the same time, offering statements of those regulators into evidence. See, Tab 81.

Office of Air Resources was in the process of reviewing an Air Toxics Operating Permit for Brown University (AR 0705-07). The University permit application covering emission sources on the University campus included information on toxic air emissions from existing sources (AR 0164-72). RIDEM's comments also recognized that the Air Toxics Operating Permit may be expanded to include other air toxics emitted by the facility, and that RIDEM "would evaluate the ambient air impacts from emissions of those substances that exceed permitting thresholds from all operations at the university" in conjunction with "evaluating a preconstruction permit for air toxics emissions from the [LSB]." (AR 0705-07).

This confirmation of the regulator's involvement and its active enforcement of air quality standards was a crucial consideration in the Agencies' decisionmaking, as evidenced by the fact that the agencies did not proceed with the FONSI until the environmental impact analysis in the EA was substantially agreed to by RIDEM. See, Prouty Declaration, ¶ 11 and Montgomery Declaration, ¶ 8. That this had been conveyed to Brown was clear from another e-mail that plaintiffs have not sought to add. The email, from Marisa Quinn of Brown to DOE and NASA, dated July 7, 2003, concludes:

> Finally - for planning purposes, assuming that the DEM comments are fine - is August 1 a reasonable date to assume we will have all documents signed? (I'm sorry to be annoying on this, but we have a schedule of work that will be impacted and the Facilities folks need to modify the schedule to reflect current plans.

The Quinn email, dated July 7, 2003, is attached as Exhibit E.

**3. Tabs 5 - 9 - Acentech Reports -** As with the documents regarding toxic air emissions, these are documents which themselves were not available to the Agency Decisionmakers (i.e., were not contained in the agency files), but the information contained

within the documents was included, at least in summary form, in other documents in the record. Included in this category are the Accentech reports on noise generated by the proposed building, together with documents referring to these reports (documents 5-9). The reports are referenced in the final EA, and are accurately summarized, finding that, while Brown has ongoing problems with violations of the City noise regulations, the noise levels produced by the Life Sciences Building would not contribute to those problems (in other words, would have no net environmental impact) (AR 0738-39, 784-85).

**4. Tabs 15 - 28 - Historic Preservation Process** - Documents related to the National Historic Preservation Act (NHPA) Section 106 process are irrelevant to this proceeding. Plaintiffs did not raise the adequacy of the Agencies' compliance with Section 106 requirements in their complaint, perhaps in recognition that the historic preservation issues became largely moot with the demolition of the three affected buildings, which, on information, took place shortly after the FONSI was signed, between September and November 2003.[6] This effectively ended plaintiffs' potential remedies under NHPA. Further, certain of these documents (Tabs 16-20, 22) deal with an internal NASA discussion among NASA management as to whether an EA was required and who should be responsible for drafting it. This was a discussion reflecting management concern regarding the agency resources necessary to complete an EA on what was regarded as a non-NASA "earmark" grant[7], and was not concerned with the ultimate outcome of

[6] Brown is subject to certain ongoing section 106 reporting and record maintenance requirements, but these do not appear to be at issue.

[7] A non-NASA earmark grant is a Congressionally-initiated grant, one in which Congress has provided funding in NASA's appropriation to be applied to a specific purpose (in this case, the LSB). In other words, NASA is simply a conduit for funds that Congress wants to give to Brown, and NASA has no institutional interest in the grant.

that process. NASA and DOE participation in the NEPA process answers any question about whether they would participate. The AR and the Appendix, not to mention hundreds of pages of documents released during discovery, reflect myriad rounds of comments on drafts through e-mails, conference calls, and meetings. Brown's engagement of a NEPA expert was at the urging of DOE, in the interest of improving the substance of the analysis. See, Prouty Declaration, ¶ 9. Clearly the fact that the EA was eventually produced and a FONSI was issued makes this internal discussion moot.

**5. Tab 30 - Early Draft EA** - Plaintiffs seek to add an early, Brown-prepared draft of the EA to the AR (Tab 30). Plaintiffs concede that this document was not contained in the Agency files and thus was not among the documents available to the deciding officials. Further, while certain draft EAs were included in the AR, their inclusion does not necessarily support an argument that the inclusion of all known drafts is either required or appropriate. With the exception of the draft that was released for public comment (AR 108), the inclusion of earlier drafts in the AR was discretionary. These documents are fundamentally working papers, whose contents do not necessarily represent the ultimate findings of the Agency Decisionmakers.[8] Ultimately, the drafts are superceded by the final decision. The inclusion of some draft versions of the EA in the AR (other than the draft released for comment) was for the purpose of demonstrating the iterative drafting process to the Court.

**6. Tabs 28 - 32, 42-46 - No Predetermination of FONSI** - This series of documents has been offered by plaintiffs as evidence of the Agencies' plan to issue a FONSI from the beginning

[8] In this regard, Tab 30 and other documents may also be protected by the deliberative process privilege. See, Town of Norfolk, 968 F.2d at 1458.

of the NEPA process. This is a mischaracterization of the e-mails in Tabs 42-46, as they actually constitute a timely "determination," based on accumulated information.[9] Moreover, the Agency Decisionmakers actively explored the air emissions issue up until the Final EA and FONSI, extending the comment period to allow the RIDEM air emissions official sufficient time to comment. See, Prouty Declaration, ¶ 11 and Montgomery Declaration, ¶ 8. None of the data or other information received made it foreseeable that a significant impact would occur, or that if it did occur, that it could not be mitigated to below significance through RIDEM permit terms and conditions, oversight, and enforcement. Id. At the extreme, RIDEM could preclude operation or could shut down the laboratory. Thus, the door "was held open" to the possibility that new information would come in. Id.

**Regarding earlier discussions** (Tabs 28-32) - Assisting an agency to determine whether to prepare an environmental impact statement (EIS) is only one purpose of an EA. The CEQ encourages agencies to supplement the CEQ regulations with their own, and specifically, to identify classes of actions that, based on the agencies' experience, (1) normally require an EIS; (2) normally require an EA, but not necessarily an EIS; and (3) actions that normally require neither, called "categorical exclusions". For example, DOE NEPA Implementing Procedures provide for use of an EA "to analyze the consequences of ongoing activities, support DOE planning, assess the need for mitigation, fully disclose the potential environmental consequences of DOE actions, or for any other reason," including a proposed DOE action that is not described

[9] The Agencies had already reviewed Brown's "Environmental Checklist" (AR 0356-0368), the submission to the State Historic Preservation Officer (AR0084-0230), and at least 3 drafts of the EA (AR0399-0427; 0461-0499; and 00084-0230).

in any of the classes of actions listed in Appendices A, B, or D to Subpart D,[10] except that an EA is not required if DOE has decided to prepare an EIS (10 CFR 1021.321(a).

