**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| WILLIAM G. TOURET, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, et al.,<br><br>Defendants. | ) | CIVIL ACTION NO. 04-198T |

PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

For the reasons discussed below, defendants NASA, DOE, and Brown have failed to counter plaintiffs' showing that the documents at issue, both individually and collectively, meet the applicable exceptions to the "record rule."

A. Documents Relating Principally to Air Emission Impacts (Tabs 1-4)

Defendants largely avoid the reasons plaintiffs offered to show that the documents contained at Tabs 1-4 are "adverse" to those included in the Administrative Record and represent a strong showing of improper conduct. Tabs 1 and 3 demonstrate that the Final EA significantly mischaracterized and understated the seriousness of the hazardous air emissions that the Life Sciences Building was anticipated to discharge. The Final EA asserted, wrongly, that the amount of annual discharge of hazardous air emissions from the Life Sciences Building would be so low that they would not require applications for one or more RIDEM air toxics permits (AR

113 [0749]). Defendants' attorneys emphasized this same (erroneous) point at the Court hearing on November 17, 2004 (tr. at 27-29, 42). [1]

---

[1] With their brief in opposition, NASA and DOE have included a lengthy table of objections. Category A of that table appears to represent a general objection that none of the documents at issue on this motion meet the exceptions to the "record rule." Category B similarly alleges generally that none of the documents that plaintiffs seek to add to the record would change the outcome of this NEPA review, a contention that we address in the main text below. Category C alleges that some of the information in these documents is addressed within the Administrative Record, but NASA and DOE do not address the reasons why we offer the documents. That argument is otherwise meritless, because plaintiffs' documents at issue here fill material gaps in the Administrative Record for the reasons described in our main brief and here. Category D alleges that NASA and DOE did not directly consider the documents at issue here, apparently based on the conclusory declarations of DOE's Vicki Prouty and NASA's Lizabeth Montgomery. Aside from the fact that NASA and DOE in fact directly considered many of the documents at issue here, it is not necessary that NASA and/or DOE directly consider a document for it to be added to the Administrative Record (see Plaintiffs' Main Brief at 4). Category E alleges that some documents offered by plaintiffs address issues that are moot. That allegation is without merit, because is mischaracterizes the purposes for which plaintiffs offer those documents. Category F alleges that certain of the documents offered by plaintiffs address issues outside of the authority of NASA and DOE. We address that objection in the main text below. Category G alleges that certain documents cannot be imputed to NASA and DOE. We address that objection in the main text below. Category H contends that certain of the documents at issue here are of a routine type supposedly typically excluded from Administrative Records. NASA and DOE fail to offer support for this dubious proposition and offer no support for their implicit proposition that *adverse* documents and documents that reflect *improper conduct* by agency personnel -- even if they might otherwise be somehow characterized as routine in nature -- should not be included within an Administrative Record. Furthermore, the Administrative Record would appear already to include routine documents having little or no probative value (e.g., AR 66-67 [0337-0339]). Category I alleges that certain documents were not available directly to NASA and DOE. That objection appears to be largely duplicative of the objection at Category D, above. Category J alleges that certain of plaintiffs' documents are "self-serving." We address that objection in the main text below. Category K alleges that documents should be excluded from the Administrative Record because they represent what NASA and DOE describe as "sandbagging." We address thats objection in the main text below. Category L alleges that documents that address only agency bad faith and/or improper conduct, but do not provide any other evidence of factual or policy information concerning the agency action at issue, should not be included in the Administrative Record (NASA/DOE brief at page 5). That objection is not supported by the case upon which NASA and DOE purport to rely, Town of Norfolk v. U.S. Army Corps of Engineers, 968 F.2d 1438, 1456 (1st Cir. 1992). NASA's and DOE's suggestion that the document at Tab 30 might be subject to the deliberative process privilege (NASA/DOE Brief at 11) is also meritless, because NASA and DOE do not address the purpose for which plaintiffs offer the document. Moreover, evidence of improper agency conduct precludes application of the privilege. See, e.g., Tri-State Hospital Supply Corp. v. U.S., 226 F.R.D. 118,

Tabs 1 and 3 reveal and explain why the Final EA's assertion was wrong. The itemized table of information shown in Tab 1 (page B1736) represented the total amount of hazardous air emissions from *all* of Brown's laboratories for year 2001. That 5,320 pound total was included in the Final EA (AR 113 [0749, 0749 fn. 3]) in conclusory form, *without the itemization set forth in Tab 1* (at page B1736) -- a point that defendants do not dispute -- and which establishes the Final EA's reliance on that information. The Final EA went on to base its estimate of the annual amount of hazardous air emissions that the Life Sciences Building would discharge as being approximately equal to the amount discharged in 2001 from the adjacent and physically-connected Biomedical Complex -- that is, one fourth of that 5,320-pound university-wide annual total amount of hazardous air emissions -- or roughly 1,330 pounds (AR 113 [0749, 0749, fn. 3]; Tabs 1, 3).

From these simple calculations, it is clear that -- in the case of the hazardous air toxic chloroform, for example -- the Life Sciences Building was anticipated to discharge annually approximately one-fourth of Brown's university-wide annual total of 214 pounds, or approximately 53 pounds. But RIDEM requires an air toxics permit for annual discharge amounts of chloroform of only 20 pounds or more (Plaintiffs' Main Brief at 6, fn. 7). Thus, using the Final EA's reasoning (see AR 113 [0749]), which was taken from the documents at Tabs 1 and 3, the anticipated discharge amount for the Life Sciences Building alone for chloroform would be over two and one-half times the RIDEM air toxics permit application threshold amount.

Furthermore, because NEPA requires evaluation of *cumulative* effects (see pages 17-18 below), the discharge calculation must also include the identical annual estimated amount of

135 (D.D.C. 2005). Town of Norfolk v. U.S. Army Corps of Engineers, 968 F.2d at 1458 (NASA/DOE Brief at 11, fn. 8) is not to the contrary.

hazardous air emissions from the adjacent and physically-connected Brown Biomedical Complex. Adding the additional 53 pounds of chloroform discharged each year from the Biomedical Complex would yield an annual estimated total of 106 pounds for the Biomedical Complex and Life Sciences Building together, or more than *five times* the RIDEM air toxics permit application threshold amount.

Lastly, in year 2001, Brown's laboratories on College Hill discharged an additional approximate 161 pounds of chloroform (214 pounds for the university laboratories as a whole less the 53 pounds attributed to the Biomedical Complex) (Tabs 1, 3). Stated another way, with the addition of the Life Sciences Building's anticipated annual discharge amount of chloroform (53 pounds), the university-wide total for College Hill would rise from the year 2001 total of approximately 214 pounds to 267 pounds, which would be more than *thirteen times* the RIDEM air toxics permit threshold amount of 20 pounds per year. The Final EA does not include this larger total in any of its calculations. Moreover, the Administrative Record is void of any evidence that RIDEM ever evaluated the potentially significant impacts within the meaning of NEPA of that larger cumulative discharge amount upon the surrounding local residential community, or that it necessarily ever would.

With respect to the email message at Tab 2, defendants do not dispute that it is adverse because it shows that it was members of the *public*, during the comment period for the Draft EA, who caused the defendants to realize that they had made a very serious error in the Draft EA's calculation of the amount of the anticipated hazardous air emissions from the Life Sciences Building (Plaintiffs' Main Brief at 7-8). Defendants discovered the error in the Draft EA's

emissions calculation only because the public inquired about the high level of hazardous emissions described in the Draft EA.[2]

Without the documents at Tabs 2 and 3, the Administrative Record would suggest incorrectly that defendants found the error without the public's assistance (AR 102 [0614-0615]), and would obscure the fact that defendants failed to notice such a serious error -- overstating the amount of anticipated annual hazardous air emissions from the Life Sciences Building by a factor of four and not realizing the very significant potential environmental impact that such an additional quantity of hazardous air emissions would likely have on the surrounding human environment. The document at Tab 2 thus provides further proof that defendants' evaluation of the air emissions issues was anything but the "hard look" NEPA requires and was so deficient it properly could be described as recklessly superficial and predetermined as discussed below and in plaintiffs' main brief.

Additionally, none of the defendants responded to plaintiffs' point (Plaintiffs' Main Brief at 8) that the document at Tab 2 is adverse and supports plaintiffs' claims of improper conduct because it provides additional evidence of defendants' attempts to withhold from the public material facts about potentially significant environmental impacts.

As for the document shown at Tab 4, defendants do not deny that Brown's consultant Swartz knew that certain of the anticipated hazardous air emissions from the Life Sciences Building would exceed the RIDEM air toxics permit application threshold amounts. The document is plainly adverse on that basis alone. NASA and DOE received copies of Swartz's email message.

---

[2] If the Life Sciences Building itself were to discharge the entire 5,320 pounds of hazardous air emissions annually -- as the Draft EA's analysis erroneously assumed -- the Life Sciences Building's emissions of chloroform *alone* would amount to 214 pounds -- over *ten*

NASA and DOE argue that another email message by Swartz purportedly provides an innocent explanation for Swartz's exclusion of the itemized list of hazardous air emissions in the Final EA. In that email message dated July 5, 2003 (NASA/DOE Brief, Exh. D), Swartz advised Marisa Quinn of Brown and others at NASA and DOE that she had decided not to include an itemized list of the air emission amounts in the text of the Final EA because the amounts were estimates and were not exact. That argument is without merit.

First, the Final EA stated that the non-itemized total of 5,320 pounds of hazardous air emissions from all of the university's laboratories represented a conservative estimate, for the same reasons that Swartz stated in the email message upon which NASA's and DOE's argument relies (AR 113 [0749]). The Final EA also stated that the estimated emissions total did not change significantly from year to year (AR 113 [0749, fn. 3]). But since the Final EA nevertheless included the non-itemized total emissions amount (5,320 pounds) with such specificity (AR 113 [0749, 0749, fn. 3]), no valid reason existed not to include the underlying itemized breakdown -- unless defendants wanted to conceal the fact that certain of the individual hazardous chemical air emissions exceeded the RIDEM air toxics permit application thresholds. If in fact defendants had been truly concerned that the 5,320-pound estimate for 2001 was uncertain, then they would not have published the total annual discharge amount in such numerically precise terms. The only reason not to include the itemized breakdown would be due to its overwhelmingly adverse nature.

