**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| WILLIAM G. TOURET, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | CIVIL ACTION NO. 04-198T |
| NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, et al., | ) | |
| Defendants. | ) | |

**COLLEGE HILL PLAINTIFFS' BRIEF IN SUPPORT OF APPEAL**

## I. INTRODUCTION

This matter is before this Honorable Court on Appeal of the decision of National Aeronautics and Space Administration (NASA) and Department of Energy (DOE). Plaintiffs Thomas A. Bennett, William G. Black, Eileen F. Rosenberg-Black, Antoinette Breed, Allyn Copp, Ronald A. Dwight, Pamela Hext Dwight, G. Dale Dulgarian, as he is Trustee for KSD Trust, Virginia G. Riggs, Yvonne G. Shilling, and College Hill Neighborhood Association (hereinafter collectively referred to as the "College Hill" Plaintiffs) submit this brief in support of their appeal.

This action arises from the Life Sciences Building project by defendant Brown University (Brown) in the College Hill section of Providence. The complaint alleges that the two federal agency defendants, NASA and DOE, violated Section 102(2)(C) of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2)(C), et seq. (NEPA) and regulations promulgated thereunder, by failing to prepare an environmental impact statement (EIS). Instead, NASA and DOE prepared an environmental assessment (EA) accompanied by a finding of no significant

impact (FONSI) concluding that preparation of an EIS was not required, because, in their erroneous opinion, the construction and operation of the new facility at Brown "would not individually or cumulatively have a significant [e]ffect on the quality of the human environment" (Administrative Record "AR" 116 [801]).

As alleged in the complaint (¶ 25), NASA and DOE failed to consider potentially significant environmental impacts, including hazardous air emissions. Further, the decision not to prepare an EIS was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. See complaint at ¶ 28. College Hill Plaintiffs also seek declaratory and injunctive relief. Id. at ¶ 29.

## II. FACTS

College Hill Plaintiffs herein respectfully adopt and incorporate here by reference the statement of facts set forth in the Brief of Plaintiff William G. Touret. (Touret Brief).

## III. ARGUMENT

In addition to the arguments raised in the Touret Brief, which the College Hill Plaintiffs adopt and incorporate here by reference, the College Hill Plaintiffs submit the following arguments in support of their appeal:

### A. NASA and DOE did not Properly Assess the Substantial Likelihood of Significant Environmental Impacts from Noise Emissions.

The Final EA purported to rely upon the results of two noise emission reports performed for Brown in early 2002 for the NHPA § 106 review, in concluding that noise emissions from the Life Sciences Building would not create a significant impact upon the human environment. The two noise emission studies were performed by Acentech, a consulting firm. Notwithstanding the

fact that the Final EA stated that it had incorporated the two Acentech reports by reference (AR 113 [0739, 0785]), they were not included in the Administrative Record.[1]

The Draft EA concluded incorrectly, on the purported basis of the two Acentech reports, that the cumulative impact of the Life Sciences Building's estimated noise emissions and the pre-existing surrounding noise levels would not exceed the maximum noise levels permitted by the city's noise ordinance (AR 98 [0560, 0573-0574]).[2] But in response to written objections by members of the public who requested copies of and reviewed the two Acentech reports after NASA and DOE first disclosed their existence in the text of the Draft EA (AR 123 [0907-0911, 1037, 1040]), the Final EA -- in an Appendix -- conceded that the Draft EA had erred in concluding that the cumulative noise emissions from the Life Sciences Building and other nearby noise emission sources would comply with the city noise ordinance (AR 113 [0785]). Notwithstanding the Final EA's admission, the main text of the Final EA stated that the Life Sciences Building when evaluated on an individual basis, apart from the other nearby noise emissions sources, would not exceed the limits of the city's noise ordinance and that therefore the proposed facility would not result in a significant impact upon the human environment (AR 113 [0753]). That conclusion was plainly wrong, however, because NEPA requires consideration of cumulative impacts, as the Final EA itself elsewhere acknowledged (AR 113

---

[1] There is no evidence that NASA or DOE ever reviewed the two Acentech reports, a clear violation of NASA's and DOE's obligation independently to verify the materials that Brown and its consultant prepared. See 40 CFR § 1506.5(a), (b) (2003). See, e.g., Washington County v. U.S. Dep't of the Navy, 357 F.Supp.2d 861, 871 (E.D.N.C.), injunction modified, 422 F.3d 174 (4th Cir. 2005) (agency personnel's reliance on abstract of technical report cited in EIS, and not report itself, was "not the thorough analysis required by NEPA").

