**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| WILLIAM G. TOURET, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | CIVIL ACTION NO. 04-198T |
| NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, et al., | ) | |
| Defendants. | ) | |

**PLAINTIFF WILLIAM G TOURET'S**
**BRIEF IN SUPPORT OF APPEAL**

Plaintiff William G. Touret respectfully submits this brief in support of his appeal from the administrative determination below.

This action arises from the Life Sciences Building project by defendant Brown University ("Brown") in the College Hill section of Providence. The complaint alleges that the two federal agency defendants that are providing partial funding for the project, the National Aeronautics and Space Administration ("NASA") and the United States Department of Energy ("DOE"), violated Section 102(2)(C) of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2)(C), et seq. ("NEPA") and regulations promulgated thereunder, by failing to prepare an environmental impact statement ("EIS") and instead preparing an environmental assessment ("EA") accompanied by a finding of no significant impact ("FONSI"). The federal agency defendants concluded that preparation of an EIS was not required, because, in their opinion, the construction and operation of the new facility at Brown "would not individually or cumulatively have a significant [e]ffect on the quality of the human environment" (Administrative Record "AR" 116 [801]).

The complaint alleges (¶ 25) that NASA and DOE failed to consider potentially significant environmental impacts, including hazardous air emissions from laboratory fume hoods and related sources. The complaint further alleges (¶ 28) that the decision by the federal agency defendants not to prepare an EIS was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, and seeks declaratory and injunctive relief (¶ 29).

## FACTS

Brown announced its intention to construct the Life Sciences Building, originally as an approximately 190,000 gross square foot facility, in or about the fall of 1999 (AR 2 [0002]). Brown chose to site the facility adjacent and physically connected to its existing Biomedical Complex, where it would lie near the base of a steep hill within the College Hill Historic District (AR 106 [0628], 113 [0719]), AR 123 [0905, 1040, 1047]). An adjacent residential neighborhood overlooks the building site from atop the hill (AR 123 [0905, 1040]).

NASA and DOE began this NEPA review after the Rhode Island Historical Preservation & Heritage Commission ("RIHP&HC") had commenced a review of the Life Sciences Building project pursuant to Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f ("NHPA").[1] The RIHP&HC had begun the NHPA § 106 review apparently in response to funding that Brown had sought and received from the federal National Institutes of Health ("NIH") in the year 2000-2001 period (AR 12 [0020], AR 16 [0028], AR 18 [0033]). Brown had originally anticipated construction of the Life Sciences Building to begin in November 2001 (AR 30 [0064-0065]).

In November 2001, Congress authorized NASA and DOE to provide partial funding for the Life Sciences Building project (AR 25 [0053], AR 26 [0058], AR 113 [0721]). In early

---

1 The RIHP&HC includes the office of the Rhode Island State Historic Preservation Officer ("RISHPO") (AR 79 [0388-0389]).

February 2002, a draft Brown document stated that NASA would provide $4 million, NIH would provide $2 million, and DOE would provide $1 million (AR 40 [0094]). By February 14, 2002, NASA was formally involved in the ongoing NHPA § 106 review (AR 41 [0231]).

On February 26, 2002, Ann Hooker Clarke of NASA visited Brown for a presentation about the Life Sciences Building for purposes of the NHPA § 106 review (AR 42 [0232-0244]). In a subsequent letter dated March 8, 2002, the RIHP&HC advised Brown and NASA that it would not enter into a Memorandum of Agreement ("MOA") in the NHPA § 106 proceeding, because in its view the adverse effects of the Life Sciences Building project upon the local historic district could not be adequately mitigated (AR 44 [0249-0250]). Thereafter, NASA requested intervention from the federal Advisory Council for Historic Preservation ("ACHP") (AR 45 [0251-0253]).[2]

DOE apparently did not become involved in the ongoing NHPA § 106 review or nascent NEPA review prior to May 2002 (AR 54 [0293-0295]). Between May and August 2002, NASA's and DOE's representatives discussed whether the Life Sciences Building project was supported by sufficient federal funding -- that is, whether the project was sufficiently "federalized" -- to qualify for this federal NEPA review, or whether the project might be exempt from review under NEPA by reason of a categorical exclusion (see generally AR 54-78 [0293-0387]).[3]

[2] Under NHPA § 106, the ACHP may override a refusal by a state SHPO not to enter into a Memorandum of Agreement. See 36 CFR § 800.7(a)(2)(2005). After a July 25, 2002 meeting between representatives from the ACHP, NASA, and DOE, the RIHP&HC indicated that it likely would approve a revised design for the Life Sciences facility (AR 69 [0354-0355]). By letter dated December 9, 2002, the RIHP&HC confirmed that it would likely approve a revised facility design (AR 79 [0388-0389]). The eventual revised design included a one-story reduction in the height of the Life Sciences Building -- from six to five above-ground floors and a reduction in usable space to approximately 170,000 square feet (AR 79 [0388-0389]). In the Final MOA, the RIHP&HC approved the project for purposes of the NHPA § 106 review (AR 115 [0791-0794]).

