UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| WILLIAM G. TOURET, et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | C.A. No. 04-198T |
| | ) | |
| NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**BROWN UNIVERSITY'S MEMORANDUM IN OPPOSITION TO CHNA'S APPEAL**

Defendant Brown University submits this Memorandum in opposition to the appeal of the College Hill Neighborhood Association ("CHNA"). The Court should uphold the decision of the National Aeronautics and Space Administration ("NASA") and the Department of Energy ("DOE") (the "Federal Agencies") under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4332(2)(C), to issue an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI"), and not an Environmental Impacts Statement ("EIS"), for the Life Sciences Building ("LSB"). As evidenced by the administrative record,[1] the Federal Agencies took the requisite "hard look" at all the relevant issues and complied with NEPA's requirements. The administrative record supports the decision of the Federal Agencies not to require an EIS. There was no clear error of judgment, the decision is not arbitrary and capricious, an abuse of discretion or otherwise contrary to law. Thus, this Court should deny CHNA's appeal and uphold the decision.

**ARGUMENT**

In enacting NEPA, Congress intended "to insure a fully informed and well-considered decision" from federal agencies.[2] Accordingly, NEPA mandates only a process to which agencies

---

[1] Brown University will use the forms adopted by Plaintiffs to refer to the documents in the administrative record, as well as those documents that the Court has ruled can be considered as extrinsic evidence.
[2] Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978).

are required to adhere.[3] EPA "does not work by mandating that agencies achieve particular substantive environmental results."[4] Rather, it establishes certain "action-forcing" procedures that compel agencies to take a "hard look" at the environmental consequences of a project.[5]

The usual first step in the NEPA process is to prepare an EA, a "concise public document" that "[b]riefly provide[s] sufficient analysis for determining whether to prepare an [EIS] or a [FONSI]."[6] An EA is an evaluative tool that is used to determine whether the effects of a proposed action are "significant" enough to require an EIS.[7] It is designed "simply to identify (and assess the 'significance' of) potential impacts on the environment; it does not balance different kinds of positive and negative environmental effects, one against the other; nor does it weigh negative environmental impacts against a project's other objectives."[8] As an evaluative tool,[9] the requirements of an EA are limited. An EA need only contain "brief discussions" of (1) the need for the proposal, (2) alternatives required by Section 102(2)(E) of NEPA, (3) environmental impacts of the proposed action and alternatives, and (4) a list of agencies and persons consulted.[10]

If an agency determines based on the EA that the proposed action will not have any "significant" environmental effects, it prepares a finding of no significant impact ("FONSI").[11] Alternatively, based on the EA, an agency may determine that an EIS is required. Under NEPA, a federal agency must prepare an EIS for any "major Federal action significantly affecting the quality of the human environment."[12] The Council on Environmental Quality ("CEQ") regulations

---

[3] Id.
[4] Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 370 (1989).
[5] Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989) (citing Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21) (1976).
[6] 40 C.F.R. § 1508.9(a)(1).
[7] 40 C.F.R. §§ 1501.3, 1501.4, 1508.9, 1508.27.
[8] Sierra Club v. Marsh, 769 F.2d 868, 875 (1st Cir. 1985).
[9] Id.; New England Naturist Ass'n, Inc. v. Larsen, 692 F. Supp. 75, 82 (D.R.I. 1988).
[10] 40 C.F.R. § 1508.9(b).
[11] New England Naturist Ass'n, 692 F. Supp. at 82.
[12] 42 U.S.C. § 4332(2)(C).

implementing NEPA, 40 C.F.R. §§ 1500-1508 ("CEQ Regulations"), provide great detail regarding what an EIS must contain.[13]

Under the First Circuit's decisions, there are two aspects of a reviewing court's NEPA analysis.[14] The Court must evaluate whether the federal agency took the requisite "hard look" by assessing the agency's compliance with NEPA's procedural requirements.[15] In evaluating compliance with NEPA's procedures, a court must apply a "rule of reason."[16] Minor deficiencies cannot serve as a basis for invalidating an agency's decision and courts cannot require a level of detail too exacting to be accomplished.[17] Similarly, courts cannot require agencies to consider alternatives that are "too hypothetical or infeasible to merit serious consideration."[18]

In addition, a court must make a substantive determination as to whether the agency's decision is arbitrary and capricious under the Administrative Procedures Act, 5 U.S.C. § 706 ("APA").[19] Under the APA, a court may set aside the decision of an agency only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[20] As the First Circuit has stated, the standard requires the Court to "determine whether the agency has examined the pertinent evidence, considered the relevant factors, and 'articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"[21] "If the agency decision was based on a consideration of the relevant factors and there has not been a 'clear

---

[13] An EIS must identify the purpose and need for the proposal. 40 C.F.R. § 1502.13. It must also contain an alternatives analysis, which presents the environmental impacts of the proposal and the alternatives. Id. § 1502.14. For an EIS, the alternatives section must "[r]igorously" explore and evaluate all reasonable alternatives, devote "substantial treatment" to each alternative, include a "no action" alternative, identify the preferred alternative and include mitigation measures if appropriate. Id. §§ 1502.14(a)-(f). An EIS must also have sections evaluating the affected environment and the environmental consequences of the proposed action. Id. §§ 1502.15, 1502.16.

[14] Roosevelt Campobello Int'l Park Comm'n v. EPA, 684 F.2d 1041, 1045 (1st Cir. 1982).

