UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| WILLIAM G. TOURET, et al., Plaintiffs | ) | |
| v. | ) | C.A. No. 04-198T |
| NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, et al., Defendants. | ) | |

**BROWN UNIVERSITY'S MEMORANDUM IN OPPOSITION TO WILLIAM TOURET'S APPEAL**

Brown University submits this Memorandum in opposition to the appeal of William G. Touret ("Touret"). The Court should uphold the decision of the National Aeronautics and Space Administration ("NASA") and the Department of Energy ("DOE") (the "Federal Agencies") under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4332(2)(C), to issue an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI"), and not an Environmental Impacts Statement ("EIS"), for the Life Sciences Building ("LSB"). As evidenced by the record,[1] the Federal Agencies took the requisite "hard look" and complied with NEPA's requirements. The administrative record supports the Federal Agencies' decision not to do an EIS. There was no clear error of judgment; the decision is not arbitrary and capricious, an abuse of discretion or otherwise contrary to law. The Court should deny the appeal and uphold the decision.

[1] Brown University will use the form adopted by Plaintiffs to refer to the documents in the administrative record as well as those documents that the Court has ruled can be considered as extrinsic evidence.

## ARGUMENT[2]

**I. The Federal Agencies' Decision That The LSB Would Not Result in Significant Environmental Impacts, Including Air Emissions, Was Not Arbitrary And Capricious, An Abuse of Discretion, Or Otherwise Not In Accordance With Law**

A. The Federal Agencies Took The Requisite "Hard Look" At Types And Amounts Of Air Emissions And Had No Obligation To Share Itemized Amounts With Plaintiffs

Touret would have this Court believe, in essence, that had the EA disclosed itemized amounts of emissions for each chemical, an EIS would have been required.[3] However, Touret does not appear to challenge the accuracy of the figures in the EA regarding overall emissions volumes for the Biomedical Complex (1500 lbs) and all laboratories at Brown University (6000 lbs), and that the Federal Agencies considered these numbers.[4] Touret also does not appear to dispute that the Federal Agencies were aware of the specific types of chemicals that might be emitted.[5] Instead, Touret attempts to base a NEPA violation on the absence of an itemized list of chemical emissions in the EA and an alleged misstatement in the final EA regarding the potential need for a Rhode Island Department of Environmental Management ("RIDEM") air toxics permit.[6]

The absence of an itemized list of emissions in the EA does not constitute error, and Touret's attempts to infer bad faith from it are without support. To the contrary, the healthy skepticism with which Defendants evaluated the air emissions issue demonstrates that the Federal Agencies took the requisite "hard look." Moreover, the decision not to include an itemized list of emissions was not arbitrary or capricious. Plaintiffs cite no authority in NEPA or elsewhere for the proposition that an itemized chemical list is a necessary element of an EA. Furthermore, the

---

[2] Brown University incorporates by reference its explanation of the applicable legal standards contained in its Memorandum in Opposition to CHNA's Appeal.

[3] Plaintiff William G. Touret's Brief in Support of Appeal ("Touret Mem.") at 7.

[4] AR 112 [0749]. Brown University will use the forms adopted by Plaintiffs to refer to the documents in the administrative record, as well as those documents that the Court has ruled can be considered as extrinsic evidence.

[5] AR Supp. Doc. 1; AR 39 [0123-0206].

[6] Touret Mem. at pp. 8-10.

absence of an itemized chemical list in the EA based on Henry Huppert's estimates is far from evidence of bad faith. It would have been imprudent to provide the itemized list of chemicals offered by Henry Huppert, given the uncertainty regarding the accuracy of the estimates. The emissions numbers provided by Henry Huppert were mere estimates and were based on a comparison of the chemical inventory in the labs at the beginning and at the end of the year.[7] However, as Lucy Swartz pointed out, the numbers were of questionable validity because some of the inventory that constitutes the "delta" may be attributable to chemicals that are still in the lab or that for some other reason do not go "out the stack."[8] Thus, it would have been imprudent for Defendants to publish such estimates to the public without a satisfactory level of confidence in their validity.

Moreover, the Federal Agencies' ultimate conclusion regarding the need for a permit, even if erroneous, was not arbitrary and capricious. There is substantial doubt as to whether and to what extent RIDEM air permits would be required. For example, the thresholds in the regulations upon which Touret relies are subject to change.[9] Common sense dictates that whether or not an air toxics permit would be required would ultimately be left to RIDEM's discretion, and would be based on estimated emissions and the thresholds in the regulations as of the time that the permit is sought.

