UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| WILLIAM G. TOURET, et al., Plaintiffs | : | |
| v. | : | C.A. No. 04-198T |
| NASA, et al., Defendants | : | |

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF OBJECTION TO PLAINTIFF COLLEGE HILL PLAINTIFFS' BRIEF**

The Court is already familiar with plaintiffs' claims.[1] The Federal defendants (NASA and DOE) incorporate herein the memoranda in support of their objection to plaintiff Touret's brief and their objections to plaintiffs' first and second motions to supplement the administrative record (record or AR), filed on August 31, 2004, Docket No. 12, and December 21, 2005, Docket No. 76. These memoranda address many of the issues raised by the "College Hill plaintiffs" (collectively referred to as CHNA plaintiffs or plaintiffs) in their brief.

In this objection, the Federal defendants address the issues specifically raised by the CHNA plaintiffs as well as plaintiffs' request for injunctive relief. Denial of plaintiffs' request for injunctive relief is appropriate because it is untimely and barred by the doctrine of laches; and because plaintiffs have failed to meet the standard for preliminary injunctive relief.

## I. FACTS, STANDARD OF REVIEW AND BURDEN OF PROOF

The Federal defendants incorporate herein the Facts, Standard of Review and Burden of Proof Sections From the Memorandum in Support of Their Objection to plaintiff Touret's brief.

[1] This objection to the College Hill plaintiffs' brief is addressed to all plaintiffs, because the College Hill plaintiffs' arguments were incorporated by plaintiff Touret.

## II. ARGUMENT

### A. THE NOISE ASSESSMENT WAS NOT ARBITRARY AND CAPRICIOUS

Plaintiffs' allegations are limited to asserting that the environmental assessment (EA) for the partial funding of the proposed Life Sciences Building (LSB) was arbitrary and capricious insofar as it concluded that no significant impacts on the environment would be caused by the use of chemicals in, and air emissions from, the LSB. There is no mention of noise impacts in the complaint, let alone an allegation that any determination regarding noise impacts was arbitrary and capricious. See, complaint, ¶¶ 17, 25. Accordingly, the Court should disregard plaintiffs' argument regarding noise impacts, to the extent it serves as the basis for their request for relief. However, if the Court considers plaintiffs' noise impact argument, the Federal defendants respond as follows:

#### 1. Noise Emissions from the LSB Will Not Increase the Ambient Noise Levels

First, contrary to plaintiffs' assertion, the EA does address cumulative noise impacts. AR 677. More importantly, the Final EA correctly asserts that "[t]he proposed Life Sciences Building would not contribute additional noise to the existing ambient noise level." AR 677. [2] This is consistent with the assessment of noise impacts in section 4.1.1.8 of the EA, which explains that "the building has been designed to limit noise emissions to the low 40 decibel (dB) level at the critical neighbor locations," consistent with the city noise ordinance. AR 669-70. The 40 dB range is the equivalent of a "quiet office or library." [3] It is also in the range of reported background levels in the residential neighborhood a block from the campus. AR 739.

---

[2] Although the Draft EA stated incorrectly that cumulative noise emissions from the building and existing noise levels would not exceed the levels permitted by the city noise ordinance, the agency decision being reviewed is the Final EA, not the Draft EA, and the Final EA is accurate.

[3] Fact Sheet of the League for the Hard of Hearing, http://www.lhh.org/noise/decibel.htm

Plaintiffs suggest that because ambient noise at the corner of Brown and Meeting Streets already exceeds the permissible limits of the city noise ordinance, and because the LSB will also produce noise, an EIS is required, irrespective of whether the proposed action will contribute to that noise level. CHNA Br. at 4. Plaintiffs' argument is erroneous for several reasons.

**2. Exceeding Local Noise Limit Is Not A Significant Impact, *Per Se***

The use of either an individual or cumulative standard of measurement only indicates the noise level; it does not interpret the impact. Interpretation of the impact is left to the judgment of the agency. Sierra Club v. United States Dept. of Transporation, 753 F. 2d 120,128 (D.C. Cir. 1985). In the instant case, the City of Providence Noise Control Ordinance limits are 55 dBA daytime, 50 dBA nighttime (8 p.m. to 7 a.m.). AR 670. By comparison, the Federal Aviation Administration (FAA) land use compatibility standards deem a 65 dB annual day-night average sound level (DNL) acceptable for residential areas. 14 CFR Part 150, App. A, Table 1 (Part 150).[4]

Plaintiffs' claim that the failure to include the Acentech reports in the EA, even though they had been incorporated by reference, somehow compels preparation of an EIS. This claim was essentially rejected by this Court when it denied plaintiffs' second motion to supplement the

