UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| WILLIAM G. TOURET, et al., Plaintiffs | : | |
| v. | : | C.A. No. 04-198T |
| NASA, et al., Defendants | : | |

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR OBJECTION TO PLAINTIFF TOURET'S BRIEF**

The Court is already familiar with plaintiffs' claims.[1] Plaintiffs seek declaratory and injunctive relief relating to the award of partial funding by NASA and DOE (the Federal defendants or the Agencies) to Brown University for construction of its Life Sciences Building (LSB). Specifically, plaintiffs seek a declaration that the actions of the Federal defendants are arbitrary and capricious under the National Environmental Policy Act (NEPA); and they seek to enjoin further construction and to compel the Federal defendants to prepare an Environmental Impact Statement (EIS).

Dismissal of plaintiffs' claims for lack of subject matter jurisdiction is appropriate because there is no live case or controversy before this Court; plaintiffs lack standing and there is no relief this Court may grant plaintiffs. Additionally, no "major federal action" was taken by the Federal defendants. Even if the Court were to reach the merits of the action, the requested relief must be denied because the Agencies' decision had a rational basis and plaintiffs have provided no evidence that agency action "could significantly affect the quality of the human environment." The Federal defendants incorporate herein the memoranda in support of their objection to the College Hill plaintiffs' brief (which addresses plaintiffs' claim for injunctive relief, among other issues) and their objections to plaintiffs' first and second motions to supplement the administrative record (record or AR), filed on August 31, 2004, Docket No. 12, and December 21, 2005, Docket No. 76. These memoranda address many of the issues raised by plaintiff Touret in his brief.

---

[1] This objection to plaintiff Touret's brief is addressed to all of the plaintiffs, because Touret's arguments were incorporated by the "College Hill plaintiffs".

## II. STANDARDS OF REVIEW

### A. STANDARD FOR DISMISSAL FOR LACK OF SUBJECT MATTER JURISDICTION

Federal courts should in most cases, avoid reaching the merits of a case prior to determining their subject matter jurisdiction. Seale v. INS, 323 F. 3d 150, 152 (1st Cir. 2003).

Once subject matter jurisdiction has been questioned, it is the plaintiff's burden to establish, by competent proof, that jurisdiction in fact exists. Pejepscot Industrial Park, Inc. v. Maine Central Railroad Co., 215 F.3d 195, 200 (1st Cir. 2000); Murphy v. United States, 45 F.3d 520, 522 (1st Cir.1995); Bank One Texas, N.A. v. Montle, 964 F.2d 48, 50 (1st Cir. 1992). "No presumption of truthfulness attaches to the [plaintiff's] allegations [of jurisdiction]." Media Duplication Services, Ltd. v. HDG Software, Inc., 928 F.2d 1228, 1235 (1st Cir. 1991). Matters outside the pleadings can be presented to and considered by the court in ruling upon a motion to dismiss for lack of subject matter jurisdiction. Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002); Dynamic Image Technologies, Inc. v. United States, 221 F.3d 34, 37 (1st Cir. 2000). "District courts have wide discretion to determine which procedures to employ in resolving the jurisdictional issue." Bank One, Texas, 964 F.2d at 51.

### B. STANDARD OF REVIEW UNDER THE ADMINISTRATIVE PROCEDURES ACT

Judicial review of a federal agency's compliance with NEPA, 42 U.S.C. § 4321, *et seq*., is governed by § 10 of the APA, 5 U.S.C. § 706(2)(A). Under that section, the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Id. Airport Impact Relief, Inc. v. Wykle, 192 F.3d 197 (1st Cir. 1999). See also, Sierra Club v. Marsh, 976 F.2d 763, 769 (1st Cir. 1992); and Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 376 (1989). The task of a court reviewing agency action under the "arbitrary and capricious" standard of the APA is to "determine whether the agency has examined the pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for its action including a rational connection between the facts

found and the choice made. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 1983; Dubois v. United States Dep't of Agriculture, 102 F.3d 1273 (1st Cir. 1996).[2]

## III. REGULATORY FRAMEWORK

### A. NATIONAL ENVIRONMENTAL POLICY ACT

NEPA, 42 U.S.C. §§ 4321, *et seq.*, serves the dual purpose of (1) informing agency decisionmakers of the significant environmental effects of proposed major federal actions and (2) insuring that relevant information is made available to the public so that "they may also play a role in both the decisionmaking process and the implementation of that decision." See, Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989). NEPA provides that federal agencies should prepare a detailed Environmental Impact Statement ("EIS") only for "major Federal actions significantly affecting the quality of the human environment ... " 42 U.S.C. § 4332(2)(C).

This mandate to the agencies is "essentially procedural ... It is to insure a fully informed and well-considered decision ... " Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978). Because NEPA was designed to provide agencies with a forward looking instrument, "NEPA procedures including impact statements are not applied retrospectively to completed projects whose status within the program is well beyond change." See,' National Wildlife Federation v. Appalachian Regional Commission, 677 F.2d 883, 889-890 (D.C. Cir. 1981). See also, Mayaguezanos Por La Salud Y El Ambiente v. U.S 198, F.3d 297, 300 (1st Cir. 1999).

