ORIGINAL

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| WILLIAM G. TOURET, et al., | |
| Plaintiffs, | |
| v. | CIVIL ACTION NO. 04-198T |
| NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, et al., | |
| Defendants. | |

**COLLEGE HILL PLAINTIFFS' REPLY TO**
**<u>BROWN'S OPPOSITION TO THEIR APPEAL</u>**

Brown argues that the Providence noise ordinance limits noise emissions only from individual noise emission sources, and that therefore plaintiffs were required to show that the anticipated noise emissions from the Life Sciences Building *alone* would exceed those limits (Brown Brief to College Hill Plaintiffs, at 4-5).[1] That argument ignores the fact that NEPA requires consideration of *cumulative* impacts, which required NASA and DOE to evaluate the cumulative impact of the noise emissions from the Life Sciences building and the surrounding noise emission sources -- which exceeded the limits of the city's noise ordinance.[2]

Next, Brown finally admits that NIH, a federal agency, provided Brown with a $2 million construction grant for the Life Sciences Building project (Brown Brief to College Hill Plaintiffs, at 6) -- a critical threshold fact that all three defendants improperly omitted to examine or disclose during the NEPA review and in the Final EA. Brown's admission confirms plaintiffs'

---

1 This reply is addressed to the four briefs in opposition filed by the defendants.

2 Contrary to Brown's assertion (Brown Brief to College Hill Plaintiffs, at 5, n. 31), the record provides ample evidence of the location of the residences of certain of plaintiff CHNA's members (see, <u>e.g.</u>, AR 48 [0281] (CHNA letterhead), AR 123 generally (written comments from CHNA members]). Moreover, plaintiff Touret, a member of CHNA (AR 48 [0281, 0284]), advised the RIHP&HC by letter on December 2, 2001 of the already

claims that the federal financing for the construction of the Life Sciences Building was materially greater than what the Final EA represented, and that the scope of the "major federal action" here in this respect was and is broader than what the Final EA disclosed (see Touret Reply to NASA/DOE, at 2-4).

The $2 million NIH construction grant was more than twice the magnitude of DOE's approximately $1 million construction grant, and NASA and DOE have not offered any legitimate reason for their failure to take the required "hard look" at, or even disclose, the $2 million NIH construction grant or the entirety of NIH's involvement in the Life Sciences Building project. NASA and DOE should have taken the required "hard look" at and disclosed Brown's *applications* for those additional construction funds. Those applications and the grant award would have provided important information about NIH's longer-term role in the Life Sciences Building project and NIH's long-term influence and control over the facility's operation.[3] In the fall of 2001 and spring of 2002, Brown's representatives strongly suggested that NIH would be providing very substantial operational funding for the Life Sciences Building (AR 123 [0901-0903]; AR 42 [0240-0242]). Those assertions by Brown's representatives were anything but speculative, in that they were made in a context of very substantial annually increasing funding by NIH for research activities at Brown (College Hill Plaintiffs' Main Brief, at 5-6; AR 42 [0240-0242]). The Draft EA's subsequent failure even to mention NIH's involvement prompted the public to submit written objections to NASA and DOE that they had failed to take the required "hard look" at the true and far more extensive scope of the NIH's and the federal government's involvement in the Life Sciences Building project (College Hill

---

excessive noise emissions from the Biomedical Complex that can be heard from his nearby home on the adjacent block of Olive Street (AR 123 [1003, 1005]); see also, e.g., AR 107 [0632]).

[3] See Touret Reply to NASA and DOE, at 3, n. 7, concerning the scope of materials upon which the parties may rely on this appeal.

Plaintiffs' Main Brief at 7). The Final EA's response was at best evasive (AR 113 [0732, 0786-0787]).

Consideration of the entirety of Brown's 2001 and 2002 suggestions of substantial long-term NIH financial involvement in the Life Sciences Building project, the $2 million NIH construction grant that defendants omitted to disclose in this NEPA review, Brown's October 2003 admission that the federal operational support for the Life Sciences Building and former Doran-Speidel Building would total at least $23.4 million of *federal* research support *annually* (College Hill Plaintiffs' Main Brief, at 5, n. 5), and the tens of millions of other federal research dollars that Brown receives annually for research (AR 35 [0078]),[4] requires the conclusion that the Final EA's failure to take the required "hard look" at the obviously more substantial scope of this "major federal action" -- the Life Sciences Building project -- was part of defendants' deliberate attempt to circumvent the required EIS, represented improper segmenting of this broader "major federal action," and was therefore arbitrary and capricious.

