UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

William G. Touret, et al.,

    Plaintiffs

v.                                                    C.A. No. 04-198T

National Aeronautics and Space
Administration et al.,

    Defendants

## MEMORANDUM OF DECISION

### Introduction

The plaintiffs brought this action for declaratory judgment pursuant to the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321, et seq., and the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706, to enjoin Brown University ("Brown") from constructing a life sciences building (the "LSB") and to declare erroneous a finding by the National Aeronautics and Space Administration ("NASA") and the Department of Energy ("DOE") that construction of the LSB would have no significant impact on the environment.

The plaintiffs claim that NEPA requires preparation of a full-blown Environmental Impact Statement ("EIS") because construction of the LSB is a "major federal action" that significantly affects the "quality of the human environment" and that the agencies' Finding of No Significant Impact ("FONSI") was arbitrary and

1

capricious. The defendants argue, among other things, that this Court lacks jurisdiction and/or that the plaintiffs lack standing because construction of the LSB is not a "major federal action." The defendants also dispute the claim that the FONSI was arbitrary and capricious.

Because this Court finds that construction of the LSB is not a "major federal action" the plaintiffs' complaint is dismissed.

### Facts

The relevant facts drawn from the administrative record, the submissions of counsel, and an evidentiary hearing conducted on January 8, 2007 are as follows. In 1999, Brown announced its intention to construct a new LSB which it, later, decided to locate on a site adjacent to its existing Biomedical Complex. The purpose of the LSB was to consolidate many of Brown's existing life sciences departments in one facility with modern laboratory space and to expand Brown's research capacity in the life sciences.

Initially, Brown planned to finance construction of the LSB entirely from its own funds, but, when it learned that federal monies might be available to pay for some of the construction costs, Brown applied for, and, ultimately received commitments from NASA, DOE, and the National Institutes of Health ("NIH") totaling $10.25 million which represented about 11% of the total project

cost.[1]

Brown formally announced its plan to construct the LSB in June of 2000 at a public meeting that it hosted prior to presenting its Master Plan to the City Plan Commission. In 2001, pursuant to § 106 of the National Historic Preservation Act ("NHPA"), the project was reviewed by the Rhode Island State Historic Preservation Officer and additional public meetings were held which were attended by a number of the plaintiffs. (Admin. R. 64-67.) In September of 2002, NASA, as the lead federal agency, initiated a NEPA review in order to assess the potential environmental impact of the project.

Throughout the NHPA and NEPA review process the plaintiffs expressed their concerns about possible adverse effects that the LSB might have on the College Hill Historic District and the health of nearby residents. (Admin. R. 77, 81.) Those concerns were voiced at the public meetings (Admin. R. 64-67), in articles and editorials in the local newspapers (Admin. R. 927, 1033, 1035-36), during meetings between Brown and the plaintiffs (Admin. R. 780, App. D to EA), and in various documents submitted to the defendants by the plaintiffs (Admin. R. 923-26, 1008).

On June 2, 2003, NASA and DOE (the "Agencies") issued a draft

---

[1] NASA provided approximately $5.25 million, DOE provided approximately $1 million and NIH provided two grants of $2 million each. The NIH grants were conditioned on Brown's commitment to use the LSB for biomedical purposes for a period of at least twenty years.

Environmental Assessment ("EA") in which they found that the LSB would have no significant impact on the environment. The Draft EA was published and interested parties were afforded 30 days in which to comment on it. On August 8, 2003, after receiving further comments from the plaintiffs and others, the Agencies issued a Final EA reiterating their FONSI.

Construction of the LSB began before this action was brought and it appears that construction, now, has been substantially completed.

## Analysis

I.  <u>The Relevant NEPA Provisions</u>

   A.  <u>The EIS Requirement and the FONSI Exception</u>

NEPA requires federal agencies involved in "major federal actions significantly affecting the quality of the human environment" to prepare detailed EISs that discuss the environmental impact of such actions and the alternatives that may exist. 42 U.S.C. § 4332(2)(C). Under NEPA, effects on the "quality of the human environment" include effects on public health. 42 U.S.C. § 4321; 40 C.F.R. § 1508.8; 40 C.F.R. § 1508.27(b)(2).