But for potential impacts on sensitive resources (the historic preservation issues - 10 CFR 1021, Subpart D, Appendix B, B(4)(i), DOE would have followed almost 10 years of precedent and applied categorical exclusion B3.12, "Siting, construction (or modification), operation, and decommissioning of microbiological and biomedical diagnostic treatment and research facilities."[11] (See, NEPA recommendation to DOE Decisionmaker, AR 0500-0501, plaintiffs' Tab 54 and Prouty Declaration, ¶ 6). Moreover, it would be a violation of a federal employee's fiduciary duty to the public to undertake preparation of an EA without making a reasonable assessment of the likelihood of potentially significant impacts. On the other hand, were a potentially significant issue to be discovered, an Agency whose mere involvement is Congressionally-initiated funding does not benefit from covering it up. However, a schedule is standard operating procedure on major projects, and even process milestones based on the most credible outcome, applying experience and prudence, are expected to change.

It is also important to remember that ... "an EA is a concise document, it should not contain long descriptions or detailed data which the agency may have gathered. Rather, it should contain a brief discussion of the need for the proposal, alternatives to the proposal, the

[10] Appendices A and B are lists of categorical exclusions, and Appendix D is the list of actions that normally require EISs.

[11] A categorical exclusion is "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal Agency in implementation of the regulations (40 CFR 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required." 40 CFR 1508.4.

environmental impacts of the proposed action and alternatives, and a list of agencies and persons consulted." CEQ "NEPA's Forty Most Asked Questions," Question 36a, 46 FR 18026, March 23, 1981. The guidance also advises, "... keep the length of EAs to not more than approximately 10-15 pages," and "incorporate by reference background data to support its concise discussion." Incorporation of tables of rough estimates of air emissions of toxic substances would be inconsistent with this guidance. Id.

**7. Tabs 41 - 52 - Selection Criteria/Adjacency Criteria -** By November 2001, when Congress included "earmarks" for the LSB in the FY02 NASA and DOE budgets, Brown had already presented its five-year and Master Plans plan; had defined and applied its site selection criteria, and was in full consultation with RIHPHC and the Providence Preservation Society over mitigation of the demolition of historic buildings and visual impacts on the historic district (See, (AR 0011-12; 0017-18; and 0033). It was not the province or role of the Agencies to determine the site selection criteria for Brown, but merely to make sure, for NEPA purposes, they were written with a clear connection to the purpose and need for the building.

**8. Tabs 42-45, 53-73 - Public Participation/Extension of Comment Period -**

Plaintiffs cite the Agencies' denial of public requests for a hearing and extension of the comment period on the draft EA as further evidence of bad faith and improper conduct. In actuality, neither the CEQ regulations nor the Agencies' implementing procedures require the conduct of a public hearing on an EA (40 CFR Part 1506.6 [CEQ]; 10 CFR Part 1021 [DOE]; and 14 CFR 1216-304 [NASA]). Moreover, as plaintiffs are already aware, NASA's regulations do not require a public comment period on a draft EA, and DOE's NEPA regulations provide for public review of a proposed FONSI only if the action is one, or closely similar to one, that

normally would require an EIS (10 CFR 1021.322(d); 40 CFR 1501.4(e)(2)).[12] As previously explained, this action is one, or closely similar to one, that normally would not require even an EA, except for the potential impact (although mitigated) on historic resources. See, Prouty Declaration, ¶ 6. DOE regulations require that a host state be given an opportunity to review and comment on any EA prior to DOE's approval (10 CFR 1921.301(d)). See, Prouty Declaration, ¶ 11. In this case, the "preapproval review" was initiated in the usual way: a letter dated June 5, 2003, enclosing the draft EA, draft MOA and draft FONSI, was sent jointly to the State NEPA Point of Contact (Chief of Statewide Planning) and the Director of RIDEM (AR 0610-0612). A notice of availability was published on June 2, 2003, with the 30-day comment period ending July 1, 2003. Advance notice was provided to the list of interested College Hill residents (AR 0530-31; 0603-09). Eight people submitted comments by July 1, 2003, 18 by July 2, 2003. These comments are summarized and answered in the final EA (AR 0699-704), and copies of all of the actual comments are included in the AR, as well (AR 0889-1084). These include comments of plaintiffs' counsel, William Harsch (AR 0627-30); an extensive comment package submitted by another attorney on behalf of a client (0889-983) that appended comment correspondence from numerous individuals (AR 0809-922, AR 1037-72; and 1075-84); as well as plaintiff Touret's 27-page comment letter dated July 1, 2003 (AR 0896-0922), amended July 7, 2003 (AR 0923-36).[13] The comments received on the EA also included two submissions

---

[12] See, the series of emails at Tabs 42-45, and the official response to requests for extension of the comment period in Appendix E of the final EA (AR 0788).

[13] The amended submission appended plaintiff Touret's May 3, 2002, letter to NASA requesting consulting party status under the Historic Preservation Memorandum of Agreement (AR 0923-36); his December 2, 2001, 12 pages of comments to the Executive Director of RIHPHC (AR 1003-14); and his November 20, 2001, 7 pages of comments to the President of

from RIHPHC, dated July 1 and July 29, 2003 (AR 0631-32; 0709-10). RIDEM comments were faxed to NASA on July 21, 2003, after several discussions with NASA over additional time (AR 0705-07). The "clearance" from the Statewide Planning Program is dated July 30, 2003 (AR 0711-13).

Meanwhile, the Agencies did not conduct their comment resolution meeting/conference call until July 22, 2003 (See, Exhibit F, Conference call agenda) after RIDEM comments were received, and the NASA and DOE Decisionmakers did not execute the FONSI until August 5 and August 7, 2003, respectively (AR 0802). DOE policy was to consider any comments that arrived after the close of the comment period, to the extent possible, and in this case, even though all comments were considered, no new issues or evidence was provided. See, July 1, 2003, and July 2, 2003, emails from Lucy Swartz, attached as Exhibit G.

**9. Tab 50 - No Action Alternative -** The interpretation of "no action" depends on the nature of the proposal being evaluated. The evaluation is of the Federal action; impacts of the funded activity are an indirect result of that action and therefore must be evaluated, but it is essential to make the distinction. In some cases, the Federal action may be pivotal, and in such cases, "no action" by the federal agency will likely mean "no project." In other cases, the Federal involvement may be too insignificant to "federalize" the project, and NEPA does not apply. However, case law on the National Historic Preservation Act rejects a "*de minimis*" level for a "federal undertaking. Therefore, NASA and DOE in this case determined that their proposed partial funding of the LSB would trigger NHPA section 106 process requirements. Considering the historic preservation impacts and public controversy, the Agencies concluded that preparation of an EA was the prudent course. However, that did not alter the fact that the Federal funding

---

Brown University.

was such a small percentage of the overall funding that there would be no difference in the project with or without federal funding, and therefore no difference in the environmental impacts of the proposed action (funding) and the no action (no funding) alternative. Had there been an indication, as has been the case in other construction grant projects, that the facility scale or design or operation would have been modified commensurate with a reduction in Federal funding, a distinction in the environmental impacts might have been discernable. See, Prouty Declaration¶ 7, 8, n.3.