Second, if in fact defendants were as *uncertain* about the content and amounts of the anticipated hazardous air emissions from the Life Sciences Building as they now suggest, then NASA and DOE should have performed an EIS. Such uncertainty would also mean that the

---

*times* the RIDEM air toxics permit application threshold amount. That fact escaped the notice of preparers of the Draft EA.

actual annual hazardous air emissions amounts might be significantly *higher* than those shown in the itemized table in Tab 1 (page B1736), not necessarily lower. One of the factors that the NEPA Council on Environmental Quality ("CEQ") regulations require agencies to consider when evaluating the significance of an environmental impact is "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." 40 CFR § 1508.27(b)(5) (2003). If the discharge amounts were so uncertain, then the consequent risks to the public would be "highly uncertain" and would involve "unique [and] unknown risks" within the meaning of 40 CFR § 1508.27(b)(5). Or as DOE's Vicki Prouty stated on August 29, 2002 more concisely, that unless the agency shows that such environmental impacts are insignificant, an EIS is required (AR 76 [0383-0384]); see also Plaintiffs' Main Brief at 34).[3]

The fact that Swartz was aware that the Life Sciences Building's hazardous air emissions would require one or more RIDEM air toxics permit applications, when considered together with the email message at Tab 2 and the evasive and misleading response from Brown to the email message at Tab 2 (AR 102 [0614-0615]), provides further support for plaintiffs' claim that defendants improperly sought to conceal from the public the true significance of the air emission issues. Furthermore, in view of the other clear evidence of Swartz's willingness to conceal significant environmental impacts from the public (as the documents at Tabs 5-9 show, and are discussed below), the most reasonable inference is that Swartz chose not to include the itemized

3 Prouty made the comment in connection with the NHPA Section 106 review, but it applies equally to the environmental impacts at issue in this NEPA review. Here, NASA and DOE construed all doubts *against* performing an EIS, whereas NEPA requires that doubts be construed *in favor* of performing an EIS. See, e.g., Sierra Club v. Marsh, 769 F.2d 868, 875, 880-882 (1st Cir. 1985). The Final EA did not consider the factors at 40 CFR § 1508.27(b) (see Plaintiffs' Main Brief at 2, fn.1).

table of air emission amounts because she knew that disclosure of that information would increase the risk that defendants would be required to prepare an EIS.[4]

Brown argues that at the most, the July 2, 2003 email message from Swartz at Tab 4 reflects some "confusion" on the part of defendants as to whether the hazardous air emission discharges from the Life Sciences Building would rise to the level that would require an RIDEM air toxics permit application (Brown Brief at 7-8).[5] But that interpretation is unreasonable because it also fails to account for the other clear evidence of Swartz's improper conduct.

Brown suggests that the issue of whether the Life Science's Building's hazardous air emissions might require one or more applications for an RIDEM air toxics permit is not relevant.[6] But Brown omits to state that defendants have previously emphasized to this Court the

---

4 At pages 13-14 of their brief, NASA and DOE suggest that because the CEQ guidelines recommend that EAs be limited to 10-15 pages, it would have been improper for NASA and DOE to include the itemized table of hazardous air emissions shown in Tab 1 (page B1736) -- apparently because the information contained in the table would require too much space. The information contained in the table at Tab 1 (page B1736) plainly could have fit within the Final EA's discussion of hazardous air emissions without difficulty and should also have been included in the Administrative Record. But more importantly, NASA and DOE ignore the fact that the excessive length of the Final EA itself is another factor that militates in favor of an EIS here. See Sierra Club v. Marsh, 769 F.2d at 874 (quoting CEQ, *Forty Most Asked Questions [Question and Answer 36a]*, 46 Fed.Reg. at 18037).

5 In its brief at page 7, Brown asserts that "Plaintiffs do not appear to argue that the administrative record contains false or misleading information regarding the nature and extent of existing and anticipated air toxics emissions from the Project." To the contrary, to the extent that the Administrative Record failed to include the itemized information set forth at Tab 1 (page B1736), it was in fact false and misleading for the reasons we have described. We also describe here and in our main brief other aspects of the information in the Draft EA, Final EA, and Administrative Record that were false, misleading, and incomplete as far as the hazardous air emissions and other issues are concerned. We also note that the three declarations by plaintiffs' experts, which have been furnished to defendants previously and are not among the documents at issue on this motion, further describe in detail other deficiencies in the Final EA's treatment of the hazardous air emissions issues and related information contained in the Administrative Record.

6 Defendants' attempts to rely on RIDEM's failure to object to the Draft EA (NASA/DOE Brief at 7-9, Brown Brief at 7-8) are misplaced for at least two reasons. First, defendants overlook the fact that NASA and DOE never provided RIDEM with accurate, itemized discharge amounts for the hazardous air emissions that the Life Sciences Building would emit. Second, it

importance of the Final EA's assertion that the Life Sciences Building would not require applications for one or more RIDEM air toxics permits (transcript of November 17, 2004 hearing at 27, 42-43). Also overlooked by Brown is the fact that if the Final EA had acknowledged that the anticipated hazardous air emissions from the Life Sciences Building and Biomedical Complex would, for example in the case of chloroform, be more than five times the RIDEM air toxics permit application threshold (see discussion above), NASA and DOE would have been very hard pressed to claim in the Final EA that those air emission discharges would *not* represent a potentially significant environmental impact within the meaning of NEPA. The fact that the anticipated emissions from the Life Sciences Building would necessarily require one or more applications for air toxics permit applications, *by itself*, militates strongly in favor of a conclusion that the hazardous air emissions from the Life Sciences Building represented a potentially significant environmental impact within the meaning of NEPA and that NASA and DOE thus should have prepared an EIS on that basis alone.

Defendants also contend, relying on the Magistrate Judge's November 21, 2005 order concerning plaintiffs' motion to compel Brown to answer plaintiffs' requests for admissions, that

---

is not RIDEM's responsibility to determine whether an EIS should be required for a project such as the Life Sciences Building. RIDEM sets general rules that may or may not adequately protect a local environment, and, moreover, the Final EA provided no assurance whatsoever that RIDEM would have jurisdiction to regulate all of the hazardous air emissions that the Life Sciences Building might discharge. NEPA, on the other hand, requires federal agencies to consider potentially significant impacts on specific local environments. See 40 CFR § 1508.27(a) (2003). Thus, contrary to Brown's assertion (Brown Brief at 7-8), the mere fact that Brown might eventually obtain one or more RIDEM air toxics permits for certain of the hazardous air emissions that the Life Sciences Building would discharge, would not necessarily preclude those or other hazardous emissions from causing a significant environmental impact within the meaning of NEPA, which should have caused NASA and DOE to perform an EIS.

adverse and improper conduct by Brown cannot be attributable to NASA and DOE. That argument is without merit for several reasons.[7]

First, the CEQ regulations make NASA and DOE responsible for the information submitted by Brown. 40 CFR § 1506.5(a), (b) (2003). To the extent that the Final EA relied on incorrect and misleading information that Brown supplied that is the result of improper conduct by Brown, NASA and DOE are responsible for those errors and any such misconduct as it adversely affected the Final EA. In his November 21, 2005 order, the Magistrate Judge did not address the significance of 40 CFR § 1506.5(a), (b), and defendants also fail to address it here.

Second, even if under 40 CFR § 1506.5(a), (b) NASA and DOE are not *automatically* responsible for such improper conduct by Brown in this NEPA review, NASA and DOE are at least responsible for that improper conduct by Brown of which they had notice. See Davis v. Mineta, 302 F.3d 1104, 1112-1113 (10th Cir. 2002). In Davis v. Mineta, the federal agency was held responsible for an improper agreement entered into by a non-party consultant that prepared an EA for the agency. The court held that the federal agency was responsible for the agreement (which reflected predetermination by the consultant), because the federal agency was "involved throughout the NEPA process and knew of the agreement." 302 F.3d at 1112-1113. Additionally, the court found that the federal agency was responsible because it had failed to conduct a sufficient independent review of the consultant's actions to insulate the agency from the effects of the improper bias reflected by the consultant's agreement. Id. at 1112-1113. Here, defendants concede that NASA and DOE were similarly involved throughout the NEPA process (NASA/DOE Brief at 4; Brown Brief at 19).

---

7 On December 1, 2005, plaintiffs filed objections to the Magistrate Judge's order, and those objections are currently under review by this Court.

Furthermore, the evidence already included in the Administrative Record illustrates that NASA and DOE knew that the Draft EA's and Final EA's evaluation of the hazardous air emission information was seriously deficient and its conclusions contrived. For one thing, the Draft EA (AR 98 [0570]) and Final EA (AR 113 [0749]) included a false and misleading description of the so-called RWDI Report (AR 40 [0173-0201]). The description was false and misleading because, among other things, it implied that the RWDI Report -- an air *intake* study that defendants attempted to hold out improperly as a comprehensive study of the Life Sciences Building's likely air emission impacts -- had included the results of "wind-tunnel testing" and other physical air modeling. No such "wind tunnel testing" or other physical air modeling in fact was performed by RWDI -- as a review of that document shows. That false and misleading language could only have been added to the Draft EA and Final EA to create the impression that such air modeling had been performed, when in fact it had not. Not surprisingly, defendants have since attempted, figuratively speaking, to remove the RWDI Report from the Final EA and Administrative Record, by advising this Court that the Final EA somehow did not rely upon it (see Plaintiffs' Main Brief at 9, fn. 12).[8]

In addition, notwithstanding the fact that the Draft EA had included the false and misleading description of the RWDI Report, Henry Huppert of Brown expressly confirmed to NASA and DOE in an email message on or about July 8, 2003 -- after the Draft EA had been published but approximately one month before the Final EA was released -- that no air modeling

---

8 At the November 17, 2004 hearing before this Court, defendants' counsel claimed that the RWDI Report, which the Final EA described (AR 113 [0749]), somehow was not relied upon by the Final EA and was not otherwise relevant to the Final EA (November 17, 2004 hearing transcript, at pages 33-34, 42-43). Defendants' counsel claimed that the Final EA relied, instead, in concluding that the hazardous air emissions would not create a significant environmental impact, on the (erroneous) fact that the hazardous air emissions from the Life Sciences Building would not require application for one or more RIDEM air toxics permits (November 17, 2004 hearing transcript, at pages 27, 42-43).

had been performed (see Plaintiffs' Main Brief at 9, fn. 12). Notwithstanding Huppert's July 2003 email confirmation, however, the Final EA later included the identical false and misleading description of the RWDI Report that had been included in the Draft EA.