[2] The February Acentech report was based on speculation as to the specific equipment that the Life Sciences Building would utilize that would be the source of the noise emissions (AR 123 [0909]). The February Acentech report acknowledged that the potential noise emissions might in fact be far higher than what Acentech estimated (AR 123 [0909]). At best, Acentech recommended hypothetical noise mitigation efforts, which did not obviate the requirement for an EIS. Sierra Club v. Marsh, 769 F.2d 868, 877 (1st Cir. 1985).

[0760]); see also 40 CFR §§ 1508.7 (evaluation of cumulative impacts must consider past, present, and reasonably foreseeable actions by all federal and non-federal agencies and persons), 1508.8, 1508.27(b)(7)(2003); National Resources Defense Council v. U.S. Forest Service, 421 F.3d 797, 814-817 (9th Cir. 2005). And given the admission in the Appendix to the Final EA that cumulative noise emissions at the proposed site for the Life Sciences Building already exceeded the permissible limits of the city noise ordinance, the Final EA's conclusion that the noise emissions would not cause a significant impact was thus a plainly contrived result. See, e.g., Citizens for Responsible Area Growth v. Adams, 477 F.Supp. 994, 1004 (D.N.H. 1979) (attempt to bypass acknowledged significant impacts was inconsistent with NEPA).

B. NASA and DOE failed to Examine Actions and Activities that Could have Significant Cumulative Impacts Within the Meaning of NEPA.

Additionally, NASA and DOE failed to examine other past, present, and reasonably foreseeable future actions and activities for potentially significant cumulative impacts within the meaning of NEPA.[3] See, e.g., Dubois v. U.S. Dep't of Agriculture, 102 F.3d 1273, 1286 (1st Cir. 1996), cert. denied, 521 U.S. 1119 (1997) ("The agency need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action. . . . In this context, reasonable foreseeability means that "'the impact is sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision'") (quoting Sierra Club v. Marsh, 976 F.2d 763, 767 (1st Cir. 1992)). These impacts include (1) impacts from other federal agency and private funding, (2) impacts from biological pathogen laboratories, and (3) impacts from additional development within the College Hill historic district.

---

[3] In March 2003, NASA and DOE criticized the then-current version of the Draft EA for its failure to include an analysis of other actions and activities at Brown (AR 84 [0453]).

During the 2000-2001 time frame, the federal National Institutes of Health (NIH) awarded Brown a $2 million grant for the Life Sciences Building project (AR 40 [0094]). NASA and DOE did not mention the $2 million NIH grant in the Final EA, even despite objections from the public that Brown had previously indicated that NIH was a major financial supporter of Brown's biomedical programs (AR 106 [0627-0628], AR 123 [0901-0903], AR 42 [0240-242]). By omitting mention of that NIH funding, the Final EA failed to identify and evaluate all of the federal actions that together constituted the "major federal action" here. 42 U.S.C. § 4332(2)(C); 40 CFR § 1508.18(a), (b), 1508.25(a) (1)-(3) (2003) ("connected actions" and "cumulative actions" must be considered together; "similar actions" should be considered together "when it is the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions").[4]

The Final EA also failed to identify and evaluate the considerable other federal research support specifically designated for the Life Sciences Building that Brown expects to receive (AR 106 [0627-0628]; AR 113 [0787]), AR 123 [0901-0903, 0928-0931]. Brown has suggested that the Life Sciences Building would initially generate at least $13.4 million annually in such federal support (Complaint ¶ 10; Brown Answer ¶ 10).[5] As a consequence of the EA's failure to identify and evaluate these substantial additional federal research monies already designated for the Life Sciences Building, the Final EA again failed to identify and evaluate all of the federal

---

4 The NIH funding would appear to qualify as a "connected," "cumulative," and "similar" action within the meaning of 40 CFR § 1508.25(a) (1)-(3) (2003).

5 In its Answer, Brown admitted the allegations of paragraph 10 of the Complaint, which stated that Brown estimated that the Life Sciences Building, together with the smaller former Doran-Speidel Building in the Jewelry District, would together attract an estimated $23.4 million in federal research support annually. Of that annual total, Brown has estimated that that the former Doran-Speidel Building would attract at least $10 million in annual federal research support (see AR 123 [0931]). Brown thus apparently estimates that the Life Sciences Building will attract the balance of at least $13.4 annually in such federal research support.

actions that together constituted the "major federal action" here.[6] The Final EA's failure to identify all of the committed and otherwise expected federal funding for the Life Sciences Building project, from which all of the actions constituting the "major federal action" must be determined and evaluated, strongly supports an EIS being required here. See 40 CFR § 1508.27(b) (4) (2003); Fund for Animals v. Norton, 281 F.Supp.2d 209, 234-235 (D.D.C. 2003); AR 123 [0901-0903].