[3] DOE later determined that its categorical exclusions did not apply here (AR 88 [500]).

Notwithstanding their uncertainty, however, NASA's and DOE's representatives appear to have assumed from the outset that they would eventually perform a NEPA review (AR 53 [0291]). They further appear to have assumed that any NEPA review would require only an EA and FONSI, and not an EIS. By June 2002, Brown had furnished NASA with an approximately 146-page draft document entitled "Submission to State Historic Preservation Officer February 4, 2002" (AR 40 [0084-0230]). The draft contained a collection of documents assembled by Brown for possible use in the NHPA § 106 review that indicated the existence of potentially significant environmental impacts including hazardous air emissions. Brown apparently did not furnish copies of the draft document to anyone other than NASA and DOE. On June 11, 2002, NASA's Hooker-Clarke advised DOE's Clarence Hickey that Brown's "inch-thick proposal" -- Brown's aforesaid draft "Submission to State Historic Preservation Officer February 4, 2002" -- "would form the basis of EA with some rearranging" (AR 58 [0306]).[4]

In June 2002, NASA's Hooker-Clarke described the $2 million NIH grant for the Life Sciences Building project as only a $1 million grant, for equipment (AR 54 [0297], AR 57 [0305], AR 58 [0306]).[5] NASA and DOE thereafter apparently disregarded the NIH grant entirely in connection with the NHPA § 106 and NEPA reviews. In February 2003, Congress increased the amount of NASA's grant for the Life Sciences Building project to a total of $5.25 million (AR 81 [0398]), and thus the Final EA thus later described the federal grants for the Life Sciences Building project as including only the $5.25 million grant from NASA and the $1 million grant from DOE (AR 113 [0721]).

---

[4] NASA identified the "inch-thick proposal" as the document shown at AR 40 [0084-0230]) in its July 22, 2005 Responses to Plaintiffs' Request for Production of Documents (Response No. 1(b)).

[5] An October 5, 2001 article in the Providence Journal stated that Brown might use NIH money for Life Sciences Building demolition-related activities (AR 22 [0039]).

By early September 2002, NASA and DOE had begun this NEPA review (AR 78 [0386-0387]). NASA and DOE delegated to Brown the task of preparing the EA (AR 82 [0399-0427]). By mid-April 2003, however, NASA and DOE remained dissatisfied with Brown's progress after reviewing a second draft EA that Brown had prepared (AR 84 [0450-0454], AR 86 [0456-0460], AR 89 [0516]). As a result, NASA and DOE recommended and Brown hired consultant Lucinda Swartz of Battelle Memorial Institute in early May 2003 to complete the writing of the Draft EA, for it to be released to the public soon afterwards, in mid-May (AR 86 [0456], AR 90 [0517-0519]). Swartz took over the drafting of the EA, and NASA and DOE released a formal Draft EA and Draft FONSI, and a Draft MOA in the NHPA § 106 review, to the public on or about June 2, 2003 (AR 96 [0530-0531]). NASA and DOE refused the public's requests for an extension of the 30-day comment period for the Draft EA, but extended the comment period for two Rhode Island state agencies (AR 107 [0632], AR 113 [0788]). On or about August 8, 2003, NASA and DOE released the Final EA and Final FONSI in this NEPA review, and the Final MOA in the NHPA § 106 review (AR 115 [0791-0794], AR 116 [0799-0802], AR 117 [0803]).

## ARGUMENT

### I. THE COURT SHOULD SET ASIDE THE FONSI BECAUSE NASA'S AND DOE'S DECISION TO ISSUE THE FONSI WAS ARBITRARY AND CAPRICIOUS, AN ABUSE OF DISCRETION, OR OTHERWISE CONTRARY TO LAW

Section 102 of NEPA, 42 U.S.C. § 4332 requires that "to the fullest extent possible: . . . (2) all agencies of the Federal Government shall -- (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on -- (i) the environmental impact of the proposed action. . . ."

Regulations promulgated by the Council on Environmental Quality ("CEQ") provide guidance for implementing 42 U.S.C. § 4332(2)(C) and for determining when an EA and EIS are required. See 40 CFR §§ 1501.3-1501.4 (2003). The principal purpose of an EA is to assist an agency in determining whether an EIS should be performed. Sierra Club v. Marsh, 769 F.2d 868, 873-876 (1st Cir. 1985) ("[t]he purpose of an EA is simply to help the agencies decide if an EIS is needed"); 40 CFR § 1501.4(c) (2003). "When the determination that a significant impact will or will not result from the proposed action is a close call, an EIS should be prepared. . . . It is only when the proposed action '*will not* have a significant effect on the human environment,' 40 CFR § 1508.13, that an EIS is not required." National Audubon Society v. Hoffman, 132 F.3d 7, 13 (2d Cir. 1997) (emphasis in original, some citations omitted).