[15] Id. at 1046.

[16] Massachusetts v. Andrus, 594 F.2d 872, 884 (1st Cir. 1979).

[17] Id. (citing Suffolk County v. Secretary of Interior, 562 F.2d 1368, 1377-78 (2d Cir. 1977)).

[18] Id. (citing Vermont Yankee, 435 U.S. at 551).

[19] Roosevelt Campobello Int'l Park Comm'n, 684 F.2d at 1045.

[20] Id.

error of judgment,' then the agency decision was not arbitrary and capricious.[22] While a reviewing court's analysis must be "searching and careful," courts are not permitted to substitute their judgment for that of an agency regarding the environmental consequences of a proposed action.[23]

## ARGUMENT

### I. The Federal Agencies Took A "Hard Look" At Noise Emissions And Reasonably Concluded That They Were Not Individually Or Cumulatively Significant

CHNA's attack on the Federal Agencies' noise analysis is unwarranted. CHNA seems to argue that because cumulative ambient noise levels from the LSB might exceed numerical thresholds in the local noise ordinance, *ipso facto* the noise emissions would have a "significant" impact as defined under NEPA.[24] CHNA's reliance on the local noise ordinance is a "red herring." The City of Providence Noise Control Ordinance does not specifically regulate ambient noise. Rather, the Ordinance sets specific maximum noise levels from particular *sources*. For example, Section 16-97 of the Ordinance makes it unlawful to operate certain equipment at levels above 50 or 55 dBA, depending on the time of day.[25] Similarly, Section 16-98 makes it unlawful without a special permit to operate equipment or perform construction work outside during certain hours of the day if it creates "unnecessary, excessive or offensive noise."[26] CHNA offers no evidence that any of the equipment or construction work associated with the LSB would violate the local noise ordinance. Indeed, CHNA does not appear to dispute the conclusion in the Accentech reports commissioned by Brown University[27] that the sound *from the LSB itself* would meet the local ordinance limits.

---

[21] Airport Impact Relief, Inc. v. Wykle, 192 F.3d 197, 202 (1st Cir. 1999).
[22] Dubois v. United States Dep't of Agriculture, 102 F.3d 1273, 1285 (1st Cir. 1996) (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (emphasis in original).
[23] Citizens to Preserve Overton Park, 401 U.S. at 416; Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976) (citation omitted); Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).
[24] College Hill Plaintiff's Brief in Support of Appeal ("CHNA Mem.") at p. 4.
[25] Providence, Rhode Island, Code of Ordinances ch. 16, § 16-97 (2005).
[26] Id. § 16-98.
[27] While not reproduced in the administrative record, the Accentech reports are incorporated by reference into the final EA. AR 112 [0785]. Indeed, portions of the Accentech reports are quoted in the final EA

Aside from its misplaced reliance on the local noise ordinance, CHNA cites no evidence in the record that the cumulative noise emissions from the LSB are likely to result in any cumulatively "significant" impacts.[28] To the contrary, the final EA states that the proposed LSB "has been designed to limit noise emissions to the low 40-decibel level at the critical neighbor locations."[29] In addition, while background levels at the corner of Brown and Meeting Streets are the highest, the final EA makes clear that background levels as near as a block away drop "significantly" to "the mid- to upper-40s dBA" roughly half a block away and "the low-40s dBA" roughly a block away.[30] There is no evidence that resulting background levels would have any significant impact on nearby residents.[31] Therefore, it cannot be said that the Federal Agencies' failed to examine the potential impacts of noise emissions or that their finding that the LSB would not cause any significant noise impacts was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## II. The Federal Agencies Were Not Required To Examine Speculative Future Actions

In taking the requisite "hard look" under NEPA, agencies need only consider "reasonably foreseeable" impacts and "need not consider potential effects that are highly speculative or indefinite."[32] The duty to describe impacts is measured by the objective standard of a person of ordinary prudence and must be evaluated based on "the perspective of the decisionmaker at the time the decision is made."[33] Based on these principles, the final EA appropriately excluded as speculative other sources of funding, possible impacts from potential future use of biological

---

prepared by the Federal Agencies. As a result, this Court should summarily reject Plaintiffs' suggestion that the Federal Agencies never reviewed the Accentech reports. CHNA Mem. at p. 3, n.1.

[28] 40 C.F.R. § 1508.27.

[29] AR 112 [0785].

[30] AR 112 [0785].

[31] It is significant that CHNA offers no evidence regarding the location of its office or its members' residences in relation to the noise levels at the receptors measured by Accentech.

[32] Sierra Club v. Marsh, 976 F.2d 763, 768 (1st Cir. 1992).