Even if a permit were required, Touret fails to present any evidence that Brown University would not receive the necessary permit(s) from RIDEM or that those permits would not be sufficiently protective of human health. Inherent in Touret's argument is the misplaced assumption that exceeding the air toxics thresholds and needing a permit are the functional equivalent of causing significant impacts to the environment under NEPA. To the contrary, RIDEM's Air Pollution Control Regulation No. 22 makes clear that RIDEM has wide discretion to impose a host of

---

7 AR Supp. Docs. 1 & G.
8 AR Supp. Doc. G.
9 AR 108 [0705].

conditions on permit holders to ensure that there are no significant impacts to the environment, including measures "to ensure that emissions from the facility do not cause ground level concentrations that exceed Acceptable Ambient Levels."[10]

In any case, the record is clear that RIDEM would undertake a thorough evaluation of whether the "[LSB] would have the potential to exceed the thresholds listed in Air Pollution Control Regulation No. 9" and that RIDEM might expand the air toxics permit, the application for which RIDEM was reviewing at the time of the EA, to "include other toxics emitted by the facility."[11] Moreover, in evaluating Brown University's application for a preconstruction permit, RIDEM made clear that it would "evaluate the ambient air impacts from emissions of those substances that exceed permitting thresholds from all operations at the university."[12] Therefore, the Federal Agencies took a "hard look" at the issue of air emissions, and Touret's challenge to the Federal Agencies' conclusions must fail.

B. <u>Referring To The RWDI Report In The EA Was Not Arbitrary And Capricious</u>

The inclusion of the RWDI report in the final EA does not undermine the conclusion that the Federal Agencies took a "hard look" at the issue of air emissions, and in no manner suggests that their ultimate decision not to do an EIS was arbitrary or capricious. The RWDI report was among the documents the Federal Agencies reviewed during the NEPA process. It was attached to the February 2002 draft submission to State Historic Preservation Officer that is contained in the record.[13] Therefore, it was appropriate for the Federal Agencies to identify it in the final EA.

Furthermore, the description of the RWDI report was not misleading or erroneous, and the final EA made clear the report's limitations.[14] For example, the final EA makes clear that Brown

---

[10] Air Pollution Control Reg. No. 22, § 22.5.7 (April 27, 2004).
[11] AR 108 [0705-06].
[12] <u>Id.</u>
[13] AR 39 [0173-205].
[14] AR 112 [0749].

University had "commissioned" a study, as opposing to having completed one. In addition, the EA discloses that the "intent of [the study] was to provide guidance in locating new air intakes," among other things.[15]

While Touret may disagree with the analysis or conclusions in the RWDI report, it is not necessary for Defendants or this Court to delve into the substance of the report. Touret does not dispute that the RWDI report was not relied upon in any significant manner. Indeed, one can readily infer from the plain language of the analysis of air emissions in the EA that the Federal Agencies' conclusion was not premised in any meaningful way, if at all, on the RWDI report.[16] To the contrary, the final EA dedicates a mere three sentences to identifying the RWDI report.[17] Therefore, there was no error in including the RWDI report in the final EA or in the language used to do so.

C. Consideration of RIDEM's Air Permitting Program Was Entirely Reasonable

The Federal Agencies' consideration of RIDEM's air permitting program was entirely reasonable and supports the conclusion that the Federal Agencies took the necessary "hard look" at air emissions. Even a cursory review of RIDEM's air pollution control regulations makes clear that RIDEM does consider cumulative impacts from emissions. For example, Air Pollution Control Regulation No. 22 regulates toxic emissions from a "facility," which is defined as "all pollutant-emitting activities which . . . are located on one or more contiguous or adjacent properties, and are under the control of the same person."[18] Moreover, Air Pollution Control Regulation No. 22 provides, in relevant part, that no stationary source may receive a permit unless it can be demonstrated that "[t]he emissions of any listed toxic air contaminant from the proposed facility [will] not cause an impact, at or beyond the property line of the facility, which exceeds the

---

[15] Id.
[16] AR 112 [0749].
[17] Id.

Acceptable Ambient Levels for that contaminant."[19] Therefore, RIDEM's regulations are consistent with NEPA's concern about cumulative impacts.