---

[4] 14 CFR, Part 150, Appendix A, Table 1, identifies the maximum noise level acceptable for certain uses. The FAA process involves mapping ambient noise contours at various decibel levels and comparing them to FAA guidelines for determining the significance of noise impacts. Part 150 Noise Compatibility Program, 14 CFR Part 150, *et seq*. To the best of our knowledge, reviewing courts have not overturned a case in which the FAA uses Part 150 to deem the noise created by a proposed transportation project "insignificant." 3 Nev. L. J. 613, 629-630 (Spring 2003). See, e.g., City of Bridgeton v. Slater, 212 F.3d 448, 461 (8th Cir. 2000), in which the Eighth Circuit rejected plaintiffs' argument that use of Part 150's Table 1 was inconsistent with the "protected use" of a historic district and upheld a determination of 'no significant noise impacts' based on the application of FAA noise compatibility standards "for auditoriums, concert halls, outdoor music shells, amphitheaters, nature exhibits, zoos, parks, resorts, and golf courses" (up to 65 dB) to a proposed project in a historic district. The court found that the historic district in question was located just off a main road, permitted automobile traffic on its one main street, and included numerous bars, restaurants, and retail shops." Id.

record by adding these two documents to the record. See, CHNA Br. at 3-4. In any event, the EA, at Section 3.1.8, incorporates the summary from the Acentech reports verbatim. The report measured existing background sound levels at the corner of Brown and Meeting Streets, the closest point to the site, at a nearly constant 56-58 decibels, just slightly above the local ordinance limits, but within the FAA "acceptable" level. AR 738-39. This information was provided to plaintiffs in response to their comments. AR 784-85. The Agencies appropriately took these existing conditions into consideration when assessing the impact of the anticipated 40 dB noise generation of LSB operations. Given the obvious logic that a 40 dB source does not have a significant impact on a 58 dB environment, incorporation of the report summary in the EA is a reasonably "hard look."[5] In any event, even noise levels above FAA compatibility levels may be "insignificant." See, e.g., City of Waltham v. United States Postal Service, 786 F. Supp. 105, 124 (D. Mass. ), in which increases in noise resulting in sleep disruption for no more than six residential houses was "not legally significant."

**3. Noise Emissions From The LSB Will Have No Effect On Ambient Noise Levels**

Plaintiffs have not alleged that the LSB noise emissions will have an effect on the ambient noise levels, nor have they provided any factual support for this premise. Under similar circumstances, the D.C. Circuit, in Town of Cave Creek, Arizona v. FAA, 325 F.3d 320, 326 (D.C. Cir. 2003), upheld an FAA determination that the addition of a 48.7 DNL noise source would cause no significant increase in noise levels in the 65 DNL contour, and no "reportable increase" within the 45-60 DNL contour. Similarly, in the instant case, the addition of a 40 dB source would not have a significant impact on a 58 dB environment.

Even if an increase in ambient noise could be attributed to the LSB, the character of the surrounding area would yield a finding of "no significant impact." See, e.g., Don't Ruin Our

[5] When two sound sources of equal intensity or power are measured together, their combined intensity level is 3 dB higher than the level of either separately. See, e.g., http://www.sfu.ca/sonic-studio/handbook/Decibel.html,

Park v. Stone, 802 F. Supp.1239, 1252 (M.D. Pa. 1992). In Don't Ruin Our Park, the court looked beyond the category of use to the actual character of the area:

> The park was not a pristine wilderness setting, but a recreational area. Swimming, fishing, picnicking, boating and pleasure driving are all permitted within park boundaries ... Against this background, Defendants justifiably concluded that the noise impact generated by the activities of the 104th Aviation will have only minimal impact on park visitors, and there is no basis for a conclusion to the contrary.

Id. at 1252. A cumulative noise increase of 1 dBA found to be not significant in the pristine environment of Jackson Hole was upheld in Sierra Club v. United States Dept of Transportation, 753 F 2d 120. (D.C. Cir. 1985). Likewise, the Fifth Circuit has found that a 3 dBA increase is imperceptible to the average human. Citizen Advocates for Responsible Expansion (I-CARE) v. Dole, 770 F.2d 423, 430 (5th Cir. 1985). In Don't Ruin Our Park, quoted *supra,* the plaintiffs were unable to persuade the court that a 5 to 16 dB increase was a significant impact.