NEPA "does not command the agency to favor an environmentally preferable course of action, only that it make its decision to proceed with the action after taking a 'hard look at environmental

---

[2] For the proposition that a *less* deferential standard of review should apply (College Hill Pls' Br. at 15), plaintiffs rely upon Davis v. Mineta, 302 F.3d 1104, 1112-13 (10th Cir. 2002); Fund For Animals v. Norton, 281 F. Supp.2d at 226-30 and Washington County v. United States Dept. Of The Navy, 357 F. Supp. 2d at 874-75. However, in Davis, cited for the proposition that the prejudgment to issue a FONSI rather than an EIS diminishes the deference owed to the Federal defendants, the Tenth Circuit applied the arbitrary and capricious standard and not a less deferential one. Davis at 1112. Neither Fund For Animals, nor Washington County suggest otherwise.

consequences.'" Sabine River Authority v. Dep't of Interior, 951 F.2d 669, 676 (5th Cir. 1992), citing Robertson, 490 U.S. at 350. Therefore, in conducting a NEPA review, the courts must only consider whether the decision of an agency was "based on consideration of the relevant factors" and whether "there is a rational basis for its decision." Hodges v. Abraham, 300 F. 3d at 445.

One challenging a decision not to prepare an EIS, must show a substantial possibility that agency action could significantly affect the quality of the human environment. Sierra Club v. Marsh, 769 F.2d at 870 (emphasis in original). "If the record reveals such a substantial possibility with sufficient clarity, the agency's decision not to produce an EIS violates NEPA. Id.

**B. COUNCIL ON ENVIRONMENTAL QUALITY**

The Federal Council on Environmental Quality (CEQ), has issued detailed regulations and guidance for agencies interpreting NEPA's statutory requirements, including how to decide when an EIS is needed and how to go about preparing one. See, 40 CFR § 1500.1, *et seq.* (1984). In order to determine whether an action is one requiring an EIS, the agency may prepare an environmental assessment (EA). 40 CFR § 1501.4(b). See, Sierra Club v. Marsh, 769 F. 2d at 870 ("The CEQ regulations permit federal agencies to make a preliminary EA aimed at determining whether the environmental effects of a proposed action are 'significant.'"); Anacostia Watershed Society v. Babbitt, 871 F. Supp. 475, 482 (D. D.C. 1994). "An EA is a concise document that briefly discusses the relevant issues and either reaches a conclusion that preparation of an EIS is necessary or concludes with a Finding of No Significant Impact (called in environmental jargon, a 'FONSI.'" Sierra Club v. Marsh, 769 F. 2d at 870, citing 40 CFR § 1508.9, 1508.13. See also, Sierra Club v. U.S. Dept. of Transportation, 753 F.2d 120, 126 (D.C. Cir. 1985) (If a FONSI is made after analyzing the EA, then preparation of an EIS is unnecessary). As the oft-quoted Seventh Circuit has stated, "[t]he EA is "a rough-cut, low-budget, environmental impact statement designed to show whether a full-fledged environmental impact statement -- which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project -- is necessary." Cronin v. U.S. Dept. Of Agriculture, 919 F.2d 439, 443 (7th Cir. 1990).

CEQ regulations also prescribe for EISs, but equally relevant to EAs, that "[i]mpacts shall be discussed in proportion to their significance. There shall only be brief discussions of other than significant issues." 40 CFR 1502.2(b). DOE guidance on the sliding scale approach to NEPA analysis expands upon this direction.

> Generally, those proposals with greater potential for significant environmental impact require more analysis than those proposals with small environmental impacts. In using the sliding scale approach to NEPA analysis, the preparer should analyze issues and impacts with the amount of detail that is commensurate with their importance.

http://www.eh.doe.gov/nepa/tools/guidance/green_book2004_12_30_final.pdf. Finally, the CEQ emphasizes that NEPA's purpose is not to generate paperwork – even excellent paperwork – but to foster excellent action. 40 CFR § 1500.1( c ). NEPA documents must concentrate on the issues that are truly significant, rather than amassing needless detail. 40 CFR § 1500.1(b).

## IV. FACTS

Except as noted below, or as appears in the text of our briefs, the Federal defendants accept, for purposes of this administrative appeal, the chronology of events set forth in plaintiff Touret's brief. The Federal defendants provide the following information for clarification.

The Federal defendants' action that is the subject of this NEPA challenge - the award of partial funding to Brown for "continued development" of the LSB - has already been completed.[3] Following issuance of the final EA and FONSI in August 2003, all grant funds were made available to Brown. See, Declarations of Patrice Brewington (DOE Declaration), Ann Clark (NASA Declaration). NASA executed its grant to Brown on 9/16/03, with funding from two appropriations. AR 860; 53; 58; 398; 721. DOE, which had already executed its grant, allowed the

---

[3] See, Conference Reports accompanying H.R. 2620 (PL 107-272) and 2311 (PL 107-258), November 6, 2001 and October 30, 2001, respectively.

use of the funds. AR 640.[4] Brown has drawn down all of the funds from the agencies and on information, has used tens of millions of its own. See, NASA and DOE Declarations.[5] On information, construction of the LSB is now 85% complete, and occupancy is scheduled for August 2006.

By the time Congress identified funds for "continued development" of the LSB in NASA's and DOE's 2002 fiscal year (FY02) appropriations, Brown's Five Year Plan, including the proposed LSB expansion, had been fully vetted and finalized. AR 4-19, 24-31, 34-41, 695-97. Brown had completed site selection, and its consultation with the Rhode Island Statewide Planning Program and Historic Preservation and Heritage Commission (RIHP&HC) was well advanced. AR 20, 22-23, 32.[6] When NASA and DOE were contacted by RIHP&HC, officials from Brown and RIHP&HC were already discussing mitigation of the effects of the LSB on the historic district by altering its scale, massing and design under the National Historic Preservation Act (NHPA) Section 106 process. AR 231, 254, 260.

Because historic preservation issues precluded DOE use of its "categorical exclusion" for Biomedical Research Facilities (see argument, *infra*), it decided to address the historic preservation issues by joining with NASA in preparing an EA. AR 500-01.[7] Plaintiffs have not challenged the

---

[4] See also, 10 CFR 1021.216(i) ("If the NEPA process is not completed before award of the contract, financial assistance, or joint venture, then the contract, financial assistance or joint venture shall be contingent on completion of the NEPA process.")