Brown's arguments in defense of the Final EA's failure properly to consider feasible building site alternatives (Brown Brief to College Hill Plaintiffs, at 9-11), the Final EA's deficient "no action alternative" (id. at 11), the *pro forma* nature of the public participation process (id. at 12-15), and evidence of predetermination (id. at 18-19) are meritless for the reasons included in the College Hill Plaintiffs' Reply to NASA and DOE (at 3-5).

Brown's attempt to excuse the Final EA's failure to consider explicitly the possible need for an EIS from the perspective of the "significantly" factors at 40 CFR § 1508.27 (a) and (b)

---

[4] Brown acquired the former Doran-Speidel building in May 2003, during the NEPA review period, in order to make available even more research capacity than the Life Sciences Building would provide (College Hill Plaintiffs' Main Brief, at 10, n. 10). Brown's acquisition of the former Doran-Speidel building during the NEPA review period here proves that Brown could only have been certain, during the NEPA review period, of its post-construction receipt of the $23.4 million of *annual federal* research funds, and that its future receipt of those funds was not speculative.

(Brown Brief to College Hill Plaintiffs, at 15-18) fails largely for the same reasons that NASA's and DOE's similar arguments fail (see College Hill Plaintiffs' Reply to NASA and DOE, at 4). In attempting to excuse the importance of the Final EA's failure, Brown -- like NASA and DOE -- implicitly concedes (Brown Brief to College Hill Plaintiffs, at 15-18) that the Final EA failed to take the required "hard look" at three related "significantly" factors that are especially relevant to the potentially significant environmental impacts from hazardous air emissions at issue here. The first is the Final EA's failure properly to consider the significance of the specific locale that will likely be most severely impacted by the Life Sciences Building's individual and cumulative hazardous air emissions: the residential neighborhood that extends atop the sharp Meeting Street hill and looks down upon the Life Sciences Building and its hazardous air emission exhausts (40 CFR § 1508.27(a)). The second is the Final EA's failure to recognize that the unique geography will all but certainly result in human exposure to greater concentrations of hazardous air emissions, because the exhausts of the Life Sciences Building discharge their hazardous air emissions at the same elevation as the ground level of the overlooking, hilltop residential homes. Sophisticated air modeling plainly should have been utilized with respect to this section of the affected environment. The third is the fact that defendants never determined the existing external ambient concentrations of hazardous air emissions for that specific locale (or for any other part of the potentially-affected area), nor did they determine the likely increases in those concentrations that would occur once the Life Sciences Building began operating (Touret Main Brief, at 14). Those failures thus underscore the importance of the fact that the short- and long-term effects of those hazardous air emission impacts, even before consideration of the unique geography, are highly uncertain and involve unique or unknown risks (40 CFR § 1508.27(b)(5)). Lastly, from the discussion above, the Final EA cannot be said to have considered seriously the

significance of the plaintiffs' objections that the far broader scope of this "major federal action" required an EIS (see College Hill Plaintiffs' Reply to NASA/DOE, at 4, n. 5).

## CONCLUSION

For the reasons stated here and in plaintiffs' main briefs on this appeal, the Court should award plaintiffs the relief that they request in their main briefs, together with such other and further relief that the Court deems appropriate.

Dated: June 2, 2006

J. WILLIAM W. HARSCH/Bar No. 3688
CAROLYN A. MANNIS/Bar No. 4275
170 Westminster Street, Suite 800
Providence, RI 02903
Tel. (401) 454-4466
Fax (401) 351-3914

Attorneys for Plaintiffs Thomas A. Bennett, William G. Black, Antoinette Breed, Allyn Copp, Ronald A. Dwight, Pamela Hext Dwight, G. Dale Dulgarian, as he is Trustee for KSD Trust, Virginia G. Riggs, Yvonne G. Shilling, and College Hill Neighborhood Association

CERTIFICATE OF SERVICE

I hereby certify that on the 2d day of June, 2006, I caused a copy of the foregoing to be sent by first-class mail to the following:

Robin E. Feder, Esq.
Assistant U.S. Attorney
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Beverly E. Ledbetter, Esq.
Vice President and General Counsel
Box 1913
Brown University
Providence, RI 02912-1913

Joseph Avanzato, Esq.
Kristen W. Sherman, Esq.
ADLER POLLOCK & SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

William G. Touret
11 South Angell Street #264
Providence, RI 02906-5206