Regulations promulgated by the Council on Environmental Quality ("CEQ") to assist agencies in determining whether a proposed action would significantly affect the quality of the human environment contemplate a two-step process. First, the agency

may decide whether the proposed action is categorically exempted from NEPA's environmental review requirements because it is a type of action that experience shows has no significant effect on the environment. See 40 C.F.R. § 1501.4(a)(2).[2] If the proposed action does not fall into one of the exempt categories and it is clear that the action will have a significant environmental impact, a full blown EIS must be prepared. See 40 C.F.R. § 1501.4(a)(1). Alternatively, in cases where it is unclear whether the proposed action will significantly affect the environment, the agency may prepare an EA that "'briefly' discusses the relevant issues and either reaches a conclusion that preparation of an EIS is necessary or concludes with a 'Finding of No Significant Impact' (called, in environmental jargon, a 'FONSI')." Sierra Club v. Marsh, 769 F.2d 868, 870 (1st Cir. 1985) (citation omitted). See 40 C.F.R. § 1501.4(b), (c).

If the EA concludes that the proposed action will significantly affect the human environment, a detailed EIS must be

---

[2] In their briefs, the Agencies argue that the FONSI was supported by "agency experience" because DOE has a categorical exclusion for projects involving the construction of biomedical facilities. See 10 C.F.R. § 1021 Subpt. D, App. B3.12. While the categorical exclusion could not be applied in this case due to the LSB's potential impact on historically significant resources, the Agencies argue that DOE's experience that such facilities do not significantly affect the human environment is nevertheless supportive of the FONSI in this case. See 10 C.F.R. § 1021 Subpt. D, App. B(4)(I). The Court rejects this argument because the EA never refers to, or purports to rely on, DOE's categorical exclusion.

prepared but, if the agency makes a finding of no significant impact, no EIS is required. Sierra Club v. U.S. Dep't of Transp., 753 F.2d 120, 126 (D.C. Cir. 1985). Thus, an EA has been described as "a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement - which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project- is necessary." Cronin v. U.S. Dep't of Agric., 919 F.2d 439, 443 (7th Cir. 1990).

In analyzing the effects of a proposed action, the agency must consider the cumulative effects of the project. 40 C.F.R. § 1508.8 (effects defined to include cumulative effects). The CEQ regulations define cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

B.  FONSI Review

A party aggrieved by a FONSI may appeal to the district court pursuant to § 10(e) of the APA, 5 U.S.C. § 706(2)(A). Under that section, the agency's determination will be affirmed unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In deciding whether a FONSI is arbitrary and capricious a court may not substitute its judgment for that of the agency but, rather, is limited to determining whether the agency "'has considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1284-85 (1st Cir. 1996) (quoting Baltimore Gas & Elec. v. NRDC, 462 U.S. 87, 105 (1983)). In the words of the Supreme Court, "[t]he only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of action to be taken.'"); Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21, 96 S. Ct. 2718, 2730, 49 L. Ed. 2d 576 (1976). See, Dubois, 102 F.3d at 1284 ("NEPA requires that the agency take a 'hard look' at the environmental consequences of a project before taking a major action.").

Generally, judicial review of the agency's decision is "confined to the full administrative record before the agency at the time the decision was made." Envtl. Defense Fund, Inc. v. Costle, 657 F.2d 275, 284 (D.C. Cir. 1981) (citing Camp v. Pitts, 41 U.S. 138, 142, 93 S. Ct. 1241, 1244, 36 L. Ed. 2d 106 (1973)). However, in relatively rare cases, the reviewing court may permit the record to be supplemented. See Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989); Conservation Law Found. of New England, Inc.

v. Clarke, 590 F. Supp. 1467, 1474-75 (D. Mass. 1984). Here, this Court did permit some limited supplementation by the plaintiffs.

In any event, a party challenging a FONSI "must show a 'substantial possibility that agency action could significantly affect the quality of the human environment.'" Sierra Club v. Marsh, 769 F.2d at 870 (internal quotations and citation omitted).

II. The "Major Federal Action" Requirement

   A. What Constitutes a "Major Federal Action"

NEPA does not apply to all actions undertaken by a federal agency. NEPA requires preparation of an EIS only with respect to "'major federal actions' which significantly affect the quality of the environment." NAACP v. Medical Center, Inc., 584 F.2d 619, 623 (3d Cir. 1978).