**10. Tab 60 - Brown's Submission to State Historic Preservation Officer (SHPO) -** There is no dispute that the AR includes the February "draft" submission to the SHPO (AR 0084-0230) that was received by NASA and DOE and that NASA and DOE did not consider the March version (Tab 60). The difference between the February and March versions is that the March version only references the RWDI report and air permit application, whereas the February version included them as appendices. Plaintiffs allege that "bad faith" is evidenced by Brown's submission of the shorter March submission, which prevented members of the public from having access to information which would have alerted them to environmental impact data. However, Brown's intentions are irrelevant. Plaintiffs, and the rest of the public, had the data when they reviewed the Draft EA and then commented upon it extensively. More importantly, the difference in the two versions had no effect on the outcome of the Section 106 and NEPA processes, as the air emission impacts were summarized in the EA; and RIHPHC, through its extensive interactions with Brown and the Agencies, obtained all of the information it considered a prerequisite to entering into a Memorandum of Agreement for the mitigation of effects on the historic district. Plaintiffs have neither the standing to raise complaints on behalf of RIHPHC,

nor any remedy. The section 106 process has been completed.

**11. Tabs 74-77 Speculation regarding Future activities at LSB -** According to the CEQ regulations, a "Proposal":

> ... exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated.

40 CFR 1508.23. CEQ guidance indicates that a mere "contemplation" is not sufficient. Therefore, if the proposed action envisions a number of potential phases, and subsequent phases are speculative - dependent on the unpredictable results of earlier phases - then it is not improper to postpone evaluation of subsequent phases.

NEPA does not require an agency to consider the possible environmental impacts of less imminent actions when evaluating the potential impacts of a proposed action. Since the operative requirement is for the agency to have the environmental impact information ready "at the time at which it makes a recommendation or report on a proposal for federal action," the scope of the proposed action must be defined at that time. For phased actions such as research and development projects, for which planning for subsequent phases may not have developed to a point where a meaningful analysis of impacts can be done, or for which funding is not assured, future phases will not have proceeded to a point where they qualify as "proposals" and NEPA requirements do not attach. CEQ regulations confirm this intent, by instructing the agency to "focus on issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe." 40 CFR 1508.28(b).

The Second Circuit has identified two factors that determine the extent to which environmental analysis under NEPA may be deferred. County of Suffolk et al., v. Secretary of the Interior et al., 562 F.2d 1368, 1378 (2d Cir. 1977). The court considered (1) whether obtaining more detailed useful information on subsequent phases is "meaningfully possible" when the NEPA review for an earlier stage is performed; and (2) the importance of having the additional information when deciding whether or not to proceed with the project. Both of these factors are relevant to the Agencies' decision to proceed with an EA without NIH cooperation. Like "phased projects," the operation of the LSB is not something that,

> once authorized, cannot be modified or changed, [thereby making it] essential to obtain such information as is available, speculative or not, for whatever it may be worth in deciding whether to make the crystallized commitment ...

Id. at 1378. Rather, the operation of the LSB is more akin to

> a multistage project [that] can be modified or changed in the future to minimize or eliminate environmental hazards disclosed as the result of information that will not become available until the future,

Id. The Agencies' conduct was consistent with this direction. First, environmental impacts of future research proposals, like the proposals themselves, were speculative at best; second, it could not be said that once constructed, the impacts of operating the LSB could not be modified. Research projects, through peer review, safety review, and regulatory oversight, can be modified as information on impacts is revealed. Plaintiffs' Tab 14 evidences the Agencies' attempts to assure that the EA provided a summary discussion of future operations; however, more detailed information on the day-to-day operation of the facility was considered too speculative and beyond an EA-level summary discussion.

## IV. CONCLUSION

For all of the forgoing reasons, the Federal defendants request that this Honorable Court deny plaintiffs' second motion to supplement the administrative record in this case.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

ROBIN E. FEDER
Assistant U.S. Attorney
Fleet Center
50 Kennedy Plaza, 8th floor
Providence, RI 02903
(401) 709-5000
(401) 709-5017 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of December, 2005, I caused a copy of the foregoing to be forwarded, by postage prepaid mail, to :

J. William W. Harsch, Esq.
170 Westminster Street, Suite 800
Providence, RI 02903

Joseph Avanzato, Esq.
Kristen W. Sherman, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
2300 Financial Plaza
Providence, RI 02903-2443

William Touret
11 South Angell Street, #264
Providence, RI 02906-5206

Beverly E. Ledbetter, Esq.
General Counsel
Office of the General Counsel
Brown University
110 South Main Street
Providence, RI

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| WILLIAM G. TOURET, et al., Plaintiffs | : | |
| | : | |
| v. | : | C.A. No. 04-198T |
| | : | |
| NASA, et al., Defendants | : | |

**DECLARATION OF VICKI L. PROUTY**

I, Vicki L. Prouty, declare and make the following declaration under penalty of perjury:

1. I am presently employed by the United States Department of Energy (DOE) as an Assistant Chief Counsel for the DOE Chicago Office (CH).

2. I have over 25 years experience providing legal support to elements of the DOE Chicago Office on, among other things, the requirements of the National Environmental Policy Act (NEPA), the National Historic Preservation Act (NHPA), and other federal environmental protection mandates.

3. In executing my duties, I participate in the NEPA review determinations for all "congressional initiative construction grants" included in DOE appropriations. Between 1984 and 2002, when DOE issued the NEPA determination on Brown University's Life Sciences Building (LSB), DOE administered 153 such grants.

4. The DOE NEPA Compliance Program requires concurrence of DOE counsel as to the legal adequacy of an environmental assessment (EA) before it is approved by the Agency Decisionmaker, and in a "finding of no significant impact" (FONSI) before it is issued.[1]

5. In 2002 and 2003, I provided legal support to the CH NEPA Compliance Officer (NCO), Peter Siebach, who was DOE's "recommending official" for Brown's LSB, and to the Chicago Office Manager, Marvin Gunn, the "Agency Decisionmaker."