In that same July 2003 email message, Huppert stated that because no air modeling had been performed, one could *not* say that the hazardous air emissions from the Life Sciences Building would be diluted to such an extent that they would *not* increase the concentration of hazardous air emissions at ground level at or beyond the property line. But rather than include that admission in the Final EA, Huppert recommended that the Final EA contain what he described as an admittedly vague (and unsupported) alternative statement, namely, that the air emissions from the Life Sciences Building would be diluted to such an extent that they would be *unlikely* to increase the concentration of hazardous air emissions at ground level at or beyond the property line. The Final EA included Huppert's admittedly vague alternative language (AR 113 [0749]) and omitted mention of his confirmation that no air modeling had been performed.[9]

The significance of these documents is that as a result of Huppert's July 2003 email message, NASA and DOE necessarily knew that no air modeling had been performed and that, as result, they could *not* state truthfully that air emissions from the Life Sciences Building would *not* increase the concentration of hazardous air emissions at or beyond ground level at the property line. But in the Final EA, NASA and DOE included the same false and misleading description of the RWDI Report that had been included in the Draft EA (thereby again falsely implying that sophisticated air modeling had been performed), did *not* include in the Final EA Huppert's confirmation that air modeling had *not* been performed, and included in the Final EA

---

9 NASA and DOE argue that the relevant measure is the ground level ambient concentration of hazardous air pollutants (NASA/DOE Brief at 7-9). But they omit to state that the Final EA's only mention of that measure was its inclusion of Huppert's admittedly vague alternative language described above (AR 113 [0749]), which was unsupported by any data.

Huppert's admittedly vague alternative statement that concealed Huppert's admission that defendants could *not* state that the air emissions from the Life Sciences Building would *not* increase the concentration of hazardous air emissions at the property line.

If the Final EA had stated what NASA and DOE actually knew, that air modeling had not been performed and that therefore defendants did not know whether the hazardous air emissions from the Life Sciences Building would increase the concentration of hazardous air emissions at or beyond ground level at the property line, then an EIS would have been required -- because the Final EA would have conceded that the hazardous emissions could *not* be shown to be insignificant. But defendants did not include that information in the Final EA because, one can only conclude, they were predetermined not to perform an EIS.

Returning to the documents at Tabs 1-4 that are at issue here, from the false and misleading description of the RWDI Report and the Huppert July 2003 email message alone (which are already in the Administrative Record), NASA and DOE knew that the air emissions analysis in the Final EA was materially false and misleading and that an EIS should have been required. With that knowledge, and the additional knowledge from Swartz's July 2, 2003 email message in which she indicated that the hazardous air emissions from the Life Sciences Building would require application for one or more RIDEM air toxics permits, NASA and DOE plainly knew sufficient facts about Brown's misconduct as it is reflected by Tabs 1-4 for that improper conduct to be chargeable to NASA and DOE.[10]

---

[10] The fact that NASA and DOE failed to request from and review all of the written materials upon which Brown and its consultant relied in preparing the Draft EA and Final EA, and failed independently to inquire about other matters such as the adequacy of the public participation process, would appear to establish, *prima facie*, their failure properly to verify independently the work by Brown and Swartz within the meaning of 40 CFR § 1506.5(a), (b). Furthermore, if NASA and DOE had performed such a review, one would have expected those materials to have been included in the Administrative Record, and most of this motion would

B. Documents Relating Principally to Noise Emission Impacts (Tabs 5-9)

Defendants also avoid discussion of the very adverse content of the documents at Tabs 5-9 and the compelling evidence of additional improper conduct that they embody. Defendants' objections to the two Acentech noise emission reports (Tabs 5 and 6) are entirely without merit. NASA and DOE concede that they never obtained or reviewed copies of the two Acentech reports and thus never reviewed them (a clear violation of 40 CFR § 1506.5(a) and (b)), despite the fact that the Draft EA's and Final EA's analyses of the noise emission issues expressly relied upon those reports. Furthermore, all three defendants fail to address the significance of the fact that the Final EA expressly incorporated the two Acentech reports by reference (Plaintiffs' Main Brief at 11).

NASA and DOE contend that it is sufficient that they merely reviewed the summaries of the two Acentech reports that Brown and its consultant included in the Draft EA and Final EA, because the summaries of the two Acentech reports were supposedly "accurate[]" (NASA/DOE brief at 10). That argument has no force, because the summary of the two Acentech reports in the Draft EA misrepresented the findings of those reports -- which the Final EA later acknowledged in response to plaintiffs' written objections (Plaintiffs' Main Brief at 11). Furthermore, the Final EA went on to apply a plainly contrived and incorrect standard of review to the conclusions of the Acentech reports, to avoid a finding that the noise emissions would exceed the city's noise ordinance limits (Plaintiffs' Main Brief at 11-12) -- a fact that defendants do not dispute.

The summaries of the two Acentech reports in the Draft EA and Final EA were also materially incomplete because they did not report that the conclusions of the Acentech reports

---

have been unnecessary. See Strahan v. Linnon, 966 F.Supp. 111, 114 (D. Mass. 1997)

were largely speculative. Acentech admitted that it did not know what specific equipment or equipment configurations the Life Sciences Building would utilize (Tab 5, page P02819-02823; see also AR 123 [0908-0909]). Acentech acknowledged the possibility that the noise emissions from the Life Sciences Building could be far higher than the Draft EA and Final EA suggested, thereby increasing the likelihood of a significant environmental impact (Tab 5, page P02822-02823).[11]

NASA, DOE, and Brown do not address the content the email messages included at Tabs 7 and 9. Those email messages confirm that Brown and its consultant Swartz knew that the Life Sciences Building's anticipated noise emissions would, on a cumulative basis, *exceed* the city's noise ordinance limits, and confirm that they fully understood the contrived analysis of the noise emissions issues that was set forth in the Final EA (see Plaintiffs' Main Brief at 11-12).

As stated in plaintiffs' main brief (at 12-13), the email messages included at Tab 8 demonstrate that Brown's consultant Swartz advised Brown's representatives to *discourage* local resident Ron Whitley from submitting written comments to NASA and *DOE during the formal comment period for the Draft EA*. Defendants do not dispute this. From the documents included at Tabs 7 and 8, Swartz thus clearly saw her role as helping Brown to complete the NEPA process as quickly as possible -- and if necessary to help Brown *conceal* evidence of significant impacts -- to achieve the desired outcome of a FONSI and to avoid the possibility of a later EIS. Swartz's actions as reflected in the documents at Tabs 7-8 thus also provide additional evidence

(exception to "record rule" for materials that agency should have considered).

[11] Even if the summaries did accurately portray the two Acentech reports (they do not), it would nevertheless still be appropriate to add the two reports for completeness as they were incorporated by reference in the Final EA yet included nowhere.

in support of the conclusion that Swartz would likely have intentionally sought to conceal from the public the true nature of the anticipated hazardous air emissions, as discussed above.[12]

The documents at Tabs 7-9 thus also reflect a clear absence of objective good faith on the part of Brown and its consultant Swartz, additional evidence of the intentional failure by NASA and DOE to supervise and verify independently Brown's and its consultant's contributions to the Draft EA, Final EA, and the NEPA review generally, as required pursuant to 40 CFR § 1506.5(a), (b), and additional evidence that NASA and DOE failed -- here, intentionally -- to take the required "hard look" at the environmental consequences of their proposed action.[13]

To the extent that defendants claim that Brown's misconduct as reflected by the documents at Tabs 7-9 should not be attributed to NASA and DOE, NASA and DOE were plainly aware of sufficient facts for Brown's misconduct to be charged to NASA and DOE. With regard to the documents at Tabs 7 and 9, one comment letter to the Draft EA described to NASA and DOE in detail the manner in which the Draft EA had misrepresented the conclusions of the two Acentech reports, and which letter caused the Final EA to acknowledge that the Draft EA's summary of the Acentech reports had in fact been inaccurate (Plaintiffs' Main Brief at 11). The plainly contrived standard of review that the Final EA subsequently applied to the noise emission issues (see Plaintiffs' Main Brief at 11-12) to achieve a finding of no significant impact is self-evident, and, although it was prepared by Brown and its consultant Swartz, NASA and DOE knew of and acquiesced to it since it was part of the text of the Final EA (Plaintiffs' Main Brief at 11-12).

---

[12] The appended May 19, 2003 email message at Tab 9 reveals a third, undisclosed Acentech report, dated April 4, 2002, which confirms that the Life Sciences Building's anticipated noise emissions could raise further the already excessive ambient noise levels.

[13] The documents at Tabs 1-4 and 5-9 also confirm the importance of public scrutiny of the NEPA process.

With regard to the document at Tab 8, the undeniable misconduct that it demonstrates is also chargeable to NASA and DOE, because it is a reasonable inference that the actions by Swartz and Brown that it describes were part of the larger effort on the part of Brown, NASA, and DOE to frustrate the public participation process and otherwise misrepresent to the public the significance of potential environmental impacts -- in order to circumvent the obligation to prepare an EIS and begin construction of the Life Sciences Building as quickly as possible.[14]

C. Documents Relating Principally to Omitted Consideration of Other Agency Funding (Tabs 10-14)

Defendants' objections to the documents at Tabs 10-14 are also without merit. NASA and DOE contend, first, that the two Brown construction grant applications to NIH (at Tabs 10 and 11) are not adverse within the meaning of the "record rule" and do not represent evidence of improper conduct by defendants because NASA and DOE did not have authority to make NIH a party to this NEPA review. NASA and DOE contend that only NIH had such authority (NASA/DOE Brief at 4).[15] That argument is unavailing.

Even if NASA and DOE did not have any formal authority to compel NIH to participate as a party to this NEPA review, NEPA required NASA and DOE to take a "hard look" at NIH's involvement in the Life Sciences Building project and at the potentially significant individual and cumulative environmental impacts that might result (see Plaintiffs' Main Brief at 36, 36 fn. 34).[16] As both the Draft EA (AR 98 [0580]) and Final EA (AR 113 [0760]) acknowledged:

> [The CEQ] regulations . . . require federal agencies to consider the cumulative impacts of a proposal (40 CFR 1508.25). A cumulative

---

[14] The documents at issue on this motion that show improper conduct on the part of Brown and its consultant are also adverse for the reason that they will be relevant to any consideration of injunctive relief that this Court may eventually consider issuing against Brown.

[15] Brown makes a similar argument at pages 16-18 of its brief.

[16] For this reason, the unsupported legal conclusions asserted at ¶ 22 of the Prouty Declaration and ¶ 20 of the Montgomery Declaration, that it would have been improper for the agencies to include NIH-related documents in the Administrative Record, are meritless.

> impact on the environment is the impact that results from the incremental impact of an action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency (federal or non-federal) or person undertakes such other actions (40 CFR 1508.7). This type of an assessment is important because significant cumulative impacts can result from several smaller actions that by themselves do not have significant impacts. (Emphasis added.)