The Final EA similarly failed to examine the potentially significant cumulative effects resulting from the all of the actions constituting the "major federal action" here together with other past, present, and reasonably foreseeable substantial federal and other private actions -- research and related funding for Brown's biomedical research programs generally. 40 CFR § 1508.7, 1508.8 (2003). In the 2000-2001 period alone, Brown received over $100 million in research-related funding support, of which a majority was federal (AR 35 [0078]). Of that total, over $11 million was defense-related (id.). The Brown Biomedical Complex, which is apparently Brown's largest single laboratory facility on College Hill, together with the adjacent and physically-connected Life Sciences Building, by their sheer combined size would be presumed to attract a majority of future such annual research funding at Brown. The Final EA did not examine the past, present, and reasonably foreseeable future actions and activities stemming from that and other funding, but instead provided only a conclusory summary of activities that were anticipated to take place within the Life Sciences Building alone -- thus only

---

6 Brown apparently intends to apportion certain of the proceeds from such future federal research funding to offset construction and other infrastructure costs of the Life Sciences Building through indirect cost recovery agreements (see AR 123 [0901]; AR 35 [0078 (citing article, "Recovery of indirect costs plays key role in campus research")]). That fact suggests that such proceeds might, over the useful life of the Life Sciences Building, cause the entirety of the construction costs of the facility to be paid for with federal funds. The Final FONSI acknowledged that the future operation of the Life Sciences Building was a reasonably foreseeable "outcome" of the proposed action (AR 113 [0801]).

suggesting obliquely what activities might have taken place, might be taking place, or might take place in the future within other nearby Brown laboratory facilities (AR 113 [0732-0734, 0745-0757]).[7]

In response to the public's criticism that the Draft EA failed to examine the undisclosed substantial federal and other private funding for the Life Sciences Building and its potentially cumulative impacts (AR 106 [0627-0630], AR 123 [0901-0903]), the Final EA only stated that details of such funding were speculative and that other agency funding would be subject to the NEPA regulations of the funding agencies (AR 113 [0732, 0786-0787]). But by failing to identify and evaluate those known other actions and potentially significant cumulative impacts, NASA and DOE materially understated the true scope of the "major federal action" here, 40 CFR § 1508.25 (2003), and engaged in improper segmentation. 40 CFR § 1508.27(b)(7)(2003); Sierra Club v. Marsh, 769 F.2d at 879, 881.

The Final EA stated that research activities at the Life Sciences Building might in the future involve the use of more hazardous Biosafety-Level 2 "moderate risk" biological pathogens (AR 113 [0732-0733]). NASA and DOE, however, did not examine whether the adjacent Biomedical Complex or other Brown laboratories already were performing more potentially hazardous pathogen research, and if so, at what Biosafety Level. A Biosafety Level 3 laboratory, or a laboratory having the most potentially hazardous Biosafety Level 4 designation at the Biomedical Complex or other Brown laboratory buildings, could increase the likelihood and thereby render reasonably foreseeable the use of such more hazardous facilities at the Life

---

7 Certain of the actions that are funded by that additional federal research funding, also not identified or evaluated in the Final EA, could represent additional aspects of the "major federal action" here, and thus should have been identified and evaluated.

Sciences Building.[8] Alternatively, such existing or reasonably foreseeable Biosafety Level 3 or 4 laboratories could independently represent actions yielding cumulatively significant impacts on the surrounding human environment. Cf. Foundation on Economic Trends v. Heckler, 756 F.2d 143, 153-156 (D.C.Cir. 1985) ("complete failure" by NIH to evaluate impacts of experiments involving genetically engineered organisms); see also Dubois v. U.S. Dep't of Agriculture, 102 F.3d at 1286 (reasonable forecasting requirement). In April 2003, NASA and DOE had urged Brown to address the subject of possible Biosafety Level 3 and 4 laboratories (AR 84 [0454]).