Judicial review in NEPA cases is governed by the Administrative Procedure Act, which provides in relevant part that "The court shall -- . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be -- (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also id. § 706(D); Dubois v. U.S. Dep't of Agriculture, 102 F.3d 1273, 1284-1285 (1st Cir. 1996), cert. denied, 521 U.S. 1119 (1997) (arbitrary and capricious situations include those where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise" . . . . These are merely "examples;" others could be recited as well") (citations omitted). The agency must take a "hard look" at the environmental consequences of its proposed action, Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21 (1976); see also, e.g., Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349-350 (1989) (same; NEPA process is

intended to ensure that agencies will carefully consider detailed information concerning significant environmental impacts, make that information available to the public, which may participate in the decisionmaking and implementation of the agency's action); Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97-98 (1983); Foundation on Economic Trends v. Heckler, 756 F.2d 143, 151 (D.C.Cir. 1985); Dubois v. U.S. Dep't of Agriculture, 102 F.3d at 1285-1286. Another factor that the courts consider is whether the agency prejudged the outcome of the NEPA review. See, e.g., Davis v. Mineta, 302 F.3d 1104, 1112 (10th Cir. 2002). One challenging a decision *not* to prepare an EIS must show a "substantial possibility that agency action 'could significantly affect the quality of the human environment.'" Sierra Club v. Marsh, 769 F.2d at 870 (citations omitted).[6]

A. The Final EA Failed to Disclose the Substantial Possibility of Significant Environmental Impacts from Hazardous Air Emissions

The Final EA, at pages 28-32 (AR 113 [0747-0751]), offered several points in support of its conclusion that hazardous air emissions from the LSB would not create a significant impact upon the human environment. Each was unsupported.

1. Material Understatement of Hazardous Air Emissions

The Final EA stated that that none of the hazardous air emissions from the proposed Life Sciences Building, alone or in combination with air emissions from other Brown laboratory buildings, "would rise to a level requiring an air toxics permit from RIDEM [Rhode Island Department of Environmental Management] under Rhode Island's Air Toxics Regulations because they would be far below the minimum quantities stated in the regulations (RIDEM Air

[6] The complaint (¶¶ 2, 7, 11, 13, 17, 19-22) and Administrative Record (e.g., AR 47 [0255-280], AR 48 [0281-0284], AR 106 [0627-0630]), AR 123 [0896-1036]) establish that plaintiff Touret and the separately-represented plaintiffs have standing to bring this action. See, e.g., Dubois v. U.S. Dep't of Agriculture, 102 F.3d at 1280-1283; Washington Legal Foundation v. Massachusetts Bar Foundation, 993 F.2d 962, 971-972 (1st Cir. 1993).

Pollution Control Regulation No. 22)" (AR 113 [0749]).[7] That statement was not accurate, and its inaccuracy was not apparent, because the Final EA did not include itemized estimated annual quantities of the hazardous air emissions, by chemical, that the Life Sciences Building was anticipated to discharge. Rather, the Final EA provided only total estimated annual discharge amounts in pounds for the hazardous air emissions as a group (AR 113 [0749, 0749 fn. 3]).

But Brown knew, and NASA and DOE also knew or should have known, that certain of those anticipated emissions would in fact exceed the RIDEM air toxics permit application thresholds. In an email message dated May 13, 2003 from Henry Huppert of Brown to Brown's consultant Lucy Swartz, Huppert included an itemized table, by chemical, of Brown's university-wide annual laboratory emissions for 2001 (AR Supp. Doc. 1).[8] The table of emissions was an itemization of the 5,230-pound annual emissions total to which the Final EA referred and upon which the Final EA's discussion about hazardous air emissions impacts in part relied (see AR 113 [0749, 0749 fn. 3]).

In the case of chloroform, for example, according to the Final EA's methodology,[9] the Life Sciences Building would be anticipated to discharge approximately 53 pounds annually. That quantity would exceed the 20-pound per year threshold for RIDEM air toxic permit

---

7 At the Court hearing on November 17, 2004, defendants' attorneys stressed the importance of this statement in the Final EA (tr. at 27-28, 41-43).

8 Administrative Record Supplemental Document __ ("AR Supp. Doc. __") refers to those documents that were the subject of the Court's February 23, 2006 and March 27, 2006 orders. By those orders, the Court ordered the Administrative Record supplemented with Plaintiffs' Doc. 1 to which the February 23, 2006 order referred, permitted plaintiffs to utilize as extrinsic evidence Docs. 43-49 to which that same order referred, and ordered the Administrative Record supplemented with NASA's and DOE's Exh. G to which the March 27, 2006 order referred.