[33] Id. at 767 (citation omitted).

pathogens and potential impacts to historic resources that might result from future development.[34]

First, the Federal Agencies properly omitted from the final EA any analysis of the $2 million National Institute of Health ("NIH") grant, because it would not have altered the NEPA process. CHNA appears to argue that the NIH grant should have been considered in determining whether the project constituted a "major federal action" that requires an EIS. CHNA cites no authority to support its assertion.[35] Moreover, even if the Federal Agencies had considered the additional $2 million from NIH, the total funding would not have raised the project to the level of a "major federal action" requiring an EIS. In considering whether federal funding "federalizes" a project, courts have compared the amount of the federal funding at issue to the overall project cost.[36] Where the percentage of federal funding is low, that funding alone does not render a project a "major federal action" requiring an EIS.[37] The courts have reasoned, at least in part, that low levels of federal funding do not give the government any real control over the project at all.[38] In fact, the CEQ Regulations expressly exclude from the definition of a "major federal action" certain types of federal funding where the federal agency lacks control over the subsequent use of such funds.[39]

---

[34] Plaintiffs' complaint does not specifically allege these deficiencies.
[35] CHNA Mem. at p. 5.
[36] See, e.g., Ka Makani O Kohala Ohana, Inc. v. Water Supply, 295 F.3d 955, 960 (9th Cir. 2002); Landmark West! v. United States Postal Service, 840 F. Supp. 994, 1006 (S.D.N.Y. 1993).
[37] Ka Makani O Kohala Ohana, 295 F.3d at 960 n.5 (federal contribution of $1.3 million for an $80 million project, less than two percent, was insufficient to turn project into a "major federal action" and court would not alter conclusion if percentage was as high as 2.5 percent); Landmark West!, 840 F. Supp. at 1006 (declining to find federal funding of $9.8 million and acceptance of a promissory note of $15 million, for $250 million project, to be sufficient alone to trigger NEPA).
[38] See Ka Makani O Ohana, 295 F.3d at 960 (USGS and HUD lacked the degree of power, authority or control over the project necessary to render it a major federal action); Landmark West!, 840 F. Supp. at 1007 ($9.8 million payment did not give the Postal Service control over the project as whole); Environmental Rights Coalition, Inc. v. Austin, 780 F. Supp. 584, 600-01 (S.D. Ind. 1991) ("A federal court should not find jurisdiction under NEPA on the basis of federal funding alone unless that funding continues to give the funding agency control over some aspect of the project.").
[39] 40 C.F.R. § 1508.18(a).

The NASA and DOE grants were slightly less than $5.3 million and $1 million, respectively.[40] The total estimated project cost was approximately $92 million.[41] Therefore, the federal funding represented less than 7 percent of the total project cost.[42] Including another $2 million for the NIH grant would only raise the level of federal involvement to less than 9 percent of the total project cost. In addition, as set forth in Brown University's Declaration ("Brown Affidavit") (Exhibit 1), the Federal Agencies had no control over the LSB itself and had no ability to influence or control the outcome of the LSB in any respect.[43] For example, even a cursory review of the NASA grant terms and conditions makes clear that the lion's share of day-to-day decision-making with respect to the construction of the LSB rested with Brown University.[44] Final decision-making power remained at all times with Brown University.[45] Based on the above, even if NASA and DOE had considered the NIH grant, such additional funding would have been insufficient to render the LSB a "major federal action."

The final EA also properly excluded any analysis of possible future sources of funding, federal or otherwise.[46] At the time that the EA and FONSI were issued, there was no credible evidence upon which one could have estimated the amount, if any, of future federal funding. CHNA fails to provide anything more than speculation regarding the potential for future funding. Although Brown University indicated that the LSB and the former Doran-Speidel Building might attract as much as $23.4 million, combined, in the future, Brown University's optimistic estimates of future federal funding from other sources is far too speculative for the Federal Agencies to have considered it in evaluating whether there was sufficient federal involvement to trigger the need for

---

40 Brown Affidavit at ¶¶ 2-3; Declaration of Ann H. Clarke at ¶ 2; Declaration of Patrice Brewington at ¶ 3.
41 AR 112 [0721].
42 CHNA Mem. at p. 5, n.5.
43 Brown Affidavit at ¶ 6.
44 See AR 120 [0862-0888].
45 Brown Affidavit at ¶ 6.
46 CHNA Mem. at p. 5.

an EIS. As the EA indicates, "[f]unding for research activities at the proposed [LSB] would come from many sources, not just federal agencies."[47] Moreover, as the EA points out, future federal funding might likely be subject to yet another NEPA review process.[48] Therefore, it was neither necessary nor appropriate to consider other federal funding in deciding whether to do an EIS.

Similarly, lump sums that Brown University received for past research are an unreliable indicator of either the amounts or uses of future funding. Using past funding amounts to estimate future amounts ignores the potential impacts of unpredictable external circumstances, such as reductions in the federal budget and the effect of increased competition from other organizations for federal grants. Also, even assuming stable levels of federal funding, one cannot predict what portion of the funding would be allocated to the LSB. As a result, nothing in the record supports CHNA's "presumption" that the Biomedical Complex would attract "the majority of future such annual research funding at Brown."[49] Thus, at the time of the final EA, the potential impacts of federal and private funding were too speculative to have been analyzed in the EA.

As with other sources of funding, any analysis regarding the future use of the LSB for Biosafety Level 3 or 4 laboratory work was also properly excluded from the final EA because such uses were not reasonably foreseeable at the time of the final EA. CHNA does not cite to any documents in the record that even suggest, let alone compel, the conclusion that Biosafety Level 3 or 4 research would take place at Brown University in the future. As CHNA points out, the Federal Agencies commented on the draft EA by indicating that *if* the LSB would use Biosafety Level 3 or 4 agents, they should be identified.[50] Absent any discussion of these uses in the EA, one can reasonably infer that such agents would not be used. Therefore, future use of possible Biosafety Level 3 or 4 pathogens was not "reasonably foreseeable" as to merit analysis in the EA.