Touret's assertion that "there is no evidence that RIDEM's procedures would result in enforceable mitigation measures" is also incorrect.[20] As set forth above, Air Pollution Control Regulation No. 22 gives RIDEM broad authority to impose conditions on permits,[21] and as with any permit, it is subject to revocation[22] and civil penalties[23] for non-compliance. Therefore, it was reasonable for the Federal Agencies to consider the role of RIDEM's air permitting authority and future review of the LSB emissions in taking the "hard look" required by NEPA.

D. The Absence Of Air Modeling Does Not Undermine The EA

Touret's attempt to undermine the validity of the EA and FONSI based on the absence of air modeling is unsuccessful for several reasons. First, there is no requirement in NEPA, and Touret cites to none elsewhere, for the proposition that air modeling is a pre-requisite to an adequate EA. Second, there is no basis for finding that the absence of air modeling, of the sort contemplated by Touret, means *ipso facto* that the Federal Agencies did not have an understanding of existing and future air emissions. To the contrary, the EA makes clear that the Federal Agencies had evaluated the types and amounts of emissions. Having determined that the types and amounts of emissions were such that they would not have any significant impacts, it matters not whether and to what extent those emissions spread geographically.

Third, the allegedly vague language offered by Henry Huppert was not made in bad faith or in an attempt to "mislead unsuspecting readers" into believing that comprehensive modeling had

---

18 Regulation No. 22, § 22.1.6 (emphasis supplied).
19 Id. § 22.2.3(a).
20 Touret Mem. at p. 15.
21 Regulation No. 22, § 22.5.7.
22 Id. § 22.5.9.
23 See RIDEM Rules and Regulations for the Assessment of Administrative Penalties (May 2000).

been done.[24] To the contrary, the change in the EA's language indicates that the Federal Agencies and Brown University were careful to accurately represent to the public the facts of the LSB. Touret cites no record evidence to contradict the validity of the EA's statement regarding the unlikely increase in ground-level concentrations of hazardous air pollutants at or beyond the property line.[25] Similarly, Touret cites no evidence in the record that any of the alleged "hazardous air pollutants" would individually or cumulatively result in any "significant" impacts within the meaning of NEPA.

E. The Federal Agencies Adequately Considered Pathological Waste Incinerator Use

It is beyond dispute that information regarding the pathological waste incinerator at Brown University was presented to the Federal Agencies during the NEPA review process.[26] Moreover, Touret does not challenge the validity of the statement in the EA that the LSB would have no incinerator, so no releases from incinerators would occur.[27] Rather, Touret appears to argue that the EA is deficient for not comprehensively evaluating the existing pathological waste incinerator.

Based on the evidence before the Federal Agencies at the time the EA was issued, there was no reason for the Federal Agencies to have undertaken a comprehensive analysis of incinerator emissions. As set forth in the "Brown University Biomed Center/Grimshaw-Gudewicz Air Permit Summary" included in the February 2002 draft SHPO submission, the existing incinerator is used to burn pathological waste from biomedical research.[28] As that summary states, the unit is exempt from Sections 39.3 through 39.10 of RIDEM's Air Pollution Control Regulation No. 39 (Hospital/Medical/Infectious Waste Incinerators), but is subject to and included in the University's Air Operating Permit.[29] The record contains a letter from RIDEM stating that the Brown University incinerator is exempt from regulation because "an incinerator is exempt from

[24] Touret Mem. at 14.
[25] AR 112 [0749].
[26] AR 39 [0123-24, 0145-51].
[27] AR 39 [0784].
[28] AR 39 [0123].

sections 39.3-39.10 of [Regulation No. 39] if it only burns pathological waste."[30] Therefore, provided the type of waste remains the same (and there is no evidence in the record to the contrary), the addition of pathological waste from the LSB would not alter the fact that the activity is exempt.

Touret makes much ado about "potential" dioxin emissions from the incinerator.[31] However, there is no evidence in the record regarding the existence or amounts of dioxin that might be emitted from such an incinerator. Given the absence of such evidence, there is no basis to conclude that the Federal Agencies' evaluation was any less than exacting, let alone that their decision to issue an EA and FONSI was arbitrary and capricious.