## B. THE AGENCIES CONSIDERED CUMULATIVE IMPACTS

Plaintiffs' claim that the Agencies' decision, to the extent it "failed to examine other past, present, and reasonably foreseeable future actions and activities," was arbitrary and capricious. CHNA Br. at 4. Plaintiffs' arguments focus on impacts from (1) the future funding of research in the LSB; (2) biological pathogen laboratories; and (3) additional development within the College Hill historic district. To the extent these claims were not alleged in the complaint, there is no need to address them here. To the extent that the Court considers the argument, the Federal defendants note the following: [6]

### 1. Future Funding of Research in the LSB

#### a. Operation of the LSB, Including Federally Funded Research, Was Addressed in the Appropriate Level of Detail

[6] Items 2 and 3 are so speculative that the Federal defendants do not address them. See, e.g., Sierra Club v. Marsh, 976 F.2d, 763, 768 (1st Cir. 1992). See also, Tr. p. 49, February 17, 2006, Docket No. 83.

This issue is a 'red herring.' The impacts analyzed will not change regardless of the funding source. Nonetheless, the EA addresses future operation of the LSB in several places. Section 2.3.2 of the EA describes the types of activities to be carried out in the LSB, many of which are currently being conducted in older buildings without the benefit of technological improvements in safety and containment. AR 239; 731-34; 754-57; 786-88. The level of detail provided is consistent with the nature and function of an environmental assessment. See, 40 CFR 1502.2(b).

**b. The Relocation and Consolidation of Ongoing Activities Does Not Have a Significant Environmental Impact**

The cumulative impact concept originated in a Congressional concern that "the effects of many federal decisions about a project or a complex of projects can be individually limited but cumulatively considerable." Cumulative Effects Under the National Environmental Policy Act, CEQ Study, 1997 [7] The Agencies note in Section 4.1.3. of the EA, entitled Cumulative Impacts, that because of their small volume and/or short duration, none of the impacts, the operation of the LSB, when added to other past, present and reasonably foreseeable future activities in the area of Brown University or Providence, Rhode Island, would result in cumulatively significant environmental impacts.

DOE experience provides a rational basis for the Agencies' determination. 10 CFR Part 1021, Subpart D, Appendix B3.12. In addition to the categorical exclusion for biomedical research facilities, DOE categorical exclusions from NEPA also include the:

> Relocation of machinery and equipment, such as analytical laboratory apparatus, electronic hardware, maintenance equipment, and health and safety equipment, including minor construction, necessary for removal and installation, where uses of the relocated

---

[7] http://ceq.eh.doe.gov/nepa/ccenepa/sec1.pdf

> items will be similar to their former uses and consistent with the general missions of the receiving structure.

10 CFR Part 1021, Subpart D, Appendix B1.31. This categorical exclusion takes into consideration the fact that the activities take place in enclosed spaces, and the fact that the new structure will incorporate improved safety and environmental protection technology. Agency regulations promulgated in accordance with the APA are presumed not arbitrary and capricious. See, Citizens for Scenic Severn River Bridge, Inc. v. Skinner, 802 F. Supp 1325, 1332 (D.MD 1991). DOE experience is also captured in Categorical Exclusion B3.6.

> Siting, construction (or modification), operation and decommissioning of facilities for indoor bench-scale research projects and conventional laboratory operations (for example, preparation of chemical standards and sample analysis); small-scale research and development projects; and small scale pilot projects (generally less than two years) conducted to verify a concept before demonstration actions. Construction (or modification) will be within or contiguous to an already developed area (where active utilities and currently used roads are readily accessible.)

These categorical exclusions provide a rational basis for the Agencies' conclusion that transfer and consolidation of ongoing research in the LSB would have no significant impact on the environment, individually or collectively with other actions with individually minor effects taking place over a period of time. 10 CFR 1508.7. There is no precedent for plaintiffs' suggestion that the Agencies should have prepared an EIS on the basis of potentially significant cumulative environmental impacts of research on the Brown Campus. The potential environmental impacts of the proposed action are individually and collectively insignificant.

Their suggestion that the agencies are engaging in "improper segmentation" is flawed. This is not a situation in which the agencies are evaluating one leg of a highway development project. See, e.g., National Wildlife Federation v. Appalachian Regional Commission, 677 F.2d 883 (D.C. Cir. 1981). The LSB is not a multi-stage project.

**c. Prospective New Research**

Plaintiffs' claim that the Final EA failed to identify and evaluate all of the federal actions that together constituted the "major federal action" is, in essence, that significant funding from the National Institutes of Health (NIH) did not receive adequate NEPA review. CHNA Br. at 7. Defendants note first that plaintiffs' motion to supplement the record with documents relating to NIH funding was denied, disposing of this issue. See, February 17, 2006 Tr., Docket No. 83. Nonetheless, if the Court addresses it, defendants assert the following:

The EA addresses "reasonably foreseeable" future research in the LSB and on the Brown campus in general. AR 760. This ongoing research was discussed, *supra*. However, "new" research is different than "foreseeable" research, due to the length, complexity, and uncertainty in the processes by which new proposals are approved and funded in the research setting. Research funding is not provided in a lump sum – it is provided by numerous agency components (it is the National Institutes of Health, for example) to individual faculty members to support individual research proposals they have submitted to the University and the funding sources. So, even though NIH funding for biomedical research at Brown University in the 2000-2001 period exceeded $100 million and NIH funding of a wide variety of research at Brown may be steadily increasing, AR 778; 78-79; 240-42, unless and until these proposed research projects have been found worthy (generally through peer-review), they do not constitute "proposed actions" and are therefore not ripe for NEPA review. Dubois v. United States Dept. of Agriculture, 102 F.3d 1273, 1286 (1st Cir. 1996), citing Sierra Club v. Marsh, 976 F.2d 763, 767 (1st Cir. 1992).

Plaintiffs' related argument that the LSB will increase the likelihood that much more hazardous research is performed in the LSB is fear-mongering speculation at best. An agency need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action. Dubois, 102 F.3d at 1286. In this context, reasonable

foreseeability means that "the impact is sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision." Id. An environmental effect would be considered "too speculative" for inclusion in the EIS if it cannot be described at the time the EIS is drafted with sufficient specificity to make its consideration useful to a reasonable decision-maker. Sierra Club v. Marsh, 976 F.2d at 768.

**C. IT WAS NOT THE AGENCIES' PROVINCE TO IMPOSE A SPECIFIC SITE ON THE GRANTEE**

Plaintiffs argue that the agencies failed to consider feasible alternative sites and that the no-action alternative analysis was deficient. CHNA Br. at 9. They are wrong. The range of alternatives that must be discussed is a matter within an agency's discretion. Indeed, the range of alternatives an agency must consider is narrower when the agency has found that a project will not have a significant environmental impact. Friends of Ompompanoosuc v. FERC, 968 F.2d 1549, 1558 (2d Cir. 1992); Utah Envtl. Cong. v. Bosworth, 285 F. Supp. 2d 1257, 1274-75 (D. Utah 2003); rev'd on other grounds, 439 F.3d 1184, 1195 (10th Cir. 2006). More importantly, NEPA "is not an authorization to undo what has already been done." Jones v. Lynn, 477 F.2d 885, 889 (1st Cir. 1973).

The evaluation of impacts under NEPA is only meaningful with respect to "agency decisions [that] are yet to be made, and what decisions, although already made, remain open to revision." Id. at 890. In this case, Brown had already selected and announced the site for the LSB when the Federal defendants became involved. It was a decision not open to revision, given the *de minimis* amount of project funding. See, NASA, DOE and Brown declarations. Thus, the agencies' explanation of the selection process that had already taken place was reasonable. Although there was some discussion during the administrative process regarding Brown's site selection criteria and in the EA of the site selected, the agencies' only role was to determine if the LSB, at the site selected, would impose a significant impact on the human environment.

In this case, because the site was already selected, site selection was not an alternative available to defendants. Thus, the proposed action was partial funding and the only alternative was *not* funding the building: "no action." The reasonable range of alternatives is determined by the purpose of the proposed action. See, e.g., Environmental Defense Fund v. Tennessee Valley Authority, 371 F. Supp. 1004 (E.D. Tenn. 1973) (Only alternatives that are reasonably available need be considered). The interpretation of "no action" depends on the nature of the proposed Federal action being evaluated. If the Federal action is "funding", no action is "no funding." If the amount of the Federal funding is significant, "no action" by the federal agency will likely mean "no project." In other cases, the Federal funding is not essential to the continuation of the project, and "no funding" does not mean "no project." Sometimes, it has meant continuation of the project at a lesser scope. Generally, when funding is a very small proportion of the total cost of the project, a court will find a project is not federalized. Ka Makani 'O Kohala Ohana Inc. v. Department of Water Suply, 295 F.3d 955 (9th Cir. 2002); Friends of the Earth, Inc. v. Coleman, 518 F2d 323 (9th Cir. 1975). In this case, the Agencies were providing less than 7% of project funding, but conducted a NEPA review for other reasons – historic preservation. However, that did not alter the fact that the Federal funding was such a small percentage of the overall funding that there would be no difference in the project with or without federal funding, and therefore no difference in the environmental impacts of the proposed action (funding) and the no action (no funding) alternative.