[5] The combined funding by the Agencies was $6.25 million, less than 7% of the initial project cost estimate of approximately $94 million. AR 640, 295.

[6] Contrary to Touret's assumption, Touret Br. at 2, it is unknown why RIHP&HC had begun NHPA Section 106 review in the 2000-2001 period.

[7] DOE's categorical exclusion can be found at 10 CFR Part 1021, Subpart D, App. B 3.12; B 4(i). NASA, which does not have DOE's experience with biomedical facilities, did not have a categorical exclusion for this purpose.

NHPA review, only the NEPA review, and more specifically, air emissions.

In June 2002, DOE questioned whether the proposed Federal funding was sufficient to "federalize" the LSB. AR 296-97, 301. Discussions on this topic proceeded through July 2002. AR 307, 310, 317, 319, 322, 377. Ultimately, the Agencies deferred to the Advisory Council for Historic Preservation (ACHP), and its view that the Federal funding invoked the NHPA Section 106 process. AR 354-55, 369-370. The Agencies also concluded that the historic preservation issues and public concerns over environmental impacts such as air emissions and noise, could most effectively be addressed in an EA. AR 369.

NASA and DOE had no control over the LSB and were not consulted after construction began. Brown selected the site before the agencies were informed of the grants. Final decision-making power for the siting, design, construction and operation of the LSB and the acceptance of Federal funds remained at all times with Brown. See, NASA, DOE and Brown Declarations.

Plaintiff s' assertions, regarding the setting of the LSB are misleading. "By 1920, development in the immediate area was almost exclusively commercial and institutional. AR 660. See also, 654, 660, 101, 104, 106.

## V. ARGUMENT

### A. PLAINTIFFS' CLAIMS SHOULD BE DISMISSED FOR LACK OF CASE OR CONTROVERSY

#### 1. Plaintiffs Lack Standing and Their Complaint Should be Dismissed for Lack of Jurisdiction

The Article III "case or controversy" clause requires that a plaintiff have standing before invoking the power of a federal court. See, Allen v. Wright, 468 U.S. 737, 750-751 (1984). In order to establish standing under Article III of the Constitution, each plaintiff must make a three part showing: (1) that he or she has suffered an injury in fact - an invasion of a judicially cognizable

interest which is concrete and particularized; (2) that there be a causal connection between the injury and the conduct complained of and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Bennett v. Spear, 520 U.S. 154, 167 (1997) (citation omitted); see also, Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992); and Council Of Ins. Agents & Brokers v. Juarbe-Jimenez, 443 F.3d 103, 107-08 (1st Cir. 2006) (also setting forth standing requirements for associations.). "The party invoking federal jurisdiction bears the burden of establishing these elements." Lujan, 504 U.S. at 561. Plaintiffs in this case have failed to meet their burden of pleading with regard to the second and third elements. Therefore, plaintiffs lack standing and their claims must be dismissed.

As to causal connection, plaintiffs have alleged that they will be irreparably harmed by hazardous air emissions from the LSB "together with the hazardous air emissions from other Brown laboratories and other facilities." See, complaint, ¶¶ 17 and 25. However, plaintiffs fail to demonstrate the causal connection between the allegedly harmful emissions and the Agencies' partial funding of the LSB. This is not a situation in which the Federal defendants are constructing or operating a Federal facility. Plaintiffs must demonstrate that the Agencies had approval, supervision, control, or at least a certain level of consultation over the spending of Federal funds. In the absence of ongoing federal involvement and control there is no jurisdiction for a federal court to order a federal agency to undertake a NEPA or an NHPA review." Gettysburg Battlefield Preservation Ass'n v. Gettysburg College, 799 F. Supp. 1571, 1581-82 (M.D. Pa. 1992). In this case, not only was the Federal contribution such a small portion of the construction financing that the LSB would have been built without it, but the Agencies had no control over the LSB at any time. AR 518; 520-21; 651. See, NASA and DOE declarations.

Accordingly, the nexus between alleged shortcomings in the Federal defendants' NEPA

analysis and any anticipated environmental impacts that plaintiffs now cite as the source of their injury, is missing. Rather, any impacts resulting from the construction or operation of the LSB are attributable solely to Brown's decision to proceed with the construction.

As to redressability, Article III requires that it be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Bennett, 520 U.S. at 167; accord Comfort v. Lynn School Committee, 418 F.3d 1, 11 (1st Cir. 2005) (Redressability requires a substantial likelihood that the relief sought will in fact remedy the alleged injury) (emphasis supplied). See also, North Carolina Utilities Comm'n v. Federal Energy Regulatory Comm'n, 653 F.2d 655, 667 (D.C. Cir. 1981). The Federal action that is the subject of this NEPA challenge is the partial funding of construction of the LSB. AR 638, 640, 646. Any harm allegedly suffered by plaintiffs in this case as a result of the Federal grants to support Brown's construction of the LSB is not redressable because the grants have been executed and the funds have been disbursed to Brown. See NASA and DOE Declarations. Even if the funds could be reclaimed, invalidation of the grant at this stage would not change the environmental impacts of the 85% constructed, soon-to-be fully operational building. See, Brown Declaration. Because plaintiffs' alleged injuries cannot be redressed, they lack standing and their claims should be dismissed.

**2. Plaintiffs' Claims Are Moot and Should Be Dismissed For Lack of Jurisdiction**

It is axiomatic that under Article III of the Constitution, federal courts may only decide an actual "case or controversy." See, e.g., Defunis v. Odegaard, 416 U.S. 312, 319 (1974). "Mootness is a jurisdictional defect, rooted in Article III case or controversy considerations." Horizon Bank & Trust Co. v. Massachusetts, 391 F.3d 48, 53 (1st Cir. 2004). "Courts cannot, consistent with Article III, wander into the 'realm of the advisory and the hypothetical.'" Id. "A case is moot when the issues are no longer live or the parties no longer have a legally cognizable interest in the outcome."