In order for a project to be deemed a "major federal action" federal agency involvement must consist of something more than mere approval by the federal government of private party action. See Mayaguezanos por la Salud y el Ambiente v. United States, 198 F.3d 297, 301-302 (1st Cir. 1999) (approval does not constitute major federal action when it is not a prerequisite to private action). Furthermore, agency involvement in the project must be more than "minimal," "incidental" or "marginal." Ka Makani 'O Kohala Ohana Inc. v. Water Supply, 295 F.3d 955, 960 (9th Cir. 2002) (providing USGS assistance in preliminary studies assessing groundwater availability and furnishing less than 2% of the funding for the

project was only "'[m]arginal' federal action [that] will not render otherwise local action federal.") (internal citation omitted)); Save Barton Creek Ass'n v. FHWA, 950 F.2d 1129, 1137 (5th Cir. 1992) (no major federal action where "[t]here has been no federal commitment and only minimal federal intervention" in helping to compile NEPA compliance documentation so as to preserve future state eligibility for federal funding); Ringsred v. City of Duluth, 828 F.2d 1305, 1308 (8th Cir. 1987) (approval of contract between Tribe and City concerning construction of parking ramp not "major federal action" because not required and only "incidental" to the project); Save the Bay, Inc. v. U.S. Corps of Eng'rs., 610 F.2d 322, 327 (5th Cir. 1980) (Corps of Engineers' issuance of a pipeline permit did not turn construction of private manufacturing plant into a major federal action because only "incidental federal involvement.").

Because federal involvement may take a variety of forms that include regulation, control, financing and/or authority to approve, and because the degree of involvement may vary, there is no bright line rule for determining the precise level of federal involvement that is required to federalize an otherwise private project. See Ka Makani, 295 F.3d at 960 ("There are no clear standards for defining the point at which federal participation transforms a state or local project into a major federal action.") (citation omitted); Save Barton Creek Ass'n, 950 F.2d at 1134 ("No litmus

test exists to determine what constitutes 'major federal action.'"). However, because the environmental review process is intended to inform "the decision-maker," an agency's "ability to influence or control the outcome in material respect" is the dominant factor in determining whether a project amounts to "major federal action." Save Barton Creek Ass'n, 950 F.2d at 1134.

Where the federal "involvement" consists only of funding a construction project, the project does not rise to the level of "major federal action" unless the funds represent a significant portion of the project cost. Consequently, a project receiving 18% of its funding from the federal government has been held not to be a "major federal action" where the funding agency "could not exercise discretion and control over the design, location or choice of alternatives for the nonfederally funded portions." Riverfront Garden Dist. Ass'n v. City of New Orleans, 2000 WL 1789952 *7 (E.D. La. Dec. 6, 2000). See Village of Los Ranchos de Albuquerque v. Barnhart, 906 F.2d 1477, 1482 (10th Cir. 1990) (where FHWA provided $58,972.00 for preliminary environmental study of bridge project and actively assisted with preparation of EIS, "federal involvement with the bridge project[] was minimal, and, as a matter of law, did not rise to the level of 'major federal action' so as to bring the project within the purview of federal environmental laws.").

    B.   <u>Construction of the LSB</u>

In this case, the uncontradicted evidence is that none of the

federal agencies regulated, exercised any control over, or had approval authority with respect to construction or operation of the LSB. The agencies' involvement in the project consisted solely of providing what amounted to 11% of the funding and conditioning payment of approximately half of that amount on a requirement that the building be used as a biomedical facility for at least 20 years. Furthermore, the uncontroverted evidence is that Brown originally planned to build and would have built the LSB without federal funds.

While there may be cases in which federal funding, alone, rises to a level that converts what otherwise would be a state or private project into a "major federal action," this is not one of them. See Riverfront Garden Dist. Ass'n, 2000 WL 1789952 at *7; Ka Makani, 295 F.3d at 961 (2% federal funding did not federalize state water project where federal agencies "lacked the degree of decision-making power, authority, or control over the Kohala Project needed to render it a major federal action.").

C. Use of the LSB

The plaintiffs argue that construction of the LSB is a "major federal action" because it is likely that federal funds also will be provided for research activities to be conducted there. However, that argument is not convincing because the plaintiffs have failed to present any evidence that such funding will be provided or that it is linked to construction of the LSB.

11

NEPA applies to "proposed" actions by a federal agency and not to possible future activities in which some federal agency might be involved. The only evidence presented regarding future federal funding of research activities at the LSB was testimony that Brown <u>anticipated</u> that construction of the LSB would attract approximately $13 million in unspecified research grants.[3] <u>United States v. S. Florida Water Mgmt. Dist.</u>, 28 F.3d 1563, 1573 (11th Cir. 1994) ("The possibility that federal funding will be provided in the future is not sufficient to federalize a state project, even when such funding is likely."); <u>Proffitt v. Dep't of Interior, ex rel. Lujan</u>, 825 F. Supp. 159, 161 (W.D. Ky. 1993) (Plans to seek future federal funding are irrelevant because "the intent to seek federal funds in the future does not establish the requisite federal nexus for NEPA.").