6. According to DOE regulations, the siting, construction (or modification), operation, and decommissioning of microbiological and biomedical diagnostic treatment and research facilities, such as the LSB, are categorically excluded from NEPA. [2] This categorical

---

1/ See, DOE Order 451.1B. See also, http://www.directives.doe.gov/pdfs/doe/doetext/neword/451/o4511bc1.pdf

2/ 10 CFR 1021, Subpart D, Appendix B, B(4)(i), B3.12.

exclusion, 61 FR 36221-36239, adopted July 9, 1996, was the result of a DOE "lessons learned analysis" of all of its final EAs on biomedical research facilities during the period 1990 through 1994, each of which concluded with FONSIs. Two of the DOE officials most involved in the LSB NEPA process were involved in the 1995 "lessons learned" activity that generated, among others, categorical exclusion B3.12, discussed above.

7. But for the potential impacts on sensitive resources (the historic preservation issues), DOE would have followed almost 10 years of precedent and concluded that the proposed partial funding action for Brown's LSB fell within categorical exclusion B3.12.

8. I participated in the discussions with NASA over the applicability of NEPA to the "Congressional initiative funding" to Brown for the LSB[3]; about the integration of DOE's and NASA's NEPA processes; about the absence of legal precedent for members of the public, such as the College Hill Neighborhood Association (CHNA) as a consulting party in the MOA with the Rhode Island Historic Preservation and Heritage Commission (RIHPHC); about the characterization of the proposed action and the "no action alternative"; and about the selection criteria for, and reasonable alternatives to, the preferred site and the proposed action.

9. In connection with the legal support I provided on Brown's LSB, I reviewed every draft document associated with the NEPA and NHPA compliance processes, including the Memorandum of Agreement with the State Historic Preservation Officer, the EA and FONSI. Based on my review of drafts of the EA prepared by Brown, I also concurred with the CH NCO's recommendation that Brown engage a NEPA expert contractor in the interest in improving the substance of the analysis in the EA.

10. In connection with the legal support I provided on Brown's LSB, I also participated in the discussions with NASA counsel and air quality experts over the analysis of the cumulative

---

[3] Because Federal funding was a small percentage of overall funding, project planning was well underway before the appropriations bill was passed, and there was every indication that the project would proceed, unmodified, if Federal funding were not forthcoming. Similarly, because Federal funding was a small percentage, there was a question whether the Federal agencies' involvement was significant enough to "federalize" the project, a prerequisite for NEPA to apply. However, research into case law on the National Historic Preservation Act section 106 process revealed the absence of any "*de minimis*" level for a "federal undertaking," and therefore the Agencies' proposed partial funding of the LSB triggered NHPA requirements. After due deliberation, the Agencies concluded that NHPA requirements and the public controversy made proceeding with an EA process a prudent approach. However, that did not change the Agencies' determination that the Federal funding was such a small percentage of the overall funding that "no action" did not put the project at risk. On that basis, it was reasonable to conclude that there would be no difference in the environmental impacts of the proposed action and the no action alternative, as both would result in the construction and operation of the LSB. Had there been an indication, as has been the case in other construction grant projects, that the facility scale or design or operation would have been modified commensurate with a reduction in Federal funding, a difference in environmental impacts might have been discernable.

toxic air emissions from the LSB and Brown's campus. In this regard, I reviewed the Rhode Island Department of Environmental Management's (RIDEM) Toxic Air Regulations

11. DOE and NASA actively explored the air emissions issue up until issuance of the Final EA and FONSI. DOE regulations require that a host state be given an opportunity (14-30 days) to review and comment on any EA prior to DOE's approval of the EA. (10 CFR 1021.301(d)) The Agencies delayed the final determination on the EA until after RIDEM comments were received. RIDEM comments did not dispute the Agencies' proposed determination of no significant impacts, and confirmed that toxic air emissions would be mitigated to below prescribed ambient air levels through RIDEM permit terms and conditions, oversight, and enforcement. Should new information regarding emissions affect this determination, RIDEM could preclude operation of the LSB and/or any emissions sources at Brown.

12. Throughout the NEPA process, I was careful to point out in discussions with DOE officials the need to remind Brown University officials and their contractor that the issuance of a FONSI was not a foregone conclusion, but would depend upon the findings of the EA.

13. After review and consideration of the pertinent documents,[4] I concurred in the determination that toxic air emissions were not a potentially significant environmental concern. This conclusion was based on (1) extensive past experience with impact analyses of similar facilities whose future operational emissions were equally speculative; (2) the role that RIDEM played in the ongoing enforcement of air quality standards; (3) the more stringent standards about to be promulgated by RIDEM; and (4) the opportunity for state regulators, especially RIDEM, to review and provide comment on the EA, as part of the DOE EA process. 10 CFR 1021.301(d).

14. Ultimately, I concurred in the issuance of a FONSI, because the construction and operation of the LSB did not have the potential for significant impacts on the human environment.

15. I was the designated lead DOE employee for the compilation of the Administrative Record (AR) for the final EA.

16. I have reviewed the Appendix to Plaintiffs' Motion to Supplement the Administrative Record (the Appendix) in the above case, and am thoroughly familiar with those documents. They were not included in the AR, for the reasons identified in the Chart, attached as Exhibit C, to the memorandum in support of the Federal defendants' objection to plaintiffs' second motion to supplement the record.

---

[4]/ The pertinent documents considered by DOE are contained in the administrative record (AR).

17. In compiling an AR, intra-agency or inter-agency staff memoranda, such as routine administrative communications, including emails scheduling meetings, arranging teleconferences, forwarding of other emails, or coordinating actions; or documents containing deliberative communications, such as documents reflecting the editing process, are typically excluded. However, a selected few such communications were included in the AR compiled for this litigation over the Brown LSB for the purpose of documenting the extensive dialogue and information collection conducted by the Agencies, including the extensive involvement the Agencies had in planning an integrated NEPA process and evaluating the potential for environmental impacts. Exhibit C.

18. The Agency Decisionmaker was not aware of, and therefore could not have considered, any of the documents in the Appendix in deciding to prepare an EA and to issue a FONSI. Exhibit C.

19. DOE did consider the information contained, or issues raised, in some of the documents in the Appendix. That information and those issues, including the vast majority of the issues and information on environmental impacts, already appear in documents contained in the AR. Exhibit C.

20. Nothing contained in the documents in the Appendix materially changes the information that was available to DOE, and therefore, none of the documents offered by plaintiffs to supplement the AR would have changed the decision to prepare an EA or to issue a FONSI. Exhibit C.

21. Documents that were received, created or located subsequent to the issuance of the FONSI were not available to DOE and could not have been included in the AR. Exhibit C.