It is beyond dispute that NASA and DOE failed completely to consider the possible cumulative incremental impacts of NIH's "past, present, and reasonably foreseeable actions, " 40 CFR § 1508.7 (2003). Here, the Draft EA and Final EA failed even to disclose the mere *existence* of the $2 million NIH grant to Brown for the Life Sciences Building, which is startling if for no other reason than the NIH grant was twice the amount of the DOE grant. Nor did the Draft EA or Final EA disclose that the $2 million NIH grant was intended primarily for construction, and not solely for equipment, as NASA's Ann Hooker Clarke incorrectly advised DOE, the public, and others (see Plaintiffs' Main Brief at 27, 31; see also, e.g., AR 56 [0300-0302], AR 58 [0306]).[17]

It also cannot be disputed that NASA and DOE failed completely to examine other funding by NIH that was already directed for the Life Sciences Building in the form of sponsored research, which the grant application at Tab 11 described (see also Tab 14; Plaintiffs' Main Brief at 17). The Final EA stated (falsely), in response to the public's objections during the comment

---

[17] An NIH document dated August 23, 2005, entitled "Notice of Grant Awards Report" (Exhibit A hereto), was produced by NIH to plaintiffs in response to a FOIA request by plaintiffs several months ago, but only was received by plaintiffs on December 8, 2005 and produced to defendants' counsel the following day. It appears to confirm that the NIH grant to Brown was at all times in the amount of $2 million, was intended primarily for construction of the Life Sciences Building, and that as a condition of the grant award, Brown agreed to maintain the Life Sciences Building as a biomedical research facility for 20 years (Exh. A hereto, pages 2, 5; see also Plaintiffs' Main Brief at 19).

period (AR 106 [0627-0628], AR 123 [0901-0903]), that any research funding by NIH and other agencies for the Life Sciences building was purely speculative (AR 113 [0732, 0787]).[18]

NASA's and DOE's failure to examine the cumulative effects of past, present, and reasonably foreseeable future actions by NIH and other agencies was all the more improper given the sheer magnitude of the annual funding by NIH and other federal agencies for Brown's research activities, which Brown's Dr. Peter Shank described at the two public meetings about the Life Sciences Building project in the fall of 2001 (see, e.g., Tab 53 (page P00543), Tab 54 (page P00549), AR 123 [0902]), and to NASA in February 2002 (AR 42 [0240-0242]). Such research funding alone by NIH and others to Brown in the 2000-2001 period had exceeded $100 million annually (AR 35 [0078-0079]). That the true extent of NIH's unexamined involvement and influence in the Life Science Building project was far greater than suggested by the present record is further indicated by the fact that Brown, as a condition of obtaining the NIH grant, agreed to maintain the Life Sciences Building as a biomedical research facility for twenty years (Plaintiffs' Main Brief at 19; see also id. at 71-72).[19] Defendants do not deny that 20-year agreement.

NASA and DOE thus did not need NIH to be joined as party to this NEPA review in order to examine NIH's involvement in the Life Sciences Building project. NASA and DOE could and should have requested information from NIH directly. Alternatively, NASA and DOE

---

18 NIH is mentioned in the Final EA (AR 113 [0787]) only because plaintiffs objected during the comment period to the Draft EA's failure to address NIH's then-assumed involvement in the Life Sciences Building project.

19 Defendants do not deny the adverse significance of the Environmental Analysis Forms that were included with the two Brown grant applications to NIH, or the fact that the January 31, 2001 grant application (Tab 11) showed that the use of Brown's pathological waste incinerator -- a likely source of carcinogenic dioxins -- would as a consequence likely increase (Plaintiffs' Main Brief at 15-17, 70-71).

could easily and should have obtained information about NIH's involvement in Brown University projects from Brown itself.

NASA and DOE stated in the Final EA (AR 113 [0787]), and suggest here (NASA/DOE Brief at 4), that it was appropriate to allow NIH alone to determine to extent to which it may be subject to NEPA. That argument is without merit, however, for the additional reason that it represents a form of "segmentation" or "piecemealing," which is improper under NEPA (see Main Brief at 15, fn. 20). Such "segmentation" or "piecemealing" improperly ignores NEPA's requirement that cumulative effects (even if individually insignificant) must be evaluated at one time in an entirety. See, e.g., Sierra Club v. Marsh, 769 F.2d at 881. By omitting *any* consideration of NIH's involvement in the Life Sciences Building project and in other possibly related projects at Brown (especially any such projects located at the adjacent Biomedical Complex or other laboratories on College Hill), NASA and DOE failed to take the required "hard look" at the possible effects of past, present, and reasonably foreseeable cumulative future actions by NIH -- whose involvement in the Life Sciences Building project is plainly part of the same "major federal action," 42 U.S.C. § 4332(2)(C), as the proposed action by NASA and DOE here.

NASA and DOE claim that NIH declined to cooperate (Prouty Decl. ¶ 22; Montgomery Decl. ¶ 20). But there is no evidence dated prior to plaintiffs' filing of this motion to support this new, self-serving suggestion that NASA and DOE ever asked for NIH's cooperation or that NIH refused. To the contrary, the evidence presented in plaintiffs' main brief (at 26-31) shows that NASA and DOE, did not want to acknowledge any involvement by NIH in the Life Sciences Building project. Acknowledging the existence of the $2 million NIH grant to Brown for the Life Sciences Building project would have increased the extent of assumed federal monetary

involvement in the project at a time when NASA was trying to avoid its own involvement on the ground that the extent of federal monetary involvement was insufficient (see, e.g., Tabs 19-23; Plaintiffs' Main Brief at 26-31; AR 55 [0301]). Furthermore, including NIH in this NEPA review necessarily would have caused the NEPA review to expand and require more time, given the very substantial ongoing involvement of NIH and other federal agencies and private organizations in Brown's research activities (AR 35 [0078-0079], AR 106 [0627-0628], AR 123 [0901-0903, 0931]; Tabs 77, 82) and thus also would have increased the likelihood of an EIS being required.

Moreover, if there were any truth to NASA's and DOE's newly announced contention of non-cooperation by NIH, NASA and DOE would be expected at the least (a) to have disclosed in the Draft EA and Final EA the fact that NIH contributed $2 million in construction grant monies for the Life Sciences Building, (b) not to have omitted mention in the Draft EA and Final EA that NIH research monies were already funding activities that were to be moved to the Life Sciences Building; and (c) to have disclosed in detail in the Draft EA and Final EA their new contention here that NASA and DOE had attempted unsuccessfully to obtain NIH's cooperation in this NEPA review and later decided to proceed despite not receiving that cooperation.

Some evidence would also be expected to have been included in the Administrative Record to that effect. See, e.g., AR 114 [0789-0790] (August 5, 2003 DOE memorandum omits mention of NIH funding and alleged NIH non-cooperation). The CEQ regulations provide that a "lead agency" -- here, both NASA and DOE (AR 113 [0721]) -- is required to request the cooperation of other federal agencies in the preparation of an EIS where "more than one Federal agency … [i]s involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity." 40 CFR § 1501.5(a)(1) (2003). The

CEQ regulations (40 CFR § 1501.6 (2003)) further provide that "Upon request of the lead agency, any other Federal agency which has jurisdiction by law shall be a cooperating agency." The regulations permit a "cooperating agency" to seek to limit its participation or to decline to participate in the proposed action (not the NEPA review), and a copy of any such request must be submitted to the Council on Environmental Quality. 40 CFR § 1501.6(c)(2003).[20]

The Draft EA's and Final EA's omission of any mention of NIH's specific involvement in the Life Sciences Building project, even despite detailed objections from the public during the comment period for the Draft EA (AR 123 [0901-0903]), further compels the conclusion that NASA's and DOE's new claim that they attempted unsuccessfully to obtain NIH's cooperation with this NEPA review, failed, and then made a deliberate decision to proceed without NIH's cooperation, is without any basis in fact. In this respect, the evasive and wholly conclusory assertions by DOE's Vicki Prouty and NASA's Lizabeth Montgomery -- and the similarly conclusory "information and belief" assertions contained in NASA's and DOE's brief on this motion (NASA/DOE brief at 4) -- thus represent improper *post hoc* rationalizations. See, e.g., DuBois v. U.S. Dept. of Agriculture, 102 F.3d 1273, 1289 (1st Cir 1996), cert. denied, 521 U.S. 1119 (1997).[21]

Lastly, regarding the document at Tab 14, NASA and DOE claim that the Final EA omitted to mention the NIH research grants described there (see Plaintiffs' Main Brief at 21) supposedly because NASA and DOE were attempting only to provide a summary description of

---

[20] Although these provisions by their terms apply to the preparation of an EIS, logic would suggest that they apply as well to the preparation of an EA, because one of the purposes of an EA is to determine whether to perform an EIS (Plaintiffs' Main Brief at 2, fn. 1). NEPA's policy against "segmentation" or "piecemealing" discussed above, would also appear to preclude limiting the applicability of 40 CFR §§ 1501.5 and 1501.6 to EISs. See also 40 CFR § 1502.4(a) (2003) (related proposals are to be evaluated in one EIS).

the research activities that were to be performed in the Life Sciences Building (NASA/DOE Brief at 19). That argument is entirely unpersuasive, especially in light of the public's comments to the Draft EA on this issue (AR 23 [0901-0903]), is without any support in the Administrative Record, and in any event represents another impermissible *post hoc* rationalization.[22]

D. Documents Relating Principally to Improper <u>Predetermination of Result (Tabs 15-53)</u>

Defendants' objections to the documents within this group are also without any merit. Significantly, none of the defendants denies that predetermination is improper under NEPA (Plaintiffs' Main Brief at 22, fn. 27).

NASA and DOE first attempt, unsuccessfully, to explain away the documents (Tabs 15-28) that reveal NASA's and DOE's efforts to avoid participating in the NHPA Section 106 and NEPA reviews and otherwise improperly to limit the scope of the NEPA review. The fact that NASA and DOE were unsuccessful in avoiding having to participate in this NEPA review plainly does not render the information contained in these documents moot, as NASA and DOE claim (NASA/DOE Brief at 11). Rather, the documents are highly relevant, material, and adverse and support plaintiffs' claims of improper conduct for the reasons we stated in our main brief.

With respect to the documents at Tabs 28-32, and 42-46, NASA and DOE largely ignore the compelling evidence that proves that these documents are adverse and provide additional clear evidence of predetermination and other improper behavior. The document at Tab 28 is a

---

[21] Conspicuously absent from NASA's and DOE's opposition papers is any declaration from NASA's Ann Hooker Clarke, whose various email messages on this issue we addressed in our main brief (at 26-31).

[22] In our main brief at pages 16-17, fn. 22, we stated incorrectly that Brown produced a copy of its January 31, 2001 grant application to NIH (Tab 11) to plaintiffs in discovery. To the contrary, Brown objected to plaintiffs' discovery requests as they related to NIH and did not produce a copy of that document.

pivotal and devastatingly adverse document on the issue of predetermination, for the reasons we discussed in our main brief (at 35-37). It is also adverse and supports plaintiffs' showing of bad faith and improper conduct for the additional reason that the document at Tab 28 was not included in the Administrative Record or in NASA's and DOE's previous FOIA production (see Plaintiffs' Main Brief at 36-37), a point that NASA and DOE fail to address.