The Final EA also failed to consider the potential for further major facility development within the existing historic district as a result of the construction of the Life Sciences Building. The primary reason that Brown located the Life Sciences Building at the chosen site was to enable the Life Sciences Building to be adjacent and physically connected to the Biomedical Complex (see Section C, below). Logic would dictate that by so substantially increasing the core of certain of Brown's biomedical and other life sciences assets within the historic district, such development would increase the likelihood that Brown or other entities would seek to place similar facilities within the same general area -- thereby risking additional significant impacts to the historic district and historic resources. See 40 CFR § 1508.27(b)(6) (2003); Sierra Club v. Marsh, 769 F.2d at 879 (agency cannot ignore uncertain but probable secondary effects of its decisions) (quoting *CEQ's Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18026, 18031 (1981)). The Rhode Island Historical Preservation & Heritage Commission (RIHP&HC) initially rejected the Life Sciences

---

[8] The Final EA's statement that the purpose of the Life Sciences Building is to enable Brown to engage in "breakthrough scientific collaborations" (AR 113 [0723]), together with the intense competition between academic institutions for federal and other funding, are additional factors that could render such a Biosafety Level 3 or Level 4 capability -- as one of many possible secondary effects -- reasonably foreseeable within the meaning of NEPA. Sierra Club v. Marsh, 769 F.2d at 877-882.

Building project because it had concluded that its adverse effects *alone* would violate NHPA § 106 (AR 44 [0249-0250]).[9]

C. NASA and DOE Did Not Properly Consider Feasible Alternative Sites.

DOE and NASA also failed to consider feasible alternative sites. Consideration of feasible alternatives is a core requirement under NEPA. See 42 U.S.C. § 4332(2)(C)(iii), (E); 40 CFR §§ 1500.2(e), 1502.14, 1508.9(b) (2003); Native Ecosystems Council v. U.S. Forest Service, 428 F.3d 1233, 1245 (9th Cir. 2005) (EA must include a discussion of alternatives to the proposed action); Davis v. Mineta, 302 F.3d 1104, 1120 (10th Cir. 2002); Dubois v. U.S. Dep't of Agriculture, 102 F.3d at 1286. The Final EA's consideration of feasible alternatives was seriously deficient in at least two respects. First, its analysis of alternative building locations was deficient. Second, the NASA and DOE's "no-action alternative" comparative analysis in the Final EA was improper and inadequate.

Brown chose the site for the Life Sciences Building prior to the commencement of the NHPA and NEPA reviews here and apparently without any regard for NEPA considerations (see AR 40 [0089-0090]). NASA's and DOE's representatives in turn adopted Brown's original site selection criteria, notwithstanding their awareness -- discussed below -- that those criteria were insufficient under NEPA. Those criteria do not withstand critical examination and thus appear to have served as little more than a thinly-veiled attempt to justify the previously-made site location choice by Brown -- that the Life Sciences Building be located adjacent and physically connected to the existing Biomedical Complex.[10]

[9] On May 15, 2003, DOE's Peter Siebach acknowledged that Brown would likely build additional large-footprint facilities in the immediate area (AR Supp. Doc. 48).

[10] The seven criteria set forth in the Final EA at AR 113 [0724] do not withstand scrutiny for many reasons, including the following: (1) Brown's Master Plan could be amended to include building sites within the City of Providence not already included in Brown's then-current Master Plan. Providence Zoning Ordinance § 503.4(B) (1995). (2) The building site was not

On May 15, 2003, DOE's Peter Siebach stated in an email message that, in his view, the Life Sciences Building did not need to be located on College Hill, but could be located near Rhode Island Hospital (one of Brown's teaching hospitals) (see AR Supp. Doc. 48).[11] Defendants knew that plaintiffs and other members of the public had expressed the same point on numerous previous occasions (see, e.g., AR 47 [0255-0275], AR 48 [0282]). And in mid-May 2003, rather than evaluate possible alternative feasible sites as required, defendants' representatives did the opposite: they simply embellished Brown's original site selection criteria (AR 40 [0089-0090]) to ensure that Brown's predetermined site (adjacent to the Life Sciences