9 The Final EA estimated the annual total of the Life Sciences Building's hazardous emissions by starting with the annual total of hazardous air emissions for all of the university's laboratories (AR 113 [0749, 0749 fn. 3]). The Final EA then estimated that approximately one-fourth of those emissions are discharged by the existing and adjacent Brown Biomedical Complex (id.). The Final EA then further estimated that emissions from the Life Sciences Building would be approximately equal to those from the Biomedical Complex (id.). The university-wide total of annual emissions in 2001 for chloroform was 214 pounds (AR Supp. Doc. 1). The Biomedical Complex thus would be estimated to have discharged one-fourth that amount, or approximately 53 pounds, and the Life Sciences Building would be anticipated to discharge an additional approximately 53 pounds annually. The Final EA stated that the university-wide emissions totals did not change substantially year to year (AR 113 [0749, fn. 3]).

applications by 33 pounds. RIDEM Air Pollution Control Regulation No. 22 (Air Toxics), Table III (1992, 2004). When considered cumulatively with the approximately 53 pounds of additional chloroform that the adjacent Biomedical Complex was anticipated to discharge annually, the total would exceed the 20-pound per year RIDEM threshold by 86 pounds.[10] Moreover, when considered cumulatively with the year 2001 total of estimated hazardous emissions from all of the university's laboratories, the total of chloroform emissions would be approximately 267 pounds -- or some 247 pounds more per year than the 20-pound annual RIDEM air toxics permit application threshold amount. Under the Final EA's methodology, emissions of hydrazine and methylene chloride would meet or exceed the RIDEM air toxics permit application threshold amounts.[11]

In an email message dated July 5, 2003, Brown's consultant Swartz recommended that the Final EA not disclose the itemized emission amounts shown in the Huppert May 13, 2003 email message, on the supposed ground that the itemized amounts were rough estimates (AR

[10] NEPA requires consideration of past, present, and reasonably foreseeable future cumulative impacts -- direct and indirect -- within the meaning of NEPA. See 40 CFR §§ 1508.7 (evaluation of cumulative impacts must consider past, present, and reasonably foreseeable actions by all federal and non-federal agencies and persons), 1508.8, 1508.27(b)(7)(2003). "The agency need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action. . . . In this context, reasonable foreseeability means that "the impact is sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision."" Dubois v. U.S. Dep't of Agriculture, 102 F.3d at 1286 (quoting Sierra Club v. Marsh, 976 F.2d at 767).

[11] In the case of hydrazine, annual emissions for the university as a whole in year 2001 were estimated to total 0.2 pounds (two-tenths of a pound). The RIDEM air toxics permit application threshold for hydrazine was and is one-tenth that amount, or 0.02 (two one-hundredths of a pound) per year. RIDEM Air Toxics Rule No. 22, Table III (1992, 2004). According to the Final EA's methodology discussed above, the Life Sciences Building would be anticipated to discharge 0.05 pounds per year of hydrazine, or two and one-half times the RIDEM air toxics permit threshold amount. The cumulative total for the Life Sciences Building and Biomedical Complex would be 0.10 pounds per year, or five times the RIDEM air toxics permit application threshold amount. Lastly, when considered cumulatively with the total year 2001 estimated hazardous emissions from all of the university's laboratories, the total of hydrazine emissions would be approximately 0.25 pounds -- or some 0.23 pounds (eleven and one-half times) more per year than the 0.02 pound RIDEM air toxics application threshold amount. Also applying the Final EA's methodology, methylene chloride emissions would, upon the operation of the Life Sciences Building, meet the RIDEM air toxics application threshold of 200 pounds per year, on a university-wide basis. RIDEM Air Pollution Control Regulation No. 22 (Air Toxics), Table III (1992). Certain other of the hazardous chemicals in Huppert's itemized table, such as acetic acid, ethyl acetate, ethyl ether, and pentane, are not included in the list of air toxics at RIDEM Air Pollution Control Regulation No. 22 (Air Toxics), Table III (1992, 2004). Thus, although these unlisted

Supp. Doc. G). But by disclosing in the Final EA the total annual amount of those emissions (5,230 pounds), as well as the reasons why they were considered rough estimates (AR 113 [0749, 0749 fn. 3]), the only possible reason for not also disclosing the *itemized* amounts would have been defendants' desire to conceal the falsity of the Final EA's assertion that those emissions would not require application for an RIDEM air toxics permit, and thereby conceal the obviously greater seriousness of those emissions -- which if disclosed would have required an EIS.[12] Brown, and indirectly NASA and DOE, wrongfully withheld the itemized hazardous air emission information that is contained in the May 13, 2003 Huppert email message until August 2005, when Brown produced it to plaintiffs in the course of discovery in this action.

2. The RWDI Report

Defendants did not perform air modeling for this NEPA review. Defendants therefore did not determine the likely future outdoor concentrations -- individually or cumulatively with hazardous air emissions from the adjacent Brown Biomedical Complex or any of Brown's other laboratories on College Hill -- of the anticipated future hazardous air emissions from the Life Sciences Building. Nor did defendants determine the *existing* outdoor concentrations of the hazardous air emissions from those presently operating other facilities.

But notwithstanding those omissions, the Final EA included a description of a December 5, 2001 "Air Quality Assessment Report" by the firm of Rowan, Davis, et al. (the "RWDI Report"), which was prepared prior to the commencement of this NEPA review. The description suggested that such tests had in fact been performed:

---

chemicals are hazardous, because they are unlisted by RIDEM they could not have required an RIDEM air toxics permit application.