---

[47] AR 112 [0787].
[48] Id.
[49] CHNA Mem. at p. 6.

Finally, the Federal Agencies properly omitted from the EA any discussion of the "potential for further major facility development within the existing historic district as a result of the construction of the [LSB]."[51] CHNA offers no evidence in the record to suggest that additional major facility development was contemplated by Brown University,[52] let alone foreseeable. Moreover, CHNA cites no evidence in the record that, even if such development occurred, it would cause "significant impacts to the historic district or historic resources."[53] Therefore, because the nature and amounts of future funding, the use of biological pathogens and the prospect of additional development within the College Hill historic district were too speculative to be "reasonably foreseeable," the Federal Agencies properly excluded such matters from their analysis.

## III. The Federal Agencies' Site Selection Analysis Was Thorough, And The Site Selection Was Reasonable Based On The Evidence Before NASA And DOE

As with an EIS, an EA must contain a "brief discussion[ ] . . . of alternatives as required by section 102(2)(E) [of NEPA]."[54] The CEQ Regulations dictate the contents of the alternatives section, and provide guidance in evaluating the sufficiency of such a section. The regulations state that an alternatives section should include: (1) rigorous exploration and objective evaluation of all reasonable alternatives as well as a brief discussion explaining those alternatives eliminated from consideration; (2) substantial treatment of each alternative considered in detail; (3) reasonable alternatives not within the lead agency's jurisdiction; (4) the no-action alternative; (5) the identity of the preferred alternative; and (6) appropriate mitigation measures, where applicable.[55] While NEPA contemplates a "thorough study" of alternatives, it in no manner dictates the result of the

---

50 AR 83 [0454].
51 CHNA Mem. at p. 8.
52 Brown University submits that Peter Siebach's opinion regarding future construction in the area is not a valid indicator of whether Brown University planned future projects in the area. AR Supp. Doc. 48.
53 Id.
54 40 C.F.R. § 1508.9(b).
55 40 C.F.R. § 1502.14(a)-(e).

comparison, because the agency retains discretion to make the ultimate decision.[56]

Based on the above, the evaluation of alternative sites contained in the final EA readily passes muster. The final EA contains an extensive analysis of alternatives that began as early as 1999 with a Building Site Selection Study performed by a professional consultant at Shepley, Bullfinch, Richardson & Abott.[57] As the final EA describes, seven potential sites were identified and measured against seven screening criteria.[58] The alternatives considered included construction on and off campus, renovation of existing facilities and the "no action" alternative.[59] Brown University commissioned yet another study to evaluate the possibility of renovating an on-campus building as an alternative, but that study found renovation could not accommodate modern lab equipment.[60] The final EA evaluates all seven locations against the criteria and explains why the site bordered by Olive, Brown and Meeting Streets was the only site that satisfied all of the criteria.[61]

CHNA challenges the site selection criteria, but does not establish that the Federal Agencies failed to meet the procedural requirements of NEPA[62] or that the site ultimately chosen was arbitrary and capricious. The First Circuit has held that it is not sufficient "simply to make a facially plausible suggestion; rather, an intervenor must offer tangible evidence that an alternative site might offer a 'substantial measure of superiority" as a site.[63] CHNA does not even attempt to establish that any of the alternative locations that it proposes would be substantially superior.

Finally, CHNA suggests that Brown University should be required to undertake Herculean efforts such as amending its Master Plan, applying for special use permits, locating the facility out of

---

56 New England Coalition on Nuclear Pollution v. U.S. Nuclear Regulatory Comm'n, 582 F.2d 87, 95 (1st Cir. 1978).
57 AR 119 [0835-36].
58 AR 112 [0724].
59 Id.
60 AR 112 [0727]. The GPR Planners Collaborative report from 1999 is expressly incorporated by reference into the final EA. Id.
61 AR 112 [0727-28].
62 See 40 C.F.R. § 1502.14(a)-(e).

the City, or even breaking apart the Life Sciences Program into components and relocating "component parts" at another location.[64] However, requiring such a strained analysis runs counter to the letter and spirit of NEPA. As the Supreme Court has stated, a discussion of alternatives cannot be "found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man. Time and resources are simply too limited to hold that an [EIS] fails because the agency failed to ferret out every alternative . . . ."[65] Under decisions of the First Circuit, courts cannot require an evaluation of alternatives "too fanciful or hypothetical, but rather are constrained to determine only whether the alternatives analysis in dispute was "reasonable."[66] As a result, CHNA's challenge to the site selection criteria should be disregarded.

This Court should also reject CHNA's challenge to the Federal Agencies' "no action" alternative. CHNA does not dispute that the final EA addresses this alternative, but CHNA disagrees with the Federal Agencies' interpretation of this requirement. However, the interpretation of the "no action" alternative in the final EA was reasonable and not arbitrary and capricious.[67] The CEQ, NASA and DOE regulations provide no interpretation of this requirement. The Federal Agencies in this case deemed the "action" at issue to be their respective federal grants. The EA reflects the Federal Agencies' belief that the LSB would be built even without federal funding. In short, the "no action" or no funding alternative would have the same outcome – the same LSB would be built. The Federal Agencies' belief was reasonable because federal funding constituted less than seven percent of the total project cost.[68] Therefore, it cannot be said that interpreting the "no action" alternative requirement as was done in the final EA was arbitrary and capricious.