## II. The Court Should Deny Injunctive And Declaratory Relief, And Not Remand The Case, Because LSB Is Substantially Complete And Plaintiffs Unreasonably Delayed

Plaintiffs' Complaint seeks injunctive relief to require the Federal Agencies to prepare an EIS and to enjoin the further construction of the LSB "pending compliance with the requirements of NEPA."[32] The Complaint also requests that the Court enter a declaratory judgment in Plaintiffs' favor "with regard to the actions of NASA and DOE."[33] However, the Court need not reach the merits of Plaintiffs' requests because no meaningful relief can be granted at this stage. Where, as here, the federal funds have been disbursed and the challenged project is substantially complete, a request for relief such as Plaintiffs seek is moot. Furthermore, regardless of mootness, Plaintiffs do not satisfy the standard for injunctive relief, and Plaintiffs are further barred under the doctrine of laches. Finally, the LSB has been virtually completed, so remanding the matter back to the Federal Agencies to supplement the EA or perform an EIS would provide no meaningful relief at this late date.

---

[29] Id.
[30] AR 39 [0146]; see Air Pollution Control Regulation No. 39, § 39.2.2.
[31] Touret Mem. at pp. 15-16.
[32] Complaint for Declaratory and Injunctive Relief ("Complaint") at p. 11.
[33] Id.

A. The Court Should Deny Relief Because Plaintiffs' Requests Are Moot

Discussing injunctions generally, the First Circuit has noted that it "has been common ground throughout the last century" that a matter ,"although live when taken, may be rendered moot by subsequent developments."[34] Specifically, a case is moot when the court is unable to provide effective relief with respect to the claim before it.[35] The First Circuit has expanded on this:

> No mandate that we might issue can turn back the pages of the calendar and either stop the commission of the allegedly infringing act or fully palliate its effects. Though federal courts possess great authority, they lack the power, once the bell has been rung, to unring it.[36]

In the context of NEPA, federal courts outside the First Circuit have held that when the work is virtually complete, the case is moot because the court could award no meaningful relief. In some instances, the courts premised their decision on lack of jurisdiction. For example, the Second Circuit in Knaust determined that it did not have jurisdiction to decide the NEPA challenge due to mootness, because the disputed park was constructed, the federal funds had been disbursed and there were no pending applications for further federal assistance.[37] The court, reasoning that the appeal before it "sought to enjoin the future occurrence of events that are already in the past," concluded that it had no jurisdiction.[38]

In other cases, courts assumed the existence of jurisdiction, but concluded that they could not provide any meaningful relief. In One Thousand Friends of Iowa v. Mineta, the Eighth Circuit held that a NEPA challenge and requests for injunctive and declaratory relief were moot where the

---

[34] CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc., 48 F.3d 618, 621 (1st Cir. 1995) (citing Mills v. Green, 159 U.S. 651, 653 (1895)).
[35] Oakville Dev. Corp. v. FDIC, 986 F.2d 611, 613 (1st Cir. 1993).
[36] CMM Cable, 48 F.3d at 621.
[37] Knaust v. City of Kingston, 157 F.3d 86, 88 (2d Cir. 1998).
[38] Id.

challenged highways had been completed.[39] As to injunctive relief, the court stated that issuing an injunction to preserve the status quo as of the time that the litigation was filed would be impossible.[40] Declaratory relief requiring a new EA would also be without effect because "the project the new EA would assess is already in place."[41]

Similarly, in Bayou Liberty Associates, the Fifth Circuit concluded that neither injunctive nor declaratory relief was available where the construction was substantially completed.[42] The court stated that "[w]hen a party seeks an injunction to halt a construction project the case may become moot when a substantial portion of that project is completed."[43] Because the construction authorized by the permit at issue was substantially complete, the court concluded that an injunction suspending the permit would result in no meaningful relief.[44] The court further held that granting a declaration that the process used by the Corps was arbitrary and capricious would also provide no meaningful relief.[45]

The Sixth Circuit in Neighbors Organized to Insure a Sound Environment concluded that the NEPA appeal before it was moot where the challenged airport terminal was already completed.[46] The court reasoned that the activities to be enjoined, construction of the airport, had already occurred.[47] Therefore, because the court was "not in a position to prevent what ha[d] already occurred," the Sixth Circuit found the appeal moot and remanded it for dismissal.[48]