## D. PUBLIC PARTICIPATION PROCESS WAS MORE THAN REQUIRED BY LAW

Neither NASA, nor DOE, regulations require a public comment period on a draft EA.[8]

---

[8] DOE's NEPA regulations provide for public review of a proposed FONSI only if the action is one, or closely similar to one, that normally would require an EIS (10 CFR 1021.322(d); 40 CFR 1501.4(e)(2)). As previously explained, this action is one, or closely similar to one, that normally would not require even an EA, except for the potential impact (although mitigated) on historic resources. See, Prouty Declaration, ¶ 6, attached to the Federal defendants' objection to the second motion to supplement the record. Plaintiffs do not challenge the Federal defendants

Similarly, the First Circuit has commented that nothing in the CEQ regulations requires circulation of a draft EA for public comment, except under certain limited circumstances. Alliance To Protect Nantucket Sound, Inc. v. U.S. Dept. of Army, 398 F.3d 105, 115 (1st Cir. 2005). The vast majority of Circuits addressing this issue agree. See, e.g., Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257, 1279 (10th Cir. 2004); Pogliani v. United States Army Corps of Eng'rs, 306 F.3d 1235, 1238-39 (2d Cir. 2002); Como-Falcon Cmty. Coalition v. Dep't of Labor, 609 F.2d 342, 345 (8th Cir. 1979).

Thus, the plaintiffs in this case were allowed to participate even though they had no right to participate. DOE policy was to consider any comments that arrived after the close of the comment period, to the extent possible, and all comments received regarding the LSB were considered.[9] The draft EA and FONSI were issued in June 2003. AR 530, 531. The Final EA and FONSI were issued in August 2003. AR 714, 799. In the interim, comments were solicited from the public, as well as from State agencies. AR 610. When the comment period was kept open so that the host State, in this case, RIDEM, could offer its input on the project. AR 705-07, late comments from members of the public were also considered. [10]

---

actions under the National Historic Preservation Act (NHPA).

[9] See, the official response to requests for extension of the comment period in Appendix E of the final EA. AR 704.

[10] As noted, DOE policy was to consider any comments that arrived after the close of the comment period, to the extent possible, and all comments received regarding the LSB were considered. AR 699-704; and 889-1084. In this case, the 30-day comment period ended July 1, 2003, and the Agencies did not conduct their comment resolution meeting/conference until July 22, 2003, (See, Exhibit F to the Federal defendants' objection to plaintiffs' second motion to supplement), after RIDEM comments were received. Advance notice of the comment period was provided to the list of interested College Hill residents. AR 530-31; 603-09. Eight people submitted comments by July 1, 2003, and 18 submitted comments by July 2, 2003. These comments were summarized and answered in the final EA (AR 0699-704), and copies of all of the actual comments were included in the AR, as well (AR 0889-1084). These included a 27-page comment letter dated July 1, 2003 and other communication from plaintiff William G. Touret (AR 0896-1036 ; 1073-75); comments submitted by another attorney on behalf of a client (0889-90) and comment correspondence from numerous other individuals (AR 0891-95; 1037-72 and 1076-8484). The comments received on the EA also included two submissions from

**E. THE CEQ REGULATIONS**

Plaintiffs allege that an EIS is required because the "significantly regulations," 40 CFR § 1508.27(a), (b) were not considered. They are mistaken. The regulations were considered, even though they were not referenced. The EA addresses each of the points raised, albeit without citation to the regulations.[11] See, e.g., Spiller v. White, 352 F.3d 235, 243 (5th Cir. 2003) (failure to specifically address each point in a factor-by-factor fashion is irrelevant). The factors listed in the regulation are simply a list of relevant factors that should be considered in gauging whether an impact is "intense" and, therefore, significant. Id. Moreover, the regulations do not prescribe the weight to be given to these criteria. Friends of Ompompanoosuc, 968 F.2d at 1556. Plaintiffs' reliance on Sierra Club v. Marsh, 769 F. 2d at 979 (sic) is misplaced. Sierra Club only says that an "agency must consider the "degree which an action may establish a *precedent for future actions with significant effects.*" (Emphasis in original). Sierra Club involved the building of a cargo port, causeway and industrial park on a previously-undeveloped, wooded 940 acre island in upper Penobscot Bay off the coast of Maine. Id. at 872. Moreover, in that case, (unlike the instant case), three environmental agencies which reviewed the EA believed that the project would result in a significant impact on the environment and that an EIS was required. Id. at 873. The First Circuit said that "the record makes it nearly impossible to doubt that building the causeway and port will lead to further development of [the i]sland." Id. at 878.

---

RIHPHC, dated July 1 and July 29, 2003 (AR 0631-32; 0709-10). RIDEM comments were faxed to NASA on July 21, 2003, after several discussions with NASA over additional time (AR 0705-07). The "clearance" from the Statewide Planning Program is dated July 30, 2003 (AR 0711-13). No new issues were identified or evidence provided during the comment or extended comment periods. See, July 1, 2003, and July 2, 2003, emails from Lucy Swartz, attached as Exhibit G to the Federal defendants' objection to plaintiffs' second motion to supplement.