Id. "Another way of putting this is that a case is moot when the court cannot give any 'effectual relief' to the potentially prevailing party." Id. "Mootness is closely related to standing, and in fact has been described as the standing requirement placed in a time frame, albeit with some important differences." Id. It "can arise in different types of situations. A case can of course be moot at the outset by virtue of the facts asserted in the complaint. Or a case not moot at the outset can become moot because of a change in the fact situation underlying the dispute, making relief now pointless." Id. Accord, Clarke v. United States, 915 F.2d 699, 701 (D.C. Cir. 1990) ( "Even where litigation poses a live controversy when filed, the doctrine requires a federal court to refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'"). Among other things, a claim may be rendered moot where intervening events prevent the court from granting any effective relief, even assuming that the plaintiff were to prevail on its underlying claim. See, e.g., Murphy v. Hunt, 455 U.S. 478, 481-82 (1982); Burlington Northern R.R. Co. v. Surface Transp. Bd., 75 F.3d 685, 688 (D.C. Cir. 1996); Gaines v. Continental Mortgage & Inv. Corp., 865 F.2d 375, 378 (D.C. Cir. 1989).

In the case at bar, the FONSI was signed by NASA and DOE officials on August 5, 2003, and August 7, 2003, respectively, and plaintiffs were notified by letter dated August 8, 2003. AR 714, 799, 803; see also, Complaint ¶16. Plaintiffs filed their complaint on May 21, 2004, over nine months later. By that time, NASA and DOE had executed the grants. See, NASA and DOE Declarations. As of today, all of the grant funds have been drawn down and Brown has irrevocably invested millions in the LSB. Id. [8]

---

[8] Plaintiffs could have sought a temporary restraining order or preliminary injunction to stop NASA's and DOE's processing of the grant funds or construction of the LSB when the FONSI was issued, or nine months later when they filed suit. In fact, they did not ask for injunctive relief until the filing of their brief on April 3, 2006, almost three years after issuance of the final EA and FONSI and the

NEPA does not impose procedural requirements on "completed projects whose status within the program is well beyond change." National Wildlife Federation v. Appalachian Regional Commission, 677 F.2d at 889-890. The courts are reluctant to grant relief after the challenged project has been substantially or wholly completed, even in instances where the agency has acted in violation of NEPA-mandated preconstruction procedures. Bayou Liberty Ass'n, Inc. v. United States Army Corps of Engineers, 217 F.3d 393, 396 (5th Cir. 2000). See also, Ogunquit Village Corporation, 553 F.2d 243, 246-47 (1st Cir. 1977); and One Thousand Friends of Iowa v. Mineta, 364 F.3d 890, 893-94 (8th Cir. 2004).

Distribution of the funds and completion of the LSB in this case are well beyond change, making it impossible for this Court to grant plaintiffs any effective relief under NEPA. Because there is no longer a live case or controversy before the Court, this case should be dismissed as moot. [9]

## B. PLAINTIFFS' CLAIMS SHOULD BE DISMISSED FOR LACK OF JURISDICTION BECAUSE THERE WAS NO MAJOR FEDERAL ACTION

NEPA does not apply to the actions of state, local, or private entities unless the Federal government has, in some manner, become sufficiently involved in a particular undertaking of the state, local, or private entity so as to "federalize" that project for purposes of NEPA. It is clear that there are Federal activities and actions that are not sufficiently significant as to amount to "major Federal action" under the provisions of NEPA. See, e.g., Mayaguezanos Por La Salud, 198 F.3d at 302 ("We look to whether federal approval is prerequisite to the action taken by the private actors

---

near-completion of the building. This action and their motion are too late.

[9] See, e.g., Knaust v. City of Kingston, 157 F.3d 86, 88 (2nd Cir. 1998) (holding that plaintiff's claim was moot where the construction of a federally-funded park had been finished and where the federal funds at issue had been fully disbursed); see also, Neighborhood Transp. Network, Inc. v. Pena, 42 F.3d 1169, 1172 (8th Cir. 1994); and Bayou Liberty, 217 F.3d at 398.

and whether the federal agency possesses some form of authority over the outcome."); Ka Makani 'O Kohala Ohana Inc. v. Water Supply, 295 F.3d 955, 960 (9th Cir. 2002); and Atlanta Coalition on the Transportation Crisis, Inc. v. Atlanta Regional Commission, 599 F.2d 1333, 1347 (5th Cir. 1979).[10]

The presence of federal financial assistance is generally just one factor in the analysis of whether there is sufficient federal control over, responsibility for, or involvement with an action to trigger applicability of NEPA. See, *e.g.*, Atlanta Coalition, 599 F.2d at 1347; and Ringsred v. City of Duluth, 828 F.2d 1305, 1308 (D. Minn. 1987). In Riverfront Garden District Association, Inc. v. City of New Orleans, 2000 WL 1789952, *6 (E.D. La. Dec. 6, 2000), the agency paid $15,000,000 of the $88,000,000 cost of the subject project. Nonetheless, the court concluded that even though the amount of federal money involved was not insignificant, the focus was to be on the ability to influence or control the outcome in material respects, and the federal government could not exercise discretion and control over the design, location or choice of alternatives. In order to determine whether a particular Federal action is sufficiently major to trigger NEPA's requirements, one must look to the nature of the federal funds used and the extent of federal involvement. Ka Makani, 295 F.3d at 960. The need for Federal control over a project before it will be deemed a major Federal action is reflected in many NEPA cases. See, e.g., Ka Makani, 295 F.3d at 960-61. ("The [agencies] lacked the degree of decision-making power, authority, or control over the [project] needed to render it a major federal action ... Because the final decision-making power remained at