The defendants argue that, because the LSB is not a "major federal action" and because it would have been built even if no federal funds had been provided, (1) this Court lacks subject matter jurisdiction over the plaintiffs' claims and (2) the plaintiffs lack standing to assert those claims. Indeed, there is authority supporting both arguments. Courts consistently have held that NEPA confers jurisdiction only with respect to major federal

---

[3]While there was testimony that, in applying for the NIH grants, Brown included a list of researchers already receiving federal research grants who would be moved to the LSB, that research presumably would have continued even if the LSB were not built.

actions. See <u>Citizens Alert Regarding the Env't v. EPA</u>, 259 F. Supp. 2d 9, 26-27 (D.D.C. 2003) ("plaintiffs cannot establish that the Moosic Mountain pipeline is a major federal action; the Court therefore lacks jurisdiction to enjoin construction of that project pending a federal NEPA analysis of the pipeline's projected environmental impact.") <u>aff'd</u>, 102 Fed. Appx. 167 (D.C. Cir. 2004); <u>Ross v. FHWA</u>, 972 F. Supp. 552, 555 (D. Kan. 1997) ("subject matter jurisdiction is contingent upon a finding of 'major federal action' in the [project].") <u>aff'd</u>, 162 F.3d 1046 (10th Cir. 1998); <u>Marbled Murrelet v. Babbitt</u>, 1997 WL 361232 *8 n.6 (N.D. Cal. 1997) (absence of "'major Federal action' compels the conclusion that the court lacks subject-matter jurisdiction over Plaintiffs' claims."). Courts also have held that, under NEPA, a plaintiff lacks standing to challenge a private project that does not depend on federal approval or funding. <u>Citizens Alert Regarding the Env't v. Leavitt</u>, 355 F. Supp. 2d 366, 373 (D.D.C. 2005) (holding no standing because no causal connection between alleged injury from construction of sewer pipeline and agency's FONSI because town was proceeding to construct pipeline regardless of outcome of agency's EA); <u>Fund for Animals v. Babbitt</u>, 2 F. Supp. 2d 570, 575 (D.Vt. 1997) (holding no causal connection between federal funding for a moose hunt and plaintiff's alleged injury because the state, alone, administered the program and would have continued it without federal funding) <u>judgment aff'd,</u> 152 F.3d 918 (2d Cir. 1998)

(holding case moot).

Whether one views the failure to establish that the LSB is a "major federal action" as depriving this Court of subject matter jurisdiction, depriving the plaintiffs of standing, or as a missing element in the plaintiffs' claim, it is fatal to the plaintiffs' case.

III.     The Agencies' NEPA Review

Even though the LSB is not a "major federal action," this Court feels compelled to briefly comment on the plaintiffs' substantive claims in the hope that its comments might help, in the future, to clarify an agency's obligations in preparing an EA.

A.     The "Hard Look" Requirement

The gist of the plaintiffs' claim that the FONSI was arbitrary and capricious is that the Agencies did not adequately measure and/or assess the environmental effects of air and noise emissions from activities to be conducted in the LSB. In essence, the plaintiffs' claim is that the Agencies failed to take a "hard look" at the environmental effects of the LSB.

The elements of a "hard look" are not easily defined, See Nat'l Audubon Soc'y v. Dep't of the Navy, 422 F.3d 174, 185-86 (4th Cir. 2005) ("What constitutes a 'hard look' cannot be outlined with rule-like precision."); Daniel R. Mandelker, *NEPA Law and Litigation*, § 3:7 (West 2006), but an agency's obligation in preparing an EA has been aptly described as follows:

14

> Simple, conclusory statements of 'no impact' are not enough to fulfill an agency's duty under NEPA. . . . Merely reciting the safety features of a proposed facility without carefully analyzing the possible environmental dangers associated with the proposal does not constitute the type of environmentally informed decisionmaking that drafters of NEPA had in mind. An environmental assessment must offer something more than a "checklist" of assurances and alternatives. It must indicate, in some fashion, that the agency has taken a searching, realistic look at the potential hazards and, with reasoned thought and analysis, candidly and methodically addressed those concerns.

Found. on Econ. Trends v. Weinberger, 610 F. Supp. 829, 841 (D.D.C. 1985) (internal quotations and citation omitted).