22. On information, NASA requested NIH's participation in the NEPA process, but NIH declined the invitation. Neither DOE, nor NASA, could compel the National Institute for Health (NIH) to participate in the NEPA process. Therefore, it would be improper to include documents relating to NIH funding of the LSB in the AR in this case. Exhibit C.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this Nineteenth day of December 2005.

Vicki L. Prouty

VICKI L. PROUTY
ASSISTANT CHIEF COUNSEL
UNITED STATES DEPARTMENT OF ENERGY

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| WILLIAM G. TOURET, et al., Plaintiffs | : | |
| | : | |
| v. | : | C.A. No. 04-198T |
| | : | |
| NASA, et al., Defendants | : | |

**DECLARATION OF LIZABETH R. MONTGOMERY**

I, Lizabeth R. Montgomery, declare and make the following declaration under penalty of perjury:

1. I am presently employed by the National Aeronautics and Space Administration's (NASA) Goddard Space Flight Center (GSFC) as an engineer.

2. For approximately 9 years I have provided support to NASA/GSFC in satisfying the requirements of the National Environmental Policy Act (NEPA), and other federal environmental protection requirements.

3. I participate in determinations of the appropriate level of NEPA review, and in the preparation, review, and approval of environmental assessments (EAs) and other NEPA documents.

4. In 2002 and 2003, I provided technical support to NASA in conjunction with the NEPA process for the Brown University (Brown) Life Sciences Building (LSB) construction grant. Specifically, I participated in NASA's determination to prepare an EA; to coordinate with the Department of Energy (DOE) and to integrate NASA's and DOE's NEPA processes; to issue the draft EA/FONSI for public comment; and in the determination that the construction and operation of the LSB would not have the potential for significant impacts on the human environment.

5. In connection with the technical support I provided on Brown's LSB, I reviewed draft and final documents associated with the NEPA and NHPA compliance processes, including the Memorandum of Agreement (MOA) with the State Historic Preservation Officer (SHPO); the EA; and FONSI. I also provided support in the preparation of the MOA and EA. This included discussions among NASA, DOE, Brown and state regulators over potential impacts and the EA.

6. I also participated in the discussions between DOE and NASA over the applicability of NEPA to "pass through" funding to Brown for the LSB; about the integration of DOE's and NASA's NEPA processes; about the characterization of the proposed action and the "no action alternative"; and about the selection criteria for, and reasonable alternatives to, the preferred site and the proposed action.

7. I also participated in the discussions with DOE personnel, including counsel and air quality experts over the analysis of the cumulative toxic air emissions from the LSB and Brown's campus.

8. DOE and NASA actively explored the air emissions issue up until the Final EA and FONSI, extending the comment period to allow the RIDEM air emissions officials and others sufficient time to comment. It was NASA's intent not to proceed with presenting the final EA to the deciding official until RIDEM had provided us with comments. None of the data or other information received made it foreseeable that a significant impact would occur, or that if it did occur, that it could not be mitigated to below significance through RIDEM permit terms and conditions, oversight, and enforcement. RIDEM could have precluded operation or could shut down the laboratory. Thus, the door was held open to the possibility that new information regarding emissions would come in and change the outcome of the NEPA process.

9. Throughout the NEPA process, I, together with other involved NASA officials, was careful to repeatedly point out in discussions with Brown University officials and their contractor that the issuance of a FONSI was not a foregone conclusion, but would depend upon the findings of the EA.

10. NASA concurred with the DOE conclusion that toxic air emissions were not a potentially significant environmental concern. This conclusion was based on (1) extensive past experience with impact analyses of similar facilities whose future operational emissions were equally speculative; (2) the role that RIDEM played in the ongoing enforcement of air quality standards; (3) the more stringent standards about to be promulgated by RIDEM; and (4) the opportunity for state regulators, especially RIDEM, to review and provide comment on the EA, as part of the DOE EA process. 10 CFR 1021.301(d).

11. Ultimately, I recommended the preparation of an EA and issuance of a FONSI, because the construction and operation of the LSB did not have the potential for significant impacts on the human environment. I am familiar with the documents that were available to and relied upon by the NASA decisionmaker when he considered the EA.

12. I was the designated lead NASA employee for the compilation of the Administrative Record (AR) for the final EA.

13. I have reviewed the Appendix to Plaintiffs' Motion to Supplement the Administrative Record (the Appendix) in the above case, and am thoroughly familiar with those documents.

14. In compiling an AR, intra-agency or inter-agency staff memoranda, such as routine administrative communications, including emails scheduling meetings, arranging teleconferences, forwarding of other emails, or coordinating actions; or documents containing deliberative communications, such as documents reflecting the editing process, are typically excluded. Such "routine exclusions," were not included in the AR in this case either. Exhibit C.

15. Neither I, nor the Agency Decisionmaker considered any of the documents in the Appendix in deciding to prepare an EA and to issue a FONSI. Exhibit C.

16. NASA did consider the information contained, or issues raised, in some of the documents in the Appendix. That information and those issues, including the vast majority of the

issues and information on environmental impacts, already appear in documents contained in the AR. Exhibit C.

17. Certain documents contained in the AR were included to document some of the extensive dialogue and information collection conducted by the Agencies.

18. Nothing contained in the documents in the Appendix materially changes the information that was available to NASA, and therefore, none of the documents offered by plaintiffs to supplement the AR would have changed the decision to prepare an EA or to issue a FONSI. Exhibit C.

19. Documents that were received, created or located subsequent to the issuance of the FONSI were not available to NASA and could not have been included in the AR. Exhibit C.

20. NASA requested NIH's participation in the NEPA process, but NIH declined the invitation. Neither DOE, nor NASA, could compel the National Institute for Health (NIH) to participate in the NEPA process. Therefore, it would have been improper to include documents relating to NIH funding of the LSB in the AR in this case. Exhibit C.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this the 19th day of December 2005.