NASA and DOE object to the document at Tab 30 on the ground that it is a preliminary draft of the EA (NASA/DOE Brief at 11). NASA and DOE acknowledge, however, that the Administrative Record contains other preliminary drafts of the EA (NASA/DOE Brief at 11). They fail otherwise to address the points for which we offer the document (Plaintiffs' Main Brief at 37-38). Similarly, NASA's and DOE's objections to the document at Tab 42 (which NASA and DOE erroneously refer to as Tab 72 (NASA/DOE Brief at 6)) ignores the reasons for which plaintiffs offered the document.

At page 12 of their brief, NASA and DOE assert that they relied on the fact that if adverse hazardous air emission impacts later presented themselves, RIDEM could address them at that time. But there is no evidence in the record to suggest that RIDEM might have the jurisdiction or ability to regulate all of the potential hazardous emissions from the Life Sciences Building or other potential risks, and plaintiffs have already demonstrated that such an assumption is wrong (see Plaintiffs' Brief at 17, fn. 24, 70-71; pages 39-40 below). Furthermore, NEPA permits consideration of possible mitigations in an EA only when they are imposed by statute or regulation or are part of the original proposal. See Sierra Club v. Marsh, 769 F.2d at 877, 880 (quoting CEQ, *40 Most Asked Questions [Question and Answer 40],* 46 Fed.Reg. at 18038). Such a purportedly wholesale and non-specific effective delegation by NASA and DOE

to RIDEM of NASA's and DOE's obligation to take the required "hard look" at the nature of and the risks attendant to the anticipated hazardous air emissions thus would be improper.

NASA and DOE describe DOE's categorical exclusions (NASA/DOE Brief at 12-13), apparently in an unsuccessful attempt to offer a legitimate explanation for the overwhelming evidence of NASA's and DOE's predetermination. In this NEPA review, DOE concluded that an EA would be necessary because its own categorical exclusions did *not* apply (see, e.g., AR 88 [0500]). Once DOE reached that determination, DOE's categorical exclusions were no longer relevant and DOE was bound by NEPA's remaining rules and regulations concerning EAs. DOE was thus required to perform an EA, and thereafter, if necessary, an EIS. The fact that such a categorical exclusion might have applied under different factual circumstances, however, did not permit DOE to cut corners and perform the materially incomplete and predetermined EA as occurred here.

NASA and DOE omit to state that although DOE initially considered whether its grant to Brown might qualify for a categorical exclusion under DOE's regulations, NASA was not subject to DOE's regulations. The discussion about DOE's categorical exclusions thus has no applicability to NASA's actions.

Moreover, since NASA was not subject to DOE's regulations, NASA's sole threshold criterion here for evaluating whether an EA or EIS should be performed was whether the cumulative federal agency funding for the Life Sciences Building project was sufficient to result in a "major federal action" within the meaning of 42 U.S.C. § 4332(2)(C) and whether the criteria at 40 CFR § 1508.27(b) indicated the need for an EIS (see Plaintiffs' Main Brief at 2, fn. 1). That fact explains why NASA's Ann Hooker Clarke was so eager to disregard the existence of the $2 million NIH construction grant to Brown, on the erroneous bases that NIH had

supposedly "reprogrammed" its grant from being one for construction to one solely for "equipment" (Tabs 19-20) and that the NIH grant was in the lesser amount of $1 million (Plaintiffs' Main Brief at 30).[23] NASA's attempts to avoid participation in this NEPA review on the ground that there might be insufficient federal involvement apparently ended, however, when Congress raised NASA's initial grant amount in July 2002 by $2.5 million to a total of $5.25 million (Plaintiffs' Main Brief at 28, fn. 32). NASA presumed that construction projects of $3 million or more required at least the preparation of an EA (Plaintiffs' Main Brief at 28).

NASA and DOE assert at page 13 of their brief that "an Agency whose mere involvement is Congressionally-initiated funding does not benefit from covering [potentially significant environmental impacts] up." To the contrary, if an agency succeeds in avoiding having to perform an EIS, the agency saves considerable time, money, and other resources, and avoids the risk that feasible alternatives will be found that present fewer or no significant environmental impacts to the human environment -- and avoids the consequent additional risks of major project changes (such as changes to building site locations) and delays of years or more. Indeed, those very considerations appear to have motivated DOE's Clarence Hickey's August 29, 2002 secret agreement with NASA's Hooker-Clarke (Tab 28) to ensure that this NEPA review would end with a FONSI (see, e.g., AR 57 [0305] (expressing concern about possible delay); AR 76 [0383-84] (same)) -- especially in view of DOE's Vicki Prouty's prior suggestions that an EIS would be required (Plaintiffs' Main Brief at 34-35), and about which suggestions Prouty is notably silent in her opposing declaration here.

NASA and DOE next contend that, with respect to the documents at Tabs 41-52, it was not appropriate for those agencies to determine the site selection criteria for Brown (NASA/DOE

23 As discussed in plaintiffs' main brief (at 26), Hooker Clarke also questioned whether NASA might also be able to "reprogram" its own grant to Brown to avoid having to participate

Brief at 14). But that argument misstates plaintiffs' claim. Rather, for the reasons stated in our main brief (at page 22), NASA and DOE had an obligation under NEPA to discuss reasonable alternatives to the proposed project. See 42 U.S.C. § 4332(2)(E); 40 CFR § 1508.9(b)(2003) (discussion of alternatives is required); Davis v. Mineta, 302 F.3d at 1120 ("[a] properly-drafted EA must include a discussion of appropriate alternatives to the proposed project").

Consideration of feasible alternatives is one of the most fundamental requirements under NEPA, which reflects the essence of NEPA's purpose. See, e.g., 40 CFR §§ 1500.2(e), 1502.14 (2003). Here, as described in our main brief (at 35-37), NASA and DOE secretly and improperly foreclosed any such consideration even before the preparation of the preliminary drafts of the Draft EA had begun. NASA and DOE do not address the reasons why Brown's original site selection criteria were contrived (Plaintiffs' Main Brief at 21) or the substantial evidence of the extensive and improper efforts that defendants' representatives made in May 2003 to embellish those deficient criteria (Plaintiffs' Main Brief at 45-48). Nor do NASA and DOE address the admissions by DOE's Peter Siebach that (a) the Draft EA did not adequately consider reasonable alternatives (Plaintiffs' Main Brief at 48, fn. 36), (b) the Life Sciences Building did not need to be located on College Hill (it could feasibly have been located elsewhere) (Plaintiffs' Main Brief at 47-48), and (c) the adjacency criterion proposed by Swartz in May 2003 too obviously sought to ensure the predetermined site selection choice (Plaintiffs' Main Brief at 47). Brown makes the related meritless argument that because NASA and DOE prematurely and improperly rubber-stamped Brown's original site selection criteria, the Final EA should somehow be deemed to have considered reasonable site alternatives (Brown Brief at 12-13, 21).

---

in this NEPA review.

NASA and DOE object to inclusion in the Administrative Record of the document at Tab 50 concerning the discussion of the required "no-action alternative" (NASA/DOE Brief at 16-17). NASA and DOE contend that NASA and DOE did not need to consider the hypothetical environmental effects of the Life Sciences Building not being constructed at the chosen location, by reason of the supposedly small percentage of federal money supporting the project (id.). Apart from the improper *post hoc* nature of these arguments, the premise of NASA's and DOE's argument is faulty.[24] As discussed above, NASA and DOE never took the required "hard look" at the many funding sources for the Life Sciences Building project, or the largely federal character of the project, and therefore their assumption that the federal funding component was *de minimis* was and is invalid.

The federal funding for the Life Sciences Building project was not simply the sum of the construction grants that NASA and DOE would make to Brown. It also included the $2 million construction funding grant by NIH to Brown that NASA and DOE improperly ignored and the very considerable additional monies that NIH and other agencies were anticipated to spend for research at the Life Sciences Building over at least the next 20 years. Portions of those federally-sponsored research contracts would be used to recover the building's cost (Tab 13), a point that was raised in one of the comment letters to the Draft EA (Plaintiffs' Main Brief at 20). In the Final EA, NASA and DOE ignored that point raised by the comment letter (id.) and ignore it again here. But for Brown's expectation that it would receive those very substantial future federal revenue streams, it is highly questionable whether Brown would have commenced the

---

[24] This argument, for which NASA and DOE offer no supporting legal authority, rests entirely on the recent Prouty and Montgomery declarations. Significantly, DOE's Prouty does not deny plaintiffs' showing that, prior to the issuance of the Final EA, Prouty originally urged that the no-action alternative should be analyzed as a "no-build" alternative (Plaintiffs' Main Brief at 36-37, fn. 34). The Prouty and Montgomery declarations accordingly represent

Life Sciences Building project. And the documents at Tabs 77 and 82 explain that such future substantial revenue streams were reasonably foreseeable (see also AR 123 [0931] (noting Brown's then-anticipated NIH and other federal research revenues for a separate, newly announced biomedical facility in the Jewelry District)).

For its part, Brown objects to this group of documents on the ground that merely commencing a NEPA review with the initial expectation that it will conclude with the issuance of an EA (and which might possibly be followed by an EIS) is not evidence of predetermination (Brown Brief at 8, 18-19). Brown's objection misstates plaintiffs' claim. As is the case here, evidence that federal agencies and other participants with whom they perform a NEPA review have decided to issue a *FONSI* before the EA preparation has even begun, and that therefore no EIS will follow, and have taken other concrete steps that ensure that only a *FONSI* and no subsequent EIS will result, is impermissible and is clearly evidence of predetermination. And contrary to Brown's assertion (Brown Brief at 8), the agencies were pushing to conclude this NEPA review quickly (see, e.g., AR 86 [0456] (DOE's Siebach noting on April 30, 2003 that NASA wanted the Draft EA published two weeks later)). In fact, the agencies recommended that Swartz be hired to assist Brown to complete the Draft EA and Draft FONSI by reason of the delay that had been caused by Brown's prior lack of experience with the NEPA process (see AR 86 [0458]).

Brown next makes the illogical argument that if the Court eventually finds that the agencies' decision not to perform an EIS was not arbitrary and capricious, then there necessarily will not be a finding of predetermination, and that therefore plaintiffs' additional evidence here of predetermination should not be included in the Administrative Record (Brown Brief at 9). But

---

improper *post hoc* rationalizations on this point. Dubois v. U.S. Dept. of Agriculture, 102 F.3d at 1289.

it is this very evidence of predetermination that demonstrates, together with other evidence here and in the Administrative Record, that the agencies' decision not to perform an EIS was arbitrary and capricious and otherwise contrary to law.

Brown also asserts that NASA's and DOE's denial of plaintiff College Hill Neighborhood Association's request for consulting party status in the parallel NHPA Section 106 review could not have had an impact on the outcome of the NHPA Section 106 review (Brown Brief at 11-12). But Brown avoids responding to plaintiffs' point (Plaintiffs' Main Brief at 29-30) that the denial adversely affected the public's participation in this NEPA review and represents evidence of frustration of the public participation process and predetermination.