---

required to be located within Brown's existing Institutional Zone, because Brown could apply for a special use permit to be excused from that requirement -- as it did in May 2003 when it acquired the former Doran-Speidel Building in the Providence Jewelry District (see AR 123 [0931] (describing Brown's special use permit)). Providence Zoning Ordinance § 503.5(C) (1995). (3) Adjacency to the existing Biomedical Building was not an absolute requirement, because Brown had sited or intended to site similar facilities off of College Hill (at Rhode Island Hospital and the former Doran-Speidel Building). Furthermore, as discussed below, NASA and DOE never considered whether individual component parts of the Life Sciences Building could feasibly be sited elsewhere; (4) The concept of "reasonable proximity" is unduly vague; as is discussed below, DOE's Peter Siebach implicitly conceded that Rhode Island Hospital (one of Brown's teaching hospitals) was within reasonable proximity to Brown's main campus. (5) Available land having a footprint sufficient for the facility's 170,000 gross square foot area likely could be found within or outside of the city of Providence and within reasonable proximity to Brown's main campus. (6) Available land for the facility did not need to be owned by Brown, because the substantial revenues that the facility is anticipated to generate, as discussed above, would render the acquisition cost of land immaterial. In fact, Brown did not previously own the land under the former Doran-Speidel Building, which it acquired in May 2003 (AR 123 [0901]). (7) This factor -- avoiding disruption of the surrounding residential areas -- is irrational, because the aggregation of heavy research facilities at the same location maximizes the most health-threatening hazardous air and noise impacts upon the immediately surrounding human environment (see also AR 123 [0915-0918]). Notably, Brown's May 2003 acquisition of the former Doran-Speidel Building in Providence's Jewelry District, for additional biomedical research space, violated most if not all of the Final EA's purported site selection criteria that NASA and DOE offered to justify the site location of the Life Sciences Building on College Hill (see AR 123 [0915]).

11 Administrative Record Supplemental Document __ ("AR Supp. Doc. __") refers to those documents that were the subject of the Court's February 23, 2006 and March 27, 2006 orders. By those orders, the Court ordered the Administrative Record supplemented with Plaintiffs' Doc. 1 to which the February 23, 2006 order referred, permitted plaintiffs to utilize as extrinsic

Building) would be the only site that would satisfy the Final EA's criteria (see AR Supp. Doc. 43-49). In the course of that effort, DOE's Peter Siebach rejected an additional "adjacency" criterion that Brown's consultant Swartz proposed, out of concern that the contrived nature of the embellishment effort would be transparent and too obvious (AR Supp. Doc. 48). On April 23, 2003, DOE's Siebach had written that, with respect to the then current Draft EA, "I don't like that no other alternative was really analyzed, but hey, it is a Congressionally mandated [g]rant" (AR 86 [0458]).[12] Notwithstanding Siebach's criticism, NASA and DOE included the proposed "adjacency" criterion in the Final EA with little change (AR 113 [0724]).

A second deficiency in the Final EA was its failure properly to analyze the required "no-action alternative" comparison. See 40 CFR § 1508.25(b)(1) (2003). NASA's and DOE's representatives recognized in March 2003 that "No Action is defined as no change from existing conditions and that the proposed action would not take place" (AR 84 [0452]).

The Final EA, however, stated that because the percentage of federal funding for the construction of the Life Sciences Building was not greater, the Life Sciences Building would likely be built even if NASA's and DOE's construction grants were not made, and that therefore the environmental impacts of the agencies' not taking their proposed action would not be different (AR 113 [0761]). The Final EA's reasoning was faulty because (a) it failed to compare

---

evidence Docs. 43-49 to which that same order referred, and ordered the Administrative Record supplemented with NASA's and DOE's Exh. G to which the March 27, 2006 order referred.

[12] Additionally, the Final EA failed to evaluate the Life Sciences Building from the standpoint of its component parts (i.e., conference rooms, administrative offices, individual laboratory facilities, animal care facilities, and the like), that is, as less than an entirety, to determine whether any of those component parts could feasibly be sited elsewhere. In 2002, Brown agreed to reduce the height of the Life Sciences Building from six stories to five, and in mid-2003 acquired the former Doran-Spiedel Building in the Providence Jewelry District -- apparently in part to replace the abandoned floor space at the Life Sciences Building project (AR 123 [0901]). Especially in view of DOE's Peter Siebach's comment that the Life Sciences Building did not need to be sited on College Hill, there is no reason to believe that most if not all

the possible impacts, if any, that would result from the Life Sciences Building not being built at the proposed location -- i.e., if there were no change from existing conditions; and (b) for the reasons discussed above, the actual federal funding for the Life Sciences Building project, and thus the true scope of the "major federal action" here, are substantially greater than simply the sum of the NASA and DOE construction grants.[13]

D. The Public Participation Process was Deficient and *Pro Forma.*

The public participation process, another fundamental NEPA requirement, 40 CFR §§ 1500.1(b), 1500.2(e) (2003), was seriously inadequate and merely *pro forma* in nature. NASA and DOE refused plaintiff CHNA's May 3, 2002 request for direct involvement during this NEPA review (AR 48 [0281-0284], AR 78 [0386-0387]), despite DOE's private acknowledgement that such participation by CHNA "would seem consistent with the spirit of [NEPA]" (AR 75 [0381]).[14] NASA, DOE, and Brown also refused to provide forthright and reasonable responses to inquiries from the public (see, e.g., AR 102 [0614-0615] (Brown's response to public inquiry omitted mention of itemized table of hazardous air emissions shown in AR Supp. Doc. 1, which omission concealed the seriousness of the existing and anticipated hazardous air emissions)).