[12] If in fact the itemized air toxic estimated discharge amounts were as uncertain as Swartz suggested in her July 5, 2003 email message, that uncertainty alone should have caused NASA and DOE to have performed an EIS. 40 CFR § 1508.27(b)(5) (2003); National Audubon Society v. Hoffman, 132 F.3d at 13, College Hill Plaintiffs' Brief at 14, 14 fn. 16.

> The University also commissioned a study to mathematically model, physically model and wind tunnel test the effect of the emissions at the immediately surrounding buildings, assuming dilution would increase beyond these buildings (Rowan, et al. 2001). The study also modeled the effect of the existing emissions listed above, and other surrounding exhausts, at the proposed building's air intakes. The intent of this was to provide guidance in locating new air intakes, but this can also be used as a worst-case scenario, assuming that dilution increases as the emissions travel farther away from the building. (AR 113 [0749].)

The above description was misleading in several respects. First, as the text of the RWDI Report demonstrates, no wind tunnel testing or other physical air modeling for the Life Sciences Building was in fact performed. Second, the RWDI Report did *not* "assum[e that] dilution would increase beyond these buildings" or that the results of the RWDI Report in whole or in part "could be used as a worst-case scenario, assuming that dilution increases as the emissions travel farther away from the building." Those statements were unsupported by the RWDI Report itself and were otherwise erroneous, because the RWDI Report had failed to distinguish between "near field" dilution and "far-field" dilution.[13] Third, the description of the RWI Report implied that the RWDI Report represented a comprehensive health and safety study of the anticipated hazardous emissions from the Life Sciences Building. But to the contrary, Brown's architects had commissioned the RWDI Report only to assist them in locating air *intakes* for the Life Sciences Building.[14] Brown's architects were seeking only to prevent indisputably hazardous

---

[13] "Near field" dilution results primarily from the dilution of emissions from exhaust fans from entrainment of ambient air due to the momentum and, in some cases, buoyancy (warm air lighter than cold air) of the exhaust. (Entrainment refers to the incorporation of adjacent, ambient air into a jet or plume of gas, due to shear forces exerted by the latter on the former, with the result that the continuing jet or plume is comprised of a mixture of the initial exhaust and ambient air.) "Far-field" dilution results from plume mixing subsequent to the near field dilution, and is dependent upon wind speed and other weather conditions. By reason of "far field" dilution, air emissions may reach their peak concentration some distance from the point of discharge. (On February 17, 2006, the Court denied plaintiffs' request to submit expert declarations in support of this appeal, but allowed plaintiffs to refer to the points made by plaintiffs' three expert witnesses, tr. at 61. Certain of the analysis within this brief about the RWDI Report, as well as the discussion below about possible dioxin emissions, are taken from those expert declarations.)

[14] The RWDI Report was incomplete and inaccurate for the following additional reasons: (a) The RWDI Report evaluated informally only the "near field" dilution concentrations of the anticipated emissions from the Life Sciences Building under the American Conference of Governmental and Industrial Hygenists (ACGIH) 8-hour

and other harmful emissions from being drawn back *into* the Life Sciences Building after discharge and harming persons *inside* the facility.[15]

Faced with criticism of the Final EA's description of the RWDI Report and the RWDI Report itself, defendants' attorneys advised this Court on November 17, 2004 that the RWDI Report was not relevant to this NEPA review and that the Final EA had not relied upon it (tr. at 33-34, 42-43). Thus for all of these reasons, the Final EA should not have included the misleading description of the RWDI Report or have referenced the RWDI Report.

3. The July 8, 2003 Huppert Statements

Additional comments by Brown's Henry Huppert, made on or about July 8, 2003, further undermine and contradict the Final EA's description of the RWDI Report and the Final EA's and Final FONSI's determination that hazardous air emissions from the Life Sciences Building would not result in a significant environmental impact. On or about July 8, 2003, Brown's

---

workday and 40-hour workweek occupational limits (AR 40 [0181]). The "near field" concentrations of the several chemicals mentioned in the Final EA (AR 113 [0749]) would have to be diluted between 1,000 and 100,000 times from the limits allowed under ACGIH 8-hour workday and 40-hour work week occupational limits to meet the limits set forth in RIDEM Air Pollution Control Regulation No. 22 (Air Toxics) at the "far field" concentration points -- the abutting residential areas. (b) The ACGIH 8-hour workday and 40-hour work week occupational limit values are published for an employee exposure for a conventional 8-hour workday and a 40-hour work week. Those ACGIH limit values do not address the effects of the emissions on: (1) the public at large, which includes more-sensitive individuals such as children, the elderly, and immuno-compromised individuals; and (2) individuals such as residents for whom exposure may be far more continuous than an 8-hour workday and a 40-hour work week. Plaintiffs advised NASA and DOE that persons with sensitive immune systems resided in the local area (AR 123 [0892, 0906, 1037, 1040, 1042, 1068]). Paragraph 13 of Brown's Answer admitted that "Three Providence public schools, two Providence private schools, and at least four nursing homes are located in the vicinity of Brown and the project site." Complaint ¶ 13. The RWDI Report indicated only that unspecified, more stringent criteria should perhaps be applied "if chemical usage is intense or if potentially exposed people are sensitive" (AR 40 [0193]). (c) The RWDI Report made no attempt to determine or evaluate the specific hazardous chemicals or quantities thereof that the Life Sciences Building would discharge (AR 40 [0180-0184]). (d) The RWDI Report was based on speculation as to certain of the specific equipment and equipment configurations that the Life Sciences Building would utilize to discharge hazardous air emissions (AR 40 [0176-184]). (e) The RWDI Report was prepared prior to Brown's decision to reduce the height of the facility by one floor (see AR 40 [0187] (diagram shows original 85-foot building height). As a result, the rooftop discharge exhausts would be lower to the ground and likely closer to the residential homes that would overlook the Life Sciences Building from the hilltop immediately above by reason of the unique topography. (f) The RWDI Report observed that the discharge exhausts for the laboratory fume hoods at the adjacent Biomedical Complex, which faced the residential neighborhood to the west, "do not meet industry standards" (AR 40 [0183]). (g). The Final EA contained no evidence that recommendations in the RWDI Report for additional analysis might be implemented (AR 40 [0185-0186]).