---

[63] Valley Citizens for a Safe Environment v. Aldredge, 886 F.2d 458, 462 (1st Cir. 1989).
[64] CHNA Mem. at pp. 9-10, n.10.
[65] Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 551 (1978).
[66] Grazing Fields Farm v. Goldschmidt, 626 F.2d 1068, 1074 (1st Cir. 1980); Valley Citizens, 886 F.2d at 458 (citing Vermont Yankee, 435 U.S. at 551).
[67] See AR 112 [0734].
[68] AR 112 [0734].

## IV. The Federal Agencies Adequately Involved The Public In The Process

CHNA has no basis to claim that the denial of its request for "consulting party" status rendered the public participation process deficient or *pro forma*, because CHNA had no right to such status.[69] Under the Advisory Council on Historic Preservation regulations implementing the NHPA, 36 C.F.R. 8001 et seq. ("Section 106 Regulations"), only the following have a right to serve as "consulting parties" during the Section 106 process: (1) the state historic preservation officer; (2) certain Indian tribes and native Hawaiian organizations; (3) representatives of local government; and (4) applicants for federal assistance.[70] In addition, those with a demonstrated interest in the undertaking "may" be allowed to serve as consulting parties.[71] However, even these enumerated classes are not consulting parties as of right.[72] The Section 106 Regulations merely require an official to consider requests for consulting party status from such entities and the official retains discretion to permit or deny such status.[73] Because CHNA did not fall within any of the enumerated classes of consulting parties as of right, the denial of such status cannot be actionable.

Moreover, the record demonstrates that despite the absence of *de jure* "consulting party" status, CHNA had *de facto* consulting party status. As detailed in Appendix A to the MOA, the public was heavily involved in the Section 106 process leading up to the MOA being signed in August of 2003.[74] As early as October 2001, Brown University was meeting with CHNA to present its plans for the proposed building.[75] The following month, the public was invited to a November 28, 2001 meeting hosted by the Rhode Island SHPO for the purpose of gathering comments on the

---

69 CHNA Mem. at p. 12.
70 36 C.F.R. § 800.2(c)(1)-(4).
71 36 C.F.R. § 800.2(c)(5).
72 Neighborhood Ass'n of the Back Bay, Inc. v. Federal Transit Admin., 407 F. Supp. 2d 323, 334 (D. Mass. 2005).
73 36 C.F.R. § 800.3(f)(3); Neighborhood Ass'n, 407 F. Supp. 2d at 334 (citing 36 C.F.R. § 800.3(f)(3)).
74 AR 114 [0795].
75 AR 114 [0795].

proposed LSB.[76] Following that meeting, after revising the design of the proposed LSB, Brown University met with CHNA on July 31, 2002 and two times during October of 2002 to discuss the revised plans.[77] After the November 28, 2001 meeting, Brown University, the Federal Agencies and the Rhode Island Historic Preservation & Heritage Commission communicated in writing with or copied the public on correspondence regarding the progress of the Section 106 review.[78] Moreover, CHNA communicated its objections and concerns about the possible impacts of the proposed LSB on the College Hill Historic District.[79] Therefore, the denial of "consulting party" status was a mere formality and did not preclude CHNA from being actively involved in the Section 106 process.

Similarly, CHNA's argument that the public did not receive "forthright and reasonable responses" to their inquiries is also unpersuasive.[80] To the contrary, the administrative record indicates that Plaintiff Touret asked for and received very specific information about air emissions from Brown University.[81] The fact that Defendants did not provide Touret with an itemized list of emissions as set forth in AR. Supp. Doc. 1 is inapposite. As set forth in Brown University's Memorandum in Opposition to William Touret's Appeal, that document was deemed to be insufficiently accurate to be relied upon. Moreover, when asked about air emissions relating to the Life Sciences Program, Brown University did not in any way attempt to hinder Plaintiffs from learning about emissions. Rather, Brown University referred Touret to RIDEM, where he could find annual emissions statements that contained "estimates of specific chemical emissions."[82]

Equally important, CHNA cites no legal authority for the proposition that Brown University was required to provide any and all information that the public desired upon demand. As Magistrate

---

[76] AR 26 [0059]; AR 41 [0232-44].
[77] AR 114 [0797].
[78] See e.g., AR 30 [0069-71]; AR 32 [0073-76]; AR 43 [0249-50]; AR 77 [0386-87]; AR 78 [0388-89]; AR 106 [0631-32]; AR 110 [0709-10].
[79] AR 46 [0255-80].
[80] CHNA Mem. at p. 12.
[81] AR 101 [0614-15].

Judge Martin remarked in denying Plaintiffs' Motion to Compel Discovery, "Brown was not required to make any disclosures prior to the issuance of the Draft EA."[83] In affirming that Order, this Court remarked at the February 17, 2006 hearing that NEPA does not require "that a particular study or anything else gets provided instantly to proposed objectors" and that putting the draft EA out for public comment cured any possible taint.[84] Therefore, not sharing certain information with the public prior to the draft EA does not render the public participation process deficient.