---

[39] One Thousand Friends of Iowa v. Mineta, 364 F.3d 890, 893 (8th Cir. 2004). Accord Neighborhood Transp. Network, Inc. v. Pena, 42 F.3d 1169 (8th Cir. 1994) (case moot where an injunction against further construction on a finished project would "serve no purpose and afford plaintiffs no relief.")
[40] Id.
[41] Id. at 894.
[42] Bayou Liberty Ass'n, Inc. v. United States Army Corps of Eng'rs, 217 F.3d 393, 396-98 (5th Cir. 2000). Accord Springer v. United States Marshal, No. 04-40551, 2005 WL 1412634, at *1 (5th Cir. 2005) (case moot where challenged detention facility was completed and occupied).
[43] Id. at 396 (citing Florida Wildlife Fed'n v. Goldschmidt, 611 F.2d 547 (5th Cir. 1980)).
[44] Id. at 397.
[45] Id.
[46] Neighbors Organized to Insure a Sound Env't, Inc. v. McArtor, 878 F.2d 174, 178 (6th Cir. 1989).
[47] Id.
[48] Id. at 178-79.

This Court should conclude that this case is moot because the LSB is substantially completed. The federal funds were long ago released in 2003 to Brown University.[49] The funds have been drawn down and spent.[50] In addition, the LSB is 85% complete.[51] Given that construction is substantially completed, any type of injunctive relief would be futile.

This Court should reject any argument that this case is not moot because of the exception for cases that are "capable of repetition yet evading review."[52] That exception applies where there is a "reasonable expectation" that the same complaining party would be subjected to the same action again and the action must be too short in duration to be fully litigated prior to cessation or expiration.[53] In attempting to establish this exception, it is not enough to offer "a mere physical or theoretical possibility" that the parties would be embroiled in a like controversy.[54] There is no reasonable expectation that any of the Plaintiffs would confront the present situation in the future. There is no evidence of any pending funding applications by Brown University before NASA or DOE and no evidence that any are planned. Therefore, this Court should find that the issues and relief in this case are moot.

B. Regardless Of Mootness, Plaintiffs Are Not Entitled To Injunctive Relief

As Plaintiffs have not requested damages, they can only obtain relief, if any, in the form of a permanent injunction.[55] However, the First Circuit has expressed both doubt and concern about the very availability of any such relief where a project has been completed.[56] In Ogunquit Village, the dunes restoration project that was the subject of the disputed EIS had been completed at the time

---

[49] See Brown University Declaration ("Brown Affidavit") (Exhibit 1 to Brown University's Memorandum in Opposition to CHNA's Appeal) ("Brown Affidavit") at ¶¶ 2-3. See also Declaration of Patricia Brewington at ¶ 4; Declaration of Ann H. Clarke at ¶ 3.
[50] Brown Affidavit at ¶ 8; Declaration of Patricia Brewington at ¶ 4; Declaration of Ann H. Clarke at ¶ 3.
[51] Brown Affidavit at ¶ 4.
[52] Southern Pacific Terminal Co. v. I.C.C., 219 U.S. 498, 515 (1911).
[53] Weinstein v. Bradford, 423 U.S. 147, 149 (1975).
[54] Murphy v. Hunt, 455 U.S. 478, 482 (1982) (per curiam).
[55] Plaintiffs never moved for a preliminary injunction; only permanent injunctive relief is at issue.

litigation was filed challenging the adequacy of the EIS.[57] The district court held that equitable relief could not be granted once the project was completed; the First Circuit affirmed.[58] The First Circuit, in evaluating the possible types of relief, considered the possibility of requiring "remedial work" where it would not require dismantling a structure, but concluded that it could provide "no set of workable principles that would not open up a vast number of completed projects to a flood of belated litigation."[59] Moreover, the court stated that the prospect of lengthy litigation and "additional, large and unplanned expenditures of public funds in undoing and redoing what has been done would give pause to any court."[60]

The court in Ogunquit Village also found that requiring further study of the alternatives was unworkable because of the problems inherent in fashioning the criteria to decide when such relief is appropriate and the danger of opening the doors to litigation for minor lapses in planning.[61] Therefore, having been "unable to fashion a remedy which could stand the test of general applicability," the First Circuit ruled that in the absence of bad faith, it could not award post-completion relief.[62] Based on this case and the others cited above, Brown University submits that relief should not be awarded in this case because the LSB is substantially completed.