[11] (2) public health and safety: AR 639; 650-51; 654; 664-67; 669-673; 677 (3) sensitive resources: AR 638-39; 656-60; 673-676; (4 - 7) effects on the quality of the human environment: AR 639; 650-51; 654; 664-67; 669-673; 10 CFR Part 1021, Subpt D, App. B3.12; (8) historic resources: AR 638-39; 656-60; 673-676; (9) endangered species - not applicable; (10) violation of environmental or other laws: 654; 656; 665-668; 10 CFR Part 1021, Subpt D, App. B3.12

Plaintiffs' additional argument that because the EA was 66 pages, and not the recommended 10-15 pages for an EA, that it must necessarily have required an EIS, has been rejected by the First Circuit. Sierra Club, 769 F. 2d at 875 ("We should not give conclusive weight, one way or the other to the simple facts of EA length, complexity, and controversy"). In this case, the EA covers a broad spectrum of issues, including land use, geology, soils, biological resources, water resources, traffic and parking, noise, cultural and historic resources and socioeconomic resources, action alternatives and Brown's site selection criteria, as well as air quality and emissions during both construction and operation of the LSB. Plaintiffs' complaint with the EA is quite narrow. In fact, plaintiffs focus on just one of these many issues: air emissions once the LSB becomes operational.

## F. THERE WAS NO PREDETERMINATION

The outcome of the NEPA review in this case was not predetermined.[12] Brown selected the site before the agencies became involved and the Agencies did not control selection of the site. See, NASA and DOE Declarations. Although it is true that agencies are expected to engage in good faith fact-finding, when their findings are challenged as arbitrary and capricious, the agencies' actions are judged in accordance with their stated reasons. Spiller v. White, 352 F.3d 235, 241-242 (5 th Cir. 2003).

## G. PLAINTIFF'S' REQUEST FOR INJUNCTIVE RELIEF IS UNTIMELY AND BARRED BY THE DOCTRINE OF LACHES

[12] Although the outcome of the NEPA review in this case was not predetermined, it was a reasonable assumption that there would be no significant air or noise impacts, and that the review process would conclude with a FONSI. This assumption was based on a number of factors, including DOE's extensive experience with biomedical buildings, documented in its categorical exclusion, 10 CFR Part 1021, subpart D and Appendix B3.12, and the mitigation of adverse impacts on historic resources. AR 791. Even though the Agencies remained open to data evidencing otherwise, AR 610-12, no new issues were identified and no new evidence was provided in comments on the draft documents. AR 889-1084. See also, bench decision on plaintiffs' second motion to supplement the record, which appears in Docket No. 83, transcript dated February 17, 2006, pp. 13-14, and the July 1, 2003, and July 2, 2003, emails from Lucy Swartz, attached as Exhibit G to the Federal defendants' objection to plaintiffs' second motion to supplement.

Plaintiffs seek an order enjoining construction and operation of the LSB pending the Agencies' compliance with NEPA. Plaintiffs' request should be summarily denied based on the equitable doctrine of laches. "In order to prove the affirmative defense of laches, the defendant must demonstrate that there has been an unreasonable delay in asserting the claim and that the defendant was materially prejudiced by that delay." Hutchinson v. Pfeil, 105 F.3d 562, 564 (10th Cir. 1997). "[D]elay is an important consideration in the assessment of irreparable harm." GTE Corp. v. Williams, 731 F.2d 676, 679 (10th Cir. 1984). See also, Conservation Law Foundation, Inc. v. Busey, 79 F.3d 1250, 1271 (1st Cir. 1996) (district court denied injunctive relief on the ground that plaintiffs would suffer no irreparable harm, based on accrued delay between filing of complaints and request for injunctive relief) (CLF v. Busey). An injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights, a plaintiff demonstrates the lack of need for speedy action and cannot complain of the delay involved pending any final relief to which it may be entitled after a trial of all the issues. GTE Corp, 731 F.2d at 679.

The timeline in the case before this Court is analogous to CLF v. Busey, *supra*. After comments were received and reviewed, the Final EA and FONSI were issued on or about August 8, 2003. AR 799-802. On August 11, 2003, the Federal defendants notified plaintiffs that they had completed their NEPA analysis. AR 803-13. See also, Complaint ¶16. Plaintiffs waited more than nine months before filing their complaint on May 21, 2004. However, even then plaintiffs did not seek a temporary restraining order or preliminary injunction to stop NASA's and DOE's processing of the grant or Brown's construction of the LSB when it filed suit.[13] In