---

[10] Triggers for § 106 Review under the National Historical Preservation Act (NHPA), another statute that requires a review of the impact of certain Federal projects on environmental resources, are similar to the triggers for NEPA and Courts generally treat major federal actions under NEPA as closely analogous to 'federal undertakings' under NHPA. Sugarloaf Citizens Assoc., 959 F.2d at 515. See also, Sac and Fox Nation of Missouri v. Norton, 240 F.3d 1250, 1263 (10th Cir. 2001); Woodham v. Federal Transit Admin., 125 F. Supp. 2d 1106, 1110 (N.D. Ga. 2000); and Business and Residents Alliance of East Harlem v. Jackson, 430 F.3d 584, 586 (2d Cir. 2005).

all times with [the third party], we conclude that the Federal involvement was not sufficient to constitute 'major federal action."); United States v. Southern Florida Water Management District, 28 F.3d 1563, 1572 (11th Cir. 1994); Sugarloaf Citizens Association v. FERC, 959 F.2d 508, 512 (4th Cir. 1992) ("'the federal agency must possess actual power to control the non-federal activity.'"); Sierra Club v. Hodel, 848 F.2d 1068, 1089 (10th Cir. 1988); and Save Barton Creek Association v. Federal Highway Administration, 950 F.2d 1129, 1134-35 (5th Cir. 1992). See also, South Bronx Coalition for Clean Air, Inc. v. Conroy, 20 F. Supp. 2d 565, 570-71 (S.D.N.Y. 1998) (court considered federal influence or control more important than the presence of federal dollars). Requiring an EIS for anything less would needlessly hinder the Government's ability to carry on its myriad programs and responsibilities in which it assists, informs, monitors, and reacts to activities of individuals, organizations, and states, but in which Government plays an insubstantial role. NAACP v. Medical Center, Inc., 584 F.2d 619, 634 (3d Cir. 1978).

In the instant case, the Federal defendants' contribution to the construction of the LSB of approximately $6 million dollars is less than 7% of the entire cost of the project. More importantly, however, Federal approval was not prerequisite to Brown's building of the LSB, and the Federal agencies at no time possessed any authority over the construction or the outcome of the project. See, NASA and DOE Declarations.

**C. THE AGENCIES' DECISION WAS NOT ARBITRARY AND CAPRICIOUS**

Plaintiffs' claims fail on the merits. The Agencies' fundamental conclusion that the LSB would have a minimal impact on the environment is supported by the record. The primary environmental impact was to historic resources. AR 639, 791. This impact was mitigated through a memorandum of agreement (MOA) negotiated by the Federal defendants, Brown and RIHP&HC, and has not been challenged by plaintiffs. AR 791. The remaining two impacts have been

categorically excluded from NEPA. 10 CFR Part 1021, Subpart D, App. B3.12. Moreover, the second environmental impact, "a small volume of air pollutant emissions" during construction, AR 639, has not been challenged either. "[A] small increase in the use of hazardous materials and in the generation of hazardous, radioactive, and biological waste as a result of research conducted in the building," is the basis of plaintiffs' complaint.

**1. The Conclusion is Consistent with Agency Regulations and Experience**

The agencies', especially DOE's, extensive experience evaluating the environmental impacts of similar projects is uncontroverted. See, Prouty Declaration, attached to the Federal defendants' objection to plaintiffs' second motion to supplement the record (Prouty declaration). As noted, DOE regulations do not require an EA for microbiological and biomedical diagnostic treatment and research facilities, because they have been found to have no potential for significant impact on the environment.[11] See, 10 CFR Part 1021, Subpart D, Appendix. B3.12, B (4)(i), and Prouty declaration. This categorical exclusion was the result of a DOE "lessons-learned analysis" of all of DOE's final EAs on biomedical research facilities during the period 1990 through 1994, each of which concluded with a FONSI. Id. [12]

---

[11] The AR in this case bears out the categorical exclusion. The "very small" volume of fugitive emissions from the LSB was conservatively estimated at 1,500 pounds of emissions per year, primarily from ethanol, a volatile organic compound, widely used in biological research. AR 650. By comparison, "[a] 2002 Ford Focus driven 12,500 miles in a year would emit more than 8,000 pounds of pollutants, primarily carbon dioxide and carbon monoxide." AR 0615. See also, http/www.epa.gov/emissweb/ (average of 5,400 pounds of carbon dioxide emissions from a "green" car per year at 12.000 miles per year); http/www.fueleconomy.gov (counting all emissions, a 2005 Ford Taurus emits 8.1 tons per year; a 2003 Ford Escort 6.4 tons per year).

[12] The categorical exclusion was promulgated on July 9, 1996, following publication in the Federal Register, public review and comment, and response to public comment, and was adopted only after determining that it conformed with NEPA and CEQ regulations. 40 CFR 1507.3(a). This process is presumptively reasonable and not arbitrary and capricious. See, e.g., Citizens for the Scenic Severn River Bridge, Inc. v. Skinner, 802 F. Supp. 1325, 1332 (D. Md. 1991); City of Alexandria v. Federal Highway Admin., 765 F.2d 1014, 1019-20 (4th Cir. 1985) .