One of the difficulties in deciding whether the hard look requirement has been satisfied is determining the extent to which an agency permissibly may rely on the fact that the proposed action is subject to or complies with standards established by another agency specifically charged with responsibility for regulating the environmental effects at issue. Here, too, there are no bright line rules. Thus, while it may be appropriate to consider compliance with air quality standards as supporting the conclusion that emissions will not significantly affect public health, see 40 C.F.R. § 1508.27(b)(10); Border Power Plant Working Group v. DOE, 260 F. Supp. 2d 997, 1020-21 (S.D. Cal. 2003) ("If ambient air quality standards are designed, as they are, to protect human health, then a finding that the projects do not violate those standards logically indicates that they will not significantly impact public health."), an agency would "abdicate" its NEPA

15

obligations by conclusively presuming that the compliance with another agency's requirements means that the environmental effects of a proposed action are insignificant because "[c]ertification by another agency that its own environmental standards are satisfied involves an entirely different kind of judgment" than what NEPA requires. Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n, 449 F.2d 1109, 1122-29 (D.C. Cir. 1971).

However, while the distinction between considering compliance with another agency's requirements as an indication of no significant environmental impact and viewing compliance as excusing any further inquiry is fairly easy to state, it, sometimes, may be difficult to apply. That is especially true in cases where the other agency actually has reviewed and approved the proposed action. Compare Surfrider Found. v. Dalton, 989 F. Supp. 1309, 1323-24 (S.D. Cal. 1998) (where USMC project satisfied requirements of California Coastal Commission, USMC was not required to provide further analysis of cumulative effects in its EA because "the agency best in position to observe and regulate the cumulative effects on that coastline, the California Coastal Commission, awarded a Consistency Determination to the project . . . NEPA does not ask more."); and North Carolina v. FAA, 957 F.2d 1125, 1129-30 (4th Cir. 1992) (an agency may not avoid NEPA requirements "by simply relying on another agency's conclusion about a federal action's impact on the environment.").

B.  <u>The EA</u>

Here, in assessing the LSB's effect on air quality, the Agencies based their estimate of emissions on historical data regarding the quantity of materials consumed in the Biomedical Complex's laboratories and pointed out that emissions from the LSB and the University, as a whole, would be monitored and subject to regulation by RIDEM and other agencies responsible for enforcing air quality standards. The estimate of emissions was, if anything, conservative because as the EA observed, the historical data fails to account for the fact that some of the material consumed in the Biomedical Complex is not emitted into the air but rather remains in the laboratory; and, in any event, the data shows a downward trend in the quantity of materials consumed during recent years. In assessing the LSB's impact on air quality, it also was appropriate to take into account the fact that the emissions would have to comply with human health standards established by agencies specifically charged with responsibility for regulating them.

Nevertheless, there is some question as to whether the Agencies adequately considered the cumulative effect of emissions from the LSB. In addressing "cumulative impacts," the EA concludes that "[t]he fugitive emissions from the laboratories in the proposed Life Sciences Building, together with the emissions from the laboratories in the existing Biomedical Complex and the other laboratories at Brown University, would not result in cumulative

17

emissions exceeding the minimum quantities of air toxics regulated by RIDEM," (Admin. R. 760), but the EA does not state the basis for that conclusion. The conclusion that emissions from the LSB will be similar to those emanating from the Biomedical Complex appears to be based on the assumption that activities, now being conducting in the Complex will be transferred to the LSB, but the EA makes no mention of what activities are likely to take place in the Biomedical Complex after the transfer or what emissions they are likely to generate. Moreover, the Huppert Report suggests that, in fact, the quantities of some emissions may exceed permissible levels and therefore may require a special permit.

Similar questions may be raised with respect to the cumulative effects of noise emissions from the LSB. The EA states that the ambient sound level in the surrounding neighborhood was "nearly constant at around 56 - 58 dBA [decibels], day and night" (Admin. R. 739) and that the LSB was "designed to limit noise emissions to the low 40-decibel level at critical neighbor locations" (Admin. R. 753). The EA goes on to state that "[t]he operation of the building would not add to the ambient noise level in the surrounding area," (Admin. R. 760-61), but it does not explain how this conclusion was reached. More specifically, it does not discuss how cumulative noise levels produced by sounds of different decibel levels are calculated.

In any event, because the LSB is not a "major federal action,"

18

this Court does not reach the question of whether these omissions render the FONSI arbitrary and capricious or whether the plaintiffs have demonstrated a substantial possibility of significant environmental impact.

## Conclusion

For all of the foregoing reasons, the plaintiffs' complaint is dismissed and judgment shall enter in favor of the defendants.
IT IS SO ORDERED,

_/s/ Ernest C. Torres_
Ernest C. Torres
Sr. U.S. District Judge
Date: 4/26/07