LIZABETH R. MONTGOMERY
ENGINEER
NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

| TAB # | DOCUMENT DESCRIPTION | A. Outside of Court's Criteria | B. No Change in Outcome | C. Issues Duplicative | D. Document Not Considered | E. Moot | F. No Authority | G. Imputation | H. Routinely Excluded | I. Not Available | J. Self-Serving | K. Sand Bagging | L. No Data Cited |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Huppert e-mail to Swartz re: Air Emissions | X | X | AR 0747-51; 0783-84 | X | X | | X | | X | | | |
| 2 | Touret Email to Quinn re: Air Emissions | X | X | | X | X | | X | | X | | X | X |
| 3 | Huppert Email to Quinn re Air emissions | X | X | | X | X | | X | | X | | | |
| 4 | Huppert email to Montgomery and Siebach re Air Emissions | X | X | | X | X | | | X | X | | | |
| 5 | Acentech Report | X | X | AR 0738-9; 0784-5 | X | | | | | X | | | |
| 6 | Acentech Report | X | X | | X | | | | | X | | | |
| 7 | Dietel email to Quinn | X | X | | X | | | X | | | | | |
| 8 | Schwarz email to Quinn | X | X | | X | | | X | X | | | | |
| 9 | Schwarz email to Dietel | X | X | | X | | | X | X | | | | X |
| 10 | Documents relating to NIH grant application | X | X | | X | | X | | X | X | | X | X |
| 11 | | X | X | | X | | X | | X | X | | X | |
| 12 | | X | X | | X | | X | | X | X | | X | X |
| 13 | | X | X | | X | | X | | X | X | | X | X |
| 14 | | X | X | | X | | X | X | X | X | | X | X |

| TAB # | DOCUMENT DESCRIPTION | A. Outside of Court's Criteria | B. No Change in Outcome | C. Issues Duplicative | D. Document Not Considered | E. Moot | F. No Authority | G. Imputation | H. Routinely Excluded | I. Not Available | J. Self-Serving | K. Sand Bagging | L. No Data Cited |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15 | Brown ltr to SHPO | X | X | | X | X | X | | | X | | | X |
| 16 | Internal correspondence Among NASA Officials re: NASA role in approval process, Historical preservation and NIH role | X | X | | X | X | | | X | | | | X |
| 17 | | X | X | | X | X | | | X | | | | X |
| 18 | | X | X | | X | X | | | X | | | | X |
| 19 | | X | X | | X | X | | | X | | | | X |
| 20 | | X | X | | X | X | | | X | | | | X |
| 21 | | X | X | | X | X | | | X | | | | X |
| 22 | | X | X | | X | X | | | X | | | | X |
| 23 | Touret notes | X | X | | X | X | X | | X | X | X | X | X |
| 24 | Email correspondence between NASA and DoE Officials re NHPA 106 Review | X | X | AR 0645 | X | X | | | X | | | | X |
| 25 | | X | X | | X | X | | | X | | | | X |
| 26 | | X | X | | X | X | | | X | | | | X |
| 27 | | X | X | | X | X | | | X | | | | X |
| 28 | | X | X | | X | | | | X | | | | X |
| 29 | 10/01/02 Brown Daily Herald Article | X | X | | X | | | X | | X | | | X |
| 30 | Draft EA | X | X | AR Tabs 82, 87, 97, 108, 113 | X | X | | | X | X | | | |

| TAB # | DOCUMENT DESCRIPTION | A. Outside of Court's Criteria | B. No Change in Outcome | C. Issues Duplicative | D. Document Not Considered | E. Moot | F. No Authority | G. Imputation | H. Routinely Excluded | I. Not Available | J. Self-Serving | K. Sand Bagging | L. No Data Cited |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 31 | Clarke email to Montgomery | X | X | AR Tab 115 | X | | | | X | | | | X |
| 32 | Quinn email to Montgomery | X | X | | X | | | | X | | | | X |
| 33 | Emails between Brown officials regarding schedule for conclusion of the EA | X | X | | X | | | X | X | | | | X |
| 34 | | X | X | | X | | | X | X | | | | X |
| 35 | Documents related to the decision to Contract with Battelle and the resultant purchase order | X | X | | X | | | X | | | | | X |
| 36 | | X | X | | X | | | X | | | | | X |
| 37 | | X | X | | X | | | X | | | | | X |
| 38 | | X | X | | X | | | X | | | | | X |
| 39 | | X | X | | X | | | X | | | | | X |
| 40 | | X | X | | X | | | X | | | | | X |
| 41 | 5/12/03 Meeting Agenda | X | X | | X | | | | X | | | | X |
| 42 | "Brown" notes on Agency comments on preliminary draft EA at 5/12/03 comment resolution workshop | X | X | AR 0452 -54; 0456 -62 | X | X | | | X | X | | | |

| TAB # | DOCUMENT DESCRIPTION | A. Outside of Court's Criteria | B. No Change in Outcome | C. Issues Duplicative | D. Document Not Considered | E. Moot | F. No Authority | G. Imputation | H. Routinely Excluded | I. Not Available | J. Self-Serving | K. Sand Bagging | L. No Data Cited |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 43 | Note: Document 43 is in the AR at 0614-0615.<br><br>Series of e-mails for the purpose of reaching agreement on proper characterization of site selection criteria (to assure they are clear, credible, accurate, compelling, justified, etc.), proper characterization of proposed action and no-action alternatives, and integration of the two Agencies' NEPA process requirements. | X | X | AR 0614 -15 0643 | X | X | | | X | | | | X |
| 44 | | X | X | | X | X | | | X | | | | X |
| 45 | | X | X | | X | X | | | X | | | | |
| 46 | | X | X | AR 0645 | X | X | | X | X | X | | | X |
| 47 | | X | X | AR 0614 -15, 0643 | X | X | | X | X | X | | | X |
| 48 | | X | X | | X | X | | | X | | | | X |
| 49 | | X | X | | X | X | | X | X | X | | | X |
| 50 | | X | X | AR 0518 0520 0521 0651 | X | X | | | X | | | | X |
| 51 | | X | X | AR 0458 0638 0640 | X | X | | | X | | | | X |
| 52 | e-mail 05/27/03 with draft EA and FONSI | X | X | | X | X | | X | X | X | | | X |

| TAB # | DOCUMENT DESCRIPTION | A. Outside of Court's Criteria | B. No Change in Outcome | C. Issues Duplicative | D. Document Not Considered | E. Moot | F. No Authority | G. Imputation | H. Routinely Excluded | I. Not Available | J. Self-Serving | K. Sand Bagging | L. No Data Cited |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 53 Process | Notice of 10/16/01 public meeting and Touret's notes thereon | X | X | AR 0273 -75 | X | | | X | X | X | | X | X |
| 54 | Press account of meeting 10/16/01 | X | X | | X | | | X | | | | X | X |
| 55 | Sanderson Notes in public meeting 11/28/01 | X | X | AR 0064 -67, 0656, 0669 -70 | X | | | X | | X | | | X |
| 56 | Greenwood notes on public meeting 11/28/01, noise concerns | X | X | | X | | | X | | X | | | X |
| 57 | Touret's notes of public meeting 11/28/01 | X | X | | X | | | X | | X | | X | X |
| 58 | Fleming letter to Brown, re: 10/16/04 meeting | X | X | | X | | | X | | X | | X | X |
| 59 | Fax cover to Quinn, w/attached letter Sanderson to Quinn, with list of inter'd parties from 11/28/01 public meeting. Failure to use to share reports. | X | X | AR 0603 -09 | X | X | | X | | | | | X |