Defendants also omit mention of the fact that numerous documents already included in the Administrative Record provide further support for plaintiffs' claim of improper predetermination. For example, between June 2002 and even as late as the June 2, 2003 publication of the Draft EA, defendants' representatives consistently assumed that the primary issue was historic preservation (see, e.g., AR 58 [0310]; AR 88 [0500, 0504], AR 93 [0522] ("[h]istoric preservation is the only issue, and that's been resolved"). DOE's Peter Siebach made the same point to RIDEM and the other state agencies in the memorandum that he forwarded to those agencies *after* the June 2, 2003 publication of the Draft EA (AR 100 [0611]).

Also significant is the absence of *any* consideration by defendants, after DOE's Prouty's suggestions in August 2002, that an EIS might be necessary (see Plaintiffs' Main Brief at 34-35). And nowhere in the Administrative Record does there appear to be any evidence that NASA and DOE considered the applicability of the CEQ "significance" factors at 40 CFR § 1508.27(b) (2003) that provide guidance on whether an EIS should be performed. Defendants did not respond to plaintiffs' arguments showing that some courts have held that meeting only one of

those factors requires performance of an EIS, or that a majority of those factors militated in favor of performing an EIS here (Plaintiffs' Main Brief at page 2, fn. 1). NASA's and DOE's apparent failure even to consider the applicability of those provisions represents additional evidence of improper predetermination and a failure to take the required "hard look" at the environmental consequences of the proposed action.

E. Documents Relating Principally to Frustration and Failure of the Public Participation Process (Tabs 53-73)

NASA, DOE, and Brown object to this group of documents on the ground that plaintiffs allegedly did not have a right to comment on the Draft EA, and that therefore any frustration of the public's ability meaningfully to submit comments regarding the Draft EA are of no legal significance.[25] Accordingly, defendants' arguments continue, this group of documents cannot be "adverse" or indicative of improper conduct on the part of defendants within the meaning of those exceptions to the "record rule." Defendants' arguments are without merit for several reasons.

First, for the reasons discussed above and in our main brief, defendants knew prior to the publication of the Final EA that an EIS was required here. An EIS would require a more formal public participation process. See, e.g., 40 CFR §§ 1501.7, 1503.1-1503.4 (2003). Defendants' decision to provide at least a limited comment period for the Draft EA appears to represent an implicit acknowledgement of that fact (see Tab 43, citing 40 CFR § 1501.4(e)(2), Tab 44; AR 91 [0520]).

[25] Defendants' arguments rely on the November 21, 2005 order by Magistrate Judge David L. Martin, denying plaintiffs' motion to compel Brown to provide answers to plaintiffs' requests for admissions to Brown. As stated above, plaintiffs submitted objections to this Court on December 1, 2005 to set aside the Magistrate Judge's order, and those objections are under consideration by this Court.

Second, although the CEQ regulations do not require public comment in every case before issuance of a Final EA and FONSI, the regulations do require that "NEPA procedures must insure that environmental information is available to . . . citizens before decisions are made and before actions are taken. The information must be of high quality. . . . public scrutiny [is] essential to implementing NEPA." 40 CFR § 1500.1(b) (2003); see also id. § 1500.2(d) ("Federal agencies shall to the fullest extent possible . . . [e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment" (emphasis added)), 1501.4(b) ("The agency shall involve . . . the public, to the extent practicable, in preparing [environmental] assessments"), 1506.6(a)-(e) (2003). See also, e.g., Sierra Club v. Marsh, 872 F.2d 497, 500 (1st Cir.1989) (importance of prior public comment); Citizens for Responsible Area Growth v. Adams, 477 F.Supp. 994, 998 (D.N.H. 1979) ("Section 102(2)(C) of NEPA provides a mandate of uncommon clarity. . . . As a practical matter, a threshold decision not to prepare an EIS may represent the last comprehensive environmental consideration a project receives. It is certainly the last opportunity for other agencies and the public to challenge the formal adequacy of environmental planning. The threshold determination, thus, is of profound importance") (emphasis added).

The CEQ regulations require federal agencies to adhere not only to the letter but also to the *spirit* of NEPA, 40 CFR §§ 1500.1(a), 1500.3 (2003). The CEQ regulations are applicable to and binding on all federal agencies. Id. § 1500.3 (2003). Defendants do not deny that NEPA reviews must be conducted with *objective* good faith (Plaintiffs' Main Brief at 5).

Here, at least as early as February 2003, over two months before the June 2, 2003 publication of the Draft EA, NASA and DOE knew -- by reason of the improperly predetermined outcome of this NEPA review -- that the NEPA review would conclude not only with the

issuance of a FONSI, but also with Brown's immediate commencement of construction activities (see, e.g., Tabs 32, 44; see also, e.g., AR 86 [0457-0458]). Thus, NASA and DOE knew that the public would not have any meaningful opportunity to comment on the Draft EA or Final EA other than during the 30-day comment period for the Draft EA. As a result, for the public to have had a right to comment before the agency action began, 40 CFR § 1500.1(b) (2003), the public had a right to submit comments prior to the publication of the Final EA.

The public's right to submit comments prior to the publication of the Final EA included the right to submit comments based upon "information ... of high quality." 40 CFR § 1500.1(b) (2003). But NASA and DOE failed to provide such information of high quality to plaintiffs and other members of the public during the comment period for the Draft EA. For one thing, the Draft EA's presentation of the hazardous air and noise emission information was seriously flawed, for the reasons discussed above and in plaintiffs' main brief. For another, NASA and DOE failed to take the required "hard look" at the environmental consequences of the proposed action, by failing properly to consider the cumulative effects of actions by other federal agencies such as NIH, which as discussed above was also providing major construction funding for the project.[26]

Furthermore, in the face of the documents in this group, defendants apparently realize (NASA/DOE Brief at 17-18, Brown Brief at 23) that they no longer can continue to deny that they withheld from the public prior to the June 2, 2003 publication of the Draft EA copies of the two Acentech noise reports (Tabs 5 and 6) and the Draft "Submission to State Historic Preservation Officer February 4, 2002" (AR 40 [0084-0230]) (which included as appendices

[26] NASA's and DOE's brief (at 15-16) incorrectly matches certain of the authors and the written comments that those authors submitted during the comment period for the Draft EA that are included in the Administrative Record. Plaintiffs respectfully refer the Court to the index to

copies of the December 5, 2001 RWDI Report and the undated "Brown University Biomed Center/Grimshaw-Gutewicz Air Permit Summary").

By withholding from the public for over one year until the comment period for the Draft EA the above documents and other information relating to hazardous air and noise emissions and other potential threats to health and safety to which the Draft EA later referred (and about which the public had requested information from Brown) (Plaintiffs' Main Brief at 57-61; AR 48 [0281-0284])), and providing plaintiffs and members of the public only thirty days in the middle of the summer of 2003 to review that highly technical information, defendants intentionally and wrongfully deprived plaintiffs and the public of a reasonable opportunity to review and investigate that information prior to submitting their comments. It is reasonable to infer that defendants' actions in this respect were intended to and did materially hinder, delay, and ultimately prejudice the public's ability to learn about these potentially significant impacts, and thereby rendered the public participation process improperly *pro forma* in nature. See Fund for Animals v. Norton, 281 F.Supp.2d 209, 225-229 (D.D.C. 2003) (*pro forma* public participation process for EA resulted in finding that agency failed to take required "hard look" at environmental consequences of proposed action; predetermination found); also Davis v. Mineta, 302 F.3d at 1112-1113 (*pro forma* public participation process; predetermination found).[27] NASA's and DOE's remarkable assertion (NASA/DOE Brief at 17) -- that Brown's reasons for withholding from the public the "Submission to State Historic Preservation Officer February 4,

---

the Administrative Record, which appears accurately to match those authors with their written comments (AR 123 [0889-1084]).

[27] The fact that defendants belatedly produced certain of the withheld information upon the publication of the Draft EA and afterwards (by request) that plaintiffs had requested previously did not cure the prejudice from defendants' delay, given its incompleteness. If defendants had provided that information to plaintiffs in early or mid-2002, plaintiffs could have more thoroughly investigated the potentially significant hazardous air and noise emission impacts that those documents suggested and could possibly have avoided the need for this litigation.

2002" and the reports it included and referenced for nearly 18 months prior to the June 2, 2003 publication of the Draft EA are irrelevant -- is thus meritless.[28]

As a group, thus, these documents are adverse and represent strong evidence of improper conduct within the meaning of the "record rule" because they show the deliberately improper *pro forma* nature of defendants' interaction with the public throughout the administrative review period and confirm that the descriptions in the Draft EA and Final EA about the public participation process were materially false and misleading. For example, those descriptions fail to state that defendants *refused*, in the nearly 18-month period prior to the June 2, 2003 publication of the Draft EA, to provide the public with the material written information within defendants' possession that related to hazardous air emissions and noise emissions and other potentially significant health and safety impacts (Tabs 61, 63, 64; see also, e.g., AR 48 [0281-0284]; AR 78 [0386-0387]). One can also search the documents within this group in vain for evidence that Brown's representatives ever disclosed *orally* to the public at the various public meetings the fact that there might be such potentially significant environmental impacts from the Life Sciences Building project.

The documents within this group are adverse and represent further proof of improper conduct for the additional reason that they show that even after NASA and DOE received the public's objections to the fact that defendants had withheld material information from the public for over one year prior to the June 2, 2003 publication of the Draft EA, NASA and DOE failed independently to verify that information -- in violation of 40 CFR § 1506.5(a), (b). Indeed,

---

[28] Brown furnished copies only of the appendices to the "Submission to State Historic Preservation Officer February 4, 2002" to the public, on request, following the publication of the Draft EA. Plaintiffs did not learn of the existence of the body of that February 4, 2002 draft document until July 2004, when NASA and DOE produced it as part of the Administrative Record. See also transcript of November 17, 2004 hearing in this action at 28-33 (Brown's

rather than verify that information, the Final EA responded to those objections by stating conclusorily and falsely that in the period prior to the publication of the Draft EA, defendants had advised the public of the potential environmental impacts from the Life Sciences Building (AR 113 [0788]) ("Brown University has provided information regarding … the types of research that would be conducted in the building and the potential environmental impacts that could result from the construction and operation of the building, since June 2000").[29]

The fact that the Final EA responded falsely to the public's objections should not come as a surprise, given the fact that it was Brown's consultant Swartz who drafted the text of the Final EA and the Final EA's responses to the public comments (see NASA/DOE Brief, Exh. G). Aside from the fact that Swartz had no personal knowledge of the events at issue prior to her retention by Brown on or about May 2, 2003, one month before the Draft EA was published, Swartz's willingness to misrepresent facts and otherwise subvert the NEPA process to help Brown quickly conclude the NEPA review and avoid having to perform an EIS is clear from the documents at Tabs 1-9 and 43-49 and the corresponding discussions in our main brief and here.[30]

---

suggestion that copies of the "Submission to State Historic Preservation Officer February 4, 2002" were made available to the public in 2002).