In their comments to the Draft EA, the public objected to defendants' withholding all evidence that indicated that activities at the Life Sciences Building had the potential to result in significant environmental impacts to the human environment, and to NASA's and DOE's refusal to provide a materially sufficient comment period to enable the public to investigate and

---

of the other individual components of the Life Sciences Building could not similarly have been feasibly sited elsewhere.

[13] Notwithstanding the public's objections (AR 123 [0915-0920]), the Final EA simply repeated the same site selection criteria and no-action analysis from the Draft EA (AR 98 [0546-0549-0581]).

meaningfully comment on the information presented for the first time in the Draft EA (see, e.g., AR 106 [0627-0630], AR 123 [0891-0892, 0896-0900, 1037-1041, 1043-1045, 1047, 1049, 1051-1053, 1055, 1057, 1059-1060, 1063, 1065, 1067, 1070-1074, 1078, 1080-1081, 1083]).[15] NASA and DOE, whose representatives never met with the public, did not independently investigate the public's objections to the inadequacy of the public participation process. See 40 CFR § 1506.5(a), (b) (2003); AR 91 [0520]. In response to the public's objections, the Final EA asserted conclusorily and falsely that Brown had disclosed to the public the potentially significant impacts of the Life Sciences Building prior to the publication of the Draft EA, and failed to identify any such information that Brown or anyone else had supposedly provided (AR 113 [0788]). The Final EA further asserted that, despite its statement that the intended emphasis of the Life Science Building included "cutting edge" research and development (AR 113 [0723], AR 35 [0078]), the activities at the Life Sciences Building were not intended for commercial or industrial purposes (AR 113 [0786]).

The wholly deficient public participation process here was all the more prejudicial to plaintiffs and the public because, for the reasons described above, the Final EA's analyses of individual and cumulative impacts from hazardous air emissions and noise emissions, cumulative impacts from other federal agency and private actions, and feasible alternatives were incomplete, superficial, and contrived. The ultimate effect of the inadequate public participation here was that NASA and DOE, for this additional reason, never took the required "hard look" at all of the potentially significant environmental impacts and related issues, see Fund for Animals v. Norton, 281 F.Supp.2d at 225-229 (*pro forma* public participation process for EA resulted in finding that

---

[14] Federal agencies are required to comply with both the letter and spirit of NEPA. 40 CFR §§ 1500.1(a)(2003), 1500.3; Sierra Club v. Marsh, 769 F.2d at 882.

[15] None of the separate reports to which the Draft EA and Final EA referred was distributed with either document.

agency failed to take required "hard look" at environmental consequences of proposed action); see also Davis v. Mineta, 302 F.3d 1104, 1112-1113 (10th Cir. 2002) (*pro forma* public participation process for EA), and failed to disclose those potentially significant impacts for public evaluation. Dubois v. U.S. Dep't of Agriculture, 102 F.3d at 1285-1286 (one of NEPA's twin aims is to make environmental information available to the public before agency action is taken).

E. Other Factors Support an EIS Requirement Here.

Other factors further support an EIS being required here. First, NASA and DOE never considered the CEQ "significantly" regulations found at 40 CFR § 1508.27(a), (b) (2003). The First Circuit has suggested that consideration of these factors is mandatory. Sierra Club v. Marsh, 769 F.2d at 979, citing 40 CFR § 1508.27(b)(6). Some courts have held that satisfaction of one or more of the factors set forth at 40 CFR § 1508.27 requires an EIS. Fund for Animals v. Norton, 281 F.Supp.2d at 218-219 (citing cases); see also, e.g., National Audubon Society v. Hoffman, 132 F.3d 7, 18 (2d Cir. 1997). The majority of these factors favor requiring an EIS here.[16]