consultant Lucinda Swartz asked Huppert to review the following proposed sentence for the Final EA: "Moreover, all emissions would be diluted to such an extent that there would be no increase in ground level concentration of a hazardous air pollutant at ground level at or beyond the property line."[16] Huppert replied that the preceding sentence "is difficult to say without air modeling." Huppert went on to state that "I know this is vague but ..." and then offered Swartz the following alternative language: "Emissions from the [Life Sciences] building are diluted to such an extent that [they would be] unlikely to increase ground level concentration of a hazardous air pollutant[] at or beyond the property line'" (emphasis added). Swartz later added Huppert's alternative language to the Final EA's discussion of hazardous air emissions (AR 113 [0749]).[17]

The concededly vague alternative language above that Huppert offered to Swartz and which Swartz in turn added to the text of the Final EA concealed the fact that because defendants had not performed any air modeling, as Huppert had admitted to Swartz, defendants did not know the levels of *existing* external concentrations of hazardous air pollutants that were *already* being generated by Brown's adjacent Biomedical Complex and Brown's other College Hill laboratory buildings. As stated above, Brown's existing laboratories presently discharge approximately four times the quantity of hazardous air emissions as the Life Sciences Building is anticipated to discharge annually (AR 113 [0749, 0749 fn. 3]). Those hazardous emissions could be imposing short- and/or long-term significant impacts on the human environment now.

---

15 Within the Life Sciences Building laboratories, fume hoods would protect workers from exposure to hazardous chemicals AR 113 [0748]). The fume hoods would be vented to the outside air (id.).

16 The exchange between Huppert and Swartz was included in a July 8, 2003 email message sent to NASA and DOE that became part of the Administrative Record pursuant to plaintiffs' assented-to motion filed November 12, 2004. A copy of the July 8, 2003 email message was filed separately on February 10, 2005 as Court Document No. 31. Plaintiffs learned of the existence of the July 8, 2003 email message in August 2004 when NASA produced a copy in response to a request by plaintiffs pursuant to the Freedom of Information Act.

For the same reason, Huppert and the Final EA also lacked any basis for Huppert's admittedly vague assertion that emissions from the Life Sciences building were *unlikely* to *increase* ground level concentrations of hazardous air pollutants at or beyond the property line.[18]

The July 8, 2003 Huppert statements confirm that NASA and DOE knew that no air modeling had been performed and that the Final EA had included deliberately vague language to conceal the fact that the Final EA had no information from which defendants could have determined the existing or future additional external concentrations of hazardous air emissions from the Life Sciences Building. The Huppert statements thus also confirm that the inaccurate description of the RWDI Report could only have been included in the Final EA to mislead unsuspecting readers into believing that NASA and DOE had performed a comprehensive analysis of the anticipated hazardous emissions from the Life Sciences Building, when in fact NASA and DOE had made no such analysis. If the Final EA had properly disclosed those omitted facts, an EIS would have been required, because the Final EA would have admitted that NASA and DOE had not established that the hazardous air emission impacts had *not* been shown to be insignificant (see AR 76 [0383 (unless the impacts were shown to be insignificant, "we are in EIS territory"), 0384 (same)]); National Audubon Society v. Hoffman, 132 F.3d at 13.

---

17 The changes that defendants made to the Final EA on the air emissions issues were apparently prompted by the public's criticisms of the Draft EA's treatment of those issues (see, e.g., AR 102 [0614-0615], AR 106 [0628-0629]), AR 113 [0749 fn. 3], AR 123 [0891-0892, 0903-0907, 1037, 1039-1040, 1042-1043, 1045-1047]).