This Court previously rejected the argument that the public had inadequate opportunity to comment on the draft EA. In the Order denying Plaintiff's Motion to Compel Discovery, Magistrate Judge Martin ruled that, except in "exceptional circumstances" not present here, the CEQ Regulations "do not provide for a public comment period or otherwise confer on the public a right to comment on draft EAs."[85] This ruling is consistent with applicable regulations. The CEQ Regulations do *not* provide for a public comment period for a draft EA, and do not otherwise confer on the public a right to comment on a draft EA.[86] Although the CEQ Regulations contemplate public comments for an EIS, they specifically omit conferring a public right to comment on a draft EA.[87] Indeed, the First Circuit has remarked that "[n]othing in the CEQ regulations requires circulation of a draft EA for public comment, except under certain limited circumstances."[88]

---

[82] AR101 [0614].

[83] Memorandum and Order Denying Plaintiffs' Motion to Compel Discovery (November 21, 2005) ("Magistrate's Order") at p. 8.

[84] Transcript of Hearing on Plaintiffs' Motion to Supplement Record and Appeal of Magistrate Decision (February 17, 2006) ("Hearing Tr. (2/17/06") at p. 11.

[85] Magistrate's Order at p. 7 (citing 40 C.F.R. §§ 1500-1508). Accord Alliance to Protect Nantucket Sound, Inc. v. United States Dep't of the Army, 398 F.3d 105, 115 (1st Cir. 2005) (citing 40 C.F.R. § 1501.4(e)(2)).

[86] See 40 C.F.R. §§ 1500-1508; see also id § 506.6.

[87] See id. §§ 1500-1508; see also id. §§ 1506.6(f), 1506.10(c).

[88] Alliance to Protect Nantucket Sound, 398 F. 3d at 115 (1st Cir. 2005) (citing 40 C.F.R. § 1501.4(e)(2)). "Public participation is required by the CEQ regulations if the proposed action is without precedent or is similar to an action that normally requires preparation of an environmental impact statement. 40 C.F.R. § 1501.4(e)(2). In such cases, an agency must make its proposed finding of no significant impact available for public review thirty days before the agency makes its final determination whether to prepare an environmental impact statement." Defenders of Wildlife, Earth Island Inst. v. Hogart, 330 F. 3d 1358, 1373 - 1374 (Fed. Cir. 2003). Plaintiffs do not allege that any of those circumstances exist in this case.

The NASA and DOE regulations implementing NEPA also do *not* provide for a public comment period for a draft EA, and do not otherwise confer on the public a right to comment on a draft EA.[89] Those regulations do contemplate public comments for an EIS, but they specifically omit conferring a public right to comment on a draft EA.[90] Accordingly, Magistrate Judge Martin correctly concluded that any hindrance on the non-existent right to comment was not actionable.[91] Having failed to present the Court with any new law or facts compelling a contrary conclusion, this Court should again conclude that the public participation process was not deficient.

## V. The Federal Agencies Took A "Hard Look" At Whether The Impacts From The LSB Would Be "Significant" And Reasonably Concluded That They Would Not

With respect to the required "hard look" and procedural analysis, CHNA does not appear to contest that the Federal Agencies considered the factors listed in 40 C.F.R. § 1508.27 that are used to guide an analysis of whether impacts from an action are "significant" enough to warrant an EIS.[92] Rather, CHNA attempts to persuade this Court that one or more of the factors has been satisfied such that an EIS should be required. To the contrary, the record evidence establishes that none of the LSB's impacts would be "significant" enough to trigger the need for an EIS.

Based on the factors relating to the "intensity" of the impacts, there is no reasonable basis to conclude that the LSB impacts would be "significant."[93] With respect to the first factor relating to an analysis of both positive and negative "impacts," in addition to evaluating the minimal or non-existent environmental impacts from the LSB, the final EA makes clear that there are multiple non-environmental benefits that would flow from the LSB.[94] The LSB would "allow breakthrough scientific collaborations in the areas of microbiology, genetics, genomics, and biochemistry" and

89 See 14 C.F.R. §§ 1216.3, 1216.309; 10 C.F.R. §§ 1021, 1021.301.
90 See 14 C.F.R. §§ 1216.3, 1216.308(a); 10 C.F.R. §§ 1021, 1021.301, 1021.311, 1021.313.
91 Id. at 7.
92 CHNA Mem. at pp. 14-15, n.16.
93 AR 112 [0745-61].

would increase the number of new faculty positions over the next five years.[95] In addition, the LSB would provide benefits outside of Rhode Island by helping the country "overcome the challenges of scientific uncertainties that limit the ability to solve many health problems plaguing our country."[96]

As to the second factor (impacts to public health and safety), for the reasons above, Brown University disputes CHNA's characterization of air and noise emissions as representing a threat to health and safety.[97] The final EA considered potential impacts on natural and physical elements, e.g., land use, geology, soils, biological resources, water resources, air quality, traffic and parking, and noise and found none to be significant. The final EA dedicated more than three pages to an analysis of potential impacts on "human health and safety" and failed to identify any significant impacts.[98]

With respect to the third factor (uniqueness of geographic area), the final EA evaluated that and identified no significant impacts to historic resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.[99] It is noteworthy that the RISHPO concluded that the three historic buildings to be removed did *not* possess outstanding historical or architectural significance.[100] Furthermore, pursuant to the mitigation measures set forth in the MOA, any "impacts to historic resources would be minor."[101] As to existence of "parklands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas," the EA disclosed no wetlands at or near the site and no surface water bodies closer than 1.4 kilometers from the site.[102] Also, no rare or endangered plants or animals were identified in the final EA. [103] Brown University submits that the