Furthermore, Plaintiffs cannot satisfy the standard for an award of injunctive relief. Whether to grant an injunction in a NEPA case is premised on traditional equity standards, and the following factors must be found: (1) plaintiffs prevail on the merits; (2) plaintiffs would suffer

---

[56] Ogunquit Village Corp. v. Davis, 553 F.2d 243 (1st Cir. 1977).
[57] Id. at 244.
[58] Id. at 245-46. The district court did not rely on the doctrine of laches.
[59] Id. at 245.
[60] Id.
[61] Id. at 245-46.
[62] Id.

irreparable harm absent an injunction; (3) the harm to plaintiffs outweighs the harm to defendants from the injunction; and (4) the public interest would not be adversely impacted by the injunction.[63]

First, for the reasons set forth above and in Brown University's Memorandum in Opposition to CHNA's Appeal, Plaintiffs have not demonstrated a NEPA violation (i.e., that the Federal Agencies failed to take the requisite "hard look" and that the decision not to do an EIS was arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law).

Second, Plaintiffs have failed to establish that the absence of an injunction would cause irreparable harm. Touret's blanket speculation that "hazardous air emissions" from the LSB pose an "unquestionable potential danger to human health and safety, and were not measured" falls far short of establishing irreparable harm with any reasonable degree of certainty. The First Circuit has made clear that "[s]peculative injury does not constitute a showing of irreparable harm."[64]

Third, the speculative harm that Plaintiffs claim is far outweighed by the harm that would befall Brown University from the issuance of an injunction at this stage. Requiring Brown University to delay any further work, and/or requiring Brown University and the Federal Agencies to re-commence the NEPA process, would cause immeasurable financial hardship and delay.

Fourth, the public interest is best served by denying the injunction. The LSB has significant benefits for the public at large. As detailed in the EA, the LSB will "allow breakthrough scientific collaborations in the areas of microbiology, genetics, geonomics, and biochemistry."[65] It would result in an increase of 50% in the biomedical research space and permit an increase in new research positions over the next five years.[66] These expanded research capabilities will have net effects far beyond the boundaries of Brown University. This "important research will help the United States overcome the challenges of scientific uncertainties that limit the ability to solve many health

---

[63] Aponte v. Calderon, 284 F.3d 184, 191 (1st Cir. 2002).
[64] Public Service Co. of N.H. v. Town of West Newbury, 835 F.2d 380, 383 (1st Cir. 1987) (citations omitted).
[65] AR 112 [0723].

problems plaguing our country."[67] Therefore, it is in the public interest that the LSB begin operations without delay.

Finally, this Court should deny any injunctive relief on the additional basis that Plaintiffs unreasonably delayed in pursuing the litigation as well as their request for injunctive relief. In Concerned Citizens on I-290, the First Circuit cited the plaintiffs' delay in upholding the district court's denial of an injunction in a NEPA case.[68] The First Circuit explained that the determination of whether a delay is prejudicial turns on "'what agency decisions are yet to be made, and what decisions, although already made, remain open to revision.'"[69] In that case, public hearings began the year before the agency published its decision and construction began six months after the suit was filed.[70] As of four months before the decision, the projects were between 22 and 47 percent completed.[71] The court, finding that the "relevant decisions [had] been largely made and relatively irrevocable work completed," upheld the district court's denial of preliminary injunctive relief.[72]

Decisions outside the First Circuit also support laches or delay as a basis for denying injunctive relief in NEPA cases.[73] The defense of laches has had particular application where, as here, the plaintiffs were on notice of the status of construction and could readily view it progressing. For example, in Save Our Wetlands, the court found inexcusable delay where the project was

---

[66] Id.
[67] Id.
[68] Concerned Citizens on I-290 v. Secretary of Transp., 641 F.2d 1, 7-8 (1st Cir. 1981).
[69] Id. at 8 (quoting Jones v. Lynn, 477 F.2d 885, 890 (1st Cir. 1973)).
[70] Id.
[71] Id. at 7.
[72] Id. at 8. While there is First Circuit precedent (in Jones v. Lynn, 477 F.2d 885, 892 (1st Cir. 1973)) expressing disfavor of laches in environmental cases, it is clear that delay can preclude relief.
[73] Concerned Citizens, 641 F.2d at 8 (affirming denial of preliminary injunction where work was substantially complete); Save Our Wetlands, Inc. (SOWL) v. United States Army Corps of Eng'rs, 549 F.2d 1021, 1027-29 (5th Cir. 1977) (finding inexcusable delay and laches in suit for injunction where plaintiffs waited more than 19 months to challenge permit, project was highly visible and defendants had expended more than $26 million on substantially-completed project); Essex County Preservation Ass'n v. Campbell, 399 F. Supp. 208, 219-20 (D. Mass. 1975) (preliminary injunction was denied based on no irreparable harm where plaintiffs failed to file suit until 10 months after EIS was published and highway construction had started); Bedford Landing