[13] Plaintiffs could have sought a temporary restraining order to prevent the agencies from executing the grants or authorizing use of the grant funds, but simply chose not to do so. Cf. One Thousand Friends of Iowa v. Mineta, 364 F.3d 890, 894 (8th Cir. 2004) (finding that plaintiff could have evaded mootness by seeking a stay of the district Court's decision pending appeal).

fact, they did not ask for injunctive relief until the filing of their brief on April 3, 2006, almost three years after issuance of the final EA and FONSI. The funds have transferred, and on information the building is nearly complete with occupancy scheduled to take place in August 2006. This action and their motion are too late. Brown has irrevocably invested millions of dollars and the Federal defendants more than $6 million in the LSB. Id. By waiting nearly three years to seek an injunction and by allowing actual construction to proceed for more than three years, plaintiffs' extensive and unreasonable delay in prosecuting their claims would result in the maximum damage to Brown and to the Federal defendants were an injunction to issue. Id. See also, Apache Survival Coalition v. United States, 21 F.3d 895, 913 (9th Cir. 1994) (holding that NHPA claims were barred by laches because a Tribe had waited two years to bring its claims, and the project proponent had invested some $4 million in a project on federal public lands under a Forest Service permit).

> In NEPA cases, the test of prejudice is whether the plaintiff's delay in bringing the suit has resulted in construction proceeding 'to a point where any significant environmental damage has already been done' and whether, in the alternative, 'construction may have gone so far that for economic reasons it would be impracticable or impossible to alter much of the basic plan.'

Natural Resources Defense Council, Inc. v. United States Army Corps of Engineers, 399 F. Supp.2d 386, 403 (S.D.N.Y. 2005). In view of the lack of diligence by plaintiffs in commencing this action, and the prejudice to all of the defendants, this Court should find that injunctive relief is not appropriate.

## H. PLAINTIFFS' HAVE NOT MET THE STANDARD FOR AN INJUNCTION

Even if the Court does not deny plaintiffs' request for injunctive relief based on laches, the request must still be denied. Whether to grant injunctive relief under NEPA is governed by traditional equity standards. CLF v. Busey, 79 F.3d at 1271, citing Sierra Club v. Marsh, 872 F.2d at 503-04. The Court must consider plaintiffs' likelihood of success on the merits, whether

the plaintiffs would suffer irreparable harm without an injunction, the appropriate "balance" of harms to plaintiffs and defendants, and the effect upon the public interest. Id. (citation omitted).

**1. STANDARD FOR INJUNCTIVE RELIEF**

To obtain a permanent injunction in the First Circuit, the moving party must establish four factors: "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury without an injunction; (3) the harm to plaintiffs would exceed the harm to defendants from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." Aponte v. Calderon, 284 F.3d 184, 191 (1st Cir. 2002). Plaintiffs bear the burden of proof. See, e.g., American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1477 (3d Cir. 1996).

**2. NO LIKELIHOOD OF SUCCESS ON THE MERITS**

If the moving party is not successful on the merits, "the remaining factors become matters of idle curiosity." Esso Standard Oil Co. v. Monroig-Zayas, WL 932546, 3-4 (1st Cir. 2006). For the reasons set out in detail, *supra*, and in the Federal defendants' objection to plaintiff Touret's brief, plaintiffs have failed to demonstrate success on the merits. Since they have not demonstrated success on the merits, their claim for injunctive relief must be denied.

**3. PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE INJURY**

Plaintiffs' delay in bringing this action is at odds with their claim of irreparable harm. See, CLF v. Busey, 79 F.3d at 1271 (district court denied injunctive relief on the ground that plaintiffs would suffer no irreparable harm, based on accrued delay between filing of complaints and request for injunctive relief); and Montrose Parkway Alternatives Coalition v. United States Army Corps of Eng'rs, 405 F. Supp. 2d 587, 600 (D. Md. 2005) (plaintiffs' one month delay from the time they learned about the denial of their motion to stay construction undermines their claim of irreparable harm). In CLF v. Busey, both complaints requested permanent injunctions in their prayers for relief, however, plaintiffs did not move to restrain or enjoin any aspect of the project

until after the court had granted summary judgment. At that time, significant commitments had been made to the project. The commitments would have been placed at risk if an injunction were granted. As in this case, the First Circuit found that public and private commitments had already been made by the time plaintiffs sought injunctive relief, and that if harm was done, "it largely had been done, not by the court's denial of injunctive relief, but by plaintiffs' failure to timely seek it." Id. at 1272. In this case, plaintiffs waited 9 months before filing suit and almost three years before seeking injunctive relief. At present, the building is nearly complete, Federal grant monies have been disbursed and Brown has spent millions. See NASA and DOE declarations.