Projects for which an EA is the appropriate level of review for DOE are the siting, construction,

However, for this categorical exclusion to be properly applied, a finding that the proposed action involved no impact on sensitive resources was required.[13] Until the RIHP+HC executed the MOA, confirming mitigation of the effects of the LSB on historic resources, this prerequisite was not satisfied. AR 792. The MOA was not executed until August 2003. AR 794. The critical fact remains that it was the unchallenged potential impacts on historic resources, subsequently mitigated to insignificance, that precluded this categorical exclusion, not air emissions or noise emissions or any other emissions. The impacts of which plaintiffs complain have been legally determined to be insignificant, as evidenced by the CEQ approval of the DOE categorical exclusion, promulgated in accordance with APA and CEQ requirements. Under similar circumstances, the First Circuit upheld the Federal Aviation Administration determination to prepare an EA instead of applying its categorical exclusion. Save Our Heritage, Inc. v. FAA, 269 F.3d 49 (1st Cir. 2001). Like DOE's rule, the FAA rule precluded application of a categorical exclusion if the action is likely to have more than a minimal effect on properties protected under NHPA § 106.

**2. The EA's Conclusion Regarding Emissions is Supported by the Record**

The agencies started with the "highly conservative" estimate that the LSB would generate

---

operation and/or decommissioning of low- or medium-energy particle acceleration facilities; energy system prototypes; and large waste storage facilities. 10 CFR Part 1021, Subpart D, App. C. NASA EA categories include specific spacecraft and flight projects in space science; specific experimental projects in aeronautics and space technology and energy technology and new space transportation systems. 14 CFR 1216.305(b). On the other hand, an EIS is the expected level of impact analysis for the following types of DOE actions: the siting, construction, operation and/or decommissioning of nuclear fuel reprocessing facilities; uranium enrichment facilities; and reactors. 10 CFR Part 1021, Subpart D, App. D. For NASA, an EIS is the expected level of review for the development and operation of new launch vehicles; space vehicles likely to release substantial amounts of foreign materials into the earth's atmosphere or into space; nuclear systems, including reactors and thermal devices. 14 CFR 1216.305(c). The LSB will have impacts that are orders of magnitude less than those identified by the agencies as requiring either an EA or EIS. See, n.15, *infra*.

[13] 10 CFR Part 1021, Subpart D, Appendix B, "Conditions that are Integral Elements of the Classes of Actions in Appendix B," Condition B(4).

approximately 1,500 pounds of emissions per year.[14] AR 666. [15]

The agencies were confident that the "very small amount of air emissions" would not present a significant impact on the human environment, either in the labs, where individuals were working directly with the chemicals or to the outside, because "containers would be kept closed when not in use" and volatile and toxic chemicals would be used under fume hoods to limit staff exposure. AR 650, 665. The bulk of these "fugitive emissions" would result primarily from the use of ethanol, a volatile organic compound use widely in biological research. AR 650. As to the even more limited chemical emissions to the outside, such emissions from fume hood exhaust stacks were to be diluted at a ratio of 3000 to 1. AR 650. Dilution would be even greater as emissions traveled farther away from the building. AR 666.

---

[14] NEPA requires agencies to complete an EA of potential impacts before making a decision on a proposal for federal action. 40 CFR 1506.1. Thus, EAs use approximations based on understandably incomplete information. It is not possible to accurately predict the emissions from a building that has yet to be built, and from operations that are themselves mere predictions.

[15] This figure is conservative for several reasons. First, the estimate was "based on information from the existing Biomedical Complex." (alternately the BC or Biomedical Building) AR 666. More specifically, the estimate for the LSB was calculated to be the same as the estimate for the Biomedical Complex - 25% of the mass balance information from the entire University - or 1,330 pounds. AR 666. The yearly estimate for the BC was 1,330 in 2001 and even less in 2002 - 1,213 pounds. This figure for the BC was rounded up to 1,500 pounds for the LSB. The BC's emissions were the relevant benchmark because "[t]he occupants of the proposed LSB were to be scientists from the Department of Molecular and Cell Biology and Biochemistry, and the Department of Neuroscience - who are currently occupants of the BC - and a new Brain Science Program," AR 638. However, the estimate (a) did not account for the "net" reduction in emissions from the BC based upon the relocation of its emission-producing activities to the LSB - there would only be a 50% increase in lab space, AR 642; (b) was not adjusted for the smaller number of laboratories in the LSB (51 in the LSB, as compared to 80 in the BC), AR 666; and ( c) did not take into account technology enhancements postdating the equipping of the BC, such as the improved performance of fume hoods, AR 650. In short, the ultimate figure is expected to be something significantly less than the estimated 1500 pounds of emissions (alternately referred to as 25% of emissions for the entire University).

Second, the estimate was calculated "based on the mass balances performed, and that figure does not account for materials that remain in the laboratories as part of experimental processes and research samples." AR 666. In other words, this is the amount used, not omitted. This assures that the estimate is high by several orders of magnitude, especially as standard laboratory policies and procedures contain volatile chemicals and minimize spills.

The Agencies found that ozone precursors were by far the largest area of air quality concern; but that the operation of the building would not result in emissions over the threshold rate for the non-attainment area. AR 667.

The Agencies also concluded, based on the conservative estimate, that toxic air emissions (as opposed to ozone precursors) would be far below the minimum quantities stated in Table III of RIDEM's Air Pollution Control Regulation 22 (Reg. 22)[16] and would not rise to a level requiring an air toxics permit from DEM; and that operation would be in compliance with DEM requirements. AR 665-66. See also, AR 615, 620. A compliance determination is consistent with CEQ regulations. "In its determination of whether its proposed action is significant, an agency must consider whether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment." 40 CFR § 1508.27(b)(10). "An agency has an obligation under NEPA, 42 U.S.C. § 4321, *et seq*., to consider whether an action might violate state or local rules." Border Power Plant Working Group v. Department Of Energy, 260 F. Supp. 2d 997 (S.D. Cal. 2003). Similarly, part of an agency's "hard look" is to obtain opinions from experts outside the agency, Marsh v. Oregon Natural Resources Council, 490 U.S. at 378-85. Montrose Parkway Alternatives Coalition v. United States Army Corps of Eng'rs, 405 F. Supp. 2d 587, 595 (D. Md. 2005), citing Hughes River Watershed Conservancy v. Johnson, 165 F.3d 283, 288 (4th Cir. 1999). This is one of the reasons DOE regulations require that the host state be provided an opportunity to review and comment on an EA prior to its approval. 10 CFR 1021.301(d). Regarding the analysis of air toxics in the EA, RIDEM commented that "[i]f emissions of any of the air toxics used in the building would have the potential to exceed the thresholds listed in air

---

[16] The Huppert estimates were added to the AR at plaintiffs' request and Exhibit A attached hereto and incorporated herein, was added at defendants' request. Exhibit A explains why the Huppert estimates were unreliable and not included in the AR.