| TAB # | DOCUMENT DESCRIPTION | A. Outside of Court's Criteria | B. No Change in Outcome | C. Issues Duplicative | D. Document Not Considered | E. Moot | F. No Authority | G. Imputation | H. Routinely Excluded | I. Not Available | J. Self-Serving | K. Sand Bagging | L. No Data Cited |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60 | Submission to SHPO March 2002. Alleges this report went to SHPO, not the 2/2002 rev that is in the AR. Latter has the RIDEM permit app and the RWDI report, and structural drawings for LSB, (not rel. to Hist Pres.) [Note – Feb rev is reflected in the EA, and issue is process and bad faith – moot.) NHPA process was concluded to the satisfaction of the SHPO. | X | X | AR 0084 - 0230 (Air = 0123-0171) 0072-0076 | X | X | | X | | | | | X |
| 61 | Touret letter to Quinn requesting information (~Touret email to Hooker) | X | X | AR 0281 - 84 | X | X | | X | | | | X | X |
| 62 | Touret Notes of meeting 7/31/02 | X | X | | X | X | | X | | | | X | X |
| 63 | Touret "Information Items" provided to Brown at meeting 7/31/02 | X | X | | X | | | X | | | | X | X |
| 64 | e-mail showing Brown did not provide Touret with requested information | X | X | | X | X | | X | X | | | | X |
| 65 | Touret Notes 10/9/02 | X | X | | X | X | | X | X | | | X | X |

| TAB # | DOCUMENT DESCRIPTION | A. Outside of Court's Criteria | B. No Change in Outcome | C. Issues Duplicative | D. Document Not Considered | E. Moot | F. No Authority | G. Imputation | H. Routinely Excluded | I. Not Available | J. Self-Serving | K. Sand Bagging | L. No Data Cited |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 66 | Internal Brown e-mail with notes of public meeting 10/9/02 | X | X | | X | | | X | X | | | | X |
| 67 | Harsch request to SHPO to be on mailing list for MOA? | X | X | AR 0084-0230 | X | X | X | | X | | | X | X |
| 68 | Fax including p. 23 of Tab 60. | X | X | X | X | X | | X | | | | | X |
| 69 | Quinn to NASA, with info on public processes. | X | X | AR 0695-0698 | X | X | | X | | | | | X |
| 70 | SHPO list of 4 doc rec'd, = not Feb 2002 draft | X | X | | X | X | | X | | X | | | X |
| 71 | Touret Notes of meeting 5/14/03 – comments Brown did not share with Agencies | X | X | | X | X | | | X | X | X | X | |
| 72 | Touret's "Outstanding Issues" provided to SHPO justifying need for extended comment period and EIS | X | X | AR 0896-0922 | X | X | | | | X | | X | X |
| 73 | 6/27/03 Meeting Attendance List and SHPO notes | X | X | X | X | X | | | | X | | | X |
| 74 Add'l Impacts | Brown Internet – Biosafety Level 3 res. in Biomed now | X | X | AR 0078 -0079 | X | | X | X | | | | | |
| 75 | Brown Internet – Aids Containment res. | X | X | | X | | X | X | | | | | |

| TAB # | DOCUMENT DESCRIPTION | A. Outside of Court's Criteria | B. No Change in Outcome | C. Issues Duplicative | D. Document Not Considered | E. Moot | F. No Authority | G. Imputation | H. Routinely Excluded | I. Not Available | J. Self-Serving | K. Sand Bagging | L. No Data Cited |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 76 | Press article on Military research $11.6M | X | X | AR 0270 | X | | X | X | | X | | | |
| 77 | Brown Press Release 10/11/03 re $13.4 addl research funding | X | X | AR 0927 -30 | X | | X | X | | X | | | |
| 78 | Apr. 6 2005 Article – new bldgs to be sited away from Hill | X | X | | X | | X | X | | X | | | |
| 79 | Touret Notes of Public Meeting 6/7/05 – re 78 above. | X | X | | X | | X | X | | X | X | X | |
| 80 | Greenwood Deposition pp. Re: no extended submiss. (see Tabs 60, 67-68, 70) | X | X | X | X | | X | X | | X | | | X |
| 81 | Morin (RIDEM) Dep. – increased use of Path Waste Incinerator from LSB not evaluated by RIDEM. | X | X | X | X | | | X | | X | | | |
| 82 | Brown Press Release, 10/6/05 NIH grant. – failure to evaluate NIH activities. | X | X | AR 0078 - 0079; 0732; 0748- 0749; 0927 -30 | X | | X | X | | X | | | X |

Date: Sat, 05 Jul 2003 08:31:30 -0400
From: "Swartz, Lucy L" <SwartzL@BATTELLE.ORG>
Subject: One more thing
To: "'marisa_quinn@brown.edu'" <marisa_quinn@brown.edu>,
"'peter.siebach@ch.doe.gov'" <peter.siebach@ch.doe.gov>,
"'Lizabeth.R.Montgomery@nasa.gov'" <Lizabeth.R.Montgomery@nasa.gov>
X-Mailer: Internet Mail Service (5.5.2655.55)

Hi again:

Remember that I said I was going to include a table that Henry Huppert had sent me that shows the emissions for each compound for 2001? After talking with Henry, we decided that was a bad idea. It suggests a level of precision that isn't there. What Henry does (and he can explain it better) is that every year he takes an inventory of the stuff in the labs – he knows what came in and he knows what's left, and he assumes everything else went out the stack. But that's not necessarily true. It could still be in beakers, for example. Since the numbers are all an estimate, it seemed better not to use them.

It's amazing the things I remember in the middle of the night!

Lucy

Lucinda Low Swartz
Battelle Memorial Institute
Telephone: 301/933-4668
Facsimile: 301/933-6796
Email: SwartzL@battelle.org

5545A

X-Sender: aclarke@mail.hq.nasa.gov
X-Mailer: QUALCOMM Windows Eudora Version 4.3.2
Date: Mon, 07 Jul 2003 13:46:23 -0400
To: peter.siebach@ch.doe.gov
From: Ann H Clarke <ann.h.clarke@nasa.gov>
Subject: Fwd: Brown University EA
Cc: lizabeth.r.montgomery@nasa.gov, swartl@battelle.org,
marisa_quinn@brown.edu, Thalley@battelle.org

In thinking about the comment regarding the incidence of cancer, I have a suggested reply response:

Operation of the proposed Life Sciences Building will be in complance with all applicable environmental permit requirements and be subject to oversight and enforcement by the various Federal, State, and local environmental and public health agencies.

If this is acceptable to all, please forward a go-ahead to Desiree at Battelle.