[29] At pages 15-16 of their brief, NASA and DOE suggest that they delayed issuing the Final EA so as to more carefully consider the public's comments. To the contrary, NASA and DOE extended the comment period for the Draft EA for thirty days *only* for the state agencies, because those state agencies had not timely received copies of the Draft EA and had requested additional time (AR 107 [0632]). But notwithstanding the fact that NASA and DOE extended the comment period for the state agencies, they *refused to extend the comment period for the public* (see also AR 91 [520]). Furthermore, in this action, NASA and DOE have previously refused to agree voluntarily to supplement the Administrative Record with 24 additional written comments from the public to the Draft EA that were submitted in error to the Rhode Island Historical Preservation & Heritage Commission, and not to NASA and DOE (see Plaintiffs' Motion to Supplement the Administrative Record, filed August 10, 2004, at 2, 2 fn. 3).

[30] Brown states incorrectly that it hired Swartz after the Draft EA was published (Brown Brief at 10). To the contrary, Brown hired Swartz on or about May 2, 2003 (see, e.g., Tabs 38-39; AR 90 [0517]), roughly one month before the Draft EA was released to the public on June 2, 2003.

The documents within this group are adverse and demonstrate improper conduct on the part of Brown, NASA, and DOE, for the additional reason that the refusal on the part of Brown, NASA, and DOE to permit the public to participate in a meaningful way consistent with the letter and spirit of NEPA was plainly based upon and was an integral part of defendants' determination to prevent anything from standing in the way of this NEPA review ending as quickly as possible and with anything but defendants' improperly predetermined outcome (a FONSI). In other words, the frustration and failure of the public participation process here was both a component and consequence of defendants' improper predetermination of the outcome of this NEPA review, and thus also represents additional evidence of that predetermination.

The documents in this section are adverse and indicative of improper conduct for the additional reason that they provide additional evidence of the absence of objective good faith on the part of NASA, DOE, and Brown in connection with this NEPA review. If one were to believe the defendants' position here, it was supposedly consistent with the letter and spirit of NEPA for the defendants to intentionally mislead the public during the administrative review period about the potentially significant impacts from the Life Sciences Building project, intentionally otherwise frustrate the public participation process, and later in the Final EA and Administrative Record conceal the fact that they had done so. Such a notion is plainly inconsistent with the letter and spirit of NEPA, and for this additional reason, the documents within this group are well within the applicable exceptions to the "record rule."[31]

NASA and DOE allege that certain of the documents within this group are self-serving or represent "sandbagging" by plaintiffs, apparently because plaintiffs did not submit them to

---

[31] Although defendants might not have been formally obligated by statute or regulation to conduct meetings with the public about the Life Sciences Building project prior to the issuance of the Draft EA or Final EA, once they elected to conduct those meetings, they were required to

NASA and DOE during the comment period for the Draft EA (NASA/DOE Brief at 5). That argument overlooks the fact that in a NEPA review such as this, the public cannot foresee what the federal agencies may choose later to include in the Administrative Record. Plaintiffs were entitled to assume that the federal agencies would take the required "hard look" at the environmental consequences of their proposed action and include within the Administrative Record the documents that represented the basis and results of that investigation. Plaintiffs were further entitled to assume that NASA and DOE would consider their comments to the Draft EA seriously and in good faith. Plaintiffs were further entitled to assume, for example, that the Final EA and Administrative Record would not omit and misrepresent material facts about the seriously deficient nature of the public participation process. Plaintiffs were further entitled to assume that defendants, and especially Brown, would not refuse to admit in the Draft EA and Final EA and before this Court that they withheld from the public in the pre-June 2, 2003 period the various reports identified above relating to air and noise emissions, other potentially significant environmental impacts, and other relevant information such as the involvement of NIH.[32]

Stated another way, if plaintiffs had been advised prior to the conclusion of the administrative review period here that NASA and DOE would publish an incomplete and misleading Final EA and Administrative Record, would largely ignore plaintiffs' comments to the Draft EA, and would otherwise not act with the required objective good faith, then plaintiffs might well have submitted all of the documents to NASA and DOE within this group as well as

---

act with objective good faith -- which Brown, the only defendant to meet with the public -- plainly failed to do, by willfully withholding material information from the public.

[32] But for Brown's counsel's continuing unwillingness to admit that their client Brown withheld the RWDI report and other materials described above (Brown Brief at 23, Plaintiffs' Main Brief at 56-57), a substantial portion of the discovery that plaintiffs conducted, the single

all of the documents contained in this motion of which plaintiffs were then aware. The documents here fill a gap in the Administrative Record that would otherwise prevent effective judicial review. Fund for Animals v. Williams, 391 F.Supp.2d 191, 198 (D.D.C. 2005). Attempting to shift the blame to plaintiffs for defendants' improper conduct is not a proper basis for seeking to exclude the documents at issue here.

F. Documents Relating Principally to NASA's and DOE's Failure to Examine Additional Potentially Significant Impacts (Tabs 74-76)

NASA and DOE object to this group of documents on the ground that NASA and DOE were not required to consider "the possible environmental impacts of less imminent actions when evaluating the potential impacts of a proposed action" (NASA/DOE Brief at 18). That argument, another impermissible *post hoc* rationalization, fails because it assumes incorrectly that NASA and DOE had in fact known that Brown was already operating a Biosafety Level 3 facility in the adjacent and physically-connected Biomedical Complex. It further assumes that NASA and DOE had concluded that such a facility would be established within the Life Sciences Building in the reasonably foreseeable future or that there would not be any reasonably foreseeable cumulative effects, see pages 17-18 above, from the operation of the existing Biosafety Level 3 facility at the adjacent Biomedical Complex. See Sierra Club v. Marsh, 769 F.2d at 878 (describing reasonably foreseeable impacts that must be considered).

NASA and DOE thus simply have no proper basis now for claiming that they believed that such an "upgrade" to a higher Biosafety Level rating at the Life Sciences Building would represent a so-called "subsequent phase" or that there would be no potential cumulative impacts from the operation of the Biosafety Level 3 facility already in existence at the Biomedical

---

Rule 37 discovery enforcement motion that plaintiffs submitted, and many of the documents that plaintiffs have offered on this motion would not have been necessary.

Complex.[33] NASA's and DOE's failure to take the required "hard look" at the environmental consequences of the Life Sciences Building project in this additional respect makes these documents adverse within the meaning of the "record rule." Furthermore, it is significant that RIDEM does not in any event review the potential environmental impacts of Biosafety Level 1, Level 2, Level 3, or the most potentially hazardous Biosafety Level 4 biological research laboratories. NASA's and DOE's attempt improperly to shift to RIDEM their burden of performing the "hard look" at the environmental consequences of their proposed action that NEPA requires in this respect is unavailing.

G. Post-August 8, 2003 Documents (Tabs 77-82)

Defendants' objections to the majority of the documents within this group are without merit, first, because with respect to the documents at Tabs 77 and 80-82, they fail to distinguish between the documents themselves, which are dated after the publication of the Final EA, and the information they contain, which was available prior to that date. Defendants otherwise do not address the reasons why plaintiffs offered those documents.

The documents at Tabs 78 and 79 provide further support for plaintiffs' claim that the Final EA's purported consideration of alternative building sites was contrived, and thus represents additional evidence of predetermination (Plaintiffs' Main Brief at 69). None of the defendants addresses that point.

## CONCLUSION

All of the documents that plaintiffs' have submitted in support of this motion are adverse within the meaning of the "record rule" and support plaintiffs' strong showing on their claims of improper conduct and bad faith. The showing that these documents make as a group -- including

33 We assume that the remainder of NASA's and DOE's argument, found at page 14 of their brief, is intended to address the documents relating to NIH found at Tabs 10-19.

Brown's intentionally misleading presentations to the public beginning in the fall of 2001 about the Life Sciences Building project, NASA's and DOE's early and improper limitations to the scope of the NEPA review, NASA's and DOE's intentional failure to take the required "hard look" at the possible environmental impacts of the Life Sciences Building project, defendants' frustration of the public's attempts timely to obtain material information from defendants about the project that contributed to the *pro forma* nature of the public participation process, and defendants' concealment of evidence of significant air and noise emission impacts and other material facts in the Final EA -- all of which was intended to and did ensure the circumvention of NASA's and DOE's obligation to perform an EIS and to achieve the speediest possible conclusion of this NEPA review -- is as compelling as it is unfortunate.

Moreover, when considered collectively with the documents already included within the Administrative Record, these documents show that an EIS should have been performed. On the other hand, this Court may ultimately conclude that defendants' improper conduct by itself warrants the setting aside of NASA's and DOE's decision to issue a FONSI and not perform an EIS.

We emphasize that because this motion does not seek a determination of the merits of this action, but seeks only to correct the seriously incomplete Administrative Record, the Court should resolve all doubts in favor of ensuring that the Administrative Record is complete and accurately represents the prior administrative proceedings. It is difficult to imagine how defendants could be unfairly prejudiced by the admission of any of the documents at issue here, in that defendants will have appropriate opportunities later to argue the merits of this case before this Court. On the other hand, to the extent that exclusion of one or more of these documents might cause an incorrect NEPA decision to stand, the potential prejudice to the long-term health

and safety of plaintiffs and other unrepresented members of the public is very real. We therefore urge the Court to exercise its discretion in favor of including all of the documents with which plaintiffs seek to supplement the Administrative Record.

Accordingly, for the reasons set forth above and in plaintiffs' main brief, the Court should order that the Administrative Record be supplemented with the documents contained in Appendix to this motion.