---

16 With respect to 40 CFR § 1508.27(a), the relevant impacts here are those that occur in the specific locale, and are short- and long-term in nature. See also, e.g., Sierra Club v. Marsh, 769 F.2d at 881. The Final EA never clearly defined the specific locale here -- the "affected environment" (see AR 113 [0735-0744]) -- for purposes of the maximum foreseeable impacts from hazardous air emissions and noise emissions. The presumably most severely impacted locale here, to which the Final EA did not specifically identify or evaluate, is the residential area on the top of the hill directly above the Life Sciences Building and Biomedical Complex at roughly the same altitude as the fume hood discharge exhausts. Subsection 1508.27(b)(1) favors an EIS, because there is no net beneficial environmental effect. Subsection (b)(2) supports an EIS, in that, at the least, certain of the potential impacts involve indisputably hazardous air emissions and excessive noise emissions. Subsection (b)(3) favors an EIS, because the local geography is unique -- by reason of historic resources and the fact that the Life Sciences Building is sited near the base of a sharp hill, above which lies a residential neighborhood. Subsection (b)(4) supports an EIS, because, as is discussed above, there is substantial controversy as to the size, nature, and effect of the "major federal action" here. Subsection (b)(5) supports an EIS, because the short- and long-term risks from exposure to individual and

The CEQ has also stated that an EA should be concise and ordinarily should not exceed 10-15 pages in length. 40 CFR § 1508.9(a) (2003); Sierra Club v. Marsh, 769 F.2d at 874 (quoting *CEQ's Forty Most Asked Questions,* 46 Fed. Reg. at 18037) ("In most cases . . . a lengthy EA indicates that an EIS is needed"). The 66-page Final EA and additional separately referenced technical reports plainly indicated a need for an EIS here.

F. NASA and DOE Improperly Predetermined the Result.

The many deficiencies described above, when considered as a whole and in the manner in which they occurred, compel the conclusion that NASA and DOE improperly decided at the outset of their involvement that the NEPA review would conclude with a FONSI and without the required "hard look" at the potentially significant impacts or feasible alternatives. Predetermination is improper under NEPA. 40 CFR §§ 1502.5, 1502.2(g) (2003).[17] In Davis v. Mineta, 302 F.3d at 1112, the Court -- by reason of evidence of agency predetermination -- applied a less deferential standard of review to the agency's EA and FONSI and found them insufficient. See also, e.g., Fund for Animals v. Norton, 281 F. Supp.2d at 226-230

---

multiple hazardous air emissions are uncertain and or unknown. Subsection (b)(6) favors an EIS, because the Life Sciences Building project could have a precedent-setting effect in causing additional similar facilities to be sited closely together within the historic district without proper consideration of potentially cumulative significant impacts. See Fund for Animals v. Norton, 281 F.Supp.2d at 234. Subsection (b)(7) supports an EIS, because the Life Sciences Building project relates to other undisclosed actions with individually unknown but potentially significant cumulative impacts such as the activities within Brown's other biomedical and other laboratory facilities which adversely affect the local historic resources and contribute various incremental potential health and safety threats to the human environment. Subsection (b)(8) supports an EIS, because the Life Sciences Building project has already resulted in the demolition of three historic structures and reasonably foreseeable related future effects could result in further adverse impacts upon the historic district and historic resources. Subsection (b)(9) does not militate in favor of an EIS, because the Life Sciences Building project is unlikely to adversely affect an endangered or threatened species. Subsection (b)(10) supports an EIS because the Life Sciences Building project threatens a violation of the city's local noise ordinance and has the potential to violate federal and local environmental laws governing hazardous air emissions.

(predetermination found, FONSI insufficient) and South Carolina v. U.S. Dept. of the Navy, 357 F.Supp.2d at 874-875 (predetermination found, EIS insufficient).

NASA's Ann Hooker Clarke's comment on June 11, 2002, that Brown's "inch-thick proposal" in the NHPA § 106 review "would form the basis of an EA with some rearranging" (AR 58 [0306]), indicates that Hooker Clarke believed from that very early date that little or no further investigation into potential environmental impacts was necessary. See, e.g., Fund for Animals v. Norton, 281 F.Supp.2d at 227 (improper EA preparation described as involving mere "cutting and pasting" of existing documents). After August 29, 2002, NASA and DOE never mention that they should even consider whether an EIS might be required (see AR 76 [0383-0384]), apparently because DOE and NASA had decided on that same date -- months prior to Brown's preparation of the first preliminary Draft EA -- that this NEPA review would end with the issuance of a FONSI (AR 76 [0384]). Thereafter, on January 29, 2003 -- before NASA and DOE had even reviewed Brown's first draft of the EA (AR 82 [0399-0427]) -- Brown's and NASA's representatives exchanged a timeline in which they indicated that the NEPA review would end with a FONSI[18] and made additional references as the weeks progressed to the fact that a FONSI would conclude this NEPA review (AR 83 [0441], AR 84 [0453], AR 86 [0457-0458], AR 88 [0500]), AR 90 [0517], AR 94 [0525]). By April 2003, NASA and DOE assumed not only that the NEPA review would conclude with a FONSI, but also that construction of the Life Sciences Building would begin immediately upon the publication of the EA and FONSI