18 The question of whether hazardous emissions from the Life Sciences Building would merely increase existing concentrations of hazardous emissions at ground level at or beyond the property line is not derived from NEPA standards. Rather, it was taken from the RIDEM air toxics permit application regulations, which were not based on NEPA. See RIDEM Air Pollution Control Regulation No. 22 (Air Toxics) § 22.5.4(a), (b) (1992). Here, the RIDEM inquiry to which Swartz and Huppert referred was especially inappropriate, because -- given the unique topography of the area, in which residential homes on the overlooking hill will be at approximately the same altitude as the Life Sciences Building's discharge exhausts -- concentrations of hazardous emissions *above* the ground level of the Life Sciences Building could be expected to impact the overlooking hilltop residential neighborhood more directly than would concentrations at the ground level of the Life Sciences Building, because the residential neighborhood will sit at approximately the same height at the air emission exhausts of the Life Sciences Building.

Like the May 13, 2003 Huppert email message discussed above, the email message containing Huppert's July 8, 2003 statements was omitted from the original Administrative Record.

4. Misplaced Reliance on RIDEM Air Emissions Permitting Program

The Final EA also suggested that Brown's assumed compliance with RIDEM's air operating permit and related air emission regulations somehow assured that there would not be any significant environmental impacts from hazardous air emissions (AR 113 [0748-0749]). That suggestion was wrong, because RIDEM's regulations did not and do not incorporate or even appear to refer to NEPA's standards and thus do not require evaluation of individual or cumulative potentially significant impacts from hazardous air emissions within the meaning of NEPA. Brown advised NASA and DOE in August 2002 that Rhode Island did *not* have a "NEPA-type law" (see AR 70 [0359] (III. (C.)(42)). Furthermore, there is no evidence that RIDEM's procedures would result in enforceable mitigation measures. See Sierra Club v. Marsh, 769 F.2d at 877.

5. Other Potentially Significant Air Impacts

The Final EA was also deficient for its failure to consider the individual and cumulative effects of potential dioxin emissions from the 40-year old pathological waste incinerator at the adjacent and physically-connected Biomedical Complex. See 40 CFR §§ 1508.7, 1508.8 (2003). The federal Environmental Protection Agency has characterized dioxins, prior to and after 2003, as an extremely dangerous family of carcinogens associated with incinerators and other combustion sources. The Final EA stated that "[n]o incinerators are planned for the proposed Life Sciences Building, thus, there would be no releases from incinerators" (AR 113 [0784]). That statement was misleading, however, because NASA and DOE knew that there was an

existing pathological waste incinerator at the adjacent Biomedical Complex (AR 56 [0302], AR 40 [0124, 0149, 0187-0188]). They also knew or should have known that activities planned for the Life Sciences Building would likely cause an increase in the use of that incinerator and thus an increase in the quantity of potential dioxin emissions from that incinerator (AR 56 [0302])). Brown's pathological waste incinerator is a part of the Biomedical Complex's Animal Care Facility (AR 40 [0149]). The Life Science Building is anticipated to include substantial additional animal care support facilities, in the form of primate housing and service areas and an operating room, to provide greater efficiency for Brown's Brain Science Program's expanding primate research activities (AR 120 [0837 fn *, 0833-0834]). The anticipated additional animal care facilities in the Life Sciences Building and expanding primate research activities suggest that use of the pathological waste incinerator would increase.[19] There is no evidence in the Administrative Record that the Brown incinerator has at any time during its 40-year existence been tested for possible dioxin emissions (see AR 40 [0146-0151]).[20]

The Final EA also failed to consider the potential short-term and long-term cumulative synergistic effects on the human environment from all of the air emissions discussed above. Nowhere in the Final EA or its referenced documents is there any mention of possible short-term or long-term adverse effects to the human population from exposure to *multiple* hazardous air emissions at the same time. To the extent that exposure to a significant concentration of air emissions of a single hazardous chemical may be assumed adversely to affect human health on a short- and/or long-term basis, exposure to multiple significant concentrations of air emissions from multiple hazardous chemicals, concurrently, would presumably impose potentially more

---

[19] An increased use of the Animal Care Facility would also be presumed to result in an increase in the use of the air toxic ethylene oxide, a sterilant (AR 40 [0123-1024, 0153-0159]).

[20] Another category of potential emissions that the Final EA failed to evaluate are those from biological pathogens, which are discussed in the College Hill Plaintiffs' Brief at pages 7-8.

severe adverse cumulative short- and/or long-term health effects. See Kleppe v. Sierra Club, 427 U.S. at 410 (agency must consider cumulative impacts of actions having synergistic environmental effects). The Providence area generally is a serious non-attainment area for ozone (AR 113 [0737, 0750-0751]).

---

Plaintiff Touret respectfully adopts and incorporates by reference in their entirety the additional points set forth in Part III (A.-F.) (pages 2-17) of the College Hill Plaintiffs' Brief in Support of Appeal, dated April 3, 2006, filed concurrently herewith.