---

94 40 C.F.R. § 1508.27(b)(1). With respect to the impacts, the CEQ Regulations do not limit the Federal Agencies' analysis to environmental impacts, contrary to CHNA's assertion.
95 AR 112 [0723].
96 Id.
97 CHNA Mem. at p. 14, n. 14.
98 AR 112 [0753-57].
99 AR 112 [0739-43, 0757-59].
100 AR 112 [0757, 0772].
101 AR 112 [0757]. For these same reasons, factor eight is not satisfied. 40 C.F.R. § 1508.27(b)(8).
102 40 C.F.R. § 1508.27(b)(3); AR 112 [0735-18].
103 AR 112 [0736]. For this reason, factor nine is also not satisfied. 40 C.F.R. § 1508.27(b)(9).

location of the site at the base of a hill with a residential area above is inapposite because there is nothing in the CEQ Regulations to indicate that this layout renders the site geographically "unique."

In connection with the fourth and fifth factors (degree that effects on human environment would be "highly controversial" or involve effects that are "highly uncertain or involve unique or unknown risks"), the final EA found no such effects. Under the fourth factor for controversial effects, CHNA cannot reasonably argue that the controversy it created over the LSB should compel preparation of an EIS.[104] Such an interpretation would require an EIS every time the public merely alleges effects on the human environment. Similarly, the sixth factor is not satisfied because the Federal Agencies concluded, based on their analysis, that potential impacts to human environment were minimal and, in any event, did not involve "highly uncertain" or "unique or unknown risks."[105] CHNA cannot compel an EIS by merely alleging, without any record evidence, that effects from exposure to "multiple hazardous air emissions are uncertain and unknown."

As for factor six, likelihood of the project setting a precedent, CHNA cites no record evidence and presents no compelling argument that the LSB would set any precedent for future actions in the area with significant effects.[106] Similarly, as to factor seven, related actions, CHNA fails to present any more than vague speculation unsupported by the record about "undisclosed actions . . . such as the activities within Brown's other biomedical and other laboratory facilities."[107]

There is no record evidence that LSB would violate environmental law (tenth factor).[108] As shown above, the LSB would not violate the noise ordinance and the record contains no evidence of "potential to violate federal and local environmental laws governing hazardous air emissions."[109]

---

104 40 C.F.R. § 1508.27(b)(4).
105 40 C.F.R. § 1508.27(b)(5).
106 40 C.F.R. § 1508.27(b)(6).
107 CHNA Mem. at p. 15, n.16.
108 40 C.F.R. § 1508.27(b)(10).
109 CHNA Mem. at p. 15, n. 16.

Even if CHNA could persuade that one of the factors set forth above signals a "significant" impact, fatal to CHNA's argument is the absence of any controlling legal authority requiring that an EIS be performed upon satisfaction of one or more of the factors. Indeed, courts have rejected the invitation to require an EIS where only one CEQ factor is present.[110] Moreover, the courts have rejected CHNA's formalistic approach, stating that "the factors listed in the regulation do not appear to be categorical rules that determine by themselves whether an impact is significant."[111]

Finally, contrary to CHNA's argument, the length of the EA does not support the preparation of an EIS in this case.[112] In Sierra Club v. Marsh, the very case relied upon by CHNA, the court acknowledged that it might be argued that a lengthy EA instead "reflect[s] a thorough consideration of potential impact on the environment."[113] Indeed, the court expressly refused to "give conclusive weight . . . to the simple *facts* of EA length, complexity and controversy."[114] Therefore, CHNA's "other factors" fail to establish the need for an EIS.

## VI. There Is No Evidence Of "Predetermination" By The Federal Agencies

Finally, CHNA's claim of improper predetermination is without merit. The Court should decline CHNA's invitation to delve into the subjective intentions of the Federal Agencies. Courts have refused to second-guess agencies' motivations because agencies' actions are to be judged on the stated reasons; agencies' subjective intentions are irrelevant unless the plaintiff makes a strong showing of bad faith or improper behavior.[115] The "evidence" offered by CHNA falls far short of making a strong showing of any bad faith. The June 11, 2002 comment by Anne Hooker Clarke regarding use of the Section 106 process as a basis for the NEPA analysis was both practical in

---

[110] Born Free USA v. Norton, 278 F. Supp. 2d 5, 23 (D.D.C. 2003).
[111] Spiller v. White, 352 F.3d 235, 243 (5th Cir. 2003).
[112] CHNA Mem. at p. 15.
[113] 769 F.2d at 874.
[114] Id. at 875 (emphasis in original).
[115] Spiller, 352 F.3d at 242. Accord National Audubon So. v. Hoffman, 132 F.3d 7 (2d Cir. 1997) (plaintiffs failed to make strong showing of bad faith predetermination).

nature and consistent with law. Indeed, it was reasonable and commendable for the Federal Agencies to avoid spending taxpayer funds to duplicate work already done. Moreover, the NHPA regulations contemplate coordination and overlap between the Section 106 and NEPA analyses.[116]