"highly visible" and "could not have escaped public attention."[74] In that case, the project in dispute was lighted at night and readily visible from two major highways, as well as highly publicized through marketing.[75] Nevertheless, the plaintiffs refrained from seeking injunctive relief.[76]

In the present case, whether labeled as laches or inexcusable delay, Plaintiffs failed to timely seek injunctive relief. All of the relevant decisions under NEPA were made almost three years ago.[77] The EA and FONSI were issued in August of 2003, and there are no aspects of the LSB still before NASA or DOE for decision.[78] Moreover, the federal funds were long ago released to Brown University. DOE grant funds were made available to Brown in August of 2003.[79] The NASA funds were obligated to Brown University in September 2003 and have been entirely drawn down.[80] Nevertheless, without any explanation for the delay, Plaintiffs did not file suit until May 2004. Even then, Plaintiffs failed to move for preliminary injunctive relief, and have never done so. The failure to act in this case is particularly egregious in light of the fact that Plaintiffs live in the neighborhood of the LSB, and can be presumed to have witnessed the ongoing work and to have been aware of its progress at all times.[81] Only now, two years after the suit commenced, do Plaintiffs press for injunctive relief. Therefore, this Court should deny Plaintiffs' request for an injunction.

C. Remanding For Supplementation Of The EA Or An EIS Would Be Futile

As with injunctive relief, there can be no just purpose served by remanding the matter to the Federal Agencies for further consideration. Federal courts have been loathe to require an EIS or further study where substantial sums of money have been spent and the project is substantially

---

Taxpayers' Ass'n v. Romney, 353 F. Supp. 1187, 1190 (D. Mass. 1972) (preliminary injunction was denied for failure to show success on the merits where plaintiffs sought to block a project that was 90% completed).

74 Save Our Wetlands, 549 F.2d at 1027.

75 Id.

76 Id. at 1028.

77 See Concerned Citizens, 641 F.2d at 8.

78 See id.

79 Declaration of Patrice Brewington at ¶ 4.

80 Declaration of Ann H. Clarke at ¶ 3.

complete, because "preparation of an EIS at [that] point would produce very little, if any, environmental benefit."[82] Similarly, courts have denied "relief requiring further NEPA documentation" on the basis that it would "avail the plaintiffs nothing."[83] Declaring the EA and FONSI to be arbitrary and capricious and requiring a new EA for the substantially-completed LSB would be contrary to the spirit of NEPA. It would result in the Federal Agencies evaluating a project already in place, a result that is contrary to the warnings that NEPA is not a basis for after-the-fact critical evaluations.[84] Therefore, this Court should not order a remand.

---

[81] Complaint at ¶¶ 2, 20.
[82] Save Our Wetlands, 549 F.2d at 1028-29.
[83] Springer, 2005 WL 1412634, at *1.
[84] One Thousand Friends of Iowa, 364 F.3d at 893-94 (citing Richland Park Homeowners Ass'n v. Pierce, 671 F.2d 935, 941 (5th Cir. 1982)).

## CONCLUSION

Based on the above, the Court should (1) rule that the Federal Agencies took the required "hard look" and their decision to issue an EA and FONSI was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and (2) deny and dismiss Touret's appeal.

Respectfully submitted,

JOSEPH AVANZATO (#4774)
KRISTEN W. SHERMAN (#5595)
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Tel. (401) 274-7200
Fax (401) 351-4607

and

BEVERLY E. LEDBETTER, ESQ. (#2208)
General Counsel
Office of the General Counsel
Brown University
110 South Main Street
Providence, RI
Tel: (401) 863-9900
Fax: (401) 863-1199

Attorneys for Defendant Brown University

Dated: May 18, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the within was hand delivered on this 18th day of May, 2006 to J. William Harsch, Esq., 170 Westminster Street, Suite 800, Providence, Rhode Island and Robin Feder, Esq., United States Attorney's Office, District of Rhode Island, Fleet Center, 50 Kennedy Plaza, 8th Floor, Providence, RI 02903 and William G. Touret, 11 South Angell Street #264, Providence, Rhode Island 02906.

*381540_2.doc*