In any event, plaintiffs' claim of irreparable harm is speculative and does not sustain their burden. The Supreme Court has held that insufficient evaluation of environmental impact under NEPA does not create a presumption of irreparable injury. Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 545(1987). See also, Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-13. (1982) (even if a federal agency violated an environmental law, an injunction need not issue unless the plaintiff demonstrates irreparable injury to the environment that outweighed other considerations, because "a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."); Conservation Northwest v. United States Forest Service, 2005 WL 2077807, *2 (E.D.Wash. 2005); United States v. Schmitt, 734 F. Supp. 1035, 1050-51 (E.D.N.Y.1990) (a violation of NEPA does not constitute *per se* irreparable harm) citing State of New York v. Nuclear Regulatory Commission, 550 F.2d 745 (2d Cir.1977 ). To constitute irreparable harm, an injury must be certain, great, and actual. Chemical Weapons Working Group, Inc. v. United States Dept. of the Army, 963 F. Supp. 1083, 1095 (D.Utah,1997), citing Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C.Cir.1985). Irreparable harm cannot be speculative; "the injury complained of [must be] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." Chemical Weapons, 963 F. Supp. at 1095 (emphasis in original), citing Regan v. Vinick & Young [In Re

Rare Coin Galleries of America, Inc.], 862 F.2d 896, 902 (1st Cir.1988) ("[s]peculation or unsubstantiated fears about what may happen in the future cannot provide the basis for a preliminary injunction").

Plaintiffs in the instant case claim that "potential environmental impacts, hazardous air emissions that the LSB is anticipated to discharge, together with the hazardous air emissions from other Brown laboratories ... *were not measured*," and that "individual and cumulative short- and long-term adverse health effects from the anticipated hazardous air emissions," *were not examined and are unknown*." Touret's Br. at 18 (emphasis supplied). As plaintiffs' claim of irreparable harm is based upon speculation, they have not met the standard for relief. Moreover, as the building would be built regardless of whether there were any Federal grant funds, injunctive relief would not result in any relief for plaintiffs.

**4. THE BALANCE OF HARMS AND THE PUBLIC INTEREST FAVOR DENIAL OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

In contrast to plaintiffs' unsupported and conclusory claims of irreparable injury, the harm that will occur to Brown and the Federal defendants if Brown is not allowed to complete the LSB is tangible and significant. Brown has invested more than $90 million in the LSB, which is more than 85% complete. CITE to a declaration or Brown's brief. See, e.g., Amoco Prod. Co., 480 U.S. at 545 (injury to the environment "was not at all probable" and was outweighed by the economic investment of third parties relying on the governmental action challenged in the litigation); and CLF v. Busey, 79 F.3d at 1272 (To be taken into account in assessing the balance of harms is the fact that between the time when plaintiffs filed suit and when they ultimately moved for injunctive relief, significant commitments were made to the project.).

On the other hand, the public has an interest in enhancing Rhode Island's reputation as a center for biomedical research and development; bolstering Rhode Island's fledgling biotech

industry; enhancing its reputation as a world-class center for secondary and medical education; attracting leading scholars, researchers and professors to the community; increasing access to the latest medical technology; improving medical care in Rhode Island; and furthering Rhode Island's economic development, including the creation of high grade jobs. AR 28, 65, 80, 246. Congress, itself, in appropriating the funds in question for the continued development of the LSB has represented the public interest in enhancing the facilities available for life science studies at the University.

Thus, the public interest, in contrast to the "presumed" harm offered by plaintiffs, weighs in favor of the Federal defendants and Brown.

## III. CONCLUSION

For all of the foregoing reasons and those set out in the Federal defendants' objection to Plaintiff Touret's brief, and those set out in the Federal defendants' objections to plaintiffs' first and second motions to supplement the record, the relief sought should be denied and the complaint should be dismissed.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

ROBIN E. FEDER
Assistant U.S. Attorney
Chief, Civil Division
Fleet Center
50 Kennedy Plaza, 8th floor
Providence, RI 02903
(401) 709-5000
(401) 709-5017 (fax)

OF COUNSEL:

Vicki L. Prouty, Esq.
U.S. Department of Energy

John H. Eckhardt, Attorney Advisor
National Aeronautics and Space Administration

**CERTIFICATION**

I hereby certify that on the 18th day of May 2006, I caused a copy of the foregoing to be forwarded, by postage prepaid mail, to :

J. William W. Harsch, Esq.
170 Westminster Street, Suite 800
Providence, RI 02903

Joseph Avanzato, Esq.
Kristen W. Sherman, Esq
ADLER POLLOCK & SHEEHAN, P.C.
2300 Financial Plaza
Providence, RI 02903-2443

Beverly E. Ledbetter, Esq.
General Counsel
Office of the General Counsel
Brown University
110 South Main Street
Providence, RI

Nancy A. DiDomenzo