Pollution Control Regulation No. 9, Brown must also apply for a preconstruction permit for the laboratory operations," but raised no objection to the proposed LSB or the activities to be conducted. AR 705-706. Thus, the Agencies' reliance on RIDEM's permitting process and oversight was appropriate.

The heart of plaintiffs' argument is based on a persistent misinterpretation of the Huppert "emissions" estimates and the thresholds in Table III of RIDEM's Air Pollution Control Regulation 22 (Reg. 22).[17] Their logic appears to be that if the Huppert estimates of toxic chemicals exceed the State's "minimum quantity applicability thresholds," they require a permit from the State and if a permit is required, the emissions have the potential to cause a significant impact on air quality, and an EIS should have been prepared. The most critical flaw in plaintiffs' logic is in treating the Huppert "estimates" as accurate measures of emissions. They were not. The Huppert estimates were expressly described as "mass balance" estimates, based on historical records of the level of acquisition of certain chemicals by Brown in 2001. AR 666.[18] The mass balance has little or no correlation to levels of emissions of those chemicals. It is merely the maximum amount of chemical that could have gone into the air, without taking into account "materials that remain in the laboratories as part of experimental processes and research samples." Second, the estimates were unreliable and not included in the AR for this reason. Exhibit A.

Plaintiffs assert that air modeling should have been required to confirm the agencies'

---

[17] The Huppert estimates were added to the AR at plaintiffs' request and Exhibit A attached hereto and incorporated herein, was added at defendants' request. Exhibit A explains why the Huppert estimates were unreliable and not included in the AR.

[18] It is for this reason that Reg. 22 "Air Toxics," adopted April 27, 2004 (but pending during EA preparation), now requires registration if the amount emitted exceeds the Minimum Quantity threshold. See, http://www.dem.ri.gov/programs/benviron/air/pdf/atoxsum.pdf (The change eliminates the unintended regulation of facilities that use but do not emit air toxics).

determination.[19] However, given DOE's experience with impacts of similar facilities, a rough "worst case" estimate was a reasonable approach. Plaintiffs have failed to show any correlation between the Huppert estimates, and any amounts emitted, or any ground level ambient concentration. It is the ground level ambient air level (AAL) concentrations that have a correlation to health effects.[20]

Plaintiffs also misapprehend the nature of the permit requirement. The purpose of the permit is to establish conditions of operation to ensure that emissions will not cause an increase in the ground level concentration of an air toxic in excess of the AAL, a prerequisite to the issuance of an "air toxics operating permit" (ATOP) under new Reg. 22. According to RIDEM guidelines, ATOPs are issued only if the stationary source is in compliance with Reg. 22, i.e., if the emissions from that source do not cause ground level impacts above the AALs. See n. 20, *supra*. Courts in a number of jurisdictions have recognized the nexus between regulatory standards and impacts on the environment. "If ambient air quality standards are designed, as they are, to protect human health, then a finding that the projects do not violate those standards logically indicates that they will not significantly impact public health." See, Sierra Club v. United States Dept. Of Transportation, 310 F. Supp. 2d 1168, 1202 (D. Nev. 2004), quoting Border Power Plant Working Group, 260 F. Supp. 2d at 1021.

Plaintiffs have offered no evidence to counter the Agencies' rational conclusion, nor have they shown any correlation between the amount of chemicals expected to be released and any

---

[19] RIDEM conducts emissions modeling in conjunction with its review of the preconstruction permit application and has acknowledged its responsibility for evaluating "the ambient air impacts from emissions of those substances that exceed permitting thresholds from all operations at the university." AR 705-07.

[20] ("The [AALs] listed in Reg. 22 are ground-level impact limits, i.e. they represent the concentration of a substance that a facility may contribute to the ambient air at or beyond its property line.")

significant impact on the human environment. Nor have they pointed to any evidence of significant environmental impacts from toxic emissions from Brown's existing biomedical complex. In fact, they have offered no more than unsupported conclusions. They have clearly failed to provide evidence of a "substantial possibility" that the LSB "could significant affect the quality of the human environment," their requisite showing.

## CONCLUSION

For all of the foregoing reasons and those set out in the Federal defendants' objection to the CHNA plaintiffs' brief, and those set out in the Federal defendants' objections to plaintiffs' first and second motions to supplement the record, the relief sought should be denied and the complaint should be dismissed.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

ROBIN E. FEDER
Assistant U.S. Attorney
Chief, Civil Division
Fleet Center
50 Kennedy Plaza, 8th floor
Providence, RI 02903
(401) 709-5000
(401) 709-5017 (fax)

OF COUNSEL:

Vicki L. Prouty, Esq.
U.S. Department of Energy

John H. Eckhardt, Attorney Advisor
National Aeronautics and Space Administration

**CERTIFICATION**

I hereby certify that on the 18th day of May 2006, I caused a copy of the foregoing to be forwarded, by postage prepaid mail, to :