> X-Sender: Marisa_Quinn@postoffice.brown.edu
> Date: Mon, 7 Jul 2003 13:24:58 -0400
> To: peter.siebach@ch.doe.gov, Lizabeth.R.Montgomery@nasa.gov,
> ann.hooker@hq.nasa.gov
> From: Marisa Quinn <Marisa_Quinn@Brown.edu>
> Subject: Fwd: Brown University EA
> Cc: swartzl@battelle.org
> X-Brown-MailScanner: Found to be clean
>
> Per our conversation and Lucy's email below, is the plan still to take the final draft EA that her technical writer is preparing and put it through the channels along with the draft FONSI and draft MOA so that we are able to expedite the final signatures.
>
> Will the signatures be done concurrently? In other words, will the EA, FONSI and MOA have several signature sheets so that signatures can be obtained from DOE, NASA, Brown and SHPO concurrently rather than consecutively?
>
> Finally--for planning purposes, assuming that the DEM comments are fine--is August 1 a reasonable date to assume we will have all documents signed? (I'm sorry to be annoying on this, but we have a schedule of work that will be impacted and the Facilities folks need to modify the schedule to reflect current plans.)
>
> Thanks-
>
> MAQ
>
>> Date: Fri, 04 Jul 2003 10:32:24 -0400
>> From: "Swartz, Lucy L" <SwartzL@BATTELLE.ORG>
>> Subject: Brown University EA
>> To: marisa_quinn@brown.edu, peter.siebach@ch.doe.gov,
>> "'Lizabeth.R.Montgomery@nasa.gov'" <Lizabeth.R.Montgomery@nasa.gov>
>> Cc: "Thalley, Desiree B" <thalley@BATTELLE.ORG>

5533

X-Server-Uuid: 9C64197D-5965-11D7-BB5A-00508BE0E046
From: "Siebach, Peter" <Peter.Siebach@ch.doe.gov>
To: "Hickey, Clarence'" <Clarence.Hickey@science.doe.gov>,
"lizabeth Montgomery (lizabeth.r.montgomery.1@gsfc.nasa.gov)"
<lizabeth.r.montgomery.1@gsfc.nasa.gov>,
"Lucy Swartz (swartzl@battelle.org)" <swartzl@battelle.org>,
"Marisa Quinn" <Marisa_Quinn@Brown.edu>
cc: "Brewington, Patrice" <Patrice.Brewington@ch.doe.gov>,
"Prouty, Vicki" <Vicki.Prouty@ch.doe.gov>
Subject: Conference call re: Brown LSB
Date: Tue, 22 Jul 2003 08:58:18 -0500
X-Mailer: Internet Mail Service (5.5.2656.59)
X-WSS-ID: 13039C90120253-01-01

Brown U. LSB Team

I have set up a conference call for today at 3:3:0 edt and 2:30 cdt for 1.5 hours. We have 7 lines to facilitate selective others who you may want to invite to participate. Our goal will be to talk about the draft final EA and bring each other up to date on our EA related activities.

The issues I have identified which I hope we can come to closure on are:

1) Cumulative impacts, NIH related concerns/need for involvement
2) MOA
3) Dept. of Health and DEM
4) Comment responses - specifically Tourett comments
5) Timeframe for final document edits
   a. Editorial
   b. Comment/issue related
6) Decision to move forward to concurrence and timeframe
7) Other issues

If I have missed any topic here, just identify it at the beginning of the call.

Thanks

Peter

Date: Tue, 01 Jul 2003 13:17:22 -0400
From: "Swartz, Lucy L" <SwartzL@BATTELLE.ORG>
Subject: RE: Comments on the EA
To: "'Siebach, Peter'" <Peter.Siebach@ch.doe.gov>,
"'Marisa Quinn'" <Marisa_Quinn@Brown.edu>, Lizabeth.R.Montgomery@nasa.gov
X-Mailer: Internet Mail Service (5.5.2655.55)

Okay, how about 9:00am Eastern/8:00am Mountain on Thursday? Alternatively, my Wednesday is now free – we could do tomorrow afternoon. Please let me know your preferences.

I have 8 comments so far, but I saw something that made me think people think they have until tomorrow to comment. So far, the comments fit easily into 5 categories: air emissions, noise, use of the building, length of the comment period, and need for an EIS. Interestingly, not a word on the historic resources!

Lucy

Lucinda Low Swartz
Battelle Memorial Institute
Telephone: 301/933-4668
Facsimile: 301/933-6796
Email: SwartzL@battelle.org

-----Original Message-----
**From:** Siebach, Peter [mailto:Peter.Siebach@ch.doe.gov]
**Sent:** Monday, June 30, 2003 7:10 PM
**To:** 'Marisa Quinn'; Swartz, Lucy L
**Cc:** Siebach, Peter; Lizabeth.R.Montgomery@nasa.gov
**Subject:** RE: Comments on the EA

Thursday morning is good. Thursday afternoon all bets are off!

-----Original Message-----
**From:** Marisa Quinn [mailto:Marisa_Quinn@Brown.edu]
**Sent:** Monday, June 30, 2003 4:36 PM
**To:** Swartz, Lucy L
**Cc:** Peter.Siebach@ch.doe.gov; Lizabeth.R.Montgomery@nasa.gov
**Subject:** RE: Comments on the EA

Sounds good to me. I'm home Thursday, but can call in from there.....Marisa

My comfort level is fine. I think me drafting responses and then a call to go over them is the best idea. How about Thursday morning? I may have to be out of the office on Wednesday, so I'm trying to keep that day free.

Lucy

Lucinda Low Swartz
Battelle Memorial Institute
Telephone: 301/933-4668
Facsimile: 301/933-6796
Email: SwartzL@battelle.org

-----Original Message-----
**From:** Siebach, Peter [mailto:Peter.Siebach@ch.doe.gov]

Date: Wed, 02 Jul 2003 15:11:44 -0400
From: "Swartz, Lucy L" <SwartzL@BATTELLE.ORG>
Subject: Version 3
To: "'marisa_quinn@brown.edu'" <marisa_quinn@brown.edu>,
"'peter.siebach@ch.doe.gov'" <peter.siebach@ch.doe.gov>,
"'Lizabeth R. Montgomery'" <Lizabeth.R.Montgomery@nasa.gov>
X-Mailer: Internet Mail Service (5.5.2655.55)

This set takes into account the last three that just came in. I've added the category of historic resources (finally – one comment). We're up to [illegible] commenters.

Lucy

Lucinda Low Swartz
Battelle Memorial Institute
Telephone: 301/933-4668
Facsimile: 301/933-6796
Email: SwartzL@battelle.org

Commenter Table2.doc

Changes to Draft EA (for Final EA)(2)2.doc