Dated: January 3, 2006

William G. Touret/Pro Se
11 South Angell Street #264
Providence, RI 02906-5206
Tel. (800) 345-0080
Fax (401) 831-5329

J. WILLIAM W. HARSCH/Bar No. 3688
CAROLYN A. MANNIS/Bar No. 4275
170 Westminster Street, Suite 800
Providence, RI 02903
Tel. (401) 454-4466
Fax (401) 351-3914

Attorneys for Plaintiffs Thomas A. Bennett, William G. Black, Eileen F. Rosenberg-Black, Antoinette Breed, Allyn Copp, Ronald A. Dwight, Pamela Hext Dwight, G. Dale Dulgarian, as he is Trustee for KSD Trust, Virginia G. Riggs, Yvonne G. Shilling, and College Hill Neighborhood Association

CERTIFICATE OF SERVICE

I hereby certify that on the 3d day of January, 2006, I caused a copy of the foregoing to be sent by first-class mail to the following:

Robin E. Feder, Esq.
Assistant U.S. Attorney
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Beverly E. Ledbetter, Esq.
Vice President and General Counsel
Box 1913
Brown University
Providence, RI 02912-1913

Joseph Avanzato, Esq.
Kristen W. Sherman, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

William G. Touret

08/23/2005 11:31 AM

# NOTICE OF GRANT AWARDS REPORT

***************************** NOTICE OF GRANT AWARD ****************************

RESEARCH FACILITIES CONSTRUCTION Issue Date:05/09/2005
Department of Health and Human Services
National Institutes of Health

NATIONAL CENTER FOR RESEARCH RESOURCES
********************************************************************************

Grant Number: 1 C06 RR015471-01 (Revised)
Principal Investigator: SHANK, PETER R PHD
Project Title: EXTRAMURAL RESEARCH FACILITIES CONSTRUCTION PROJECT

DIRECTOR
BROWN UNIVERSITY
OFFICE OF RESEARCH ADMINISTRATIO
BOX 1929
PROVIDENCE, RI 02912
UNITED STATES
Award e-mailed to: resadmin@brown.edu

Budget Period: 08/01/2000 - 06/30/2005
Project Period: 08/01/2000 - 06/30/2005

Dear Business Official:

The National Institutes of Health hereby revises this award (see ''Award Calculation'' in Section I and ''Terms and Conditions'' in Section III) to BROWN UNIVERSITY in support of the above referenced project. This award is pursuant to the authority of 42 USC 287 42 CFR 52 and is subject to terms and conditions referenced below.

Award recipients are responsible for reporting inventions derived or reduced to practice in the performance of work under this grant. Rights to inventions vest with the grantee organization provided certain requirements are met and there is acknowledgement of NIH support. In addition, recipients must ensure that patent and license activities are consistent with their responsibility to make unique research resources developed under this award available to the scientific community, in accordance with NIH policy. For additional information, please visit http://www.iedison.gov.

If you have any questions about this award, please contact the individual(s) referenced in the information below.

Sincerely yours,

# NOTICE OF GRANT AWARDS REPORT

Vicki Maurer
Grants Management Officer
NATIONAL CENTER FOR RESEARCH RESOURCES

See additional information below

SECTION I - AWARD DATA - 1 C06 RR015471-01 (Revised)

AWARD CALCULATION (U.S. Dollars):

| | |
|---|---|
| CONSTRUCTION AND RELATED COSTS (APPROVED BUDGET) | $6,139,188 |
| Federal Share | $2,000,000 |
| Non-Federal Share | $4,139,188 |
| TOTAL FEDERAL AWARD AMOUNT | $2,000,000 |
| AMOUNT OF THIS ACTION (FEDERAL SHARE) | +$0 |

FISCAL INFORMATION:
CFDA Number: 93.389
EIN: EIN
Document Number: C6RR15471A

IC/ CAN / FY2000
RR/8422459/ 2,000,000

NIH ADMINISTRATIVE DATA:
PCC: RFI09 / OC: 41.61 /Processed: MAURERV 050504 0420

SECTION II - PAYMENT/HOTLINE INFORMATION - 1 C06 RR015471-01 (Revised)

For Payment and HHS Office of Inspector General Hotline Information, see the NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm

SECTION III - TERMS AND CONDITIONS - 1 C06 RR015471-01 (Revised)

This award is based on the application submitted to, and as approved by, the NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

a. The grant program legislation and program regulation cited in this Notice

of Grant Award.
b. The restrictions on the expenditure of federal funds in appropriations acts, to the extent those restrictions are pertinent to the award.
c. 45 CFR Part 74 or 45 CFR Part 92 as applicable.
d. The NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
e. This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(see NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

Carry over of an unobligated balance into the next budget period requires Grants Management Officer prior approval.

Treatment of Program Income:
Other (See Remarks)

SECTION IV - NCRR TERMS AND CONDITIONS (REVISED):

Funds for construction may be obligated in accordance with the final construction documents and the responses to NIH comments.

----------------------------------------------------------------------------------

SECTION IV - NCRR TERMS AND CONDITIONS (REVISED 07/02/04):

THIS REVISED AWARD EXTENDS THE BUDGET AND PROJECT PERIOD END DATES

THROUGH 06/30/2005 BASED ON THE GRANTEE'S REQUEST DATED 06/23/2004. THIS IS THE FINAL EXTENSION ALLOWABLE UNDER THIS GRANT. ALL PMS FORMS TO DRAW DOWN FUNDS MUST BE SUBMITTED BY JUNE 30, 2004.

----------------------------------------------------------------------------------

SECTION IV - NCRR TERMS AND CONDITIONS (REVISED 07/22/2003):

This revised award extends the budget and project period end dates through 07/31/2004 in accordance with the grantee's letter of request dated 06/24/2003.

----------------------------------------------------------------------------------

SECTION IV - NCRR SPECIFIC TERMS AND CONDITIONS - 1 C06 RR15471-01

1. This award is based on the application submitted in response to the Request for Applications (RFA) RR-00-002, Extramural Research Facilities Construction Projects.

08/23/2005 11:31 AM

# NOTICE OF GRANT AWARDS REPORT

2. ALL FUNDS ARE RESTRICTED AND MAY NOT BE OBLIGATED UNTIL THE SCHEMATIC DESIGN, DESIGN DEVELOPMENT, AND FINAL CONSTRUCTION DOCUMENTS ARE RECEIVED AND APPROVED BY THE NCRR AND A REVISED NOTICE OF GRANT AWARD, RELEASING THESE FUNDS, HAS BEEN ISSUED.

3. Grant Award Computation:

| | | |
|---|---|---|
| a. Total Project Costs | $ 6,139,188 | |
| b. Total Eligible Costs | $ 6,139,188 | |
| c. Federal Share of "b" | $ 2,000,000 | |
| d. Federal Percentage of "b" | | 32.57% |
| e. Non-Federal Percentage of "a" | | 67.43% |

The Cost Allocation Ration (CAR) to be used in apportioning the total eligible design, construction, and fixed equipment costs for this award is 100% for the grant areas.

The Grant Participation Percentage (GPP) is limited to 32.57% of the eligible project costs or the amount of the NCRR grant award, whichever is less.

4. Contracts or other binding arrangement for construction of facilities must be effected no later than June 30, 2005.

5. The estimated date for completion of this project is June 30, 2005.

6. This award is for eligible design, construction and fixed equipment costs for renovation of space in the Department of Cognitive and Linguistic Sciences at Brown University. The project will provide 14,420 square feet of space for interactive and collaborative research activities.

7. The NCRR-funded space will include research and research support areas for the following:

| Program Area | Summary of Grant Area | Total Cost ($) | NCRR ($) |
|---|---|---|---|
| Research Laboratories | 8,000 | 3,405,930 | 1,109,574 |
| Shared Core Facilities | 3,700 | 1,575,242 | 513,175 |
| Support Space | 2,720 | 1,158,016 | 377,251 |
| Total | 14,420 | $ 6,139,188 | $ 2,000,000 |

8. The total eligible design, construction, fixed equipment costs, and Final Cost Allocation Ratio shall be in accordance with the Final Design

Documents as determined from the lowest acceptable competitive construction bid(s), and approved by the NCRR. The grantee shall identify the costs of the grant-supported areas to the satisfaction of NCRR staff. All contingency costs incurred after the award of all elements of the grant, the beginning of construction work, and costs that exceed two percent of the eligible project cost shall be borne by the grantee.

9. The grantee shall submit two sets of Schematic Design, Design Development, and Final Design Documents, including detailed cost estimates at each stage, for review and approval by the NCRR before bids and proposals are solicited by the grantee for the construction contract.

10. These terms are subject to revisions by NCRR based upon changes during the design of the facility, in order to comply with the latest DHHS, PHS, and NCRR design standards.

11. In accordance with 45 CFR Part 74.37, the grantee must record a notice of federal interest at the time construction begins. (See also the PHS Grants Policy Statement [DHHS Publication No. (OASH) 94-50,000, Revised April 1, 1994].) A copy of the Notice must be sent to the Grants Management Specialist identified below within 10 days of filing the Notice.

12. Immediately upon completion of the project or beneficial occupancy, whichever comes first, the grantee must purchase an insurance policy which protects the property against partial or total physical destruction. The policy must cover the full appraised value of the property (not just the Federal portion thereof), using state-certified appraisers. The insurance policy is to be maintained for the entire 20-year usage period.

Insurance charges are allowable charges to the grant during the period of grant support. A waiver to the requirement may be considered by NCRR if the grantee can show it is effectively self-insured against the risks involved.

13. The space created and/or renovated with these Federal funds (including the required matching funds) must be used for the research purpose for which it was constructed for twenty (20) years after occupancy unless prior written approval has been obtained from the NCRR. The NCRR will initiate recovery actions, as specified in 45 CFR 74.2 and 45 CFR 74.32, in the event this requirement is not fulfilled by the recipient institution.

14. An authorized business representative from the grantee institution

must notify the Grants Management Specialist identified below immediately upon completion of the construction project or occupancy, whichever comes first.

15. As referenced in Section III of the Notice of Grant Award, this grant is subject to the terms and conditions of the NIH Grants Policy Statement. See the NIH Grants Policy Statement, pages III-3 through III-21, for special terms and conditions applicable to construction grants.

16. Disposition of Program Income: During the project period, program income will be subject to the Deductive Alternative. Proceeds from the sale or lease of grant-supported property shall be handled in accordance with the requirements of the Property Standards, as specified in 45 CFR 74.32.

SECTION V - NCRR CONTACTS:

The Grants Management Specialist is responsible for the negotiation, award and administration of this project and for interpretation of Grants Administration policies and provisions. The Program Official or the Program Staff Administrator is responsible for the scientific,

programmatic and technical aspects of this project. These individuals work together in overall project administration. Prior approval requests (countersigned by the PI and the authorized business official) should be submitted in writing to the Grants Management Specialist. Requests may be made via e-mail provided they are routed through these same individuals.

The NCRR WWW home page is at http://www.ncrr.nih.gov

FRED TAYLOR, Program Official
Phone: (301)435-0766 Email: taylorwf@mail.nih.gov Fax: (301)480-3770

Alice Chi, Grants Specialist
Phone: (301) 435-0857 Email: chia@mail.nih.gov Fax: (301) 480-3777

SPREADSHEET
GRANT NUMBER: 1 C06 RR015471-01 (Revised)

P.I.: SHANK, PETER R
INSTITUTION: BROWN UNIVERSITY

YEAR 01

08/23/2005 11:31 AM

# NOTICE OF GRANT AWARDS REPORT

| | |
|---|---|
| | ========= |
| Construction Costs (Federal Share) | 2,000,000 |
| TOTAL FEDERAL DC | 2,000,000 |
| TOTAL FEDERAL F&A | |
| TOTAL COST | 2,000,000 |