---

[17] At the hearing on April 27, 2005, the Court denied plaintiffs' motion for leave to file an amended complaint that included four claims alleging bad faith. The Court stated that plaintiffs could pursue those claims under the original complaint (tr. at 9-10).

[18] A copy of the January 29, 2003 timeline is included in an email message of that date from Marisa Quinn of Brown to Lizabeth Montgomery of NASA, which became part of the Administrative Record pursuant to plaintiffs' assented-to motion filed November 12, 2004. A copy of the January 29, 2003 email message was filed separately on February 10, 2005 as Court Document No. 32.

(AR 86 [0458] ("Given that no construction can start until the FONSI is issued, I am somewhat astounded that more progress has not been made")). Also in April 2003, Brown's representatives stated that they were under "tremendous" pressure to begin construction of the project (AR 86 [0459-0460]), and NASA and DOE indicated that they also wanted the NEPA review completed without delay (AR 86 [0456], AR 88 [0500]); see also AR 57 [0305], AR 76 [0383-0384]).

As a consequence of that predetermined outcome, NASA's and DOE's representatives failed to take the required "hard look" at the environmental consequences of the proposed Life Sciences Building project -- indeed, as described above, they deliberately ignored and otherwise concealed evidence that was inconsistent with their predetermined result; failed to identify and evaluate the full scope of this "major federal action;" failed independently to verify that Brown's personnel -- to whom NASA and DOE had delegated the preparation of the Draft EA and Final EA -- had taken a "hard look" at the environmental consequences of the project, in violation of 40 CFR § 1506.25(a), (b) (2003);[19] failed independently to verify that the public participation was other than merely *pro forma*; and failed otherwise to act with the objective good faith that NEPA requires. Cummington v. FAA, 524 F.2d 241, 243 (1st Cir. 1975).[20]

## IV. CONCLUSION

For the reasons stated above and as contained in the Touret Brief, the Court should set aside the FONSI and issue a declaratory judgment that by reason of the insufficiency of the Final EA and FONSI, NASA and DOE have failed to comply with the requirements of NEPA.

---

[19] NASA's and DOE's duty independently to verify the work performed by Brown and its consultant Swartz, 40 CFR § 1506.5(a), (b) (2003), was heightened here, given Brown's conflict as the preparer of the Draft and Final EA (AR 113 [0766]) and the pressure that Brown claimed it was under to begin construction of the Life Sciences Building.

[20] The omission from the original Administrative Record of the documents described herein with which the Court has either supplemented the Administrative Record or to which the Court has permitted plaintiffs to refer as extrinsic evidence represents additional evidence of improper conduct by NASA and DOE.

Furthermore, pending NASA's and DOE's compliance with NEPA, the Court should enjoin defendant Brown from further construction and operation of the Life Sciences Building.

Dated: April 3, 2006

Plaintiffs Thomas A. Bennett, William G. Black, Eileen F. Rosenberg-Black, Antoinette Breed, Allyn Copp, Ronald A. Dwight, Pamela Hext Dwight, G. Dale Dulgarian, as he is Trustee for KSD Trust, Virginia G. Riggs, Yvonne G. Shilling, and College Hill Neighborhood Association
By their Attorneys:

J. WILLIAM W. HARSCH/Bar No. 3688
CAROLYN A. MANNIS/Bar No. 4275
170 Westminster Street, Suite 800
Providence, RI 02903
Tel. (401) 454-4466
Fax (401) 351-3914

CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of April, 2006, I caused a copy of the foregoing to be hand-delivered to the following:

Robin E. Feder, Esq.
Assistant U.S. Attorney
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Beverly E. Ledbetter, Esq.
Vice President and General Counsel
Brown University
110 South Main Street
Providence, RI 02912-1913

Joseph Avanzato, Esq.
Kristen W. Sherman, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

William G. Touret
11 South Angell Street #264
Providence, RI 02906-5206

William G. Touret