## II. THE COURT SHOULD ENJOIN CONSTRUCTION AND OPERATION OF THE LIFE SCIENCES BUILDING PENDING NASA'S AND DOE'S COMPLIANCE WITH NEPA

In addition to ordering that the FONSI be set aside, the Court should enjoin Brown -- pending NASA's and DOE's compliance with NEPA -- from further construction and any operation of the Life Sciences Building. For a permanent injunction to issue, the Court must find that plaintiffs have demonstrated actual success on the merits, that plaintiffs would be irreparably injured in the absence of injunctive relief, that the harm to plaintiffs from defendants' conduct would exceed the harm to the defendants accruing from the issuance of the injunction, and that the public interest would not be adversely affected by an injunction. See, e.g., Water Keeper Alliance v. U.S. Dep't of Defense, 271 F.3d 21, 30 (1st Cir. 2001) (applying standard for preliminary injunction); Conservation Law Foundation, Inc. v. FHA, 827 F.Supp. 871, 877 (D.R.I. 1993), aff'd, 24 F.3d 1465 (1st Cir. 1994) (same); U.S. Public Interest Research Group v. Atlantic Salmon of Maine, 257 F.Supp.2d 407, 433 (D.Me.) (the standard for a permanent injunction is substantially the same as for a preliminary injunction, except that a plaintiff must show actual success rather than a likelihood of success on the merits), aff'd, 339 F.2d 23 (1st 2003). A presumption in favor of injunctive relief applies where an agency has failed to meet

NEPA's requirements. Realty Income Trust v. Eckerd, 564 F.2d 447, 456 (D.C.Cir. 1977). The burden is on those who have failed to comply with NEPA to show that the equities are clearly and strongly in their favor if an injunction is to be denied. Appalachian Mountain Club v. Brinegar, 394 F.Supp. 105, 123 (D.N.H. 1975). The Court is authorized to impose injunctive relief against a private party such as Brown that receives federal funding. Foundation on Economic Trends v. Heckler, 750 F.2d at 155-156.

Plaintiffs have established that they are entitled to a judgment that NASA's and DOE's decision to issue a FONSI was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law and that there is a "substantial possibility that agency action 'could significantly affect the quality of the human environment.'" Sierra Club v. Marsh, 769 F.2d at 870 (citations omitted). The record further establishes that plaintiffs face irreparable harm without an injunction. The most significant known potential environmental impacts, hazardous air emissions that the Life Sciences Building is anticipated to discharge, together with the hazardous air emissions from other Brown laboratories and other facilities, involve unquestionable potential danger to human health and safety, and were not measured. Moreover, the individual and cumulative short- and long-term adverse health effects from the anticipated hazardous air emissions, potential other air emissions (e.g., dioxins), and other possible individual and cumulative impacts arising from undisclosed other federal and private actions were not examined in the Final EA and are unknown. See College Hill Plaintiffs' Brief at 4-9.

The appropriate balance of harms to the plaintiffs and defendants also weighs substantially in plaintiffs' favor. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance

of an injunction to protect the environment." Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 545 (1987). Furthermore, as is described above and in the accompanying brief of the College Hill Plaintiffs, the Final EA, FONSI, and Administrative Record reflect substantial bad faith and improper conduct by all three defendants. Defendants elected to proceed with construction despite their knowledge that the EA and FONSI were insufficient, in order improperly to circumvent the delay and project changes that an EIS could require. Brown thus assumed the risk that its construction activities and operation of the facility might be halted. Enjoining the "major federal action" here -- the construction and operation of the facility -- is thus reasonable under all of the circumstances. See Ogunquit Village Corp.v. Davis, 553 F.2d 243, 246 (1st Cir. 1977) (evidence of bad faith may warrant broader scope of injunctive relief). It bears repeating that Brown, and NASA and DOE withheld until this past August 2005 certain of the most damaging information -- the table of itemized air emission information contained in the May 13, 2003 Huppert email message (AR Supp. Doc. 1) -- which revealed for the first time the severity of the existing and anticipated future additional hazardous air emissions. Lastly, the public's interest in avoiding potentially serious adverse health impacts outweighs whatever interest the public might have in permitting Brown to complete the construction and commence operation of the Life Sciences Building without assurance that it can operate safely.

## CONCLUSION

For the reasons stated above, the Court should set aside the FONSI and issue a declaratory judgment that by reason of the insufficiency of the Final EA and FONSI, NASA and DOE have failed to comply with the requirements of NEPA. Furthermore, pending NASA's and DOE's compliance with NEPA, the Court should also enjoin defendant Brown from further construction and operation of the Life Sciences Building.

Dated: April 3, 2006

William G. Touret/Pro Se
11 South Angell Street #264
Providence, RI 02906-5206
Tel. (800) 345-0080
Fax (401) 831-5329

CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of April, 2006, I caused a copy of the foregoing to be hand-delivered to the following:

Robin E. Feder, Esq.
Assistant U.S. Attorney
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Beverly E. Ledbetter, Esq.
Vice President and General Counsel
Brown University
110 South Main Street
Providence, RI 02912-1913

Joseph Avanzato, Esq.
Kristen W. Sherman, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

J. William W. Harsch, Esq
Carolyn A. Mannis, Esq.
170 Westminster Street, Suite 800
Providence, RI 02903

William G. Touret