The parties' focus on issuing an EA (rather than an EIS) and establishing a proposed timeline for completing the EA is consistent with NEPA. Under NEPA, the initial focus is always on doing an EA. The purpose of an EA is to help the agencies decide whether an EIS is needed.[117] As this Court noted, it is a "means for determining whether an EIS is required."[118] Therefore, until an EA is done, there cannot reasonably be any discussion regarding the need for, or scope of, an EIS. Furthermore, if (as here) the results of the EA indicate no significant impact, there would be no need for further analysis. Thus, the absence of discussion of an EIS does not show improper predetermination of result, but rather, compliance with the letter and spirit of NEPA.[119]

Similarly, even if the Federal Agencies and/or Brown University were anxious to begin construction on the LSB, that desire is not enough to conclude that the Federal Agencies predetermined the result. First, as with any NEPA applicant, Brown University would understandably hope to complete the NEPA process as expeditiously as possible. As for the Federal Agencies, it is also reasonable to expect that they are involved in multiple NEPA reviews at any one time and, therefore, seek to avoid unnecessary delays. Therefore, CHNA fails to establish any improper predetermination of result sufficient to merit a less deferential review in this case.

---

116 36 C.F.R. § 800.3(b) (agency official should coordinate Section 106 review with any other reviews, such as reviews under NEPA).

117 40 C.F.R. § 1508.9(a)(1) (defining an EA as a concise document that provides sufficient evidence and analysis to determine whether an EIS or a FONSI should issue); see Sierra Club v. Marsh, 769 F.2d 868, 875 (1st Cir. 1985).

118 New England Naturist Ass'n, 692 F. Supp. at 82.

119 Furthermore, the absence of specific reference to doing an "EIS" after any particular date is irrelevant. It is entirely possible, if not likely, that the Federal Agencies suspected as early as August of 2002 that an EIS was not likely to be required. Indeed, the Federal Agencies were part of the Section 106 process and the record contains a lengthy February 2002 draft submission to the SHPO that contains at least a preliminary

## CONCLUSION

Based on the above, the Court should (1) rule that the Federal Agencies took the required "hard look" and their decision to issue an EA and FONSI was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and (2) deny and dismiss CHNA's appeal.

Respectfully submitted,

JOSEPH AVANZATO (#4774)
KRISTEN W. SHERMAN (#5595)
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Tel. (401) 274-7200
Fax (401) 351-4607

and

BEVERLY E. LEDBETTER, ESQ. (#2208)
General Counsel
Office of the General Counsel
Brown University
110 South Main Street
Providence, RI
Tel: (401) 863-9900
Fax: (401) 863-1199

Attorneys for Defendant Brown University
Dated: May 18, 2006

CERTIFICATE OF SERVICE

I hereby certify that a copy of the within was hand delivered on this 18th day of May, 2006, to J. William Harsch, Esq., 170 Westminster Street, Suite 800, Providence, Rhode Island and Robin Feder, Esq., United States Attorney's Office, District of Rhode Island, Fleet Center, 50 Kennedy Plaza, 8th Floor, Providence, RI 02903 and William G. Touret, 11 South Angell Street #264, Providence, Rhode Island 02906.

*377456_1.doc*

---

analysis and initial conclusions regarding many of the issues that would be addressed in the final EA. AR 39 [0084-230].

[redacted]

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| WILLIAM G. TOURET, et al.,<br>Plaintiffs, | : | |
| v. | : | C.A. No. 04-198T |
| NASA, et al.,<br>Defendants. | : | |

**DECLARATION OF RICHARD R. SPIES**

I, Richard R. Spies, declare and make the following declaration under penalty of perjury:

1. I am presently employed by Brown University as the Executive Vice President for Planning and Senior Adviser to the President, and have worked in that capacity for approximately 4 years.

2. I am familiar with the federal grant that was awarded by the United States Department of Energy (DOE) to Brown University for construction of the Life Sciences Building (LSB). Brown University received a notice of award in the amount of $969,000.00 on February 3, 2003 with an effective date of September 30, 2002. As of this date, the full amount of the grant has been disbursed to Brown University.

3. I am familiar with the federal grant that was awarded by the National Aeronautics and Space Administration (NASA) to Brown University for construction of the LSB. Brown University received a notice of award in the amount of $5,088,000.00 on October 1, 2003 with an effective date of September 1, 2003. As of this date, the full amount of the grant has been disbursed to Brown University.

4. Construction of the LSB began in 2003, with the demolition of existing structures. As of today it is approximately 85% complete with substantial completion expected in August 2006 bar any unforeseen delays.

5. A Certificate of Occupancy or a Temporary Certificate of Occupancy, as the case may be, for the LSB is expected to be obtained upon substantial completion of the LSB with occupancy by Brown University to begin within seven (7) days of receipt of the Certificate of Occupancy or the Temporary Certificate of Occupancy.

6. In connection with the LSB, neither the DOE nor NASA had any control or influence over, responsibility for, or involvement with the site selection, design or construction of the LSB. Project reports are provided to both the DOE and NASA on a monthly basis; however, all decision making power on the design and construction of the LSB remains at all times in the sole discretion of Brown.

7. Federal approval was not a prerequisite to Brown University's building the LSB. Brown University would have proceeded to construct the LSB even if the funds from either the DOE, NASA or both had not been awarded or were revoked.

8. The current total estimate for the entire project is more than 95.5 million dollars. To date Brown has expended $77,016,862.00, which far exceeds the amount of money received in federal grants for the LSB.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this the 18th day of May 2006.

Richard R. Spies.
Executive Vice President for Planning
Brown University