J. William W. Harsch, Esq.
170 Westminster Street, Suite 800
Providence, RI 02903

Joseph Avanzato, Esq.
Kristen W. Sherman, Esq
ADLER POLLOCK & SHEEHAN, P.C.
2300 Financial Plaza
Providence, RI 02903-2443

Beverly E. Ledbetter, Esq.
General Counsel
Office of the General Counsel
Brown University
110 South Main Street
Providence, RI

Nancy A. DeQuenza

D



Date: Sat, 05 Jul 2003 08:31:30 -0400
From: "Swartz, Lucy L" <SwartzL@BATTELLE.ORG>
Subject: One more thing
To: "'marisa_quinn@brown.edu'" <marisa_quinn@brown.edu>,
"'peter.siebach@ch.doe.gov'" <peter.siebach@ch.doe.gov>,
"'Lizabeth.R.Montgomery@nasa.gov'" <Lizabeth.R.Montgomery@nasa.gov>
X-Mailer: Internet Mail Service (5.5.2655.55)

Hi again:

Remember that I said I was going to include a table that Henry Huppert had sent me that shows the emissions for each compound for 2001? After talking with Henry, we decided that was a bad idea. It suggests a level of precision that isn't there. What Henry does (and he can explain it better) is that every year he takes an inventory of the stuff in the labs -- he knows what came in and he knows what's left, and he assumes everything else went out the stack. But that's not necessarily true. It could still be in beakers, for example. Since the numbers are all an estimate, it seemed better not to use them.

It's amazing the things I remember in the middle of the night!

Lucy

Lucinda Low Swartz
Battelle Memorial Institute
Telephone: 301/933-4668
Facsimile: 301/933-6796
Email: SwartzL@battelle.org

5545A

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| WILLIAM G. TOURET, et al., Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 04-198T |
| | : | |
| NASA, et al., Defendants. | : | |

**DECLARATION OF PATRICE BREWINGTON**

I, Patrice Brewington, declare and make the following declaration under penalty of perjury:

1. I am presently employed by the United States Department of Energy (DOE) as an engineer, and have worked in that capacity for 20 years.

2. For approximately 13 years, I have served as the government's project manager for Congressional-initiative grant projects. In that capacity, I assist the contracting officer with assuring grant application documentation is complete and accurate, including project description, scope, budget, and site information. I also review quarterly technical reports on the progress of the project and enter project information into the database for DOE management, who frequently receive Congressional inquiries about these projects.

3. I am familiar with the Congressional earmark in DOE fiscal year 2002 appropriations for "continued development of the Life Sciences Building at Brown University," and with the grant that was executed by DOE Contracting Officer Eric M. Simpson for that purpose on September 16, 2002, in the amount of $969,000.00.

4. DOE grant funds were obligated under the grant executed with Brown in September 2002, and were made available to Brown in August, 2003, following execution of the joint DOE and NASA Finding of No Significant Impact. Consistent with DOE regulations,[1] the grant contained a clause prohibiting the grantee from proceeding with any action that would have an environmental impact or limit future alternatives until the completion of the NEPA process. All of the DOE grant funds have been drawn down.

5. In connection with the LSB, DOE was involved in the negotiation of the financial assistance agreement (in accordance with 10 CFR Part 800); in the section 106 process under the National Historic Preservation Act; and in the NEPA process (in accordance with 10 CFR Part 1021). DOE was not involved in the design or construction of the LSB. DOE had no control over, responsibility for, or involvement with the site selection process, which was complete before DOE was informed of the earmark in FY02 appropriations. DOE did not

[1] 10 CFR Section 1021.216(i) provides: "If the NEPA process is not completed before award of the contract, financial assistance, or joint venture, then the contract, financial assistance or joint venture shall be contingent on completion of the NEPA process."

have the ability to influence or control the outcome of the LSB in any respect. Not only did the agencies lack decision-making power, authority, and control over the project, they were not even consulted once construction began. Final decision-making power remained at all times with Brown.

6. To the best of my knowledge, Federal approval or funding was not a prerequisite to Brown's building of the LSB.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this the 16th day of May 2006.

PATRICE BREWINGTON
UNITED STATES DEPARTMENT OF ENERGY

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| WILLIAM G. TOURET, et al., Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 04-198T |
| | : | |
| NASA, et al., Defendants. | : | |

**DECLARATION OF ANN H. CLARKE**

I, ANN H. CLARKE, declare and make the following declaration under penalty of perjury:

1. I am presently employed by the National Aeronautics and Space Administration (NASA) and have worked for NASA for six years. Currently, I am a Program Analyst and have worked in that capacity for seven months. Prior to that, I worked as the Executive Officer to the Chief Scientist and as an Environmental Specialist in the Environmental Management Division.

2. I am familiar with the Congressional pass-through grant that was awarded by NASA to Brown University for construction of its Life Sciences Building (LSB). NASA awarded $5,250,000.00.

3. NASA's grant funds were obligated to Brown University on September 16, 2003, and all of the grant funds have been drawn down by Brown.

4. In connection with the LSB, NASA was involved in the funding documentation; in the section 106 process under the National Historic Preservation Act; and in the NEPA process. NASA prepared an EA; signed an MOA; issued a FONSI and awarded grant money for the LSB. NASA had no control over the LSB. Brown had selected the site before NASA was informed of the earmark in FY02 appropriations, and provided NASA with justification for not selecting other sites. Not only did NASA lack decision-making power, authority, and control over the LSB, the agency was not consulted once construction began. Final decision-making power for the siting, design, construction and operation of the LSB and acceptance of Federal funds remained at all times with Brown.

5. To the best of my knowledge, Federal approval was not a prerequisite to Brown's building of the LSB.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this the 17th day of May 2006.

Ann H. Clarke

ANN H. CLARKE
PROGRAM ANALYST
NASA